UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------x

PANTELIS CHRYSAFIS, BETTY S.　　　　　　:
COHEN, BRANDIE LACASSE, MUDAN　　　:
SHI, FENG ZHOU, and RENT　　　　　　　　:
STABILIZATION ASSOCIATION OF NYC,　:
INC.,　　　　　　　　　　　　　　　　　　　　:
　　　　　　　　　　　　　　　　　　　　　　　:
　　　　　　*Plaintiffs*,　　　　　　　　　　　:
　　　　　　　　　　　　　　　　　　　　　　　:
　　　　　　-against-　　　　　　　　　　　　:
　　　　　　　　　　　　　　　　　　　　　　　:
LAWRENCE K. MARKS, in his official　　:
capacity as Chief Administrative Judge of the　　No.　21-cv-2516
Courts of New York State, ADRIAN H.　　:
ANDERSON, in his official capacity as Sheriff　:　**COMPLAINT**
of Dutchess County, New York, JAMES　　:
DZURENDA, in his official capacity as　　　　　　**JURY TRIAL DEMANDED**
Sheriff of Nassau County, New York, JOSEPH　:
FUCITO, in his official capacity as Sheriff of　:
New York City, New York, MARGARET　　:
GARNETT, in her official capacity as　　　:
Commissioner of the New York City　　　:
Department of Investigation, and CAROLINE　:
TANG-ALEJANDRO, in her official capacity　:
as Director, Bureau of Marshals, New York　:
City Department of Investigation,　　　　:
　　　　　　　　　　　　　　　　　　　　　　　:
　　　　　　*Defendants*.　　　　　　　　　　:

-------------------------------------------------------x

　　　　Plaintiffs Pantelis Chrysafis, Betty S. Cohen, Brandie LaCasse, Mudan Shi, and Feng

Zhou (collectively, the "Property-Owner Plaintiffs") and Rent Stabilization Association of NYC,

Inc. ("RSA," together with the Property-Owner Plaintiffs, "Plaintiffs"), by and through their

attorneys, Gibson, Dunn & Crutcher LLP, for their Complaint against Defendants Lawrence K.

Marks, in his official capacity as Chief Administrative Judge of the Courts of New York State,

Adrian H. Anderson, in his official capacity as Sheriff of Dutchess County, New York, James

Dzurenda, in his official capacity as Sheriff of Nassau County, New York, Joseph Fucito, in his

official capacity as Sheriff of New York City, New York, Margaret Garnett, in her official

capacity as Commissioner of the New York City Department of Investigation, and Caroline Tang-Alejandro, in her official capacity as Director, Bureau of Marshals, New York City Department of Investigation, allege as follows:

**NATURE OF THE ACTION**

1.     This case challenges the constitutionality of New York State's COVID-19 Emergency Eviction and Foreclosure Prevention Act of 2020 ("CEEFPA") (attached hereto as Exhibit A), as extended on May 4 (attached hereto as Exhibit B).  This latest extension of the State's eviction moratorium (the "CEEFPA Extension") stretches what State legislators originally sought to justify as a temporary pause on evictions during the height of the COVID-19 pandemic into an almost year-and-a-half long period during which thousands of the State's small property owners, including the Property-Owner Plaintiffs here, have been pushed to the brink of disaster.[1]  CEEFPA has trampled on their constitutional rights, denied owners any benefit from their property, and freed tenants from any consequence for refusing to pay their rent, giving them carte blanche to overstay the expiration of their leases—even if their nonpayment or lease expiration began before the pandemic.

2.     Rather than let CEEFPA expire on May 1, 2021 in the face of its many constitutional defects, the crushing economic effects on property owners, and the more targeted assistance to tenants—including eviction restrictions—that is now available through the State's recent implementation of a federal rent relief program, the State Legislature extended CEEFPA whole hog through at least August 31, 2021.  There is simply no legal, economic, or health rationale for the extension of this blanket eviction moratorium.  The notion that tenants can

---

[1]   Also suing here is the Rent Stabilization Association ("RSA"), many of whose 25,000 members are also small property owners struggling to survive during this continuing eviction moratorium.

insulate themselves indefinitely simply by submitting a vague, standardless, and unchallengeable "Hardship Declaration," was problematic enough to begin with. Now, it is downright unconscionable.

3. Indeed, the CEEFPA Extension comes just as New York is otherwise returning to normal life, with Governor Cuomo declaring that the entire State will reopen later *this month* as more and more of the State's citizens are vaccinated. *See* Chris Sommerfeldt and Dennis Slattery, *Cuomo Says New York on Track for Major Reopening, Lifting of COVID Capacity Limits by Mid-May*, N.Y. DAILY NEWS (May 3, 2021), https://tinyurl.com/9esz4d4x. And many New York courts, for their part, have resumed in-person operations Statewide, including for non-essential matters and jury trials. That CEEFPA has now been extended, without any tailoring to address this current reality on the ground, has only compounded its unconstitutionality and irrationality. It is time to end this governmental overreach.

4. CEEFPA, and specifically its Part A, tramples on Plaintiffs' constitutional rights in at least four significant, separate ways: *First*, it impermissibly compels property owners to disseminate government messages with which they disagree, in violation of their rights under the First Amendment and the New York State Constitution. Property owners are compelled to distribute "Hardship Declaration" forms drafted by the government to their tenants, a copy of which is attached hereto as Exhibit C. In these forms, tenants are invited to avail themselves of the eviction moratorium merely by checking a box asserting, *inter alia*, that the tenant is "experiencing financial hardship" and therefore "unable to pay" the rent owed due to COVID-19, or that vacating the premises would pose a "significant health risk." CEEFPA Part A § 1(4). Landlords must also provide tenants with a government-curated "list of . . . legal service providers" who are available to assist the tenants in seeking to avoid eviction. *Id.* § 3. Landlords

are required to pay for the printing and mailing of these lists and forms, and to arrange and pay for the translation of the forms into certain languages spoken by their tenants. *Id*. In essence, the State is forcing property owners to speak in support of a government eviction moratorium program with which they disagree and to recommend specific legal organizations whose aim and advice are squarely adverse to landlords' interests. This is unconstitutional compelled speech.

5. *Second*, CEEFPA Part A is void for vagueness under the federal and state Due Process clauses. It enables tenants to foreclose eviction and forsake their rental obligations by declaring "hardship" based on undefined "[s]ignificant loss of household income," "[i]ncrease in necessary out-of-pocket expenses," or "[o]ther circumstances" purportedly related to the COVID-19 pandemic, among other vague categories. *Id.* § 4. The statute thus fails to give property owners notice of the circumstances under which tenants will be exempted from state-law eviction remedies and no realistic means of predictable implementation. Furthermore, the statute does not even require that tenants identify the category of "financial hardship" that they assert applies to them. *Id.* All of this authorizes and encourages arbitrary and discriminatory enforcement, by failing to provide any standard that can be objectively applied to determine compliance.

6. *Third*, Part A of CEEFPA violates property owners' procedural due process rights under the federal and state Due Process clauses by providing them with *no way* to challenge or verify tenants' declarations of hardship, which automatically bar or stay eviction proceedings. *Id.* §§ 4, 6. Property owners are blocked from exercising their rights by nothing more than tenants' say-so. The Hardship Declaration is thus a recipe and opportunity for abuse.

7. *Fourth*, CEEFPA Part A violates Plaintiffs' First Amendment right to petition (and its state corollary), which has long been interpreted to protect access to the courts. By

categorically barring the filing and prosecution of summary eviction proceedings until at least August 31, 2021 in almost all cases in which a tenant submits a Hardship Declaration, CEEFPA tramples on property owners' rights to obtain redress through the courts.

8.      Plaintiffs seek a declaration that CEEFPA Part A is unconstitutional and preliminary and permanent injunctive relief barring its further implementation and enforcement.

9.      The State's first eviction moratorium, imposed via Executive Order on March 20, 2020, barred the "enforcement" of evictions of residential and commercial tenants.  On May 7, 2020, in a second Executive Order, the State went a step further and barred the initiation of new proceedings, in addition to prohibiting the enforcement of evictions.  This second iteration and a subsequent law continued the moratorium on evictions applied to tenants facing a "financial hardship" due to or during COVID-19.

10.     On December 28, 2020, the State took its most sweeping action yet, enacting CEEFPA.  In addition to compelling landlords to disseminate the Hardship Declarations prescribed by the State, CEEFPA imposed a blanket stay on nearly all summary proceedings, new or pending, staying all eviction proceedings until at least May 1, 2021, if tenants provided a Hardship Declaration in the form set out in the law.[2]

---

[2]  In response to CEEFPA's December 2020 enactment, the Property-Owner Plaintiffs brought an action in this District on February 24, 2021, challenging the statute's constitutionality and naming New York Attorney General Letitia James as a defendant.  *See Chrysafis v. James*, No. 2:21-cv-00998 (E.D.N.Y.) ("*Chrysafis I*").  Judge Feuerstein, assigned to the case, observed during a preliminary injunction hearing that CEEFPA's mandate requiring landlords to send Hardship Declarations to tenants "puts an additional burden on the [landlord] plaintiff[s]," and she further noted that she was "not seeing why they should have the burden of notifying their tenants." *Chrysafis I*, Dkt. 29-1 at 10:4–8.  She added that "the government should be the one to approach these individuals and give them an opportunity to explain why they should not be penalized for not paying their rent or some other reason," and that "there is no manner included that permits a review of checking off a box without any explanation or documentation." *Id*. at 10:9–20.  After Judge Feuerstein's tragic death, that

*(Cont'd on next page)*

11.    As of late April 2021, nearly 30,000 tenants in New York City alone had reportedly submitted Hardship Declarations pursuant to CEEFPA's provisions in pending cases, thereby blocking property owners from obtaining warrants of eviction for nonpayment or other violations of the terms of their leases, and tenants reportedly submitted 5,800 of those Hardship Declarations proactively to prevent cases from being commenced.  *See* Emma Whitford, *NY Bill Would Extend Eviction Protections Through August*, Law360 (Apr. 26, 2021), https://www.nysenate.gov/newsroom/in-the-news/brian-kavanagh/law360-ny-bill-would-extend-eviction-protections-through-august.  And since mid-March 2020, only nine court-mandated residential evictions have taken place—largely in November and December before CEEFPA's passage.  *See id.*  Meanwhile, the Property-Owner Plaintiffs, RSA's members, and many small landlords throughout the State have had their personal lives and finances decimated by the inability to remove nonpaying or holdover tenants, many of whom stopped paying rent or whose leases expired even before the pandemic began.  Even where property owners need to move into their own home in order not to themselves become homeless, they cannot.

