UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-----------------------------------------------------------x

PANTELIS CHRYSAFIS, BETTY COHEN,　　　　:
BRANDIE LACASSE, MUDAN SHI, FENG　　　　:
ZHOU, and RENT STABILIZATION　　　　　　:
ASSOCIATION OF NYC, INC.,　　　　　　　　:
　　　　　　　　　　　　　　　　　　　　　:
　　　　*Plaintiffs*,　　　　　　　　　　　:
　　　　　　　　　　　　　　　　　　　　　:
　　　　-against-　　　　　　　　　　　　　:
　　　　　　　　　　　　　　　　　　　　　:
LAWRENCE K. MARKS, in his official　　　　:
capacity as Chief Administrative Judge of the　:
Courts of New York State, ADRIAN H.　　　　:
ANDERSON, in his official capacity as Sheriff　:　　No. 2:21-cv-02516
of Dutchess County, New York, JAMES　　　　:
DZURENDA, in his official capacity as　　　　:
Sheriff of Nassau County, New York, JOSEPH　:
FUCITO, in his official capacity as Sheriff of　:
New York City, New York, MARGARET　　　　:
GARNETT, in her official capacity as　　　　　:
Commissioner of the New York City　　　　　:
Department of Investigation, and CAROLINE　:
TANG-ALEJANDRO, in her official capacity　:
as Director, Bureau of Marshals, New York　　:
City Department of Investigation,　　　　　　:
　　　　　　　　　　　　　　　　　　　　　:
　　　　*Defendants*.　　　　　　　　　　　:
　　　　　　　　　　　　　　　　　　　　　:

-----------------------------------------------------------x

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' APPLICATION
## FOR A PRELIMINARY INJUNCTION


GIBSON, DUNN & CRUTCHER LLP

200 Park Avenue
New York, NY 10166-0193
Telephone: 212.351.4000
Facsimile: 212.351.4035

*Attorneys for Plaintiffs*

**TABLE OF CONTENTS**

Page

PRELIMINARY STATEMENT ................................................................................ 1

FACTUAL BACKGROUND ..................................................................................... 7

    I.     Governor Cuomo Issued A Temporary Eviction Moratorium....................................... 7

    II.    CEEFPA Extended And Expanded The Eviction Moratorium. .................................... 7

    III.   CEEFPA Permits Hardship Declarations Based On Undefined Hardship Categories And Gives Landlords No Ability To Review Such Claims.................................................... 11

    IV.   The Property-Owner Plaintiffs Challenged CEEFPA's Constitutionality.................... 12

    V.    CEEFPA Was Extended For At Least Four More Months, Exacerbating Its Unconstitutional Effects And Irreparable Harms To Plaintiffs. ............................................ 14

LEGAL STANDARD................................................................................................ 16

ARGUMENT ............................................................................................................ 17

    I.     Plaintiffs Will Be Irreparably Harmed Absent Injunctive Relief. ............................... 17

    II.    Plaintiffs Are Likely To Succeed On The Merits Of Each Of Their Claims................ 18

      A. CEEFPA Violates Plaintiffs' Freedom Of Speech Rights............................................ 19

      B. CEEFPA Violates Plaintiffs' Substantive and Procedural Due Process Rights. .......... 22

      C. CEEFPA Violates Plaintiffs' Right To Petition Under The First Amendment. ........... 24

    III.   The Balance Of Hardships And Public Interest Strongly Favor Injunctive Relief....... 25

CONCLUSION......................................................................................................... 25

# TABLE OF AUTHORITIES

**Cases**

*725 Eatery Corp. v. City of New York*,
    408 F. Supp. 3d 424 (S.D.N.Y. 2019) ...................................................................16

*Abdul Wali v. Coughlin*,
    754 F.2d 1015 (2d Cir. 1985) ...............................................................................17

*ACA Int'l v. Healey*,
    457 F. Supp. 3d 17 (D. Mass. 2020) .....................................................................24

*Agudath Israel of Am. v. Cuomo*,
    983 F.3d 620 (2d Cir. 2020) ........................................................................ *passim*

*Ala. Ass'n of Realtors v. U.S. Dep't of Health & Hum. Servs.*,
    2021 WL 1779282 (D.D.C. May 5, 2021) ..............................................................2

*All. for Open Soc'y Int'l, Inc. v. U.S. Agency for Int'l Dev.*,
    651 F.3d 218 (2d Cir. 2011), *aff'd sub nom.*
    *Agency for Int'l Dev. v. All. For Open Soc'y Int'l, Inc.*,
    570 U.S. 205 (2013) .................................................................................3, 19, 21

*Bill Johnson's Rests., Inc. v. N.L.R.B.*,
    461 U.S. 731 (1983) ...........................................................................................5, 24

*Boreali v. Axelrod*,
    71 N.Y.2d 1 (1987) ...............................................................................................19

*Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*,
    447 U.S. 557 (1980) ..............................................................................................20

*Christopher v. Harbury*,
    536 U.S. 403 (2002) ..............................................................................................24

*Chrysafis v. James*,
    No. 2:21-cv-998 (E.D.N.Y.) ...........................................................................12, 13

*Citigroup Glob. Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.*,
    598 F.3d 30 (2d Cir. 2010) ...................................................................................17

*Cunney v. Bd. of Trustees of Vill. of Grand View*,
    660 F.3d 612 (2d Cir. 2011) ..............................................................................4, 22

*F.C.C. v. Fox Television Stations, Inc.*,
    567 U.S. 239 (2012) ..........................................................................................4, 22

*Fisher v. Univ. of Tex. at Austin*,
    570 U.S. 297 (2013)..................................................................19

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*,
    515 U.S. 557 (1995)..................................................................21

*Jolly v. Coughlin*,
    76 F.3d 468 (2d Cir. 1996)...................................................16, 17

*Kramer v. N.Y. City Bd. of Educ.*,
    715 F. Supp. 2d 355 (E.D.N.Y. 2010) ........................................22

*Mathews v. Eldridge*,
    424 U.S. 319 (1976)........................................................4, 22, 23

*N.Y. State Superfund Coal. v. N.Y. State Dept. of Env't Conservation*,
    75 N.Y.2d 88 (1989) ................................................................18

*Nat'l Advert. Co. v. Town of Babylon*,
    900 F.2d 551 (2d Cir. 1990)......................................................19

*Nat'l Inst. of Family & Life Advocs. v. Becerra*,
    138 S. Ct. 2361 (2018)....................................................3, 20, 21

*PSEG Long Island LLC v. Town of N. Hempstead*,
    158 F. Supp. 3d 149 (E.D.N.Y. Feb. 3, 2016) .....................3, 20, 22

*Riley v. Nat'l Fed'n of the Blind of N. Carolina, Inc.*,
    487 U.S. 781 (1988)..................................................................19

*Roman Catholic Diocese of Brooklyn, N.Y. v. Cuomo*,
    141 S. Ct. 63 (2020)..........................................................*passim*

*United Mine Workers of Am., Dist. 12 v. Ill. State Bar Ass'n*,
    389 U.S. 217 (1967)..................................................................24

