# UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| **PANTELIS CHRYSAFIS, BETTY COHEN, BRANDIE LACASSE, MUDAN SHI, FENG ZHOU, and RENT STABILIZATION ASSOCIATION OF NYC, INC.,**<br><br>**Plaintiffs,**<br><br>v.<br><br>**LAWRENCE K. MARKS, et al.,**<br><br>**Defendants.** | **Case No. 21-cv-2516 (GRB-AYS))** |

## PROPOSED BRIEF OF *AMICI CURIAE*
## HOUSING COURT ANSWERS AND MAKE THE ROAD NY

LEGAL SERVICES NYC
Edward Josephson, Director of Litigation
Roland Nimis, of counsel
40 Worth Street, Suite 606
New York, NY 10013
Tel: (646) 442-3600
ejosephson@lsnyc.org
*Attorneys for Housing Court Answers*

THE LEGAL AID SOCIETY
Judith Goldiner, Esq., Attorney in Charge,
Civil Law Reform Unit
Ellen Davidson, of counsel
Amber Marshall, of counsel
199 Water Street
New York, NY 10038
Tel: 212-577-3332
jgoldiner@legal-aid.org

*Attorneys for Housing Court Answers and Make the Road NY*

## TABLE OF CONTENTS

STATEMENT OF INTEREST OF AMICI CURIAE .................................................................1

PRELIMINARY STATEMENT ........................................................................................2

ARGUMENT ...........................................................................................................3

I.  THE COVID-19 PANDEMIC HAS CREATED A HEALTH AND AFFORDABILITY
    CRISIS AMONG NEW YORK TENANTS ...................................................................3

II.  THE RESUMPTION OF EVICTIONS FOR TENANTS FACING A HARDSHIP DUE
     TO COVID-19 WOULD CREATE A HOMELESSNESS CRISIS ..................................5

III.  THE COURT SYSTEM IS NOT CAPABLE OF ADJUDICATING ALL POSSIBLE
      EVICTION CASES DURING THE ONGOING PUBLIC HEALTH EMERGENCY ......6

IV.  NEW YORK STATE HAS RECEIVED MONEY FOR RENT RELIEF AND WILL BE
     SOON AWARDING TENANTS AND LANDLORDS OVER TWO BILLION
     DOLLARS TO ADDRESS BACK RENT OBLIGATIONS.............................................8

V.  CEEFPA REGULATES THE CONDUCT OF EVICTION PROCEEDINGS AND ANY
    EFFECT ON PETITIONER'S SPEECH IS INCIDENTAL..............................................9

VI.  THE CEEFPA DOES NOT VIOLATE PLAINTIFFS' DUE PROCESS RIGHTS. ........12

A.  The CEEFPA is not unconstitutionally vague...................................................12

B.  The CEEFPA Does Not Deprive Plaintiffs of the Opportunity to be Heard on Their
    Claims........................................................................................................14

VI.  THE CEEFPA DOES NOT DEPRIVE PLAINTIFFS OF THEIR ACCESS TO THE
     COURTS. ...................................................................................................15

VII.  THE BALANCE OF THE EQUITIES FAVORS THE STATE'S INTEREST IN
      PROTECTING THE PUBLIC HEALTH IN THE MIDST OF A GLOBAL PANDEMIC.
      .................................................................................................................18

CONCLUSION .......................................................................................................21

i

# **TABLE OF AUTHORITIES**

**Cases**

*Able v. United States*, 44 F.3d 128 (2d Cir. 1995)..........................................................21
*Apartment Association of Los Angeles County, Inc. v. City of Los Angeles*, 20-CV-05193, 2020 WL 6700568 (C.D. Cal. 2020) ...................................................................................23
*Auracle Homes, LLC v. Lamont*, 478 F.Supp.3d 199 (D. Conn. 2020); .....................................23
*Baptiste v. Kennealy*, 490 F.Supp.3d 353 (D. Mass. 2020).......................................12, 19
*Borger Management v. Hernandez-Cruz*, Case No. 2020 LTB 006637, et al., (Superior Court, D.C., December 16, 2020), https://www.dccourts.gov/sites/default/files/matters-docs/General%20Order%20pdf/order-re-filing-moratorium-for-eviction-cases-12-16-20.pdf.19
*Cafeteria & Restaurant Workers v. McElroy*, 367 U.S. 886 (1961) ...........................................16
*Chambless Enterprises, LLC v. Redfield*, 3:20-cv-01455, 2020 WL 7588849 (W.D. La 2020)...22
*Christopher v. Harbury*, 536 U.S. 40 (2002) ..............................................................20
*Dexter 345 Inc. v. Cuomo*, 663 F.3d 59 (2d Cir. 2011)....................................................22
*District Of Columbia v. Towers*, No. 21-CV-34, 2021 WL 1917103 (D.C. May 13, 2021)..19, 23, 24
*Dixon Ventures, Inc. v. Department Of Health And Human Services*, No. 4:20-CV-01518 KGB, 2021 WL 1604250 (E.D. Ark. Apr. 23, 2021) ........................................................23
*Elmsford Apartment Assocs., LLC v. Cuomo*, 469 F.Supp.3d 148 (S.D.N.Y. 2020) ...................17
*Heights Apartments, LLC. v.Walz*, 20-CV-2051, 2020 WL 7828818 (D. Minn., 2020),.............18
*Inmates of Suffolk Cty. Jail v. Rouse*, 129 F.3d 649 (1st Cir. 1997) ............................17
*Jaffe v. Clarke*, 566 F. Supp. 1500, (S.D.N.Y. 1983), aff'd, 742 F.2d 1436 (2d Cir. 1984).........22
*JDP Mortg. LLC v. Gosman*, No. 19-CV-5968 (JS)(SIL), 2020 WL 8082390 (E.D.N.Y. Dec. 21, 2020)..........................................................................................................22
*Kramer v. N.Y. City Bd. of Educ.*, 715 F. Supp. 2d 355 (E.D.N.Y. 2010) ...................................16
*Lynch v. City of New York*, 589 F.3d 94 (2d Cir. 2009) ............................................21
*Mathews v. Eldridge*, 424 U.S. 319, 335 (1976)..........................................................16
*Medical Society of State of New York v. Toia*, 560 F.2d 535 (2d Cir. 1977) ...............................21
*Plaza Health Laboratories, Inc. v. Perales*, 878 F.2d 577 (2d Cir. 1989) ...................................21
*Rubin v. Garvin*, 544 F.3d 461 (2d Cir. 2008) ..........................................................15
*Rumsfeld v. Forum for Acad. & Institutional Rights., Inc.*, 547 U.S. 47, 126 S. Ct. 1297, 164 L. Ed. 2d 156 (2006) ...........................................................................11, 12
*Sorrell v. IMS Health Inc.*, 564 U.S. 552, 131 S. Ct. 2653, 180 L. Ed. 544 (2011).....................11
*Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489 (1982) ......................15
*VIP of Berlin, LLC v. Town of Berlin*, 593 F.3d 179 (2d Cir. 2010)............................................15
*Zauderer v. Office of Disciplinary Counsel*, 471 U.S. 626, 651 (1985)........................................12