12.    On May 4, 2021, Governor Cuomo signed the CEEFPA Extension into law, which retroactively extended CEEFPA's stay of eviction proceedings until "at least" August 31, 2021, but otherwise left the law unchanged.  The constitutional and economic harms caused by CEEFPA have only been exacerbated by this extension.  In many cases, landlords have already suffered a year or more of not being able to pursue their rights against tenants who refuse to

---

case was reassigned and, then, dismissed on grounds unrelated to the merits of the dispute—the court found that the Attorney General was not a proper party defendant—thereby mooting the preliminary injunction motion.  *Chrysafis I*, Dkt. 34.  Plaintiffs now correct that technical defect, naming several proper defendants responsible for enforcing the statute.  Plaintiffs (and other property owners) continue to suffer under CEEFPA's burdensome and unconstitutional provisions.

comply with their lease obligations. With CEEFPA's eviction moratorium now extended for another four months, and many property owners consequently not receiving rental income, numerous property owners may not be able to pay their mortgages or otherwise meet their financial obligations, leading to the loss of their properties and other irreparable harms.

13. Plaintiffs here are five small property owners whose tenants have refused to pay rent for extended periods—often starting before COVID-19 began; whose tenants refuse to move out even though their leases have expired; and/or whose tenants are subject to eviction orders that cannot now be enforced because of CEEFPA, together with a residential housing industry trade association. Each of the Property-Owner Plaintiffs and many of RSA's members are suffering constitutional and other irreparable harms because of CEEFPA's provisions:

- Plaintiff Pantelis Chrysafis is the owner of a single-family home in Garden City, New York, which he currently rents out to tenants. In early 2019, Chrysafis decided to try to sell the property, and he informed the tenants that they would have a number of months to find a suitable, alternative place to live. The tenants simply stopped paying rent as a result. In the spring of 2019—well before the COVID-19 pandemic—Chrysafis was forced to hire an attorney to seek back rent. The parties temporarily settled, but his tenants failed to pay timely rent again in December 2019 and January 2020. In February 2020, Chrysafis obtained a judgment against his tenants as well as a warrant of eviction ordering the tenants to vacate by April 1, 2020. Chrysafis's tenants nevertheless remain in the home because of the eviction moratoria. They have not paid rent for almost a year and a half, totaling more than $80,000. Chrysafis has been forced to borrow money from his elderly parents to stay afloat. His inability to collect rental income, while still having significant costs of his own, has caused unending strife within his own family. Forcing Chrysafis to provide the Hardship Declaration to his tenants will in essence invite his tenants to continue to refuse to pay rent. And his tenants will certainly avail themselves of the vagueness of the Hardship Declaration form to assert financial hardship. But the timeline makes clear that his tenants' failure to pay has nothing to do with COVID-19, and Chrysafis will have absolutely no way to contest his tenants' claims.

- Plaintiff Betty S. Cohen is the owner of a single co-op unit in Brooklyn, New York, which she currently rents out to a tenant. Cohen is retired. The rental income from the co-op is her primary source of financial support, together with Social Security payments. Starting in March 2020, the tenant stopped paying rent. Despite Cohen sending him a monthly statement of arrears and notifying him of her desperate need for the rent, the tenant has been living in the co-op rent-free for more than a year. Cohen sent a notice of late payment, and initiated an eviction proceeding in September 2020. But CEEFPA has

barred Cohen from taking any meaningful action to evict the tenant, reclaim her property, or recoup unpaid rent. The tenant's annual lease expired in December 2020. On February 4, 2021, the tenant submitted what purports to be a Hardship Declaration form, checking the box for financial hardship. Cohen has no opportunity to contest his submission or receive clarification as to which category of financial hardship he claims applies. If the form is valid, she will not be able to evict her tenant, despite his non-payment and the expiration of his lease, because the tenant's submission of a declaration form stays her case until August 31, 2021. The tenant currently owes Cohen over $21,000 in unpaid rent, and that amount goes up each month with Cohen unable to act at all until the end of August.

- Plaintiff Brandie LaCasse is a retired military veteran. She is a single mother who owns and manages six properties in New York. She has a service-connected disability, which has resulted in her being immunocompromised. LaCasse decided to sell one of her properties, a single family house in Rhinebeck, New York, in November 2020. Accordingly, she served the tenants with a notice of nonrenewal pursuant to the terms of the lease. The tenants stopped paying rent in response and have refused to vacate the property despite the fact that the lease's term has concluded. LaCasse filed a holdover proceeding against the tenants in December 2020, which was immediately dismissed as a result of CEEFPA. Immediately thereafter, her tenants completed a Hardship Declaration form, claiming hardship in connection with their need for childcare. But there is no indication that the tenants' childcare situation has been affected by COVID-19, as one tenant continues to work while the other continues to stay home, as they did pre-pandemic. The tenants have violated numerous terms of the lease, causing significant damage to the property and resulting in multiple police calls in response to their conduct. Yet the mere submission of the declaration form—containing claims that LaCasse has no way to rebut or challenge—has barred her from taking any action to re-file suit to evict the tenants until August 31, 2021. To make matters worse, because of a February 2021 personal dispute, LaCasse's fiancé has recently asked her and her daughter to move out of his home, in which they are currently staying. Because LaCasse has mortgages on several of her properties, she has been unable to secure a loan to purchase a property for her personal use. She hoped to move into the Rhinebeck property—the only one of her properties in which the occupants' lease has expired—but the tenants still refuse to leave. As a result, LaCasse and her daughter been forced to remain in her fiancé's home despite his requests that LaCasse find a new place to live. To make up for her lost rental income and cover her financial obligations, LaCasse has been forced to take a new job, despite her immunocompromised status, increasing her risk of getting infected with COVID-19. The eviction moratorium is literally compelling her to risk her life in order to make ends meet. If LaCasse continues not to be able to collect rent, she may have no choice but to take yet another job, which will only increase the risk to her health and the possibility that she will get infected.

- Plaintiffs Mudan Shi and Feng Zhou (wife and husband) own a single-family home in Staten Island, New York, which they currently rent out to tenants. The rental income from the house helps cover their own rent obligations for their leased family home, which Shi and Zhou live in with their two young children and their three elderly parents. Shi

and Zhou were able to purchase the Staten Island home a few years ago, after working hard for many years and scrupulously saving. Starting in the spring of 2019—almost a year before the pandemic—the tenants stopped paying rent. Shi and Zhou are now owed $57,600 in back rent, and without the rental income from the home they are financially strapped trying to keep up with the monthly expenses on the house and the rent for the home they live in with their family. They commenced a nonpayment action on October 31, 2019—well before the coronavirus pandemic—and obtained a judgment. But before the judgment could be enforced, the proceeding was stayed due to the eviction moratoria, and that has continued due to CEEFPA. Even though their tenants' lease has expired and the tenants have not paid rent for three quarters of the term, Shi and Zhou cannot move their own family into the house. Forcing them to provide the Hardship Declaration form to their tenants effectively invites the tenants to continue to live in the property without paying rent. And their tenants will certainly avail themselves of the vague hardship categories of the declaration form to assert hardship. The tenants' failure to pay is completely unrelated to COVID-19, yet Shi and Zhou would have absolutely no viable path forward to evict the tenants or even contest their tenants' claims.

- Plaintiff RSA is a trade association dedicated to preserving and serving the interest of the residential housing industry in New York City. RSA's 25,000 members, most of whom own residential properties in the City, are being crushed by CEEFPA's burdensome restrictions. They have reported that tenants across the State have refused to pay rent, breached their leases, or overstayed their lease terms, and the owners have no redress. RSA's ethnically and socioeconomically diverse members have poured their earnings, savings, and sweat equity into purchasing and maintaining their properties. To countless RSA members, their properties serve as their main source of income, a cherished family asset, or a retirement fund. With the extension of CEEFPA, RSA's members are despondent, with some on the brink of financial ruin and at risk of losing their properties because they have not received rent for a full year and are struggling to cover their own ongoing monthly expenses. RSA's members are also suffering the effects of each of CEEFPA's unconstitutional provisions. Many RSA members have been or will be forced to send tenants Hardship Declarations and legal service provider information with which they disagree and that are detrimental to their interests. At the same time, CEEFPA fails to provide any opportunity for RSA members to challenge tenants' vague and discretionary assertions of hardship and blocks their access to the courts.

14.     Plaintiffs therefore bring this action challenging the constitutionality of Part A of CEEFPA on these many grounds. They seek a declaration that CEEFPA Part A is unconstitutional, and they further seek preliminary and permanent injunctive relief barring the State from further implementing or enforcing CEEFPA Part A in its entirety.

**PARTIES**

15.     Plaintiff Pantelis Chrysafis is the owner of a single-family home in Garden City, New York, which he currently rents out to tenants.

16.     Plaintiff Betty S. Cohen is the owner of a single co-op unit in Brooklyn, New York, which she currently rents out to a tenant.

17.     Plaintiff Brandie LaCasse owns a single-family home in Rhinebeck, New York that she currently rents out to tenants.  She owns five additional properties in New York State that are also rented out to tenants.

18.     Plaintiffs Mudan Shi and Feng Zhou (wife and husband) own a single-family home in Staten Island, New York, which they currently rent out to tenants.

19.     Plaintiff RSA is a New York City trade association representing the residential housing industry.  RSA has approximately 25,000 landlord and agent members, many of whom are directly impacted by CEEFPA's provisions.

20.     Defendant Lawrence K. Marks is the Chief Administrative Judge of the Courts of New York State.  In that role, he directs New York's Office of Court Administration and is responsible for overseeing the operation and administration of New York's courts, and for implementing and administering CEEFPA Part A.  By its express terms, CEEFPA Part A requires New York courts to implement and administer the law's Hardship Declaration provisions, as well as its restrictions and procedural requirements for eviction proceedings:

- Under the statute, "[n]o court shall accept [an eviction petition] for filing" unless the landlord submits filings demonstrating compliance with CEEFPA's Hardship Declaration requirements and stating that the tenant has not returned a Hardship Declaration or is subject to CEEFPA's narrow nuisance exception (as described below).  CEEFPA Part A § 5.  Court personnel must determine whether the notice for any such eviction proceeding includes a copy of a Hardship Declaration in English and the tenant's primary language (if not English) and, if not, "ensure that the hardship declaration is attached to such notice."  *Id.*  The court must "seek confirmation" that the tenant has received the

Hardship Declaration and has not submitted it, and where a tenant has not received the Hardship Declaration, the court must temporarily stay proceedings. *Id.*

- CEEFPA obligates the courts to hold hearings before issuing default judgments against tenants and to determine whether tenant behavior adjudged a nuisance before CEEFPA's enactment has continued. *Id.* §§ 7, 9(2). Where an eviction warrant has already issued but not been executed, a court must stay its execution "at least until the court has held a status conference with the parties." *Id.* § 8. And "[n]o court shall issue a warrant" of eviction unless it complies with the statute's requirements. *Id.* § 8(c).