*United States v. Playboy Entm't Grp., Inc.*,
    529 U.S. 803 (2000)..................................................................19

*Wooley v. Maynard*,
    430 U.S. 705 (1977)..................................................................21

**Statutes, Acts & Executive Orders**

COVID-19 Emergency Eviction and Foreclosure Prevention Act of 2020..........................*passim*

Executive Order No. 202.8 ...........................................................7

Executive Order No. 202.28 .........................................................7

N.Y. Penal Law § 210, *et. seq.*............................................................................................23

Tenant Safe Harbor Act ................................................................................. *passim*

## Constitutional Provisions

N.Y. Const. art I..............................................................................................19, 22, 24

U.S. Const. amend. I .................................................................................... *passim*

U.S. Const. amend. XIV ............................................................................................22

Plaintiffs Pantelis Chrysafis, Betty S. Cohen, Brandie LaCasse, Mudan Shi, and Feng Zhou (collectively, the "Property-Owner Plaintiffs") and Rent Stabilization Association of NYC, Inc. ("RSA," and together with Property-Owner Plaintiffs, "Plaintiffs") submit this memorandum of law in support of their application for a preliminary injunction.

## PRELIMINARY STATEMENT

This case challenges the constitutionality of Part A of New York State's COVID-19 Emergency Eviction and Foreclosure Prevention Act of 2020 ("CEEFPA") (Ex. 1), as extended on May 4 (Ex. 2).[1] This latest extension of the State's eviction moratorium (the "CEEFPA Extension") stretches what State legislators originally sought to justify as a temporary pause on evictions during the height of the COVID-19 pandemic into an almost year-and-a-half long period during which thousands of the State's small property owners, including the Property-Owner Plaintiffs here, have been pushed to the brink of disaster.[2] CEEFPA has trampled on their constitutional rights, denied owners any benefit from their properties, and freed tenants from any consequence for refusing to pay their rent, giving them carte blanche to overstay the expiration of their leases—even if their nonpayment or lease expiration began before the pandemic.

Rather than let CEEFPA expire at the end of April 2021 in the face of its many constitutional defects, the crushing economic effects on property owners, and the more targeted assistance to tenants—including eviction restrictions—that is now available through the State's recent implementation of a federal rent relief program, the State Legislature extended CEEFPA whole hog through at least August 31, 2021. There is simply no legal, economic, or health

---

[1] References to "Ex." are to the exhibits to the Declaration of Akiva Shapiro, dated May 7, 2021 and filed herewith. References to "_____ Decl." are to the declarations submitted in support of the instant application.

[2] Also suing here is the Rent Stabilization Association ("RSA"), many of whose 25,000 members are also small property owners struggling to survive during this continuing eviction moratorium.

rationale for the extension of this blanket eviction moratorium. The notion that tenants can insulate themselves indefinitely simply by submitting a vague, standardless, and unchallengeable "Hardship Declaration" was problematic enough to begin with. Now, it is downright unconscionable. Indeed, the CEEFPA Extension comes just as New York is otherwise returning to normal life, with Governor Cuomo declaring that the entire State will fully reopen later *this month* as more and more of the State's citizens are vaccinated. Ex. 3 (Chris Sommerfelt and Dennis Slattery, *Cuomo Says New York on Track for Major Reopening, Lifting of COVID Capacity Limits By Mid-May*, NY DAILY NEWS (May 3, 2021)). And the New York courts, for their part, have resumed in-person operations Statewide, including for non-essential matters and jury trials. That CEEFPA has now been extended, without any tailoring to address this current reality on the ground, has only compounded its unconstitutionality and irrationality. It is time to end this governmental overreach.[3]

Part A of CEEFPA tramples on Plaintiffs' constitutional rights in at least four significant, separate ways. Plaintiffs are likely to succeed on the merits of each of these claims.

*First*, CEEFPA Part A compels property owners to disseminate government messages with which they disagree, in violation of their rights under the First Amendment and the New York State Constitution. Specifically, property owners are compelled to distribute "Hardship Declaration" forms drafted by the government to tenants, in which tenants are invited to avail themselves of the eviction moratorium merely by checking a box asserting, *inter alia*, that the tenant is "experiencing financial hardship" and therefore "unable to pay" the rent owed due to

---

[3] Several courts have recently enjoined enforcement of the federal government's eviction moratorium, including a recent decision setting it aside nationwide. *See Ala. Ass'n of Realtors v. U.S. Dep't of Health & Hum. Servs.*, 2021 WL 1779282, at *3–10 (D.D.C. May 5, 2021) (agreeing with previous cases). While those decisions were rendered on different grounds than those raised here, they invalidated an eviction moratorium that is, in material respects, *less* onerous than CEEFPA's regime, in recognition of the overreach inherent in such moratoria.

COVID-19, or that vacating the premises would pose a "significant health risk." CEEFPA Part A § 1(4). Landlords must also provide tenants with a government-curated "list of . . . legal service providers" who are available to assist the tenants in seeking to avoid eviction. *Id*. § 3. In essence, the State is forcing property owners to speak in support of a government eviction moratorium program with which they disagree and to recommend specific legal organizations whose aim and advice are squarely adverse to landlords' interests. This is unconstitutional compelled speech. *See, e.g.*, *Nat'l Inst. of Family & Life Advocs. v. Becerra,* 138 S. Ct. 2361, 2371 (2018) (requiring party to provide a "government-drafted script about the availability of state-sponsored services" likely violates First Amendment); *All. for Open Soc'y Int'l, Inc. v. U.S. Agency for Int'l Dev.*, 651 F.3d 218, 230 (2d Cir. 2011) (enjoining policy that would unconstitutionally compel plaintiffs to "espouse the government's position"), *aff'd sub nom. Agency for Int'l Dev. v. All. For Open Soc'y Int'l, Inc.*, 570 U.S. 205 (2013).

CEEFPA is all the more egregious because the government could simply provide the forms directly to tenants. There is no justification for coopting property owners as its mouthpieces. Not only that, but property owners are also required to pay for the printing and mailing of these lists and forms, and to arrange and pay for the translation of the forms into certain languages spoken by their tenants, compounding the burden placed on them. *See PSEG Long Island LLC v. Town of N. Hempstead*, 158 F. Supp. 3d 149, 168 (E.D.N.Y. Feb. 3, 2016) (law unconstitutionally compels speech where the government "chose to forego [less restrictive] alternatives in favor of a law that not only compels the Plaintiffs to carry [its] specific message as if it were their own, but also to bear the associated costs of doing so").[4]

---

[4] Indeed, in an earlier case brought by some of these same plaintiffs challenging the original CEEFPA statute, Judge Feuerstein observed during a preliminary injunction hearing that CEEFPA's mandate requiring landlords to send hardship declarations to tenants "puts an additional burden on the [landlord] plaintiff[s]," and she further

*(Cont'd on next page)*

*Second*, CEEFPA Part A is void for vagueness under the federal and state Due Process clauses. It enables tenants to avoid eviction and forsake their rental obligations by declaring "hardship" based on undefined "[s]significant loss of household income," "[i]ncrease in necessary out-of-pocket expenses," and "other circumstances" purportedly related to the COVID-19 pandemic, among other vague categories. The statute thus fails to give property owners notice of the circumstances under which tenants will be exempted from state-law eviction remedies and no realistic means of predictable implementation. *See, e.g.*, *F.C.C. v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012) (due process requires that "regulated parties should know what is required of them so they may act accordingly"). The statute does not even require that tenants identify the category of "financial hardship" that they assert applies to them. All of this "authorizes or encourages arbitrary and discriminatory enforcement," by failing to provide any "standard that can be objectively applied" to determine compliance. *Cunney v. Bd. of Trustees of Vill. of Grand View*, 660 F.3d 612, 621-22 (2d Cir. 2011) (citations and internal quotations omitted).