**Statutes**

22 NYCRR § 208.42 .................................................................................................14
COVID-19 Emergency Rental Assistance Program of 2021 (ERAP), https://www.nysenate.gov/legislation/bills/2021/s2506/amendment/original ...........................9
N.Y. Rent Stabilization Law (N.Y.C. Admin. Code) § 26-511(c)(9) ...........................................15
N.Y.C. Rent Stabilization Code (9 N.Y.C.R.R.) § 2523.4 ........................................................16

**Other Authorities**

Biden Administration Moves to Speed Aid to Renters," N.Y. Times, May 7, 2021.
https://www.nytimes.com/2021/05/07/us/politics/renters-aid-biden-
pandemic.html?searchResultPosition=2 .................................................................................10

Chief Judge, Janet DiFiore, State of Our Judiciary, 2021, March 2, 2021, page 3,
https://www.nycourts.gov/whatsnew/pdf/21_SOJ-Speech.pdf ...................................................8

COVID-19 Dashboard by the Center for Systems Science and Engineering (CSSE) at Johns
Hopkins University (JHU). https://gisanddata.maps.arcgis.com/apps/opsdashboard/index
.html#/bda7594740fd40299423467b48e9ecf6 (last visited June 17, 2020)................................3

Ctr. for Budget and Policy Priorities, *New York Federal Rental Assistance Fact Sheet* (Dec. 10,
2019), https://www.cbpp.org/research/housing/federal-rental-assistance-fact-sheets#NY.........7

Law 360, "NY Rent Relief Yet To Drop As Eviction Law Winds Down," April 22, 2021.
https://www.law360.com/articles/1378058/ny-rent-relief-yet-to-drop-as-eviction-law-winds-
down ..........................................................................................................................................10

Mihir Zaveri, *New ZIP code data reflects disparities in N.Y.C's vaccination effort, officials say.*
(February 16, 2021), https://www.nytimes.com/2021/02/16/nyregion/nyc-covid-vaccine-zip-
codes.html....................................................................................................................................6

New York Coronavirus Map and Case Count, https://www.nytimes.com/interactive/2020/us
/new-york-coronavirus-cases.html#county (last visited June 17, 2020) .....................................4

*Number of Unemployment Insurance Beneficiaries and Benefits Amount Paid – December 2019*,
New York State Department of Labor, https://labor.ny.gov/stats/UI/Beneficiaries-and-
Amounts-by-Region-and-County-December-2019.pdf................................................................5

*Number of Unemployment Insurance Beneficiaries and Benefits Amount Paid – December 2020*,
New York State Department of Labor, https://labor.ny.gov/stats/UI/Beneficiaries-and-
Amounts-by-Region-and-County-December-2020.pdf................................................................5

*Number of Unemployment Insurance Beneficiaries and Benefits Amount Paid – January 2021*,
New York State Department of Labor, https://labor.ny.gov/stats/UI/Beneficiaries-and-
Amounts-by-Region-and-County-January-2021.pdf...................................................................5

NY Times, "Covid-19: Governor of Michigan, Battling Virus Surge, Again Calls for More
Vaccine Supplies," May 7, 2021. https://www.nytimes.com/live/2021/04/11/world/covid-
vaccine-coronavirus-cases (last visited May 11, 2021)...............................................................4

Remote Housing Court Hearings Strain Internet-Deprived Tenants Taking on Landlords," The
City, April 13, 2021, https://www.thecity.nyc/bronx/2021/4/13/22378833/remote-housing-
court-internet-deprived-bronx-tenants (last visited May 11, 2021)..............................................8

Scott Stringer, Census and the City: Overcoming NYC's Digital Divide in the 2020 Census,
Office of the New York City Comptroller (July 2019), at 5. https://comptroller.nyc.gov/wp-
content/uploads/documents/Census_and_The_City_Overcoming_NYC_Digital_Divide_Censu
s.pdf. ...........................................................................................................................................8

Shelly Nortz, *Testimony on the Disparate Impact of COVID-19 on Homeless People in New York
City before the NYS Legislature*, Coal. for the Homeless (May 18, 2020), https://
www.coalitionforthehomeless.org/wp-content/uploads/2020/05/COVID-
19TestimonyMay182020.pdf (age-adjusted mortality rate of homeless residents in NYC
shelters is 56% higher than rate for other New York City residents)..........................................7

Tamaz Cajner, *et al.*, *The U.S. Labor Market During the Beginning of the Pandemic Recession*,
    Nat'l Bureau of Econ. Research, https://www.nber.org/papers/w27159.pdf ............................5

*Vaccine Demographic Data – Race & Ethnicity*, New York State Department of Health,
    https://covid19vaccine.health.ny.gov/vaccine-demographic-data (last visited May 10, 2021). .6

## STATEMENT OF INTEREST OF AMICI CURIAE

*Amici curiae* are non-profit organizations that represent low-income tenants throughout the state of New York who would be at imminent risk of eviction if the provisions of the Emergency Eviction and Foreclosure Prevention Act challenged by Plaintiffs were found to be unconstitutional. *Amici* have a special interest and substantial expertise regarding evictions and low-income tenants in New York.

**Housing Court Answers ("HCA")** was founded in 1981 to provide legal information to *pro se* litigants in New York City's Housing Courts. HCA staffs tables at all of New York City's Housing Courts, providing information, answers to questions and advice to unrepresented litigants. Additionally, HCA operates a Hotline to explain housing court procedures to *pro se* litigants and to provide information about rent arrears assistance.