- The law also states that "[t]he office of court administration shall translate the hardship declaration" into Spanish and the next six most common languages in New York City and maintain those translated forms (and an English version) on its website. *Id.* § 10. Additionally, "[t]o the extent practicable, the office of court administration shall post and maintain on its website translations into such additional languages as the chief administrative judge shall deem appropriate . . . ." *Id.*

21. In furtherance of CEEFPA's requirements, the Office of Court Administration has issued Declaration Forms and mailed them to thousands of tenants with pending eviction cases. It has also posted on its website a form Declaration Form, along with translations into numerous languages. And Chief Administrative Judge Marks issued an administrative order, dated December 30, 2020, directing the New York State courts to conduct residential eviction proceedings in accordance with CEEFPA's provisions. *See* Admin. Order of the Chief Admin. Judge of the Courts, Order No. 340-20 (Dec. 30, 2020), https://www.nycourts.gov/whatsnew/pdf/AO-340-20.pdf. The Chief Administrative Judge maintains offices at 4 Empire State Plaza, Albany, New York 12223, and at 25 Beaver St., New York, New York 10004. The Chief Administrative Judge is named in his official capacity.

22. Defendant Adrian H. Anderson is the Sheriff of Dutchess County, New York. In that capacity, Anderson oversees the execution of eviction warrants in Dutchess County. "[L]ocal sheriffs and law enforcement departments" are "charged with enforcing" CEEFPA. *See* Press Release, Letitia James, New York Attorney General, Attorney General James Provides Guidance to Law Enforcement Group on Evictions During COVID-19 Pandemic (Jan. 7, 2021),

https://ag.ny.gov/press-release/2021/attorney-general-james-provides-guidance-law-enforcement-group-evictions-during. CEEFPA provides that "[n]o officer to whom [a] warrant [for eviction] is directed shall execute a warrant" that does not comply with CEEFPA's Hardship Declaration requirements. CEEFPA Part A § 8(d). Moreover, if a tenant provides a Hardship Declaration to a law enforcement officer to whom an eviction warrant is directed, including specifically a "sheriff of the county" in which the property is located, "the officer shall not execute the warrant and shall return the hardship form to the court," unless the court has found the tenant to have substantially infringed on others' use of the property or caused a substantial safety hazard. *Id*. § 8(c), (e). Sheriff Anderson maintains an office at 108 Parker Avenue, Poughkeepsie, New York 12601. Sheriff Anderson is named in his official capacity.

23. Defendant James Dzurenda is the Sheriff of Nassau County, New York. In that capacity, Dzurenda oversees the execution of eviction warrants in Nassau County. "[L]ocal sheriffs and law enforcement departments" are "charged with enforcing" CEEFPA. *See* Press Release, *supra* ¶ 22. CEEFPA provides that "[n]o officer to whom [a] warrant [for eviction] is directed shall execute a warrant" that does not comply with CEEFPA's Hardship Declaration requirements. *Id.* § 8(d). Moreover, if a tenant provides a Hardship Declaration to a law enforcement officer to whom an eviction warrant is directed, including specifically a "sheriff of the county" in which the property is located, "the officer shall not execute the warrant and shall return the hardship form to the court," unless the court has found the tenant to have substantially infringed on others' use of the property or caused a substantial safety hazard. *Id.* § 8(c), (e). Sheriff Dzurenda maintains an office at 100 Carmen Avenue, East Meadow, New York 11554. Sheriff Dzurenda is named in his official capacity.

24.     Defendant Joseph Fucito is the Sheriff of New York City, New York.  In that capacity, Fucito oversees the execution of eviction warrants in New York City, including in Staten Island and Brooklyn. "[L]ocal sheriffs and law enforcement departments" are "charged with enforcing" CEEFPA.  *See* Press Release, *supra* ¶ 22.  CEEFPA provides that "[n]o officer to whom [a] warrant [for eviction] is directed shall execute a warrant" that does not comply with CEEFPA's Hardship Declaration requirements.  *Id.* § 8(d).  Moreover, if a tenant provides a Hardship Declaration to a law enforcement officer to whom an eviction warrant is directed, including specifically a "sheriff of the county" in which the property is located, "the officer shall not execute the warrant and shall return the hardship form to the court," unless the court has found the tenant to have substantially infringed on others' use of the property or caused a substantial safety hazard.  *Id*. § 8(c), (e).  Sheriff Fucito maintains an office at 66 John Street, 13th Floor, New York, New York 10038.  Sheriff Fucito is named in his official capacity.

25.     Defendant Margaret Garnett is the Commissioner of the New York City Department of Investigation.  As the leader of the Department of Investigation, Garnett oversees residential evictions conducted by New York City marshals.  "[L]ocal sheriffs and law enforcement departments" are "charged with enforcing" CEEFPA.  *See* Press Release, *supra* ¶ 22.  CEEFPA provides that "[n]o officer to whom [a] warrant [for eviction] is directed shall execute a warrant" that does not comply with CEEFPA's Hardship Declaration requirements.  *Id.* § 8(d).  Moreover, if a tenant provides a Hardship Declaration to an officer to whom an eviction warrant is directed, including specifically a "marshal of the city" in which the property is located, "the officer shall not execute the warrant and shall return the hardship form to the court," unless the court has found the tenant to have substantially infringed on others' use of the property or caused a substantial safety hazard.  *Id*. § 8(c), (e).  Commissioner Garnett maintains

an office at 180 Maiden Lane, New York, NY 10038. Commissioner Garnett is named in her official capacity.

26.     Defendant Caroline Tang-Alejandro is Director, Bureau of City Marshals, for the New York City Department of Investigation. In that capacity, Garnett oversees residential evictions conducted by New York City marshals. "[L]ocal sheriffs and law enforcement departments" are "charged with enforcing" CEEFPA. *See* Press Release, *supra* ¶ 22. CEEFPA provides that "[n]o officer to whom [a] warrant [for eviction] is directed shall execute a warrant" that does not comply with CEEFPA's Hardship Declaration requirements. CEEFPA Part A § 8(d). If a tenant provides a Hardship Declaration to an officer to whom an eviction warrant is directed, including specifically a "marshal of the city" in which the property is located, "the officer shall not execute the warrant and shall return the hardship form to the court," unless the court has found the tenant to have substantially infringed on others' use of the property or caused a substantial safety hazard. *Id.* § 8(c), (e). Director Tang-Alejandro issued "guidance" on behalf of the Department of Investigation, "following consultation with the Court," instructing the New York City Marshals regarding CEEFPA's requirements. *See* Letter from Caroline Tang-Alejandro, Director, Bureau of City Marshals (April 29, 2021), https://www1.nyc.gov/assets/doi/Marshals/Advisement%20EEFP%20Act%204-29-21%20(Final).pdf. Director Tang-Alejandro maintains an office at 180 Maiden Lane, New York, NY 10038. Director Tang-Alejandro is named in her official capacity.

## JURISDICTION AND VENUE

27.     This Court has subject matter jurisdiction over Plaintiffs' constitutional claims pursuant to 28 U.S.C. § 1331.

28.     Venue is proper in this Court under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred in this District.

## FACTUAL ALLEGATIONS

### I.     Eviction Proceedings Prior To The COVID-19 Pandemic

29.     Prior to the COVID-19 pandemic, landlords were required to take a number of steps under New York Real Property Actions and Proceedings Law to resolve matters with tenants before initiating an eviction proceeding.  Tenants could be evicted, upon appropriate showings, in three principal instances: (1) when a tenant failed to pay the agreed-upon rent; (2) when a tenant severely violated a lease provision (including creating a nuisance); or (3) when a tenant stayed in the premises beyond the term of the lease (*i.e.* overstays).  RPAPL § 711.  Under the pre-COVID-19 regime, property owners also had certainty that a stay of the issuance or enforcement of an eviction warrant for unpaid rent would be granted only in certain defined circumstances.  Property owners knew, for example, that stays could be granted if they failed to make repairs or failed to pay for utilities; but they also knew the stays could be lifted once repairs were made or utilities were paid for and restored.  RPAPL §§ 755–56 (applies in or outside New York City).

30.     Such defined parameters gave property owners predictability in their businesses and lives while balancing tenants' needs with accountability.  Before COVID-19, it was also the case that stays of up to six months could be granted when hold-over tenants of "dwelling" units made an application in good faith that they could not secure a suitable alternative premises despite reasonable efforts, and that the tenant or the tenant's family would face extreme hardship if the stay were not granted.  RPAPL § 753.  But even in these instances, landlords or other petitioners had the opportunity to dispute a stay.  *See* RPAPL § 753(3) (landlords can establish a good faith desire to recover the unit in order to complete demolition and fulfill a new building construction plan).  Outside of New York City, landlords also knew that discretionary stays of

eviction warrants were also limited to instances such as when a defaulted tenant pays all back rent, taxes, and other costs satisfactory to the court.  RPAPL § 751(1).

## II.	In March 2020, Governor Cuomo Ordered a Temporary Eviction Moratorium

31.	On March 20, 2020, Governor Cuomo issued Executive Order No. 202.8, which placed a 90-day blanket eviction moratorium over residential and commercial tenants.  On May 7, 2020, via Executive Order No. 202.28, Governor Cuomo extended the eviction moratorium until August 19, 2020; under this Executive Order, landlords were prohibited from moving to evict any tenants whose default was caused by financial hardship "due to COVID-19."  Executive Order No. 202.28 clarified that the moratorium barred property owners from *initiating* an eviction proceeding or enforcing an eviction warrant during the effective period.  Although Executive Order No. 202.28 did not further define financial hardship, it directed landlords to allow tenants' security deposits to be used to pay rent that became due, but only upon the consent of a tenant suffering financial hardship due to COVID-19.  Once a tenant's security deposit was used to pay rent, the tenant was to replenish the deposit within ninety days with an amount equivalent to only 1/12 of the monthly rent.

## III.	In June 2020, The State Further Extended The Eviction Moratorium Via The Passage of the Tenant Safe Harbor Act

32.	On June 30, 2020, the State enacted the Tenant Safe Harbor Act ("TSHA"), which further extended the eviction moratorium over residential properties, and was twice extended by Executive Orders 202.66 and 202.85 at the end of 2020.  The TSHA places a prohibition on evictions against non-paying residential tenants who raise a "financial hardship" defense during a summary proceeding.  Rather than relying on the tenant's word alone, the TSHA gives landlords recourse in court to challenge a tenant's claim of financial hardship.  Courts were instructed to consider a number of factors such as the tenant's income before and after COVID-19, liquid

assets, and public welfare benefits.  The TSHA's eviction prohibition is set to expire once no part

of the county in which a tenant resides is shut down due to COVID-19 restrictions,[3] but the

inquiry it directs courts to undertake has now been limited by CEEFPA, as discussed below.