*Third*, Part A of CEEFPA violates property owners' procedural due process rights under the federal and state Due Process clauses by providing them with *no way* to challenge or verify tenants' declarations of hardship, which automatically bar and stay eviction proceedings. *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976) ("The fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner.") (citation and internal

---

noted that she was "not seeing why they should have the burden of notifying their tenants." Ex. 9 at 10:4–8. She added that "the government should be the one to approach these individuals and give them an opportunity to explain why they should not be penalized for not paying their rent or some other reason," and that "there is no manner included that permits a review of checking off a box without any explanation or documentation." *Id.* at 10:9–23. After Judge Feuerstein's tragic death, that case was reassigned and, then, dismissed on grounds unrelated to the merits of the dispute—the court found that the Attorney General was not a proper party defendant—thereby mooting the preliminary injunction motion. Plaintiffs now correct that technical defect, naming several proper defendants responsible for enforcing this statute, and renew their application for a preliminary injunction for the reasons cited during that prior hearing, among others.

quotation marks omitted).  Property owners are blocked from exercising their rights by nothing more than tenants' say-so.  The Hardship Declaration thus is a recipe and opportunity for abuse.

*Fourth*, CEEFPA Part A violates Plaintiffs' First Amendment right to petition (and its state corollary), which has long been interpreted to protect access to the courts.  *See, e.g.*, *Bill Johnson's Rests., Inc. v. N.L.R.B.*, 461 U.S. 731, 741 (1983).  By categorically barring the filing and prosecution of summary eviction proceedings until at least August 31, 2021 in almost all cases in which a tenant submits a Hardship Declaration, CEEFPA tramples on property owners' rights to obtain redress through the courts.

If CEEFPA Part A is not enjoined, Plaintiffs will face irreparable harm through the continued violation of their constitutional rights.  As the Supreme Court recently held, "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury," *Roman Catholic Diocese of Brooklyn, N.Y. v. Cuomo*, 141 S. Ct. 63, 68 (2020) (per curiam) (citation and internal quotation marks omitted), and "a presumption of irreparable injury . . . flow[s] from a violation of constitutional rights," *Agudath Israel of Am. v. Cuomo*, 983 F.3d 620, 636 (2d Cir. 2020) (citation and internal quotation marks omitted).  And those are not the only irreparable harms Plaintiffs face.  Plaintiff Cohen, a retiree on Social Security, fears she will lose the unit she has owned since 1987 because she cannot cover the expenses of ownership without replacing her non-paying tenant.  Cohen Decl. ¶¶ 1, 11.  Many RSA members are on the verge of losing their properties for the same reason.  Strasburg Decl. ¶ 10.  And CEEFPA is "literally forcing [Plaintiff LaCasse] to risk [her] life in order to make ends meet."  LaCasse Decl. ¶ 10.  Plaintiff LaCasse, who is immunocompromised, has been forced to take another job to cover her costs (and may have to take another) because she has tenants who have not paid rent in months.  LaCasse Decl. ¶¶ 1, 10.  Not only that, her fiancé has asked her to leave the house they currently

share, yet she cannot move into her own single-family home because of the eviction moratorium—despite the tenants' expired lease. LaCasse Decl. ¶ 14. Plaintiffs Shi and Zhou "can no longer pay the rent on the house [they] are currently living in," but similarly cannot evict their non-paying and lease-expired tenants so they can move into the single-family house they own. Shi Decl. ¶ 12. And Plaintiff Chrysafis, who wishes to sell the single-family house that he rents out (to non-paying tenants), was forced to borrow money from his elderly parents to retire a mortgage and pay taxes on his property, causing significant strife within the family, and may have no choice but to do so again. Vekiarellis Decl. ¶ 11. And with each passing month, it becomes less and less likely property owners like Plaintiffs will be able recover *any* back rent once evictions resume, as the amounts owed reach astronomical sums. Shi and Zhou are owed $57,600 in back rent, and counting. Shi Decl. ¶ 11. Chrysafis is owed more than $80,000. Vekiarellis Decl. ¶ 15.

Finally, the balance of hardships and public interest strongly favor injunctive relief. The COVID-19 pandemic has been present in this country for more than a year. Plaintiffs take the pandemic—and the threat it poses—extremely seriously. But as the Supreme Court made clear in granting an emergency injunction to protect First Amendment rights, "even in a pandemic, the Constitution cannot be put away and forgotten." *Roman Catholic Diocese*, 141 S. Ct. at 68. As the Second Circuit subsequently explained in barring enforcement of unconstitutional restrictions that the State claimed were necessary to combat the pandemic, "[n]o public interest is served by maintaining an unconstitutional policy when constitutional alternatives are available to achieve the same goal," *Agudath Israel*, 983 F.3d at 637. That is particularly true now, when New York has begun to resume normal life, COVID-19 vaccinations are available to all of New York's adult residents, and other, far more narrowly tailored eviction restrictions have been put in place by the

State.  This Court should thus issue a preliminary injunction enjoining enforcement of CEEFPA

Part A until such time as the Court resolves Plaintiffs' application for ultimate relief in this case.

## FACTUAL BACKGROUND

### I.     Governor Cuomo Issued A Temporary Eviction Moratorium.

On March 20, 2020, Governor Cuomo issued Executive Order No. 202.8, which imposed

a 90-day blanket eviction moratorium applicable to residential and commercial tenants.  *See* Ex.

4.  On May 7, 2020, Governor Cuomo extended the eviction moratorium until August 19, 2020

for tenants whose default was caused by financial hardship "due to COVID-19."  *See* Ex. 5

(Executive Order No. 202.28).

On June 30, 2020, the State enacted the Tenant Safe Harbor Act ("TSHA"), which further

extended the eviction moratorium for residential properties.  *See* Ex. 6 (2020 Sess. Law News of

N.Y. Ch. 127 (S. 8192-B)).  TSHA prohibits eviction of a non-paying residential tenant who raises

a "financial hardship" defense during a summary proceeding.  TSHA gave landlords recourse in

court to challenge a tenant's claim of financial hardship.  Courts were instructed to consider a

number of factors, such as the tenant's income before and after COVID-19, liquid assets, and

public welfare benefits.  TSHA's eviction prohibition is set to expire once no part of the county in

which a tenant resides is shut down due to COVID-19 restrictions, but the inquiry it directs courts

to undertake has now been limited by CEEFPA, as discussed below.