**Make The Road New York ("MTRNY")** is a nonprofit membership organization with offices and service centers in Brooklyn, Queens, Staten Island, Suffolk County, and White Plains. MTRNY's mission is to build the power of immigrant and working class communities to achieve dignity and justice. To achieve this mission, they engage in four core strategies: Legal and Survival Services, Transformative Education, Community Organizing and Policy Innovation. MTRNY has more than 22,000 members who reside in New York City, Long Island and Westchester County. Annually, 400 MTRNY members receive legal services to prevent evictions and repair unsafe housing.  Their community organizers educate our members as to their rights as tenants and support them advocating for their own rights.  Since the pandemic, many of MTRNY's members have lost their jobs and have fallen behind in rent.

1

## PRELIMINARY STATEMENT

On April 8, 2021, the New York State Legislature created the COVID-19 Emergency Rental Assistance Program of 2021 (ERAP), designed to distribute $2.3 billion in federal assistance to landlords and tenants financially impacted by the global pandemic.  The legislation directs the State Office of Temporary and Disability Assistance (OTDA) to create an on-line application portal and draft procedures and regulations to ensure that the federal funds are distributed quickly and equitably throughout the State.

Recognizing that distribution of $2.3 billion could not be commenced much less completed before the May 1 expiration of the State's eviction moratorium, and fearing that tenants would needlessly be evicted before the federal funds could be distributed (with corresponding financial harm to their landlords), on April 23, the Legislature responsibly acted to extend the moratorium in the COVID-19 Emergency Eviction and Foreclosure Prevention Act (CEEFPA) to August 31.

In light of the imminent availability of federal monetary relief, Plaintiffs' purported constitutional facial challenge to the CEEFPA is even more nonsensical than it was when they filed their original complaint in February 2021.  To the extent that Plaintiffs claim to be suffering financial distress, such distress would be aggravated, not ameliorated, if this court enjoined the extension of the State moratorium before federal funds could be released and Plaintiffs made financially whole.  Similarly, in balancing the equities of Plaintiffs' TRO request, the harm resulting from the eviction of Plaintiff's tenants on the eve of federal relief distribution far outweighs any harm to Plaintiffs if they are compelled to wait a short while longer for payment of outstanding arrears.

As in their original complaint, Plaintiffs, although paying lip service to the existence of the global pandemic that has claimed the lives of 30,000 residents, ask this court to second guess the

emergency measures taken by the State's elected leadership to prevent a resurgence of the pandemic, while rushing financial assistance to the landlords Plaintiffs claim to represent. Although Plaintiffs blithely assert that New York is now "returning to normal life," the lifting of restrictions on public and private gatherings will not undo the financial catastrophe that prevented hundreds of thousands of New Yorkers from paying their last year of rent, nor would there be anything "normal" about the mass entry of these families into the City's shelter system if evictions are allowed to resume before aid can be distributed.[1]

As set forth below, courts in New York and across the country have rejected Plaintiffs' arguments that a temporary moratorium on eviction filings constitutes either a denial of due process or a violation of the right to petition the government. Nor are Plaintiffs' constitutional rights violated by commonplace statutory pleading requirements, or the statute's inclusion of widely-used terms like "significant" and "substantial." Amici therefore urge this court to deny Plaintiffs' Motion for a Preliminary Injunction.

## **ARGUMENT**

### I. THE COVID-19 PANDEMIC HAS CREATED A HEALTH AND AFFORDABILITY CRISIS AMONG NEW YORK TENANTS

This case comes before the court during the ongoing coronavirus disease 2019 (COVID-19) pandemic. As of May 10, 2021, more than 158 million cases of COVID-19 have been reported in 219 countries and territories, resulting in more than 3.29 million deaths.[2] Over a year into the pandemic, New York remains one of the hardest hit states in the United States with 52,155 deaths,

---

[1] Although the ERAP legislation does stay eviction proceedings for tenants who have already filed applications for assistance, ERAP cannot protect tenants during the period before the application portal opens – nor is it likely that the portal will instantaneously accommodate the thousands of families needing to apply.

[2] *COVID-19 Dashboard by the Center for Systems Science and Engineering (CSSE) at Johns Hopkins University (JHU)*, https://coronavirus.jhu.edu/map.html (last visited May 10, 2021).

second only to California.[3] New York City alone accounts for 32,836 of the deaths in New York.[4] Although statistics are trending downward in New York, the State still reports over 2500 new cases each day, with over 3000 COVID victims currently hospitalized.  Only 38 percent of New Yorkers have been fully vaccinated so far.[5]  Recent upsurges in Michigan and other states, moreover, make clear that progress in the battle against COVID is always uncertain, and lack of caution can result in sharp increases in infections and deaths.[6]

In addition to the heavy death toll, COVID-19 has resulted in an unprecedented loss of employment as non-essential businesses have shut down  or reduced in-person operations to avoid spreading the disease and to comply with New York Executive Order 202.8 and federal guidance. In 2020, the over 2.4 million New Yorkers received unemployment benefits[7] as compared to the 485,000 recipients in 2019.[8] New York City, the Hudson Valley, and Long Island have been hit especially hard. These regions accounted for 1.1 million, 216,000 and 323,300 of the total 2020 claims respectively.[9] While the economy now is on a path toward recovery, the crisis is not yet over. In January 2021, there were still more active unemployment recipients than all of 2019 with

---

[3] *Coronavirus in the U.S.: Latest Map and Case Count*, https://www.nytimes.com/interactive/2020/us/coronavirus-us-cases.html (last visited May 10, 2021).
[4] *New York Coronavirus Map and Case Count*, https://www.nytimes.com/interactive/2020/us/new-york-coronavirus-cases.html#county (last visited May 10, 2021).
[5] *Coronavirus in the U.S.: Latest Map and Case Count*, https://www.nytimes.com/interactive/2020/us/coronavirus-us-cases.html (last visited May 21, 2021).
[6] NY Times, "Covid-19: Governor of Michigan, Battling Virus Surge, Again Calls for More Vaccine Supplies," May 7, 2021. https://www.nytimes.com/live/2021/04/11/world/covid-vaccine-coronavirus-cases (last visited May 11, 2021)
[7] *Number of Unemployment Insurance Beneficiaries and Benefits Amount Paid – December 2020*, New York State Department of Labor, https://labor.ny.gov/stats/UI/Beneficiaries-and-Amounts-by-Region-and-County-December-2020.pdf.
[8] *Number of Unemployment Insurance Beneficiaries and Benefits Amount Paid – December 2019*, New York State Department of Labor, https://labor.ny.gov/stats/UI/Beneficiaries-and-Amounts-by-Region-and-County-December-2019.pdf.
[9] *Number of Unemployment Insurance Beneficiaries and Benefits Amount Paid – December 2020*, New York State Department of Labor, https://labor.ny.gov/stats/UI/Beneficiaries-and-Amounts-by-Region-and-County-December-2020.pdf.