## IV.    CEEFPA Extended And Expanded The "Temporary" Eviction Moratorium

33.    Signed into law on December 28, 2020, CEEFPA immediately stayed for sixty

days all pending residential eviction proceedings,[4] even those that began on or before March 7,

2020.  CEEFPA also mandates that property owners provide their tenants with a "Hardship

Declaration" prior to commencing or continuing any eviction proceedings.  CEEFPA Part A §

1(4).  The statute provides that if a tenant submits a Hardship Declaration, eviction

proceedings—both pending and new—are to be stayed.  Prior to the CEEFPA Extension, that

stay would not expire until at least May 1, 2021 (and now, will not expire until at least August

31, 2021).  Meanwhile, tenants seeking money judgments against landlords in summary

proceedings may continue to do so; no stay applies.

34.    The Hardship Declaration consists of (1) a declaration form (the "Declaration

Form") explaining that a completed, signed declaration will bar any eviction proceedings until

May 1, 2021 (now August 31, 2021); (2) a "pre-eviction notice"—which consists of "a list of all

not-for-profit legal service providers actively handling housing matters in the county where the

---

[3]  Ch. 127, § 1, 2020 N.Y. Laws (defining the covered period of the Act as being until "none of the provisions that closed or otherwise restricted public or private businesses or places of public accommodation, or required postponement or cancellation of all non-essential gatherings of individuals of any size" apply).

[4]  The statute defines an "eviction proceeding" as a either a summary proceeding to recover possession of real property under § 7 of NY Real Property Law, a judicial proceeding, or administrative proceeding to recover possession of real property.  Landlords as well as individuals who are entitled to possession of property, such as a reversioner, purchaser, or receiver, are among a short list of individuals who may pursue a summary proceeding. RPAPL § 721.  No fees or penalties beyond lost rent may be recovered in summary proceedings. RPAPL § 702.

subject premises are located," prepared by the Office of Court Administration; and (3) a return address for the Declaration Form. *Id.* § 3. CEEFPA compels property owners to provide tenants with a Hardship Declaration "with every written rent demand for rent." *Id.* In addition, any property owner who seeks to initiate an eviction proceeding, resume a pending eviction proceeding, or execute an issued eviction warrant for any reason (outside of a tenant-caused nuisance) must first provide a Hardship Declaration to the tenant. *See id.* § 9.

35.     While the Office of Court Administration is obligated to produce translated Declaration Forms in "Spanish and the six most common languages in the City of New York, after Spanish," *id.* § 10, it is "the landlord's responsibility to obtain a suitable translation of the hardship declaration in the tenant's primary language," *id.* § 3, if the tenant's "primary language" is not one of the seven. CEEFPA contains no clause authorizing property owners to obtain reimbursement for following this mandate. Nor does it free them from the anti-discrimination laws that otherwise forbid landlords from asking their tenants information about their national origin. Yet they must somehow determine their tenants' "primary language," engage a reliable translation service to translate the Declaration Form if that language is anything other than the languages translated by the State, and cover the cost of translation. In such cases, tenants will naturally infer that landlords—not the State—prepared the forms.

36.     The Declaration Form asks tenants to "select[]" one or both "option[s]" via checking a box—either that they are "experiencing financial hardship . . . during the COVID-19 pandemic" or that "moving . . . would pose a significant health risk"—to qualify for a stay of existing eviction proceedings or a suspension of new proceedings. CEEFPA Part A §§ 1, 3; *see also* Ex. C (Hardship Declaration Form downloaded from New York Courts website), https://www.nycourts.gov/Courts/nyc/SSI/images/corona/HardshipDeclaration.pdf.

37.     A tenant need only "select[]" one of these two options, without explaining more, to submit a valid Declaration Form. *See id*.; Ex. A.  While the Declaration Form contains a "notice" clause informing the tenant that he or she is "signing and submitting the form under penalty of law," CEEFPA Part A § 1(4), the form does not need to be signed under penalty of perjury, and there is no requirement to attach corroborating documents to support the category chosen. *Cf.*, *e.g.*, Ex. B § 4 ("If there is no pending eviction proceeding and a tenant provides a hardship declaration to the landlord . . . there shall be no initiation of an eviction proceeding against the tenant until at least August 31, 2021"); *see also* Ex. A § 4.

38.     The Declaration Form lays out five possible grounds for meeting the financial hardship option—that is, grounds on which the tenant can assert that he or she is "unable to pay [his or her] rent or other financial obligation under the lease in full":  (1) a "significant loss of household income," (2) increasing "necessary out-of-pocket expenses related to performing essential work or related to health impacts," (3) "childcare [or other familial care] responsibilities . . . negatively affect[ing]" the ability "to obtain meaningful employment" or causing "increased [ ] necessary out-of-pocket expenses," (4) "moving expenses and difficulty [the tenant has] securing alternative housing," or (5) a catch-all category of "[o]ther circumstances related to [ ] COVID-19" that have "negatively affected" the tenant's ability "to obtain meaningful employment or earn income or have significantly reduced [the tenant's] household income or significantly increased [] expenses."  CEEFPA Part A § 1(4).  Per the plain language of the statute, embodied in the Declaration Form issued by the Office of Court Administration, tenants are not required to identify the particular subcategory the tenant claims applies.  Therefore, property owners receiving completed Declaration Forms are not even informed of the specific asserted justification for the tenant's non-payment.

39.     Tenants are instructed to return the Declaration Form to the property owner or, if an eviction proceeding has already commenced, to the court.

40.     Unless landlords like the Property-Owner Plaintiffs and RSA's members file a signed affidavit—this one under the penalty of perjury—with the court demonstrating that they have delivered a copy of the Hardship Declaration to a tenant—including the "manner in which the petitioner[-landlord] or the petitioner[-landlord]'s agent served a copy of the hardship declaration" and whether it was served both "in English and the tenant's primary language"— and attest that they have not "received" a completed Declaration Form in response, no property owner may commence an eviction proceeding.  *Id.* § 5.

41.     Though the law does not require confirmation or corroboration of the tenant's affirmations in a Declaration Form, property owners are unable to commence an eviction without a two-step inquiry over *their* delivery of the Hardship Declaration.  Once the court receives the landlord's affidavit in satisfaction of Part A § 5 it must first separately "determine whether a copy of the hardship declaration" in the appropriate language(s) "is annexed to the served notice of the petitioner" and, second, "seek confirmation on the record . . . that the [tenant] has received" the Hardship Declaration and has not returned a completed Declaration Form to the landlord, the landlord's agent, or the court.  *Id.* § 5(2).  Upon receipt of a tenant's Declaration Form, courts are directed further to toll the commencement of any new proceedings until the mortarium period expires.  *Id.* § 4.  Receipt of a completed Declaration Form effectively freezes ongoing eviction proceedings and certain already-issued eviction warrants until that date.

42.     Under CEEFPA, the submission of a Declaration Form with the financial hardship option selected will create a "rebuttable presumption that the tenant is experiencing financial hardship" under the TSHA, an executive order, or other state or local laws.  CEEFPA Part A

§ 11.  Accordingly, tenants may continue to avail themselves of this presumption in future proceedings beyond the expiration of the moratorium.  The law is silent on what type of evidence, if any, would rebut the presumption, or in what manner or forum such evidence may be submitted.  This step by the State effectively eliminates what little opportunity landlords had to check claims of financial hardship under the TSHA.

43.     CEEFPA also vacates any default judgments authorizing an eviction in a residential eviction matter prior to December 28, 2020.  CEEFPA Part A § 7.  The matters underlying the vacated judgments can be restored to the court calendar for a new hearing solely upon the tenant's request, or else they will remain vacated.  No new default judgments or authorizations to enforce already issued eviction warrants can be issued before August 31, 2021 (following the CEEFPA Extension).  Even if property owners wish to proceed, they must make a motion with the court and participate in an initial hearing.  *Id.* §§ 7, 8.  But the reality remains that only two exceptions change the outcome for landlords.  The matter may only continue on from an initial hearing to a summary proceeding, if the landlord can "establish" either that the tenant is exhibiting behavior equivalent to a nuisance or that the tenant has failed to return a Declaration Form after being provided with one by the landlord.  *Id.* § 9.  In all other instances, the matter is stayed.  Even if a judgment *based on* nuisance was awarded to a landlord prior to December 28, 2020, courts are directed to hold another hearing to essentially redetermine whether the tenant's unreasonable behavior has persisted further.  *Id.* § 9(2).

44.     CEEFPA's sole legal carve-out permits eviction proceedings for tenant behavior constituting a nuisance.  The nuisance standard requires establishing that the tenant "substantially infringes on the use and enjoyment of other tenants or occupants or causes a substantial safety hazard to others."  *Id.*  The standard is similar to others in New York law

concerning real property.  *See* N.Y.C. Admin. Code § 26-408 (describing eviction based on

tenant committing "nuisance" or "maliciously or by reason of gross negligence substantially

damaging the housing accommodation," acting in a manner that interferes "substantially with the

comfort and safety of the landlord or of other tenants or occupants"); 9 N.Y.C.C.R.R. § 2524.3

(describing similar standard).[5]

45.     In reality, CEEFPA's narrow nuisance exception provides landlords with virtually

no ability to evict nonpaying tenants.  Reflecting that fact, upon information and belief, no

residential tenants in New York City have been evicted—including under the nuisance

exception—since CEEFPA was signed into law on December 28, 2020.

46.     CEEFPA has effectively overridden the State's existing real property law regime

with respect to residential tenancies and replaced it with vaguer substantive directives as well as

unconstitutional landlord obligations.  In this inverse universe, all of a landlords' active or

potential proceedings for unpaid rent are until August 31, at the earliest—over a year since the

first eviction restrictions were put in place.

---

[5]  CEEFPA, as signed on December 28, 2020, also provides that any eviction proceedings
pending on or before the law's December 28 effective date (or commenced within thirty days
of that date) were automatically stayed "for at least sixty days, or to such later date that the
chief administrative judge shall determine is necessary" to permit the courts time to
implement CEEFPA's requirements and tenants time to submit Hardship Declarations.
CEEFPA Part A § 2.  In *Chrysafis I*, Property-Owner Plaintiffs challenged this provision as
violating the New York State Constitution's requirement that the chief administrative judge
only exercise delegated powers "with the advice and consent of the administrative board of
the courts."  *Chrysafis I*, Dkt. 1 ¶¶ 93–99 (quoting N.Y. Const. art. VI, § 30).  In response,
the Attorney General asserted that this claim was moot because the 60-day deadline for the
chief administrative judge to extend the automatic stay had expired without any extension.
*Chrysafis I*, Dkt. 16 at 27.  Accordingly, Plaintiffs do not assert a similar claim here, but
reserve the right to challenge the judicial delegation provision should the chief administrative
judge seek to extend CEEFPA's automatic eviction stay.