### II.    CEEFPA Extended And Expanded The Eviction Moratorium.

Signed into law on December 28, 2020, CEEFPA immediately stayed for sixty days all

pending residential eviction proceedings, even those that began on or before March 7, 2020.

CEEFPA also mandates that property owners provide their tenants with a Hardship Declaration

prior to commencing or continuing any eviction proceedings.  CEEFPA Part A § 3.  The statute

provides that if a tenant submits a Hardship Declaration, eviction proceedings—both pending and new—are to be stayed. Prior to the CEEFPA Extension, the stay would not expire until at least May 1, 2021 (and now, will not expire until at least August 31, 2021).

The Hardship Declaration consists of (1) a declaration form ("Declaration Form") explaining that a completed, signed declaration will bar any eviction proceedings until a certain date (now August 31, 2021); (2) a "pre-eviction notice"—which consists of "a list of all not-for-profit legal service providers actively handling housing matters in the county where the subject premises are located," prepared by the Office of Court Administration; and (3) a return address for the Declaration Form. *Id.* § 3; Ex. 7 (Hardship Declaration). CEEFPA compels landlords to provide tenants with a Hardship Declaration "with every written rent demand for rent." CEEFPA Part A § 3. The New York Office of Court Administration is obligated to produce translated Declaration Forms in "Spanish and the six most common languages in the City of New York, after Spanish," *id.* § 10, while it is "the landlord's responsibility to obtain a suitable translation of the hardship declaration in the tenant's primary language," *id.* § 3, if the tenant's "primary language" is not one of the seven. CEEFPA contains no mechanism by which property owners can seek reimbursement. Nor does it free them from anti-discrimination laws that forbid landlords from asking their tenants information about their national origin. Yet they must somehow determine their tenants' "primary language," engage a reliable translation service if that language is anything other than the languages translated by the State, and cover the cost of translation.

The Declaration Form, the text of which is set out in CEEFPA itself, asks tenants to "select[]" one or both "option[s]" via checking a box—either that they are "experiencing financial hardship . . . during the COVID-19 pandemic" or that "moving . . . would pose a significant health risk"—to qualify for a stay of existing eviction proceedings or a suspension of new proceedings.

CEEFPA Part A § 1(4).  A tenant need only "select[]" one of the options, without explaining more, to submit a valid Declaration Form.  While the form contains a "notice" clause informing the tenant that he or she is "signing and submitting the form under penalty of law," *id.*, there is no requirement to attach corroborating documents to support the category chosen, and no requirement that the form be submitted under penalty of perjury.  *Cf., e.g.*, *id.* § 4 ("If there is no pending eviction proceeding and a tenant provides a hardship declaration to the landlord, there shall be no initiation of an eviction proceeding against the tenant until at least August 31, 2021. . . .").

The Declaration Form lays out five possible grounds for meeting the financial hardship option—that is, grounds on which the tenant can assert that he or she is "unable to pay [his or her] rent or other financial obligation under the lease in full": (1) a "significant loss of household income," (2) increasing "necessary out-of-pocket expenses related to performing essential work or related to health impacts," (3) "childcare [or other familial care] responsibilities . . . negatively affect[ing]" the ability "to obtain meaningful employment" or "increas[ing] necessary out-of-pocket expenses," (4) "moving expenses and difficulty [the tenant has] securing alternative housing," or (5) a catch-all category of "[o]ther circumstances related to [ ] COVID-19" that have "negatively affected" the tenant's ability "to obtain meaningful employment or earn income or have significantly reduced [the tenant's] household income or significantly increased [] expenses." *Id.* § 1(4).  Tenants are not required to identify the particular subcategory the tenant claims applies. *See* Ex. 7.  Therefore, property owners receiving completed Declaration Forms are not even informed of the specific asserted justification for the tenant's non-payment.

Tenants are instructed to return the Declaration Form to the landlord or, if an eviction proceeding has already commenced, to the courts.  Unless landlords like the Property-Owner Plaintiffs and RSA's members file an affidavit with the court signed under penalty of perjury

demonstrating that they have delivered a copy of the Hardship Declaration to a tenant—including the "manner in which the petitioner[-landlord] or the petitioner[-landlord]'s agent served a copy of the hardship declaration" and whether it was served both "in English and the tenant's primary language"—and attest that they have not "received" a completed Declaration Form in response, no landlord may commence an eviction proceeding. CEEFPA Part A § 5.

Though the law does not require confirmation or corroboration of the tenant's affirmations in a Declaration Form, property owners are unable to commence an eviction without a two-step inquiry: Once the court receives the landlord's affidavit in satisfaction of Part A § 5, it must first separately "determine whether a copy of the hardship declaration" in the appropriate language(s) "is annexed to the served notice of the petitioner," and second "seek confirmation on the record . . . that the [tenant] has received" the Hardship Declaration and has not returned a Declaration Form back to the landlord, the landlord's agent, or the court. *Id.* § 5(2). Upon receipt of a tenant's Declaration Form, courts are directed to further toll the commencement of any new proceedings until the moratorium period expires. *Id.* § 4. Receipt of a completed Declaration Form effectively freezes ongoing eviction proceedings and certain already-issued eviction warrants until that date.

Under CEEFPA, the submission of a Declaration Form with the financial hardship option selected will create a "rebuttable presumption that the tenant is experiencing financial hardship" under the TSHA, an executive order, or other state or local laws—even after August 31. CEEFPA Part A § 11. This provision, together with the stay of proceedings, effectively eliminates what little opportunity landlords had to check claims of financial hardship under the TSHA. *See supra* at 7–8. The new law is silent on what type of evidence, if any, would rebut the presumption, or in what manner or forum such evidence may be submitted.

CEEFPA also vacates any default judgments authorizing an eviction in a residential eviction matter prior to December 28, 2020. CEEFPA Part A § 7. The matters underlying the vacated judgments can be restored to the court calendar for a new hearing solely upon the tenant's request, or else the judgments will remain vacated. No new default judgments or authorizations to enforce already issued eviction warrants can be issued before August 31, 2021 (following the CEEFPA Extension). Even if property owners wish to proceed, they must make a motion with the court and participate in an initial hearing. *Id.* §§ 7, 8. But the reality remains that only two exceptions can change the outcome for landlords. The matter may continue on from an initial hearing to a summary proceeding only if the landlord can either "establish" that the tenant is exhibiting behavior equivalent to a nuisance or if the tenant fails to return a Declaration Form after being provided with one by the landlord. *Id.* § 9. In all other instances, the matter is stayed. Even if a judgment *based on* nuisance was awarded to a landlord prior to December 28, 2020, courts must hold another hearing to essentially redetermine whether the tenant's unreasonable behavior has persisted further. *Id.* § 9(2). In any case, the nuisance exception is so narrow that zero residential evictions have taken place in New York City in 2021. *See* Ex. 8.