513,000 New Yorkers continuing to receive benefits.[10] COVID-19's health and economic toll has disproportionately affected low-income tenants. In the first month of the pandemic, employment for workers in the bottom quintile dropped 35% as compared to a 9% drop in employment for the highest quintile of earners.[11]

Furthermore, efforts to vaccinate have disproportionally benefited wealthy, white people even as low-income communities of color remain the hardest hit.[12] In every region of New York State, white people have been vaccinated at a higher rate than expected based on their eligible population.[13] However, Black people have been vaccinated at only 64 percent of expected rate based on population.[14]

## II.    THE RESUMPTION OF EVICTIONS FOR TENANTS FACING A HARDSHIP DUE TO COVID-19 WOULD CREATE A HOMELESSNESS CRISIS

Despite the public health emergency and attendant financial crisis, Plaintiffs argue the Constitution proscribes even temporary and tailored modifications to summary eviction proceedings. Instead, if the challenged statute was struck down and evictions were prematurely allowed to continue without limitation, the consequences for tenants would be dire. Although New York is now at last moving toward a full reopening of businesses, this progress does not retroactively undo the economic harm suffered by tenants during the previous year.  A resumption of evictions would place tenants at imminent risk of eviction at the very moment when federal aid

---

[10] *Number of Unemployment Insurance Beneficiaries and Benefits Amount Paid – January 2021*, New York State Department of Labor, https://labor.ny.gov/stats/UI/Beneficiaries-and-Amounts-by-Region-and-County-January-2021.pdf.

[11] Tamaz Cajner, *et al.*, *The U.S. Labor Market During the Beginning of the Pandemic Recession*, Nat'l Bureau of Econ. Research, https://www.nber.org/papers/w27159.pdf.

[12] Mihir Zaveri, *New ZIP code data reflects disparities in N.Y.C's vaccination effort, officials say.* (February 16, 2021), https://www.nytimes.com/2021/02/16/nyregion/nyc-covid-vaccine-zip-codes.html.

[13] *Id.*

[14] *Vaccine Demographic Data – Race & Ethnicity*, New York State Department of Health, https://covid19vaccine.health.ny.gov/vaccine-demographic-data (last visited May 10, 2021).

is about to become available (see Point IV, *infra*). Thus, the modest limitations and modifications on eviction proceedings proceeding contained in CEEFPA are entirely appropriate responses to the COVID-19 emergency.

Before COVID-19, New York already had an affordability crisis for New York tenants. Forty-six percent of New York State renters are rent burdened, and four out of ten low-income people in New York are either homeless or severely rent burdened.[15] 2,034,100 New Yorkers in 940,300 low-income households pay more than 50 percent of their incomes towards their rents.[16] Given the base level instability of housing in New York and the COVID-19-induced economic suppression, New York tenants would face mass evictions if nonpayment proceedings and evictions were allowed to resume without limitation.. If tenants are forced to double-up with relatives, enter the shelter system, or sleep on the street, more people will die and the virus will continue to spread.[17] Such a result would be particularly tragic at a time when billions in federal relief funds are about to be distributed, preventing thousands of evictions while providing help to struggling landlords.

### III.   THE COURT SYSTEM IS NOT CAPABLE OF ADJUDICATING ALL POSSIBLE EVICTION CASES DURING THE ONGOING PUBLIC HEALTH EMERGENCY

Although the New York court administration has announced the reopening of very limited in-person proceedings, physical appearances, particularly in the New York City Housing Courts,

---

[15] Ctr. for Budget and Policy Priorities, *New York Federal Rental Assistance Fact Sheet* (Dec. 10, 2019), https://www.cbpp.org/research/housing/federal-rental-assistance-fact-sheets#NY.

[16] *Id*.

[17] *See* Shelly Nortz, *Testimony on the Disparate Impact of COVID-19 on Homeless People in New York City before the NYS Legislature*, Coal. for the Homeless (May 18, 2020), https://www.coalitionforthehomeless.org/wp-content/uploads/2020/05/COVID-19TestimonyMay182020.pdf (age-adjusted mortality rate of homeless residents in NYC shelters is 56% higher than rate for other New York City residents).

will continue to be a rarity for the foreseeable future. [18] Due to social distancing requirements, Courts which hear eviction cases will continue to schedule virtual court appearances and accept most papers through e-filing, which was expanded in response to the pandemic. Indeed, currently, the majority of the Court's business is being conducted virtually.[19]  While transforming the New York Court system into a virtual court was a necessary response to the COVID health crisis, as of March 2020, about 30 percent, or 2.2 million, of New York City residents lack broadband internet access, including 350,000 who only access internet through cell phones or tablets.[20] Data widely demonstrates racial disparities in accessing broadband internet access.   Approximately 30 percent of Hispanic and Black New Yorkers lack broadband internet access, compared to 20 percent of White New Yorkers and 22 percent of Asian residents.[21]  Pro se litigants lacking internet access are unable to effectively utilize the Electronic Document Delivery System ("EDDS") or participate in teleconferences and are therefore limited in their ability to defend themselves in court.

It is rational under the circumstances to focus on the subset of cases involving tenants who do not face COVID-19 related financial hardships.  Many tenants are unrepresented by counsel and will not have the technical capability to appear or file papers virtually. When any of the components required to litigate and resolve an eviction proceeding does not function due to COVID-19-related limitations, it will create delays and waste judicial resources. Thus, if court operations should proceed at all, CEEFPA's exclusion of proceedings against COVID-19-impacted tenants is warranted by the current health crisis.

---

[18] "Remote Housing Court Hearings Strain Internet-Deprived Tenants Taking on Landlords," The City, April 13, 2021, https://www.thecity.nyc/bronx/2021/4/13/22378833/remote-housing-court-internet-deprived-bronx-tenants (last visited May 11, 2021).
[19] Chief Judge, Janet DiFiore, State of Our Judiciary, 2021, March 2, 2021, page 3, https://www.nycourts.gov/whatsnew/pdf/21_SOJ-Speech.pdf
[20] Scott Stringer, Census and the City: Overcoming NYC's Digital Divide in the 2020 Census, Office of the New York City Comptroller (July 2019), at 5. https://comptroller.nyc.gov/wp-content/uploads/documents/Census_and_The_City_Overcoming_NYC_Digital_Divide_Census.pdf.
[21] Id.