## V. CEEFPA Permits Financial Hardship Declarations Based On Vague and Undefined Circumstances And Bars Landlords From Obtaining Review Of Such Claims

47.     As described above, CEEFPA sets out a number of categories of financial hardship that a tenant can claim, based on loss of household income, increases in out-of-pocket expenses related to essential work or "health impacts," loss of income or increased expenses related to family care responsibilities, and moving difficulties and expenses. CEEFPA Part A § 4(1)–(4). These categories are vague and undefined. Exacerbating the problematic vagueness of these categories, CEEFPA permits tenants to declare hardship based on an assertion that "other circumstances related to the COVID-19 pandemic" "negatively affected [their] ability to obtain meaningful employment or earn income," "significantly reduced [their] household income," or "significantly increased [their] expenses." *Id.* § 4(5). The law provides no definitions whatsoever for any of these terms.

48.     Compounding the issue, and in keeping with CEEFPA's wholesale stripping of owners' rights and structural bar on court access, the law provides no mechanism for landlords to determine in eviction proceedings—let alone contest—the reasons for a declaration of financial hardship based on "other circumstances."

49.     Where a tenant submits a Declaration Form to the property owner, "there shall be no initiation of an eviction proceeding against the tenant" until the moratorium period expires. CEEFPA Part A § 4. To effectuate this prohibition, CEEFPA provides that "no court shall accept for filing" any eviction petition or other filing unless a landlord files an affidavit under penalty of perjury attesting that it (and its agents) have not received a Hardship Declaration or that CEEFPA's narrow nuisance exception applies. *Id.* § 5(1). Tenants, however, are not required to sign Hardship Declarations under penalty of perjury (and instead sign them only under "penalty of law," whatever that means.) Similarly, an in-progress eviction proceeding is

automatically stayed upon filing of a Hardship Declaration until (now) at least August 31, 2021, and where an eviction warrant has been issued it may not be executed until at least the same date. *Id.* §§ 6, 8. Thus, while tenants sign their declarations under penalty of law, *id.* § 1(4), property owners are for all practical purposes powerless to challenge in an eviction proceeding a tenant's representation that "other circumstances" apply, making the category ripe for abuse.

50. Each of the vague provision's infirmities is aggravated by the fact that a tenant's submission of a Declaration Form creates a rebuttable presumption of financial hardship in proceedings involving a defense under the TSHA, an executive order, or "any other local or state law, order or regulation restricting the eviction of a tenant suffering from a financial hardship during or due to COVID-19." CEEFPA Part A § 11. CEEFPA provides no explanation for the process or substantive standards by which the financial hardship presumption could be rebutted, rendering the already ill-defined "other circumstances" category hopelessly vague as to the covered proceedings. Unlike many of CEEFPA's provisions, the rebuttable presumption provision does not contain an end date and appears to continue even after the pandemic is over.

51. The contentless nature of the categories of hardship, the statute's creation of an ill-defined rebuttable presumption, and the lack of any mechanism to verify a tenant's submission are ripe for abuse and invite arbitrary application.

## VI. The Property-Owner Plaintiffs Challenge CEEFPA's Constitutionality

52. In response to CEEFPA's enactment in December 2020, the Property-Owner Plaintiffs filed suit in this District on February 24, 2021, challenging the statute's constitutionality and naming New York Attorney General Letitia James as the defendant. *See Chrysafis I.* That suit challenged CEEFPA's constitutionality on largely the same bases as in this Complaint. The Property-Owner Plaintiffs filed a motion requesting a temporary restraining

order and preliminary injunction shortly after filing suit. The case was assigned to the late Judge Sandra J. Feuerstein.

53. After expedited briefing by the parties, Judge Feuerstein held a hearing on the motion for a temporary restraining order and preliminary injunction on March 16.

54. At the beginning of the hearing, Judge Feuerstein questioned counsel for AG James regarding her argument in opposition to Plaintiffs' motion that the AG was not a proper defendant. *Chrysafis I*, Dkt. 29-1 at 5:12–6:8. While counsel for AG James was reluctant to name who she believed *would be* a proper defendant, she stated: "I will say that the court system, the New York State court system, is the entity that is enforcing the statute." *Id*. at 7:2–5.

55. Subsequently, the Court stated that CEEFPA's requirement that landlords send Hardship Declarations to tenants "puts an additional burden on the plaintiff[s]," and noted that she was "not seeing why they should have the burden of notifying their tenants." *See id.* at 10:4–8. The Court further opined that "the government should be the one to approach these individuals and give them an opportunity to explain why they should not be penalized for not paying their rent or some other reason." *Id.* at 10:9–14.

56. The Court also stated that CEEFPA's translation requirement is "somewhat burdensome, to say the least" and observed that "there is no manner included that permits a review of checking off a box without any explanation or documentation." *Id.* at 10:15–20. The Court further noted that the statute's Hardship Declaration requirement "rel[ies] on a box to be checked off without any explanation and very broad permission to stop paying rent, which is not really focused and not specific." *Id.* at 10:20–23.

57. Finally, Judge Feuerstein questioned "why . . . the burden [is] entirely on the landlord" rather than "the one seeking to be excused from their contractual liabilities . . . ." *Id.* at

11:7–11.  Counsel for the Attorney General stated that the law was intended to achieve a "public health goal" of "preventing mass evictions," which "was crucial for the time being."  *Id.* at 11:12–12:4.  The Court pressed the Attorney General's counsel on "where we are now" and whether CEEFPA would be renewed.  *Id.* at 12:5–11.  Counsel's response was that, while an extension would be up to the State legislature, "it appears that the concerns that brought about the May 1 date"—namely, winter and the delay in the State's distribution of federal rent-relief funds—"will no longer be in play."  *Id.* at 12:12–25.

58.     At the end of the hearing, Judge Feuerstein ordered full briefing, in the form of a motion to dismiss, on the Attorney General's argument that she was not a proper defendant.  Accordingly, the Attorney General moved to dismiss the case on that sole basis.  *Chrysafis I*, Dkt. 27.  In support of her motion, the Attorney General argued that CEEFPA is "administered by the court system," the statute's "litigation-related procedural prerequisites" are "administered in the first instance by court employees," and the "remainder of CEEFPA Part A's mandates apply primarily to courts and law enforcement officers who execute eviction warrants."  *Id.* at 14–15.

59.     After Judge Feuerstein's tragic death, the case was reassigned to Judge Joanna Seybert on April 12.  On April 14, Judge Seybert granted the Attorney General's motion to dismiss, concluding that the Court lacked subject matter jurisdiction because the Attorney General was not a proper defendant.  *Chrysafis I*, Dkt. 34.  In its opinion, the Court agreed with the Attorney General that "CEEFPA is administered by the New York court system" and that certain of CEEFPA's "litigation-related procedural prerequisites, as well as the '[p]rohibition on initiation of eviction proceedings' . . . are enforced by court employees . . . ."  *Id*. at 26; *see also*

*id.* ("[T]he remainder of CEEFPA's mandates apply primarily to courts and law enforcement officers who execute eviction warrants . . . .").

60.    The Court denied as moot Plaintiffs' motion for preliminary relief and did not reach the merits of the Property-Owner Plaintiffs' constitutional challenge. *Id.* at 38 n.15.

## VII.    CEEFPA Is Extended For At Least Four More Months, Exacerbating Its Unconstitutional Effects

61.    On May 3, the New York legislature passed the CEEFPA Extension, which Governor Cuomo signed into law on May 4.

62.    The CEEFPA Extension retroactively extends the effective date of the CEEFPA provisions expiring on May 1 "until at least" August 31, but otherwise leaves the law's provisions unchanged.

63.    During the legislative debate regarding the CEEFPA Extension, some state senators questioned the need to continue staying eviction proceedings entirely and expressed significant concerns about, among other things, the vagueness and overbreadth of CEEFPA's Hardship Declaration provisions, abuse of those provisions by tenants not actually suffering financial hardship, and the legislature's failure to provide appropriate relief for small landlords. Evidencing this significant disagreement, the CEEFPA Extension passed the Senate by a vote of 42 to 21 and the Assembly by a vote of 89 to 59 (with two abstentions).

64.    Even before the passage of the CEEFPA Extension, the prior eviction moratoria had pushed small property owners to "the verge of losing everything." Jim Epstein, *The Victims of the Eviction Moratorium*, REASON (Feb. 23, 2021), https://reason.com/video/2021/02/23/the-victims-of-the-eviction-moratorium/. Many were already "cutting their losses and selling or on the verge of foreclosure." Caroline Spivack, *The Other Side of Rent Debt: Five Small-Time Landlords Who Are Struck*, CURBED (Feb. 23, 2021), https://www.curbed.com/2021/02/new-

york-small-landlords-rent-debt.html.  Others themselves faced eviction after they were unable to pay their own rent because of lost income from nonpaying tenants. Jon Levine, *NYC Landlord Facing His Own Eviction as 'Deadbeat' Tenants Refuse to Pay Rent*, NEW YORK POST (Jan. 2, 2021), https://nypost.com/2021/01/02/nyc-landlord-facing-his-own-eviction-as-tenants-refuse-to-pay-rent/.  Now, Plaintiffs and other property owners will be forced to suffer for "at least" four more months (and likely far more, given that proceedings may only *begin* in September 2021) because of CEEFPA's extension.

65.     CEEFPA's disastrous impact on property owners is exacerbated by the fact that New York's housing courts are closed indefinitely to in-person hearings—despite the fact that New York Chief Judge Janet DiFiore announced on April 19 that the State's judges and court staff will return to in-person work effective May 24.  *See* Chief Judge Janet DiFiore, Message from Chief Judge Janet DiFiore (Apr. 19, 2021), https://www.nycourts.gov/whatsnew/pdf/April19-CJ-Message.pdf.  Even if eviction proceedings can actually resume after August 31, the backlog created by the courts' closure and the various eviction moratoria mean that property owners will be forced to wait an indefinite period before they can actually remove nonpaying tenants.

66.     Moreover, since CEEFPA's original passage in December 2020, all adults in New York have become eligible to receive COVID-19 vaccinations, and COVID-19 cases are in decline.  On May 3, in light of New York's "tremendous progress" against COVID-19, Cuomo announced a "major reopening" of New York State beginning May 19, including removal of capacity restrictions for most businesses. Chris Sommerfeldt and Dennis Slattery, *Cuomo Says New York on Track for Major Reopening, Lifting of COVID Capacity Limits by Mid-May*, N.Y. DAILY NEWS (May 3, 2021), https://tinyurl.com/9esz4d4x.

67.     Despite these changes, the State is forcing property owners like the Property-Owner Plaintiffs and RSA's members to continue to bear the full burdens of the eviction moratoria imposed at the beginning of the COVID-19 pandemic.  While the rest of the State begins to return to normalcy, landlords have been left behind, unable to even start (or restart) the process of removing nonpaying, lease-violating, or holdover tenants from their properties "until at least" August 31.