III. **CEEFPA Permits Hardship Declarations Based On Undefined Hardship Categories And Gives Landlords No Ability To Review Such Claims.**

As described above, CEEFPA sets out a number of vague and undefined categories of hardship that a tenant can claim. *See* CEEFPA Part A § 1(4). Exacerbating the problematic vagueness of these categories, CEEFPA permits a tenant to declare hardship based on an assertion that "other circumstances related to the COVID-19 pandemic" affect tenants' "ability to obtain meaningful employment or earn income," "significantly reduce[ their] household income," or "significantly increase" their expenses. *Id.* The law provides no definitions for any of these terms.

Compounding the issue, the law provides no mechanism for landlords to determine in eviction proceedings—let alone contest—the reasons for a declaration of hardship. Where a tenant submits a Declaration Form to the property owner, "there shall be no initiation of an eviction proceeding against the tenant" until August 31. CEEFPA Part A § 4. CEEFPA provides that "no court shall accept for filing" any eviction petition or other filing unless a landlord files an affidavit under penalty of perjury attesting that it (and its agents) have not received a Hardship Declaration or that the CEEFPA's narrow nuisance exception applies. *Id.* § 5(1). Similarly, an in-progress eviction proceeding is automatically stayed upon filing of a Hardship Declaration until (now) at least August 31, 2021, and where an eviction warrant has been issued it may not be executed until at least the same date. *Id.* §§ 6, 8. Thus, property owners are for all practical purposes powerless to challenge, in an eviction proceeding, a tenant's representation of hardship.

Each of the vague provision's infirmities are aggravated by the fact that a tenant's claim of financial hardship will create a rebuttable presumption of financial hardship in proceedings involving a defense under the TSHA, an executive order, or "any other local or state law, order or regulation restricting the eviction of a tenant suffering from a financial hardship during or due to COVID-19." CEEFPA Part A § 11. CEEFPA provides no explanation for the process or substantive standards by which the financial hardship presumption could be rebutted, rendering the already ill-defined categories hopelessly vague as to the covered proceedings. Unlike many of CEEFPA's provisions, the rebuttable presumption provision does not contain an end date.

## IV. The Property-Owner Plaintiffs Challenged CEEFPA's Constitutionality.

In response to CEEFPA's enactment in December 2020, the Property-Owner Plaintiffs filed suit in this District on February 24, 2021, challenging the statute's constitutionality on largely the same bases as alleged here and naming New York Attorney General Letitia James as the defendant. *See Chrysafis v. James*, No. 2:21-cv-998 (E.D.N.Y.) ("*Chrysafis I*"). The case was

assigned to the late Judge Feuerstein, and Property-Owner Plaintiffs moved by order to show cause for a temporary restraining order and preliminary injunction. After expedited briefing, Judge Feuerstein held a March 16 hearing on Plaintiffs' order to show cause. *See* Ex. 9.

During the hearing, in addition to the critical comments noted above, *see supra* n.4, the Court observed that CEEFPA's translation requirement is "somewhat burdensome" on property owners, "to say the least," and noted that the statute's Hardship Declaration requirement "rel[ies] on a box to be checked off without any explanation and very broad permission to stop paying rent, which is not really focused and not specific." Ex. 9 at 10:15–23. Finally, Judge Feuerstein questioned "why . . . the burden is entirely on the landlord" rather than "the one seeking to be excused from their contractual liabilities . . . ." *Id.* at 11:7–11. Counsel for the Attorney General stated that the law was intended to achieve a "public health goal" of "preventing mass evictions," which "was crucial for the time being." *Id.* at 11:12–12:4. The Court pressed the Attorney General's counsel on "where we are now" and whether CEEFPA would be renewed. *Id.* at 12:5–11. Counsel's response was that, while an extension would be up to the legislature, "it appears that the concerns that brought about the May 1 date will no longer be in play." *Id.* at 12:12–25.

At the end of the hearing, Judge Feuerstein ordered full briefing, in the form of a motion to dismiss, on the Attorney General's argument that she was not a proper defendant because she is not sufficiently responsible for enforcing CEEFPA, raised in opposition to the Property-Owner Plaintiffs' motion. Accordingly, the Attorney General moved to dismiss the case on that sole basis. *Chrysafis I*, Dkt. 27. After Judge Feuerstein's tragic death, the case was reassigned to Judge Joanna Seybert on April 12. On April 14, Judge Seybert granted the motion to dismiss, concluding that the Court lacked subject matter jurisdiction because the Attorney General was not a proper

defendant. *Chrysafis I*, Dkt. 34. The Court denied as moot the motion for preliminary relief and did not reach the merits of the Property-Owner Plaintiffs' constitutional challenge. *Id.* at 38 n.15.

Meanwhile, in April 2021, the State legislature enacted a budget allocating more than $2 billion in federal rent relief funds that New York received in December 2020. *See* 2021 Sess. Laws of N.Y. Ch. 56 (A. 3006-C), Part BB, Subpart A §§ 5, 8. Under the State's rent relief scheme, a New York tenant household is eligible for assistance—and accompanying protections against eviction—if it meets certain income requirements, someone in the household is eligible for unemployment or has suffered a loss of income or increase in costs related to COVID-19, and the household demonstrates a risk of homelessness or housing instability. *Id.* While the State's rent-relief eviction restrictions may suffer from their own legal defects and shortcomings (there is no guarantee that the funds will make landlords whole), the fact that the State's scheme prioritizes low-income tenants, the unemployed, and other specific populations; employs income requirements or cut-offs; and links stays of eviction to applications for rent relief funds demonstrates that CEEFPA's regime is overbroad, insufficiently tailored, and unnecessary.

## V. CEEFPA Was Extended For At Least Four More Months, Exacerbating Its Unconstitutional Effects And Irreparable Harms To Plaintiffs.

On May 4, 2021, Governor Cuomo signed the CEEFPA Extension into law. The CEEFPA Extension retroactively extends the effective date of the CEEFPA provisions expiring on May 1 "until at least" August 31, but otherwise extends the law's provisions unchanged.

As small-scale property owners in New York and a trade association representing the residential real estate industry, CEEFPA will continue to harm Plaintiffs if it is not enjoined.

Plaintiff Pantelis Chrysafis owns a single family home in Garden City, New York. Vekiarellis Decl. ¶ 1. After his tenants stopped paying rent in early 2019, Chrysafis was forced to file suit, and he received a judgment and warrant of eviction in February 2020 requiring the tenants

to vacate the property by April 1, 2020. Vekiarellis Decl. ¶¶ 6–8. But Chrysafis's tenants remain in the home because of the eviction moratoria, and they have not paid rent in almost a year and a half, totaling over $80,000 in back rent. Vekiarellis Decl. ¶ 15. Chrysafis's inability to evict the tenants or collect back rent has caused strife in his family, and he has been forced to borrow money from his elderly parents to stay afloat. Vekiarellis Decl. ¶ 11.