IV.     **NEW YORK STATE HAS RECEIVED MONEY FOR RENT RELIEF AND WILL BE SOON AWARDING TENANTS AND LANDLORDS OVER TWO BILLION DOLLARS TO ADDRESS BACK RENT OBLIGATIONS**

Directly prior to the passage of CEEFPA, Congress passed, and the President signed into law, the Consolidated Appropriations Act of 2021 which included the Emergency Rental Assistance (ERA) program.[22]  On April 8, 2021, the New York State Legislature created the COVID-19 Emergency Rental Assistance Program of 2021 (ERAP), designed to distribute $2.3 billion in federal assistance to landlords and tenants financially impacted by the global pandemic.[23] The legislation directs the State Office of Temporary and Disability Assistance (OTDA) to create a massive state-wide subsidy program, implemented by new rules and procedures.  The ERAP statute requires OTDA to establish eligibility standards, including priorities to govern the first 30 days of the program (Sec. 5); create an on-line application portal (Sec. 6);  and establish procedures to obtain information from and make payments to thousands of landlords across the State (Sec. 9). OTDA must also work with local municipalities to implement an "extensive outreach" effort among both tenants and landlords (Sec.12).

Given the magnitude of the undertaking, it was obvious that the ERAP program could not be made operational prior to the expiration of the May 1 moratorium expiration.  OTDA now projects that ERAP will be open for business before the end of May.[24]  Helpfully, the Biden Administration issued new rules on May 7 aimed at expediting arrears payments to landlords across the country.[25] However, it will realistically take several months for thousands of tenants

---

[22] The Emergency Rental Assistance program was established by section 501 of Division N of the Consolidated Appropriations Act, 2021, Pub. L. No. 116-260 (Dec. 27, 2020) (the Act).  The bill was passed on December 21st and signed by the President into law on December 27, 2020.
[23] See Part BB, https://www.nysenate.gov/legislation/bills/2021/s2506/amendment/original.
[24] Law 360, "NY Rent Relief Yet To Drop As Eviction Law Winds Down," April 22, 2021.
https://www.law360.com/articles/1378058/ny-rent-relief-yet-to-drop-as-eviction-law-winds-down
[25] "Biden Administration Moves to Speed Aid to Renters," N.Y. Times, May 7, 2021.
https://www.nytimes.com/2021/05/07/us/politics/renters-aid-biden-pandemic.html?searchResultPosition=2

and landlords to submit applications and for OTDA to process them.  Although Section 8 of ERAP

bars landlords from commencing or continuing eviction cases against tenants with pending

assistance applications, this provision does not apply prior to the opening of the ERAP portal, nor

could any portal immediately cope with hundreds of thousands of applications even after it opens.[26]

Accordingly, on April 23, the Legislature prudently acted to extend the moratorium in the COVID-

19 Emergency Eviction and Foreclosure Prevention Act (CEEFPA) to August 31.   Jeffrey

Dinowitz, one of the sponsors of the bill, observed that "this is life-changing legislation that allows

the New York State Office of Temporary and Disability Assistance and other relevant agencies

more time to disburse the billions of dollars in state and federal funding to people who need it. We

are still in the midst of a global pandemic and the worst economic crisis in our lifetimes. I believe

it would be immoral to allow the current moratorium to lapse. This law will save lives."[27]


## V. CEEFPA REGULATES THE CONDUCT OF EVICTION PROCEEDINGS AND ANY EFFECT ON PETITIONER'S SPEECH IS INCIDENTAL.

Plaintiffs argue that the requirement in Section 3 of CEEFPA that owners must provide a

Hardship Declaration and a list of not-for-profit legal service providers with eviction petitions and

predicate notices is subject to strict scrutiny and constitutes compelled speech in violation of the

First Amendment. Instead, Section 3, like numerous existing laws, simply regulates the contents

of the legal notices required for the commencement of an eviction proceeding. The required notices

contain only factual and uncontroversial information and do not require landlords to endorse any

viewpoint. CEEFPA's regulation of the notices required to commence an eviction proceeding

---

[26] To the extent that the CEEFPA may duplicate the protections afforded tenants who have been able to apply for ERAP, such duplication would not prejudice Plaintiffs.

[27] https://www.governor.ny.gov/news/governor-cuomo-signs-extension-covid-19-emergency-eviction-and-foreclosure-prevention-act-2020

during the COVID-19 pandemic is a regulation of conduct and any restriction of landlords' speech rights is incidental. Accordingly, Section 3 does not violate Plaintiffs' First Amendment rights.

The First Amendment does not prohibit laws directed at conduct from imposing incidental burdens on speech. *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 567, 131 S. Ct. 2653, 2664, 180 L. Ed. 544 (2011). For example, just because a ban on race-based hiring requires an employer to remove a sign reading "White Applicants Only," it is still analyzed as a regulation of conduct. *Rumsfeld v. Forum for Acad. & Institutional Rights., Inc.*, 547 U.S. 47, 126, 126 S. Ct. 1297, 1308, 164 L. Ed. 2d 156 (2006). Moreover, regulations of conduct are permissible even if they compel speech where the government's message can be accommodated without affecting an individual's own expression. *Rumsfeld*, 547 U.S. 47 at 64. In *Rumsfeld*, the Supreme Court held that a federal law requiring universities to post notices for military recruitment interviews did not violate the First Amendment rights of an association of law schools that objected to the military's discriminatory sexual orientation policies. *Id.* Likewise, the state may require the dissemination of purely factual and uncontroversial information when regulating commercial speech so long as the regulation is reasonably related to a state interest that is not unduly burdensome. *Zauderer v. Office of Disciplinary Counsel*, 471 U.S. 626 (1985).

In the eviction context, a district court, applying *Rumsfeld*, recently held that a prohibition on sending statutory notices to quit during the height of the pandemic did not violate the First Amendment because the law regulated the conduct of serving legal notices for the purpose of initiating eviction proceedings and the effect on landlords' speech rights was incidental. *Baptiste v. Kennealy*, 490 F.Supp.3d 353, at 401 (D. Mass. 2020).

Section 3 of CEEFPA is undoubtably a regulation of eviction proceedings and any abridgement of landlords' First Amendment rights is incidental. The Hardship Declaration, signed

10

by tenants under penalty of law, allows eligible tenants to inform their landlords that they are facing a financial hardship or are medically vulnerable. Service of the Hardship Declaration on landlords has the legal effect of delaying commencement of an eviction proceeding until August 31, 2021. The form provided by landlords bears the seal of the seal of the New York Unified Court System and is completed by tenants. Thus, the Hardship Declaration requirement does not compel landlords to speak. It merely requires landlords to include court forms when initiating legal proceedings for eviction.