68.     In passing the CEEFPA Extension, the State has made no attempt to tailor its eviction prohibitions to reflect the strides New York has made in combatting the pandemic.  It has also made no effort to limit the moratorium to those tenants actually in need of relief due to the effect of COVID-19, whether through documentation of hardship, income limitations or caps, or otherwise.

69.     The failure to tailor CEEFPA's provisions is all the more glaring in light of the fact that the State has now passed a budget allocating more than $2 billion in federal rent relief for tenants behind on their rent, and that the State's scheme for distribution of these rent relief funds *does* contain its own more narrowly-tailored eviction protections and restrictions applicable to landlords who receive payment out of those funds.  *See* Susan Arbetter, *Tenants and Landlords, Still Waiting on Billions in Pandemic Funding, Have Many Unanswered Questions*, SPECTRUM NEWS (Apr. 28, 2021), https://spectrumlocalnews.com/nys/central-ny/capital-tonight/2021/04/28/waiting-for-otda-.  Under the State's rent-relief scheme, a New York tenant household is eligible for assistance—and accompanying protections against eviction—if its income is at or below 80% of the area median household-adjusted income, someone in the household is eligible for unemployment or has suffered a loss of income or increase in costs related to COVID-19, and the household demonstrates a risk of homelessness or

housing instability. *See* 2021 Sess. Laws of N.Y. Ch. 56 (A. 3006-C), Part BB, Subpart A §§ 5, 8. Within that population, the State will prioritize relief for groups such as households with median incomes at or below 50% of the area median income, certain currently unemployed applicants, vulnerable populations, and tenants living in areas disproportionately impacted by the pandemic. *Id.* The regime also includes application and documentation requirements for determining eligibility. *Id.* §§ 6, 7. While the State's rent-relief eviction restrictions may suffer from their own legal defects, the fact that the State's scheme prioritizes low-income tenants, the unemployed, and other specific populations, employs income requirements or cut-offs, and links stays of eviction to applications for rent relief funds, demonstrates that CEEFPA's regime is overbroad, insufficiently tailored, and unnecessary.

## VIII. Plaintiffs Are Suffering Under CEEFPA's Unconstitutional Regime

70.    Plaintiffs have been harmed in the manner described above by virtue of CEEFPA's eviction moratorium provisions, which independently and cumulatively violate their rights under the First Amendment's Free Speech clause, the Fourteenth Amendment's Due Process clause, and the First Amendment's Petition clause, as well as their New York State Constitution corollaries. Each Plaintiff, moreover, is suffering under CEEFPA as follows.

### A.    Plaintiff Pantelis Chrysafis

71.    Plaintiff Chrysafis purchased the single-family home he owns in Garden City, New York, in 2015, to live in with his then-wife. After he and his wife separated, Chrysafis decided to sell the property, but did not find a suitable buyer. Chrysafis identified what he believed to be suitable tenants instead, and started renting it out for $5,000 per month. Chrysafis was essentially breaking even after paying approximately $18,000 in property taxes, as well as additional costs to maintain the property. Chrysafis now lives in Japan, where he has a newborn child.

72.    In early 2019, a few years into the tenancy, Chrysafis determined to try to sell the property again, and he informed the tenants that they would have a number of months to find a suitable, alternative place to live.  The tenants—one of whom told Chrysafis that he makes $200,000 a year—simply stopped paying rent as a result.  In the spring of 2019, well before the COVID-19 pandemic, Chrysafis was forced to hire an attorney to seek five months of back rent.  The parties temporarily settled, but his tenants failed to pay timely rent again in December 2019 and January 2020.  In February 2020, Chrysafis obtained a judgment against his tenants as well as a warrant of eviction ordering the tenants to vacate by April 1, 2020.  Just days before COVID-19-related shutdowns began, the tenants requested until the end of April to vacate, and Chrysafis agreed.

73.    Chrysafis's tenants remain in the home because of the eviction moratoria.  They have not paid rent in nearly a year and half, totaling more than $80,000. Chrysafis has been forced to borrow money from his elderly parents to stay afloat.  His inability to collect rental income, while still having significant costs of his own, has caused unending strife within his own family.  If it continues to be enforced, CEEFPA will extend the stay of Chrysafis's eviction proceedings against his tenants.  Forcing Chrysafis to provide the Hardship Declaration to his tenants will in essence invite his tenants to continue to refuse to pay rent.  And his tenants will certainly avail themselves of the vagueness of the Declaration Form to assert financial hardship.  But the timeline makes clear that his tenants' failure to pay has nothing to do with COVID-19, and Chrysafis will have absolutely no way to contest his tenants' claims.

**B.    Plaintiff Betty S. Cohen**

74.    Plaintiff Cohen owns a one-unit co-op in Brooklyn, New York that she rent outs to a tenant.  Cohen is retired.  The rental income from the co-op is her primary source of financial support, together with social security payments.

75.     Cohen has rented the co-op unit to a single tenant since 1995.  The current rent is $1,545 per month.  Cohen is responsible for paying for the co-op maintenance fees, which she ordinarily pays using the rental income.  The tenant has a mixed history of cooperation when it comes to the co-op fees and rent.  Although the rent is due on the 15th of each month, he has taken every opportunity to extend that deadline.  In March 2020, the tenant did not pay rent.  Although Cohen agreed to allow him to pay it back the following month and waived the late charge, the tenant never paid.  Despite Cohen sending him a monthly statement of arrears and notifying him of her desperate need for the rent, the tenant has now been living in the co-op rent-free for nearly a year.  The tenant has refused to communicate with Cohen about the unpaid rent and does not respond to her messages at all.

76.     Cohen sent a notice of late payment, and initiated a non-payment proceeding in September 2020.  But the series of eviction moratoria, including CEEFPA, have barred Cohen from taking any meaningful action to evict the tenant, reclaim her property, or recoup unpaid rent.  The tenant's annual lease expired in December 2020.  On February 4, 2021, the tenant submitted what purports to be a Declaration Form, checking the financial hardship box without any further explanation or support.  If the form is valid, Cohen will have no opportunity to contest his submission or receive clarification as to which category of financial hardship he claims applies.  And the tenant's submission of a Declaration Form will automatically stay her case until August 31, 2021, despite his non-payment and the expiration of his lease.  The tenant currently owes Cohen approximately $21,630 in unpaid rent, and that amount will increase to $23,175 as of May 15.

77.     Still obligated to cover her own living and fixed monthly costs, Cohen has resorted to asking friends to help support her.  They have graciously sent her what they can.  But

if Cohen remains unable to evict the tenant and thereby barred from finding a tenant who will pay rent, she will not be able to continue to pay her own financial expenses and may lose her rental unit.

### C. Plaintiff Brandie LaCasse

78.     Plaintiff LaCasse is a military veteran, now retired after serving her country for more than 23 years of active-duty service.  She is a single mother who owns six properties in New York, and she serves as the manager of each.  She has a service-connected disability, which has resulted in her being immunocompromised.

79.     LaCasse decided to sell one of her properties, a single family house in Rhinebeck, New York, in November 2020.  Accordingly, she served the tenants with a notice of nonrenewal pursuant to the terms of the lease.  The tenants stopped paying rent in response.  LaCasse is now owed approximately $15,000 in unpaid rent and the tenants have refused to vacate the property despite the fact that the lease's term has concluded.  LaCasse filed a holdover proceeding against the tenants in December 2020, but it was dismissed because she had not provided a Hardship Declaration to her tenants—even though CEEFPA was not yet in effect when she had filed suit. Immediately thereafter, her tenants completed a Declaration Form, claiming financial hardship in connection with their need for childcare.  But there is no indication that the tenants' childcare situation has been affected by COVID-19, as one tenant continues to work while the other continues to stay home, as they did pre-pandemic.  The tenants have also violated numerous terms of the lease, causing significant damage to the property and resulting in multiple police calls in response to their conduct.  Yet the mere submission of the Declaration Form—containing claims that LaCasse has no way to rebut or challenge—has barred her from taking any action to evict the tenants until August 2021.

80.     To make matters worse, because of a February 2021 personal dispute, LaCasse's fiancé has recently asked her and her daughter to move out of his home, in which they are currently staying.  Because LaCasse has mortgages on several of her properties, she has been unable to secure a loan to purchase a different property for her own use.  She hoped to personally move into the Rhinebeck property—the only one of her properties in which the occupants' lease has expired—but the tenants still refuse to leave.  As a result, LaCasse has been forced to remain in her fiancé's home despite his requests that she find a new place to live.

81.     Tenants in LaCasse's other properties now also believe they can refuse to pay rent with impunity.  In January 2021, tenants at a different property paid their rent late and told LaCasse that she should consider herself lucky to receive any payments at all.  They have continued to pay their rent late since that time, and they told LaCasse that they do not have to pay their rent because it is impossible for her to take them to court.

82.     To make up for her lost rental income and cover her financial obligations, LaCasse has been forced to take a new job, despite her immunocompromised status, increasing her risk of getting infected with COVID-19.  The eviction moratorium is literally compelling her to risk her life in order to make ends meet.  And she is no longer able to spend time with her daughter because she has been forced to take this additional work.  If LaCasse continues not to be able to collect rent, she may have no choice but to take yet another job, which will only increase the risk to her health and the possibility that she will get infected.

### D.     Plaintiffs Mudan Shi and Feng Zhou

83.     Plaintiffs Shi and Zhou own a single-family home in Staten Island, New York. The rental income from the house helps cover their own rent obligations for their leased family home, which Shi and Zhou live in with their two young children and their three elderly parents.

84.     Shi and Zhou were able to purchase the Staten Island home in 2014 after working hard for many years and scrupulously saving.  They lived in the house until 2018 when they decided to rent it out.  In August 2018, Shi and Zhou rented the house to a tenant, who agreed to a two-year lease with a monthly rent of $2,400.  The tenant paid rent from August 2018 through March 2019, but in April 2019 the tenant paid only half the rent due.  He has not paid any rent since.  Shi and Zhou are now owed $57,600 in back rent, and without the rental income from the house they are financially strapped trying to keep up with the property taxes and water bills on the house as well as  their own rent of $2,200 per month.  They commenced a nonpayment action on October 31, 2019—well before the coronavirus pandemic.  Although they obtained a favorable judgment, the enforcement of that judgment has been stayed due to the eviction moratoria.

85.     In August 2020, when the lease was set to expire, Shi and Zhou asked the tenant to leave the home so they could move in with their family and be relieved of their rent obligations on the home they had been renting out.  The tenant offered to vacate only if Shi and Zhou gave him $10,000.  Once Shi and Zhou agreed to a $6,000 payment, the tenant turned and demanded the money *before* he moved out.  Shi and Zhou did not feel comfortable paying under this condition.  They have been stuck in a Catch-22 ever since:  unable to meet the monthly rent obligations under their lease because they cannot obtain the supporting rental income from their own tenant.  Even though their tenant's lease has expired and he has not paid rent for three quarters of the term, Shi and Zhou cannot move their own family into the house they own.