Plaintiff Brandie LaCasse owns a single-family home in Rhinebeck, New York that she currently rents out to tenants. LaCasse Decl. ¶ 2. The tenants—who have caused an estimated $15,000 of damage to the property—stopped paying rent after LaCasse served them with a notice of nonrenewal in November 2020, when she decided to sell the property. LaCasse Decl. ¶¶ 2, 3. LaCasse filed a proceeding to remove the tenants in December, before CEEFPA took effect, but her case was dismissed because of CEEFPA's Hardship Declaration requirements. LaCasse Decl. ¶¶ 4–5. Despite the fact that their financial situation seems to be unaffected by COVID-19, the tenants subsequently submitted a Hardship Declaration. LaCasse Decl. ¶¶ 6–7. LaCasse has now been forced to take an additional job to cover her expenses—despite being immunocompromised from a disability related to her military service—increasing her risk of being infected by COVID-19. LaCasse Decl. ¶¶ 10. To date, she is owed approximately $15,000 in unpaid rent. LaCasse Decl. ¶ 9. To make matters worse, LaCasse's fiancé has recently asked her and her daughter to move out of his home, in which they are currently staying, but she has been unable to move into the Rhinebeck property. LaCasse Decl. ¶ 14. As a result, LaCasse and her daughter have been forced to remain in her fiancé's home despite his requests that she find a new place to live. *Id.*

Plaintiff Betty S. Cohen is owed over $21,000 in back rent from a tenant living in her Brooklyn, New York co-op unit, who stopped paying rent in March 2020. Cohen Decl. ¶¶ 1–2. In September 2020, Cohen commenced a nonpayment suit, but her suit will be unable to go forward

because her tenant filed a Hardship Declaration on February 4, 2021. Cohen Decl. ¶¶ 6, 7. Because of the financial losses she has suffered, Cohen—who is retired—has had to take out a $10,900 loan and rely on donations from friends. Cohen Decl. ¶¶ 2, 8. She cannot afford the costs of her unit and fears that she will lose it altogether. Cohen Decl. ¶ 11.

Plaintiffs Feng Zhou and Mudan Shi, a married couple, are owed more than $57,600 in back rent from a tenant living in their single family home who stopped paying rent in April 2019. Shi Decl. ¶¶ 1, 4, 11. Despite filing an eviction proceeding in October 2019 and struggling to pay their own rent for the separate rental unit in which they live with their young children and elderly parents, Zhou and Shi have been unable to remove the tenant. Shi Decl. ¶¶ 3, 6, 10.

Plaintiff RSA is the largest New York trade association dedicated to protecting and serving the interest of the residential housing industry, and it has approximately 25,000 members, comprised primarily of property owners. Strasburg Decl. ¶¶ 1–2. Many of RSA's members have been devastated by CEEFPA's provisions, and some are on the brink of financial ruin and at risk of losing their buildings properties they have not received rent for a year or more and are struggling to cover their own expenses. Strasburg Decl. ¶ 10.

## LEGAL STANDARD

Preliminary or emergency injunctive relief is warranted where the plaintiff demonstrates irreparable harm and shows either (a) a likelihood of success on the merits, or (b) sufficiently serious questions going to the merits and a balance of hardships tipping decidedly in the plaintiff's favor. *Jolly v. Coughlin*, 76 F.3d 468, 473 (2d Cir. 1996). Courts also consider whether the public interest favors an injunction. *Id.* When the government is the defendant, the "balance of hardships" and "public interest" factors "merge." *725 Eatery Corp. v. City of New York*, 408 F. Supp. 3d 424, 469 (S.D.N.Y. 2019). A likelihood of success requires a greater than fifty percent

probability of success, whereas the "serious questions" standard applies where the court "cannot determine with certainty that the moving party is more likely than not to prevail . . . , but where the costs outweigh the benefits of not granting the injunction." *Citigroup Glob. Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 34–35 (2d Cir. 2010).

## ARGUMENT

### I.    Plaintiffs Will Be Irreparably Harmed Absent Injunctive Relief.

If enforcement of CEEFPA is not enjoined, Plaintiffs will face irreparable harm through the continued violation of their constitutional rights. As the Supreme Court has recently reiterated, "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Roman Catholic Diocese*, 141 S. Ct. at 68. This is because "[p]recious first amendment liberties would be rendered all but meaningless if those rights could be restricted even for short periods of time." *Abdul Wali v. Coughlin*, 754 F.2d 1015, 1026 (2d Cir. 1985). The same is true of the deprivation of other constitutional rights. *See Jolly*, 76 F.3d at 482 (noting presumption of irreparable injury from constitutional violation and granting injunctive relief); *see also, e.g.*, *Agudath Israel*, 983 F.3d at 636 ("[A] presumption of irreparable injury . . . flows from a violation of constitutional rights.") *citing Jolly*, 76 F.3d at 482. With each passing day, CEEFPA is causing Plaintiffs and many other landlords to be deprived of rights guaranteed to them by the New York and U.S. Constitutions, including: forcing Plaintiffs Chrysafis, Shi, and Zhou to deliver the government's message by providing the Hardship Declaration and list of government-approved legal service providers to their tenants, in violation of their First Amendment right against compelled speech, *see* Vekiarellis Decl. ¶ 16; Shi Decl. ¶ 10; depriving Plaintiffs Cohen and LaCasse of any opportunity to contest the vague assertions in the Declaration Forms submitted to them, in violation of their Due Process rights, *see* Cohen Decl. ¶ 7; LaCasse

Decl. ¶ 8; and barring Plaintiff LaCasse from re-filing suit to evict her non-paying and held-over tenants until September, violating the Petition Clause, *see* LaCasse Decl. ¶ 6.  Many of RSA's members face similar deprivations of their constitutional rights.  Strasburg Decl. ¶¶ 7–12.

In addition to these constitutional infringements, which constitute *per se* irreparable harm, CEEFPA Part A will cause Plaintiffs other irreparable harms arising out of the dire circumstances in which Plaintiffs now find themselves.  Specifically:

- Plaintiff Cohen fears she will lose her property altogether, Cohen Decl. ¶ 11, and many of RSA's members are similarly on the brink of foreclosure because they are struggling to cover their ongoing monthly expenses, Strasburg Decl. ¶ 10.

- Plaintiff LaCasse, who is immunocompromised and at greater risk of severe complications from COVID, will be forced to continue "risk[ing] [her] life in order to make ends meet" by taking additional work.  LaCasse Decl. ¶ 10.  And she is unable to move into her own house because of her tenants' refusal to leave, despite the property damage they have caused and the expiration of their lease.  *Id*. ¶¶ 3, 14.

- Plaintiff Chrysafis's inability to remove his tenants has caused a "tremendous amount of strife" in his family, and will continue to, because it may require him to borrow money from his elderly parents a second time to make up some of the over $80,000 in back rent and cover his property's expenses.  Vekiarellis Decl. ¶ 12.

- Plaintiffs Shi and Zhou "can no longer pay the rent" on the property they are currently living in, yet they cannot move into their own home because their tenants—whose lease has expired—refuse to leave.  Shi Decl. ¶¶ 9–12.

These harms have only been exacerbated by CEEFPA's extension "until at least" August 31. Plaintiffs will continue to suffer irreparable harm if Part A of CEEFPA is not enjoined.