Although the State has mailed Hardship Declarations to all tenants with recent eviction cases, mailed notices are often lost or misdirected. The only way to ensure that all tenants who are at risk of eviction can exercise their rights under CEEFPA is to require that the Declarations be served along with and in the same manner as the eviction Petitions themselves. Many eligible tenants who were unaware of CEEFPA would rush to court to answer, needlessly creating a risk of COVID-19 spread. Others would prematurely abandon their apartments and double up with family, creating a further risk of community spread. Section 3 is the only effective way to avoid these harmful consequences.

Likewise, Section 3's requirement that landlords provide a list of legal service providers actively handling eviction cases is designed to regulate the resumption of cases and only incidentally affects landlords' speech rights. As noted above, low-income tenants are dramatically less likely to have sufficient access to and understanding of the technology required to access the courts during the pandemic. Court proceedings are primarily being conducted virtually due to the risk of in-person appearances. In order to meaningfully participate in these proceedings, litigants need to use videoconferencing software with a reliable Internet connection. Thus, connecting tenants with attorneys is necessary if court operations are to resume. In New York City, the current

11

mandatory notices of petition for summary nonpayment and holdover proceedings already provide lists of resources for litigants, including resources for legal help. 22 NYCRR § 208.42(b).

Plaintiffs' speech is only incidentally affected by CEEFPA's requirement that they send legal notices prepared by the court to tenants before they are able to commence eviction proceedings. CEEFPA only regulates Plaintiffs' eviction litigation conduct and does not require Plaintiffs to endorse any view advanced by the government. Predicate notices and notices of petition are not inherently expressive. Court forms are necessary in order to advance the state's interest in the orderly administration of justice. The state has a substantial interest in the regularity and uniformity of pleadings and CEEFPA's Section 3 advances that interest. The requirement that landlords accommodate government forms in their legal pleadings does not limit their ability to express their own views, including their disagreement with CEEFPA, the eviction moratoria, or legal service providers. Thus, Section 3 does not violate Plaintiffs' First Amendment rights.

## VI.     THE CEEFPA DOES NOT VIOLATE PLAINTIFFS' DUE PROCESS RIGHTS.

### A.  The CEEFPA is not unconstitutionally vague.

Plaintiffs wrongly claim that the CEEFPA deprives them of Due Process because its language is too vague to provide them with fair notice of CEEFPA's requirements, lacks sufficient standards to guide its application, and ensures that it will be arbitrarily and discriminatorily enforced.  Pl. Br. at 22.  However, the only "requirements" that the CEEFPA imposes on landlords are crystal clear: landlords must serve the required notices and declaration forms upon their tenants (CEEFPA, § 3), must refrain from commencing an eviction case if they have received a completed declaration from a tenant (CEEFPA, § 4), and, if commencing a proceeding, must attest that they served a blank declaration and did not receive back a completed

12

one (CEEFPA, § 5).  None of these provisions require either the landlord or the court to interpret any of the terms used in the body of the declaration itself, much less subject landlords to the risk of inadvertent perjury.  Landlords are not deprived of "fair notice of when a tenant is eligible to avoid eviction" – receipt of a completed declaration itself puts the landlord on notice that the tenant is eligible for a stay.

To the extent Plaintiffs contend that courts will be unable to consistently construe terms such as "meaningful employment," "significantly increase," and "significantly reduce," their concern is misplaced.  Courts will simply be ascertaining whether tenants have submitted declarations, not construing the contents of those declarations.  Moreover, statutes regulating economic activity, "are subject to a relaxed vagueness test" compared to laws with criminal penalties.  *Rubin v. Garvin*, 544 F.3d 461, 467 (2d Cir. 2008), *citing, Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 498–99 (1982). In *VIP of Berlin, LLC v. Town of Berlin*, 593 F.3d 179 (2d Cir. 2010), the Second Circuit specifically held that the terms "substantial or significant" were not too "vague" for constitutional application, and cited a plethora of federal statutes employing similar language.  *Id.,* at 188 n.7.  Indeed, the statutes daily construed in New York's housing courts are replete with comparable terms.  *See*, N.Y. Rent Stabilization Law (N.Y.C. Admin. Code) § 26-511(c)(9) (eviction protections for disabled tenants who cannot engage in "substantial gainful employment"); N.Y. Rent Stabilization Code (9 N.Y.C.R.R.) § 2523.4 (permitting eviction for breach of "substantial obligation" of tenancy or "interfering substantially" with the comfort or safety of others.").[28]

---

[28]  The lone case cited by Plaintiffs, *Kramer v. N.Y. City Bd. of Educ.,* 715 F. Supp. 2d 355, 356 (E.D.N.Y. 2010), found that a school regulation barring the use of vulgar terms to verbally abuse students did not on its face bar the use of such terms in a class on HIV.  Plaintiffs have cited no case remotely on point factually with the CEEFPA's use of commonly used terms such as "meaningful" and "substantial."

### B.  The CEEFPA Does Not Deprive Plaintiffs of the Opportunity to be Heard on Their Claims.

As to Plaintiffs' procedural due process claim, they assert that the CEEFPA prevents Plaintiffs from being heard at a meaningful time or manner because they cannot challenge the contents of a hardship form submitted by a tenant. Pls' Mem. at 23. *See*, *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976) (due process requires "the opportunity to be heard at a meaningful time and in a meaningful manner.").

Contrary to Plaintiffs' implication, being heard in a meaningful time and manner does not mean that Plaintiffs must have the right to be heard as soon as any claim arises. The *Mathews* Court explained that due process "is not a technical conception with a fixed content unrelated to time, place, and circumstances." *Mathews*, 424 U.S. at 334 (quoting *Cafeteria & Restaurant Workers v. McElroy*, 367 U.S. 886, 895 (1961)). It is "flexible and calls for such procedural protections as the particular situation demands." *Id.* (internal quotations omitted). As the Court in *Elmsford Apartment Assocs., LLC v. Cuomo*, pointed out, "No case says that "a meaningful time" means as soon as a cause of action accrues – especially where, as in New York, the filing of a summary proceeding is but the first step in what often takes years to accomplish, which is the ultimate eviction of a tenant." *Elmsford Apartment Assocs., LLC v. Cuomo*, 469 F.Supp.3d 148, 173 (S.D.N.Y. 2020)

CEEPFA's hardship declaration does not implicate Plaintiffs' Due Process rights. When a tenant submits a hardship declaration, it temporarily delays the prosecution of an eviction case.[29] Plaintiffs reserve all rights to unpaid rents from tenants that fall under the scope of the order. Plaintiffs will be able to pursue eviction cases in the same manner and forum as they always have after August 31st.  Moreover, landlords are free at any time to commence plenary proceedings and

---

[29] Unless the landlord alleges that the tenant is creating a nuisance or causing damage.  See CEEFPA §9.

obtain monetary judgments for outstanding rent arrears. *See Elmsford Apartment Assocs.*, 469 F.Supp.3d at 173 (S.D.N.Y. 2020). For these reasons, Plaintiffs' due process claims must fail.