86.     CEEFPA's continued enforcement would further extend the stay on the enforcement of the judgment that Shi and Zhou won during their non-payment proceeding as well as any future eviction proceeding, should they attempt to commence one.  Forcing them to

provide the Hardship Declaration to their tenants effectively invites the tenants to continue to live in the property without paying rent. And their tenants will certainly avail themselves of the vague hardship categories of the Declaration Form to assert hardship. The tenants' failure to pay is completely unrelated to COVID-19, yet Shi and Zhou would have no path forward to contest their tenants' claims.

### E. Plaintiff Rent Stabilization Association

87. Many of Plaintiff RSA's roughly 25,000 members are being crushed by CEEFPA's burdensome restrictions. They have reported that tenants across the State have refused to pay rent, breached their leases, or overstayed their lease terms because of CEEFPA's eviction moratorium, and the owners have no redress. At the same time, owners are forced to continue to cover the costs of carrying these properties even when they are not deriving any income, and with the knowledge that, while rent is technically accruing while the moratorium is in effect, it will be effectively impossible to collect once the moratorium is lifted. Tenants have also signed Hardship Declarations even when they were not, as best as the property owners could tell, suffering any financial hardship from the pandemic, and property owners have no way to challenge those declarations, prosecute ongoing eviction cases, or file new cases. This is so even when the tenants had failed to pay rent or breached their leases prior to the pandemic, and even when the property owners had obtained judgments and warrants of eviction that predated the pandemic. CEEFPA also forces property owners to send tenants Hardship Declarations and lists of legal service providers to non-paying and paying tenants alike. And CEEFPA fails to provide any opportunity for property owners to challenge tenants' vague and discretionary assertions of hardship while blocking their access to the courts for more than a year.

## CEEFPA PART A IS INVALID IN ITS ENTIRETY

88.     Since the unconstitutional Hardship Declaration is at the "core" of Part A of

CEEFPA and "interwoven inextricably through the entire regulatory scheme," *New York State*

*Superfund Coal. v. New York State Dept. of Envtl. Conservation*, 75 N.Y.2d 88, 94 (1989),

CEEFPA Part A is invalid in its entirety.  The Hardship Declaration is referenced at least 60

times throughout Part A, including in virtually every operative provision.  It would be

"pragmatically impossible, as well as jurisprudentially unsound," for the court to "attempt to

identify and excise" the Hardship Declaration, or the provisions in which it is referenced, while

"leaving the remainder of" CEEFPA Part A intact.  *Boreali v. Axelrod*, 71 N.Y.2d 1, 14 (1987);

*see also Nat'l Advert. Co. v. Town of Babylon*, 900 F.2d 551, 557 (2d Cir. 1990) (finding

constitutional and unconstitutional provisions of town ordinance restricting commercial speech

were inextricably interwoven and that the unconstitutional portions therefore could not be

severed from constitutional portions).

### FIRST CAUSE OF ACTION
**Compelled Speech – First Amendment of the U.S. Constitution and Article I, § 8 of the
N.Y. Constitution; 42 U.S.C. § 1983
(Against All Defendants)**

89.     Plaintiffs repeat and reallege the allegations set forth above as though fully set

forth herein.

90.     The First Amendment's Free Speech clause provides that "Congress shall make

no law . . . abridging the freedom of speech."  The New York Constitution (Art. I, § 8) similarly

guarantees "Freedom of speech" and mandates that "no law shall be passed to restrain or abridge

the liberty of speech."  Freedom of speech prohibits the government from telling people what

they must say.

91.     Where a law compels speech that is noncommercial in nature, that law is assessed

under the Supreme Court's strict scrutiny rubric.

92.     Where strict scrutiny applies to a First Amendment claim, the exigent

circumstances of the pandemic do not permit courts to apply a less-demanding standard.  *See,*

*e.g.*, *Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 68 (2020) (per curiam);

*Agudath Israel of Am. v. Cuomo*, 983 F.3d 620, 636 (2d Cir. 2020).

93.     CEEFPA has deprived and will continue to deprive Plaintiffs of their First

Amendment free speech rights.

94.     CEEFPA requires property owners, including the Property-Owner Plaintiffs and

RSA's members, to provide a Hardship Declaration to their tenants—using language mandated

by the government—with every demand for rent, commencement of eviction proceeding, or

petition.  That Hardship Declaration includes a Declaration Form, which provides check-the-box

options for the tenant to assert either that the tenant is "experiencing financial hardship" and

therefore "unable to pay" the rent owed, or that vacating the premises would pose a "significant

health risk."  CEEFPA Part A § 1(4).  If a tenant's "primary language" is one other than English,

"Spanish [or] the six most common languages in the city of New York," property owners must

also obtain appropriate translations of the Declaration Form at their own expense.  *Id.* §§ 3, 10.

By mandating that property owners supply this form to tenants—and arrange for the translation

of the form—CEEFPA compels Property-Owner Plaintiffs and RSA's members to endorse and

adopt these government statements as their own, even though they may disagree with the Form's

characterization of tenants' financial hardship, ability to pay, or health risks, and even though

they disagree with the resulting eviction moratorium.  As a result, the Property-Owner Plaintiffs

and RSA's members "must represent as [their] own an opinion . . . that [they] might not

categorically hold." *All. for Open Soc'y Int'l, Inc. v. U.S. Agency for Int'l Dev.*, 651 F.3d 218, 237 (2d Cir. 2011), *aff'd sub nom. Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205 (2013).

95.     In addition, CEEFPA requires the Property-Owner Plaintiffs and RSA's members to provide tenants with a "list" prepared by the Office of Court Administration "of all not-for-profit legal service providers actively handling housing matters in the county where the subject premises are located." This requirement compels endorsement of the State's selection of legal service providers, including those that may be adverse to Plaintiffs or their interests. Property owners have no discretion to omit an organization from the list, even if they disapprove of it or its activities.

96.     These pre-eviction Hardship Declaration notices are subject to strict scrutiny, because they constitute noncommercial speech under both of the Supreme Court's definitions of such speech. *First*, the Declaration Forms do not "propose a commercial transaction." *PSEG Long Island LLC v. Town of N. Hempstead*, 158 F. Supp. 3d 149, 168 (E.D.N.Y. 2016). Instead, they provide a list of legal service providers, inform tenants of potential legal options that are potentially adverse to the property owners, and make contestable assertions about tenants' alleged financial hardship and health risks. *Second*, the Hardship Declaration is not "related solely to the economic interests of the speaker and its audience." *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of New York*, 447 U.S. 557, 561 (1980). Instead, as noted, it makes contestable assertions about *tenants'* alleged financial hardship and health risks. Similarly, the list of legal service providers "in no way relates to the services that [landlords] provide," *Nat'l Inst. of Family & Life Advocates v. Becerra*, 138 S. Ct. 2361, 2372 (2018), and is therefore unrelated to the economic interests of Plaintiffs.

97.     The Hardship Declaration fails strict scrutiny, because it is not narrowly tailored to the government's interest of informing tenants about their legal rights.  To that end, there is clearly a less restrictive means available that does not burden the First Amendment rights of Plaintiffs:  The State can provide the notices to tenants directly.  Indeed, not only is the Declaration form currently available on the New York Court's website, *see* http://www.nycourts.gov/courts/nyc/SSI/images/corona/HardshipDeclaration.pdf, but, on information and belief, the state's Office of Court Administration has also mailed thousands of Hardship Declarations to tenants whose property owners have moved to evict them.  *See* Emma Whitford, *Major Takeaways From NY's New Anti-Eviction Law*, Law360 (Jan. 8, 2021), https://www.law360.com/articles/1342930/major-takeaways-from-ny-s-new-anti-eviction-law (discussing "statewide mass mailing of hardship declarations to all tenants sued in eviction cases").  Alternatively or additionally, the Government could conduct a public awareness campaign to ensure that tenants are adequately informed about their options.  The Government, however, "chose to forego these alternatives in favor of a law that not only compels [Property-Owner Plaintiffs and RSA's members] to carry [its] specific message as if it were their own, but also to bear the associated costs of doing so." *PSEG Long Island LLC v. Town of N. Hempstead*, 158 F. Supp. 3d 149, 168 (E.D.N.Y. Feb. 3, 2016).  Thus, CEEFPA violates Plaintiffs' First Amendment rights.

98.     Even if the compelled speech were commercial, however, the pre-eviction Hardship Declarations would fail the more deferential standard of review.  Because of the ready availability of alternatives, including those presently undertaken by the Government, CEEFPA imposes requirements that are "unjustified or unduly burdensome." *Becerra*, 138 S. Ct. at 2372.

99.     Defendants are compelling Plaintiffs to speak in the manner set forth above—including, for Chief Administrative Judge Marks, by implementing CEEFPA's provisions foreclosing Plaintiffs from commencing or prosecuting eviction proceedings or obtaining warrants of eviction absent the tenant's receipt of a Hardship Declaration, and, for the law enforcement defendants, by implementing CEEFPA's provisions foreclosing the execution of warrants of eviction that do not comply with the Hardship Declaration requirements.

100.     Acting under color of state law, Defendants have caused, and will continue to cause, Plaintiffs to be deprived of their free speech rights guaranteed to them by the First Amendment to the United States Constitution and its equivalent in the New York State Constitution, both facially and as applied to them.

101.     In the absence of declaratory and injunctive relief, property owners (including the Property-Owner Plaintiffs and RSA's members) will continue to be irreparably harmed and to be subjected to this deprivation of rights.

**SECOND CAUSE OF ACTION**
**Void for Vagueness – Fourteenth Amendment of the U.S. Constitution and Article I, § 6 of the N.Y. Constitution; 42 U.S.C. § 1983**
**(Against All Defendants)**

102.     Plaintiffs repeat and reallege the allegations set forth above as though fully set forth herein.

103.     The Due Process clause of the Fourteenth Amendment to the United States Constitution provides in part:  "[N]or shall any State deprive any person of life, liberty, or property, without due process of law."  The New York Constitution (Art. I, § 6) similarly directs: "No person shall be deprived of life, liberty or property without due process of law."

104.     A law is unconstitutionally vague under procedural due process principles if it "authorizes or encourages arbitrary and discriminatory enforcement," by failing to provide any

"standard that can be objectively applied" to determine compliance, *Cunney v. Bd. of Trustees of Vill. of Grand View*, 660 F.3d 612, 621-22 (2d Cir. 2011), or if it does not adequately inform people of "what is required of them," *F.C.C. v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012).

105.     The Property-Owner Plaintiffs and RSA's members have a legitimate property interest, grounded in state law, in the property they own and in the right to retake possession of that property pursuant to New York's lawful eviction process.