## II.     Plaintiffs Are Likely To Succeed On The Merits Of Each Of Their Claims.

Plaintiffs are likely to succeed in demonstrating that CEEFPA Part A is unconstitutional on its face and as applied to Plaintiffs for multiple reasons, as described below.[5]

---

[5] Since the unconstitutional Hardship Declaration is at the "core" of Part A of CEEFPA and "interwoven inextricably through the entire regulatory scheme," *N.Y. State Superfund Coal. v. N.Y. State Dept. of Env't Conservation*, 75 N.Y.2d 88, 94 (1989), CEEFPA Part A is invalid in its entirety.  The Hardship Declaration is referenced dozens of times throughout Part A, including in virtually every operative provision.  It would be

*(Cont'd on next page)*

## A. CEEFPA Violates Plaintiffs' Freedom Of Speech Rights.

The First Amendment's Free Speech Clause provides that "Congress shall make no law . . . abridging the freedom of speech." U.S. Const. amend. I; *see also* N.Y. Const. art. I § 8 ("[N]o law shall be passed to restrain or abridge the liberty of speech."). The "freedom of speech prohibits the government from telling people what they must say." *All. For Open Soc'y Int'l*, 570 U.S. at 213 (citation and internal quotation marks omitted). Where, as here, a law compels noncommercial speech, *see infra* 20, that law is assessed under the strict scrutiny rubric. *See Riley v. Nat'l Fed'n of the Blind of N. Carolina, Inc.*, 487 U.S. 781, 795 (1988). "Strict scrutiny is a searching examination, and it is the government that bears the burden [of] pro[of]." *Fisher v. Univ. of Tex. at Austin*, 570 U.S. 297, 310 (2013). To survive strict scrutiny, the government bears the burden of proving that a law is "narrowly tailored to promote a compelling Government interest." *United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803, 804 (2000). "[I]f a less restrictive alternative would serve the Government's purpose, the legislature must use that alternative." *Id*. Recent decisions, including from the Supreme Court, have made clear that where strict scrutiny applies to First Amendment claims, courts may not apply a lesser standard, even if the government contends the challenged law is necessary to combat the pandemic. *See Roman Catholic Diocese*, 141 S. Ct. at 67–68 (applying First Amendment strict scrutiny to and enjoining Governor Cuomo's fixed capacity restrictions on houses of worship); *Agudath Israel*, 983 F.3d at 635 (lower court's application of more deferential standard "in the face of the COVID-19 pandemic" "was misplaced").

---

"pragmatically impossible, as well as jurisprudentially unsound," for the court to "attempt to identify and excise" the Hardship Declaration while "leaving the remainder of" CEEFPA Part A intact. *Boreali v. Axelrod*, 71 N.Y.2d 1, 14 (1987); *see also Nat'l Advert. Co. v. Town of Babylon*, 900 F.2d 551, 557 (2d Cir. 1990) (finding constitutional and unconstitutional provisions of town ordinance restricting commercial speech could not be severed from one another because were inextricably interwoven).

With its mandate that landlords must provide notices to their tenants—using language dictated by the government—with every demand for rent, commencement of eviction proceeding, or petition, CEEFPA forces the Property-Owner Plaintiffs and RSA's members to convey messages with which they disagree. These notices are subject to strict scrutiny because they constitute noncommercial speech. First, they do not "propose a commercial transaction," such as an advertisement or offer for sale. *PSEG Long Island LLC*, 158 F. Supp. 3d at 149 (challenge to requirement to place warning signs on utility poles subject to strict scrutiny because signs were noncommercial speech). Instead, the notices are prepared by the Office of Court Administration and include a list of legal service providers to inform tenants of potential legal options that are potentially adverse to the property owners, and make contestable assertions about tenants' alleged financial hardship and health risks. The list of legal service providers "in no way relates to the services that [landlords] provide," and worse, is *adverse* to Plaintiffs' economic interests, inviting tenants to bar their own eviction proceedings and contact providers who can assist them in avoiding rent payments. *Becerra*, 138 S. Ct. at 2372 (strict scrutiny applies where government requires a private party to provide information about "state-sponsored" services relating to a "controversial" topic that the party "oppos[es]"). Furthermore, the Hardship Declaration and list of legal service providers are not "related solely to the economic interests of the speaker and its audience." *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557, 561 (1980). Instead, as noted, the Declaration Form makes claims about tenants' alleged financial hardship and health risks and about the reputability of various legal service organizations.

The Hardship Declaration clearly infringes on Plaintiffs' First Amendment rights. The Declaration invites tenants to assert either that they are "experiencing financial hardship" and therefore "unable to pay" the rent owed, or that vacating the premises would pose a "significant

health risk." If a tenant's "primary language" is one other than English, "Spanish [or] the six most common languages in the City of New York," property owners must obtain an appropriate translations of the Declaration Form at their own expense. CEEFPA Part A §§ 3, 10. By requiring that the Property-Owner Plaintiffs and RSA's members supply this form to tenants—and arrange for its translation—CEEFPA compels them to endorse and adopt these government statements, and support its moratorium policy, even though they may disagree with the Form's characterization of tenants' financial hardship, ability to pay, or health risks, and even though they oppose the resulting eviction moratorium. In other words, by compelling landlords to supply (and in some cases, translate) the Declaration Forms, the law conveys that they have the landlords' imprimatur. Property-Owner Plaintiffs and RSA's members are thus compelled to "represent as their own an opinion . . . that they might not categorically hold." *All. for Open Soc'y Int'l, Inc.*, 651 F.3d at 237; *accord Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557 (1995). The same is true of the requirement to provide a government-prepared list of legal service organizations, which forces landlords to effectively endorse organizations whose mission they may not support, and whose activities are directly adverse to their own interests. *See Becerra*, 138 S. Ct. at 2361; *Wooley v. Maynard*, 430 U.S. 705 (1977) (requiring individuals to use their private property to broadcast State message with which they disagree violates the First Amendment).

The Hardship Declaration requirement, moreover, fails strict scrutiny because it is not narrowly tailored to the government's interest of informing tenants about their legal rights. There are multiple less restrictive alternatives available that would not infringe on Plaintiffs' speech rights. Most obviously, the State could provide the Hardship Declaration to tenants directly. Indeed, the Office of Court Administration already has mailed thousands of hardship declarations to tenants whose property owners have moved to evict them. *See* Ex. 10 (Emma Whitford, *Major*

*Takeaways From NY's New Anti-Eviction Law*, Law360 (Jan. 8, 2021)).  Alternatively, the State could conduct a public awareness campaign to ensure that tenants are adequately informed about their options, and direct tenants to the Hardship Declaration already posted on government websites.  *See* Shapiro Decl. ¶ 8; Ex. 7.  The State, however, "chose to forego these alternatives in favor of a law that not only compels the Plaintiffs to carry [its] specific message as if it were their own, but also to bear the associated costs of doing so."  *PSEG Long Island*, 158 F. Supp. 3d at 168.  Plaintiffs are likely to succeed on the merits of their compelled speech claim.  *See also supra* at 7, 14 (discussing the TSHA and the federal rent relief program).