## VI. THE CEEFPA DOES NOT DEPRIVE PLAINTIFFS OF THEIR ACCESS TO THE COURTS.

Plaintiffs wrongly assert that CEEFPA bars them from access to the courts. However, the right to seek judicial relief for some wrong does not mean that litigants have a guaranteed constitutional right to his or her preferred remedy. *Inmates of Suffolk Cty. Jail v. Rouse*, 129 F.3d 649, 660 (1st Cir. 1997) (holding that there is no constitutional right to a specific form of relief); see also *Elmsford*, 469 F. Supp. 3d at 174 (finding that the Petition Clause was not violated because "although nonpayment proceedings have been suspended, [p]laintiffs can still sue . . . and the fact that is not their preferred remedy is of no moment."). Indeed, the Second Circuit has recognized that "[t]he right to petition exists in the presence of an underlying cause of action and is not violated by a statute that provides a complete defense to a cause or curtails a category of causes of action**.** *City of New York v. Beretta U.S.A. Corp.*, 425 F.3d 384, 397 (2d Cir. 2008). In *City of New York*, the Court upheld the challenged law even though it immunized a specific type of defendant from a specific type of case, finding that the law did not "impede, let alone entirely foreclose, general use of the courts by would-be plaintiffs." *Id.* at 396. Nothing in CEEFPA forecloses the general use of the courts by Plaintiffs.

Recently, in *Elmsford Apartment Assocs., LLC v. Cuomo*, 469 F.Supp.3d 148, 173 (S.D.N.Y. 2020), the District Court upheld Governor Cuomo's previous ban of all filings, proceedings and evictions, dismissing as meritless the argument that his Executive Orders infringed on the Plaintiffs' right to access the courts. The Court held that the constitutional right of access to the courts does not confer a right to bring a particular cause of action or to bring an

action at a preferred time. *Id*. at 174.  The Court relied on the fact that in New York landlords

can seek rent arrears in other proceedings and that a mere delay in filing an eviction case could

not form the basis of a right to petition claim. *Id*.  As for a delay in proceeding in cases that were

previously filed, the Court found that evicting tenants in New York is already slow and

cumbersome.  *Id*. at 158. Even in jurisdictions where eviction proceedings are neither slow nor

cumbersome, Courts across the country have dismissed claims brought by landlords claiming

that the various local, state and federal moratoria issued in response to the COVID-19 crisis,

have violated landlords' right to petition and denied their access to the courts.   See e.g. *Heights*

*Apartments, LLC. v.Walz*, 20-CV-2051, 2020 WL 7828818, at 13 (D. Minn., 2020), *Brown v.*

*Azar*, 497 F.Supp.3d 1270,  at 1289 (N.D. Ga. 2020), *Baptiste. v. Kennealy*, 490 F.Supp.3d 353,

at 393 (D. Mass. 2020).  As in *Elmsford*, Courts have relied on the temporary nature of the

prohibitions.  See *Walz*, 2020 WL 7828818, at 13 (D. Minn., 2020), (moratorium was issued in

March and as of the date of the decision was in effect until January 13, 2021); *Baptiste. v.*

*Kennealy*, 490 F.Supp.3d 353, 368-369  (D. Mass. 2020), (moratorium was issued in March and

remained in effect until October 17, 2020).  Additionally Courts have noted that rent is still owed

and that landlords are not foreclosed from seeking other remedies to collect back rent through

breach of lease cases.  See  *Brown v. Azar*, 497 F.Supp.3d 1270, at 1290 (N.D. Ga. 2020), *Walz*,

2020 WL 7828818, at 13 (D. Minn., 2020).

Recently, the District of Columbia Court of Appeals issued a stay of a lower court

decision overturning the District of Columbia's total filing ban finding that the District was

likely to succeed on the merits of its appeal.   *District of Columbia v. Towers*, 21-CV-34, 2021

WL 1917103 (D.C. May 13, 2021).  In the trial court, the property owners had argued that the

District's complete eviction ban was constitutionally infirm as it barred their access to the courts.

See *Borger Management v. Hernandez-Cruz*, Case No. 2020 LTB 006637, et al., (Superior Court, D.C., December 16, 2020), https://www.dccourts.gov/sites/default/files/matters-docs/General%20Order%20pdf/order-re-filing-moratorium-for-eviction-cases-12-16-20.pdf.   In response to the COVID crisis, the District enacted a filing moratorium which was to last 60 days after the state of emergency was lifted, an eviction ban and a ban of seeking monetary judgments for rent owed.  *Id*. *5.  Applying intermediate scrutiny, the lower court overturned the filing ban, finding it violated the plaintiffs' right to access the court.  Id. at *39.  The appellate court's stayed the trial court order finding the City likely to prevail on appeal.  The court recognized that the right to access the courts is "ancillary to the underlying claim" sought to be litigated "without which a plaintiff cannot have suffered injury by being shut out of the court."" *Towers*, 2021 WL 1917103 at *3, citing *Christopher v. Harbury*, 536 U.S. 402, 415 (2002).  Pointing out that claims for judgment of possession and eviction are defined by statute, the court found that these claims can be constricted.  *Id*. at *4.

Like Governor Cuomo's Executive Orders, the CDC moratorium and the moratoria at issue in Massachusetts and Minnesota, CEEFPA does not deny landlords access to the courts, it simply temporarily delays landlords' ability to seek rent and possession in an eviction proceeding.  The statute, and the hardship declaration complained of in this proceeding, make clear that tenants continue to owe rent and that tenants may owe late fees, interest and penalties for failing to pay rent.  See CEEFPA Part A. §1, §4.  Additionally, as noted in the hardship declaration, nothing in CEEFPA prevents landlords from seeking money judgments for tenants who owe rent.  *Id*.   The Plaintiffs whose tenants have filed hardship declarations will be able to move forward with the cases in September at the conclusion of the moratorium which means that CEEFPA has not infringed on Plaintiffs right to access the courts.  The Plaintiffs whose tenants

17

have failed to submit hardship declarations and the ones who allege nuisance behavior can file

and prosecute their cases as well as any litigant can pursue a case in the midst of an

unprecedented pandemic.  As Petitioner have not been denied the right to petition, this claim

fails.