106.     CEEFPA's hardship provision allowing tenants to claim "[s]ignificant loss of household income," "[i]ncrease in necessary out-of-pocket expenses," and "other circumstances related to the COVID-19 pandemic," among other vague and undefined circumstances, violates the procedural due process rights of the Property-Owner Plaintiffs and RSA's members because it fails to provide them fair notice of CEEFPA's requirements, is so standardless as to provide for arbitrary and discriminatory enforcement, invites unreviewable abuse by tenants, and deprives them of any procedural opportunity to discern—let alone challenge—the reasoning for Declaration Forms based on these undefined circumstances.

107.     As described in the foregoing allegations, CEEFPA's failure to define phrases including but not limited to "other circumstances," "meaningful employment," "significantly increase," and "significantly reduce" renders the "other circumstances" financial hardship category essentially meaningless, robbing landlord owners of fair notice of when a tenant is eligible to avoid eviction.  Tenants' ability to submit a valid Declaration Form without even specifying the "financial hardship" category they believe applies keeps landlords in the dark about what precisely they are rebutting.  The lack of any evidentiary obligations for tenants and fair notice to landlords makes the Declaration Forms ripe for abuse.  The same is true for the

financial hardship categories of "[s]ignificant loss of household income" and "[i]ncrease in necessary out-of-pocket expenses" relating to "essential work" or "related health impacts" during the COVID-19 pandemic, as well as that childcare responsibilities or responsibilities to care for an elderly, disabled, or sick family member during the COVID-19 pandemic have "negatively affected" the tenant's or household member's ability to obtain "meaningful employment" or "earn income" or increased their "necessary out-of-pocket expenses," that "[m]oving expenses and difficulty . . . securing alternative housing make it a hardship . . . to relocate to another residence during the COVID-19 pandemic." That vacating the premises and moving would "pose a significant health risk" is equally as vague. None of these terms is defined, and all are hopelessly vague.

108.    Because the law provides landlords with no notice about what circumstances prohibit them from evicting tenants, it essentially delegates the authority to determine the scope of CEEFPA to tenants themselves. That flies in the face of due process principles, which require "that regulated parties . . . know what is required of them so they may act accordingly." *F.C.C. v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012).

109.    Likewise, the contentless nature of these categories will result in arbitrary and discriminatory enforcement, as they provide no standards to guide their application. The arbitrary nature of the financial hardship categories is compounded by its creation of a rebuttable presumption of financial hardship in proceedings involving a defense under the TSHA, an executive order, or "any other local or state law, order or regulation restricting the eviction of a tenant suffering from a financial hardship during or due to COVID-19," as CEEFPA is silent on how the presumption may be rebutted. And if property owners make what law enforcement officials decide, in their unfettered discretion, are false statements about the tenant in their signed

affidavit to the court seeking to rebut the vague assertions of the Hardship Declaration, property owners could face perjury charges with up to a $5,000 fine and three to five years of jail time. N.Y. Penal Law § 210, *et. seq.*

110.     Defendants are depriving Plaintiffs of their property rights by means of a constitutionally violative Hardship Declaration—including, for Chief Administrative Judge Marks, by implementing CEEFPA's provisions foreclosing Plaintiffs from commencing or prosecuting eviction proceedings or obtaining warrants of eviction absent the tenant's receipt of a Hardship Declaration, and, for the law enforcement defendants, by implementing CEEFPA's provisions foreclosing the execution of warrants of eviction that do not comply with the Hardship Declaration requirements.

111.     Acting under color of state law, Defendants have caused, and will continue to cause, property owners (including the Property-Owner Plaintiffs and RSA's members) to be deprived of their property without due process, both facially and as applied to them, in violation of their due process rights under the Fourteenth Amendment.

112.     In the absence of declaratory and injunctive relief, property owners (including the Property-Owner Plaintiffs and RSA's members) will continue to be irreparably harmed and to be subjected to this deprivation of rights guaranteed to them by the United States Constitution and the New York State Constitution.

## THIRD CAUSE OF ACTION
### Due Process – Fourteenth Amendment of the U.S. Constitution and Article I, § 6 of the N.Y. Constitution; 42 U.S.C. § 1983
### (Against All Defendants)

113.     Plaintiffs repeat and reallege the allegations set forth above as though fully set forth herein.

114.    The Due Process clause of the Fourteenth Amendment to the United States Constitution provides in part:  "[N]or shall any State deprive any person of life, liberty, or property, without due process of law."  The New York Constitution (Art. I, § 6) similarly directs: "No person shall be deprived of life, liberty or property without due process of law."

115.    Property-Owner Plaintiffs and RSA's members have a legitimate property interest, grounded in state law, in the property they own and in the right to retake possession of that property pursuant to New York's lawful eviction process.

116.    CEEFPA deprives property owners, including the Property-Owner Plaintiffs and RSA's members, of their procedural due process right to "be heard at a meaningful time and in a meaningful manner" with respect to a tenants' Declaration Forms, whether premised on claimed financial hardship or purported health risks associated with relocation.  *Matthews v. Eldridge*, 424 U.S. 319, 335 (1976).  Once a tenant completes a Declaration Form—which tenants are not required to sign under penalty of perjury (and instead only under "penalty of law," whatever that means)—a pending eviction proceeding is automatically stayed until at least August 31.  Where an eviction warrant has been issued but not yet executed, execution is automatically stayed until at least that date.  And if a property owner has not yet initiated an eviction proceeding, it may not do so during the same period.  This inability to contest or obtain any review of tenants' Declaration Forms deprives Property-Owner Plaintiffs and RSA's members of their procedural due process rights—a violation made particularly severe in light of CEEFPA's vagueness and significant potential for abuse.

117.    Under due process principles, "[e]ven a brief and provisional deprivation of property pending judgment is of constitutional importance."  *Spinelli v. City of New York*, 579 F.3d 160, 174 (2d Cir. 2009) (citation omitted).

118.    Moreover, even assuming that CEEFPA's original May expiration date was of any legal relevance in the due process analysis, the law has now been extended for "at least" another four months, until August 31, 2021, with no end in sight.

119.    Compounding the harms caused by CEEFPA's indefinite deprivation of property owners' (and Plaintiffs') rights, CEEFPA and previous eviction moratoria have already impeded property owners from evicting tenants for over a year.

120.    Defendants are depriving Plaintiffs of their property rights without providing an adequate procedural remedy—including, for Chief Administrative Judge Marks, by implementing CEEFPA's provisions foreclosing Plaintiffs from commencing or prosecuting eviction proceedings or obtaining warrants of eviction upon the mere submission of a Hardship Declaration, and, for the law enforcement defendants, by implementing CEEFPA's provisions foreclosing the execution of warrants of eviction upon the receipt of a Hardship Declaration.

121.    Acting under color of state law, Defendants have caused, and will continue to cause, the Property-Owner Plaintiffs and RSA's members to be deprived of their property without due process, both facially and as applied to them, in violation of their procedural due process rights under the Fourteenth Amendment.

122.    In the absence of declaratory and injunctive relief, property owners (including the Property-Owner Plaintiffs and RSA's members) will continue to be irreparably harmed and to be subjected to this deprivation of rights guaranteed to them by the United States Constitution and the New York State Constitution.

**FOURTH CAUSE OF ACTION**
**Right to Petition – First Amendment of the U.S. Constitution and Article I, § 9 of the N.Y.**
**Constitution; 42 U.S.C. § 1983**
**(Against Chief Administrative Judge Marks)**

123.    Plaintiffs repeat and reallege the allegations set forth above as though fully set

forth herein.

124. The Petition clause of the First Amendment of the United States Constitution provides that "Congress shall make no law . . . abridging . . . the right of the people to petition the Government for a redress of grievances." The New York Constitution (Art. I, § 9) similarly guarantees the "Right to assemble and petition," and mandates that "[n]o law shall be passed abridging the rights of the people . . . to petition the government, or any department thereof."

125. "[T]he right of access to the courts is an aspect of the First Amendment right to petition the Government for redress of grievances." *Bill Johnson's Rests., Inc. v. N.L.R.B.*, 461 U.S. 731, 741 (1983).

126. Because CEEFPA completely bars a class of property owners, including the Property-Owner Plaintiffs and RSA's members, from exercising their rights to file and prosecute eviction petitions with New York courts until at least August 31, 2021—specifically, all property owners who have received, or whose tenants have submitted, a completed Declaration Form—it violates their rights under the Petition clause.

127. Even assuming that CEEFPA's original May expiration date was of any legal relevance in the right to petition analysis, the law has now been extended for "at least" another four months, until August 31, 2021, with no end in sight.

128. Defendant is depriving Plaintiffs of their access to the courts by implementing CEEFPA's provisions foreclosing Plaintiffs from commencing or prosecuting eviction proceedings upon the submission of a Hardship Declaration, and by otherwise implementing CEEFPA in a manner that prevents them from commencing or prosecuting nonpayment, holdover, ejectment, or related actions.

129.     Acting under color of state law, Defendant has caused, and will continue to cause, Plaintiffs to be deprived of rights of access to the courts and to the petition the government guaranteed to them by the First Amendment to the United States Constitution (as well as its New York state corollary), both facially and as applied to them.

130.     In the absence of declaratory and injunctive relief, property owners (including the Property-Owner Plaintiffs and RSA's members) will continue to be irreparably harmed and to be subjected to this deprivation of rights.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment against Defendants as follows:

1)     A declaration that Part A of CEEFPA is facially unconstitutional in its entirety under the First and Fourteenth Amendments to the United States Constitution and under Article I, §§ 6, 8 & 9 of the New York Constitution;

2)     In the alternative, a declaration that each of the challenged portions and provisions of Part A of CEEFPA are facially unconstitutional under the First and Fourteenth Amendments to the United States Constitution and under Article I, §§ 6, 8 & 9 of the New York Constitution;

3)     A declaration that Part A of CEEFPA is unconstitutional in its entirety as applied to Plaintiffs, or that each of the challenged portions and provisions of Part A of CEEFPA are unconstitutional as applied to Plaintiffs;

4)     A preliminary injunction and permanent injunction enjoining Defendants from implementing or enforcing Part A of CEEFPA, or, in the alternative, of implementing or enforcing each of its challenged portions and provisions, both facially and as applied to Plaintiffs;

5)  An award of fees, costs, expenses, and disbursements, including attorneys' fees and costs to which Plaintiffs are entitled pursuant to 42 U.S.C. § 1988; and

6)  Such other and further relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38, Plaintiffs demand a trial by jury in this action of all issues so triable.


Dated: New York, New York
           May 6, 2021

                                                    GIBSON, DUNN & CRUTCHER LLP

                                                    By:  /s/ *Randy M. Mastro*
                                                         Randy M. Mastro
                                                         Akiva Shapiro

                                                         200 Park Avenue, 47th Floor
                                                         New York, NY  10166-0193
                                                         Telephone:  (212) 351-4000
                                                         RMastro@gibsondunn.com
                                                         AShapiro@gibsondunn.com

                                                         *Attorneys for Plaintiffs*