**B.    CEEFPA Violates Plaintiffs' Substantive and Procedural Due Process Rights.**

The Fourteenth Amendment's Due Process Clause provides in part:  "[N]or shall any State deprive any person of life, liberty, or property, without due process of law."  U.S. Const. amend. 14; *see also* N.Y. Const. art. I § 6 ("No person shall be deprived of life, liberty or property without due process of law.").  "The fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner."  *Mathews*, 424 U.S. at 333  (citation and internal quotation marks omitted).  An independent but equally "fundamental" protection is that "no one may be required at peril of life, liberty or property to speculate as to the meaning of . . . statutes."  *Cunney*, 660 F.3d at 620 (citation omitted).  Pursuant to that principle, a law is unconstitutionally vague if it "authorizes or even encourages arbitrary and discriminatory enforcement," *id*. at 621, or if people do not "know what is required of them," *Fox*, 567 U.S. at 253.

CEEFPA's Hardship Declaration provision violates Plaintiffs' procedural due process rights (facially and as applied to them) because it fails to provide them with fair notice of CEEFPA's requirements, lacks sufficient standards to guide its application, and ensures that it will be arbitrarily and discriminatorily enforced.  *Kramer v. N.Y. City Bd. of Educ.*, 715 F. Supp. 2d

355, 356 (E.D.N.Y. 2010) ("The need for notice is at the heart of the vagueness doctrine."). CEEFPA's failure to define phrases including but not limited to "other circumstances," "meaningful employment," "significantly increase," and "significantly reduce" render the hardship categories essentially meaningless, robbing Property-Owner Plaintiffs and RSA's members of fair notice of when a tenant is eligible to avoid eviction. That lack of notice is aggravated by the fact that tenants need not even specify which category applies.

Likewise, the contentless nature of the hardship categories will result in arbitrary and discriminatory enforcement, as they provide no standards to guide their application. Tenants will be free to individually determine whether the hardship categories apply. And if property owners make what law enforcement officials decide, in their unfettered discretion, are false statements about the tenant in their signed affidavit to the court seeking to rebut the vague assertions of the Hardship Declaration, property owners could face perjury charges with up to a $5,000 fine and three to five years of jail time. N.Y. Penal Law § 210, *et. seq.* The arbitrary nature of the hardship categories is compounded by the lack of any opportunity to contest tenants' Hardship Declarations. The same is true of the statute's creation of a rebuttable presumption of financial hardship in proceedings involving a defense under the TSHA, an executive order, or "any other local or state law, order or regulation restricting the eviction of a tenant suffering from a financial hardship during or due to COVID-19," as CEEFPA is silent on how the presumption may be rebutted.

CEEFPA also deprives landlords, including the Property-Owner Plaintiffs and RSA's members, of their procedural due process right to "be heard at a meaningful time and in a meaningful manner" with respect to tenants' Declaration Forms, whether premised on claimed financial hardship or purported health risks associated with relocation. *Mathews*, 424 U.S. at 333. Once a tenant submits a Declaration Form, a pending eviction proceeding is automatically stayed

until at least August 31—no questions asked.  Where an eviction warrant has been issued but not yet executed, execution is automatically stayed until at least that date.  And if a property owner has not yet initiated an eviction proceeding, she may not do so during the same period.  This inability to contest or obtain review of tenants' Declaration Form facially and as applied to Plaintiffs deprives them of their procedural due process rights—a violation made particularly severe in light of CEEFPA's vagueness and significant potential for abuse.  Because CEEFPA is both unconstitutionally vague and denies Plaintiffs their right to a meaningful hearing, Plaintiffs are likely to succeed on their claim that CEEFPA violates their due process rights.

**C.      CEEFPA Violates Plaintiffs' Right To Petition Under The First Amendment.**

The First Amendment's Petition Clause provides that "Congress shall make no law . . . abridging . . . the right of the people to petition the Government for a redress of grievances."  U.S. Const. amend 1; *see also* N.Y. Const. art. I § 9 ("No law shall be passed abridging the rights of the people . . . to petition the government, or any department thereof.").  "[T]he right of access to the courts is an aspect of the First Amendment right to petition the Government for redress of grievances," *Bill Johnson's Rests*, 461 U.S. at 741, which is "among the most precious of the liberties safeguarded by the Bill of Rights," *United Mine Workers of Am., Dist. 12 v. Ill. State Bar Ass'n*, 389 U.S. 217, 222 (1967).  Because CEEFPA completely bars a class of property owners, including the Property-Owner Plaintiffs and RSA's members, from exercising their rights to file eviction petitions with New York courts until at least August 31, 2021, as well as to prosecute existing cases, it violates their rights under the Petition Clause.  *See Christopher v. Harbury,* 536 U.S. 403, 413 (2002) (instructing that opportunity to access the courts need not have "lost for all time" to violate right to petition).  CEEFPA denies all landlords, including Property-Owner Plaintiffs and RSA's members, the opportunity to file and litigate eviction cases—making Plaintiffs likely to succeed on the merits of their Petition clause claim.  *See ACA Int'l v. Healey*,

457 F. Supp. 3d 17, 31 (D. Mass. 2020) (granting temporary restraining order against regulation barring plaintiffs from initiating debt-collection lawsuits during COVID-19 state of emergency).

## III.  The Balance Of Hardships And Public Interest Strongly Favor Injunctive Relief.

Where, as here, a plaintiff has demonstrated likelihood of success on the merits and irreparable harm, the injunction should be issued without the need to reach or evaluate the balance of hardships and the public interest.  But even if the Court were to find that Plaintiffs demonstrated only "serious questions" going to the merits—such that the balancing of hardships and public interests were relevant—those factors would weigh in favor of granting the requested injunctive relief.  First, "no public interest is served by maintaining an unconstitutional policy when constitutional alternatives are available to achieve the same goal." *Agudath Israel*, 983 F.3d at 637.  The government may have an interest in providing financial relief to tenants, but it cannot do so in an unconstitutional manner, particularly when tenants can now avail themselves of the more targeted eviction relief made available in connection with the pending release of federal relief funds.  Second, the significant harm caused to Plaintiffs, *see supra* at 17–18, and other landlords by the implementation of the Hardship Declaration and the resulting extension of the eviction moratorium weighs in favor of injunctive relief.  CEEFPA ignores the struggles faced by the Property-Owner Plaintiffs, RSA's members, and so many other small landlords as they approach a full year of not being able to obtain rental income to offset their mortgage payments, property taxes, and income.  When compared with the constitutional and other harms imposed on Plaintiffs, the government's interest in enforcing Part A of CEEFPA is minimal.

## CONCLUSION

Plaintiffs respectfully request that the Court grant their application for a preliminary injunction pending the resolution of its claims on the merits.

Dated: New York, New York
        May 7, 2021

GIBSON, DUNN & CRUTCHER LLP

By:     */s/ Randy M. Mastro*
        Randy M. Mastro
        Akiva Shapiro
        200 Park Avenue
        New York, NY 10166
        Tel.:  (212) 351-4000
        rmastro@gibsondunn.com
        ashapiro@gibsondunn.com

        *Attorneys for Plaintiffs*