## VII.   THE BALANCE OF THE EQUITIES FAVORS THE STATE'S INTEREST IN PROTECTING THE PUBLIC HEALTH IN THE MIDST OF A GLOBAL PANDEMIC.

The Second Circuit has repeatedly held that the "where the moving party seeks to stay

government action taken in the public interest pursuant to a statutory or regulatory scheme, the

district court should not apply the less rigorous fair-ground-for-litigation standard and should not

grant the injunction unless the moving party establishes, along with irreparable injury, a

likelihood that he will succeed on the merits of his claim." *Plaza Health Laboratories, Inc. v.

Perales*, 878 F.2d 577, 580 (2d Cir. 1989); *Lynch v. City of New York*, 589 F.3d 94, 99 (2d Cir.

2009).  "This exception reflects the idea that governmental policies implemented through

legislation or regulations developed through presumptively reasoned democratic processes are

entitled to a higher degree of deference and should not be enjoined lightly."  *Able v. United

States*, 44 F.3d 128, 131 (2d Cir. 1995). "Where the grant of interim relief may adversely affect

the public interest in a manner which cannot be compensated for by an injunction bond, plaintiffs

undertake an even greater burden of persuasion.  *Medical Society of State of New York v. Toia*,

560 F.2d 535, 538 (2d Cir. 1977).

Plaintiffs, having failed to show a likelihood of success on any of their claims, make only

the most cursory of efforts to argue that the balance of the equities favors an injunction against a

statutory scheme designed to protect hundreds of thousands of tenants against the possibility of

eviction in the middle of a pandemic, and to protect the public against the health consequences of such mass evictions.

Monetary losses of the type alleged by Plaintiffs, do not constitute irreparable harm justifying issuance of an injunction. *Dexter 345 Inc. v. Cuomo*, 663 F.3d 59, 63 (2d Cir. 2011) (loss of profits from hotel rentals not irreparable); *JDP Mortg. LLC v. Gosman*, No. 19-CV-5968 (JS)(SIL), 2020 WL 8082390 (E.D.N.Y. Dec. 21, 2020), report and recommendation adopted, No. 19-CV-5968(JS)(SIL), 2021 WL 66290 (E.D.N.Y. Jan. 7, 2021) (violation of "right to collect rent" is not irreparable harm);  *Jaffe v. Clarke*, 566 F. Supp. 1500, 1501 (S.D.N.Y. 1983), aff'd, 742 F.2d 1436 (2d Cir. 1984) (accrual of rent arrears is compensable by damage award).

Federal courts across the country that have repeatedly concluded that staying government action to contain a contagious and fast-spreading disease would result in comparatively more severe injury to the community than the alleged damage to business interests.  *See, Brown v. Azar,* 20-CV-03702, 2020 WL 6364310 (N.D. Ga. Oct. 29, 2020); *Chambless Enterprises, LLC v. Redfield*, 3:20-cv-01455, 2020 WL 7588849 (W.D. La 2020); *Dixon Ventures, Inc. v. Department Of Health And Human Services*, No. 4:20-CV-01518 KGB, 2021 WL 1604250 (E.D. Ark. Apr. 23, 2021) (denying injunction against moratorium); *Auracle Homes, LLC v. Lamont*, 478 F.Supp.3d 199 (D. Conn. 2020); (refusing to enjoin an eviction moratorium); *HAPCO v. City of Philadephia*, 20-CV-3300,  482 F.Supp.3d 337, 364 (E.D. Pa. 2020)(same); *Apartment Association of Los Angeles County, Inc. v. City of Los Angeles*, 20-CV-05193, 2020 WL 6700568 at *11 (C.D. Cal. 2020) (economic harm to landlords "must yield precedence to the vital interests of the public as a whole").

Most recently, the District of Columbia Court of Appeals granted a stay of a lower court ruling that the District's eviction moratorium deprived landlords of their right of "access to the

courts." *District Of Columbia v. Towers*, No. 21-CV-34, 2021 WL 1917103 (D.C. May 13, 2021).  The court found there was a risk of irreparable harm to the City and to the tenants it sought to protect, noting that

> tenants will be unable to litigate their cases effectively during the public health emergency for any number of reasons: for example, a tenant may be sick, or caring for someone who is sick, or caring for children who are out of school; or a tenant may lack access to a home computer or a reliable internet connection needed to access forms or other case-related information online, conduct research, or attend a remote hearing;23 or a tenant may be unable to amass their proof or seek out counsel to contest the allegations being made against them or establish defenses.

*Id*.  Most important to the court was the risk that without the moratorium, tenants would lose the opportunity to save their tenancies by accessing federal relief funds:

> With additional time, once assistance is received or a job is regained, tenants may be able to avoid losing their homes. A central aim of a filing moratorium, after all, is not simply to stave off the inevitable; it is to give tenants time to stabilize and avoid displacement.

*Id.*

Here, as in *Towers* and *Brown,* 497 F.Supp.3d 1270, any economic harm to Plaintiffs pales in comparison to the harm to the public from allowing evictions to proceed before federal assistance can resolve the problems of both tenants and landlords.  Balancing the equities of protecting the public health versus temporary economic harm to landlords such as Plaintiffs herein, this Court must give precedence to the government's urgent need to contain the COVID pandemic and avoid the social catastrophe of thousands of needless evictions.

## **CONCLUSION**

*Amici* respectfully submit that Plaintiffs' motion for a preliminary injunction should be denied.

Dated: May 21, 2021

      Brooklyn, NY

                                        Respectfully submitted,

                                        LEGAL SERVICES NYC
Edward Josephson, Director of Litigation
Roland Nimis, of counsel
40 Worth Street, Suite 606
New York, NY 10013
Tel: (718) 237-5538
ejosephson@lsnyc.org

THE LEGAL AID SOCIETY
Judith Goldiner, Esq., Attorney in Charge,
Civil Law Reform Unit
Ellen Davidson, of counsel
199 Water Street
New York, NY 10038
Tel: 212-577-3332
jgoldiner@legal-aid.org

21