FILED
CLERK

4:54 pm, Jun 11, 2021

U.S. DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
LONG ISLAND OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------------X

PANTELIS CHRYSAFIS, BETTY COHEN,
BRANDIE LACASSE, MUDAN SHI, FENG
ZHOU, AND RENT STABILIZATION
ASSOCIATION OF NYC, INC.,

                            Plaintiffs,

                   -against-

LAWRENCE K. MARKS, in his official
capacity as Chief Administrative Judge of the
Court of New York State, ADRIAN H.
ANDERSON, in his official capacity as Sheriff
of Dutchess County, New York, JAMES
DZURENDA, in his official capacity as
Sheriff of Nassau County, New York, JOSEPH
FUCITO, in his official capacity as Sheriff of
New York City, New York, MARGARET
GARNETT, in her official capacity as
Commissioner of the New York City
Department of Investigation, and CAROLINE
TANG-ALEJANDRO, in her official capacity as
Director, Bureau of Marshals, New York
City Department of Investigation,

                            Defendants.

-------------------------------------------------------------------X

**MEMORANDUM
AND ORDER**
21-cv-2516 (GRB)

**GARY R. BROWN, United States District Judge:**

> *"Whatever may be thought of the expediency of this statute, it cannot be affirmed to be, beyond question, in palpable conflict with the Constitution. Nor, in view of the methods employed to stamp out the disease of smallpox, can anyone confidently assert that the means prescribed by the state to that end has no real or substantial relation to the protection of the public health and the public safety."*
>
>                          -*Jacobson v. Massachusetts,* 197 U.S. 11, 31 (1905)

Suffering significant financial hardships from measures aimed at curbing the spread of COVID-19, five small landlords seek to preliminarily enjoin enforcement of New York State's eviction moratorium and related provisions as unconstitutionally infirm. Plaintiffs have satisfactorily demonstrated a risk of irreparable harm but, particularly given the State's strong interest in combatting the severe public health emergency, fail to demonstrate a likelihood of success on their constitutional challenges or equities weighing in their favor. Thus, the application for a preliminary injunction is denied. In light of the importance of the matters at issue, the Court has consolidated the merits of the action with this application, which should facilitate appellate review.

## BACKGROUND

### A. Procedural History and the Evolving Legal Landscape

In early 2020, "New York State enacted a slate of statutes, administrative orders, and executive orders aimed at combatting both the public health risks and economic devastation wrought by the disease." *Melendez v. City of New York*, No. 20-CV-5301 (RA), 2020 WL 7705633, at *1 (S.D.N.Y. 2020).[1] The initial enactment, Executive Order ("EO") No. 202.8, entered March 20, 2020, imposed a 90-day moratorium on residential evictions. *Id.* at *3. Then, on May 7, 2020, EO 202.28 permitted the application of security deposits toward rents due while "temporarily prohibit[ing] landlords from initiating eviction proceedings against tenants who are facing financial hardship due to the pandemic." *Elmsford Apartment Assocs., LLC v. Cuomo*,

---

[1] The effects of the COVID-19 pandemic is a subject this Court has discussed at length. *See, e.g.*, *United States v. Cohn*, 481 F. Supp. 3d 122, 123 (E.D.N.Y. 2020) (examining effects of COVID-19 on criminal jury trial); *Flores v. Town of Islip*, No. 18-CV-3549 (GRB), 2020 WL 5211052 at *2 (E.D.N.Y. Sept. 1, 2020) (increased need for video conferencing as a result of the pandemic). In one case, the undersigned refused temporary injunctive relief to a stonecutting business challenging the constitutionality of a state executive order aimed at curtailing the outbreak. *Omnistone Corp. v. Cuomo*, 485 F. Supp. 3d 365, 368 (E.D.N.Y. 2020) (denying claim predicated upon "the purported absence of post-deprivation remedies under the existing regulatory framework for enforcement of the EOs" due to the availability of Article 78 review).

469 F. Supp. 3d 148, 155 (S.D.N.Y. 2020). That order emanated from a legislative enactment empowering the Governor to "temporarily suspend any statute, local law, ordinance, or order, rules or regulations, or parts thereof, of any agency during a state disaster emergency, if compliance with such provisions would prevent, hinder, or delay action necessary to cope with the disaster or if necessary to assist or aid in coping with such disaster." *Id.* at 156 (quoting N.Y. Exec. Law Art. 2-B § 29-a).

EO 202.28 extended the eviction moratorium through August 2020. *Id.* at 159. On June 6, 2020, the Governor issued EO 202.38, which extended certain portions of the earlier order, but did not affect the termination date set for the eviction moratorium. *Id.* The EOs did not address actions filed prior to their enactment, although "as a practical matter, there was not much that a landlord could do to prosecute an ongoing proceeding, as the New York State courts were closed." *Id.*

On June 30, 2020, the Tenant Safe Harbor Act was enacted. 2020 N.Y. Laws ch. 127; Docket Entry ("DE" 14-6). That act prohibited courts from issuing eviction warrants or possessory judgments through the end of the "COVID-19 covered period" – defined, through a series of incorporated executive orders, as the period from March 7, 2020 until the date on which businesses were permitted to reopen and restrictions on gatherings ceased. *Id.* Under the TSHA, a tenant could "raise financial hardship during the COVID-19 covered period as a defense" in a subsequent eviction proceeding, allowing courts to consider a broad array of factors in making such a determination. *Id.*

TSHA would remain on the shelf, though, because on December 28, 2020, the Governor signed into law the COVID-19 Emergency Eviction and Foreclosure Prevention Act of 2020 (bearing the unmellifluous acronym CEEFPA). DE 1-1, Compl., Ex. A. In passing this law, the legislature clearly set forth its intent:

Stabilizing the housing situation for tenants, landlords, and homeowners is to the mutual benefit of all New Yorkers and will help the state address the pandemic, protect public health, and set the stage for recovery.  It is, therefore, the intent of this legislation to avoid as many evictions and foreclosures as possible for people experiencing a financial hardship during the COVID-19 pandemic or who cannot move due to an increased risk of severe illness or death from COVID-19.

As such, it is necessary to temporarily allow people impacted by COVID-19 to remain in their homes.  A limited, temporary stay is necessary to protect the public health, safety and morals of the people the Legislature represents from the dangers of the COVID-19 emergency pandemic.

2020 N.Y. Laws ch. 381, § 3.  CEEFPA extended the eviction moratorium and provided more detailed procedures.[2]  It created a "hardship declaration" – in language prescribed by statute and annexed as Exhibit A – which, when executed by a tenant, would stay any eviction proceeding (even those filed before the pandemic), prevent the filing of a new proceeding and stay the execution of any eviction warrant pending the expiration of the Act's provisions.  *Id.* Part A, §§ 5-8.  The Act directs that any existing default judgment be "removed" and the matter restored to the court calendar.  *Id.* § 7.  With one notable exception, the statute's provisions were set to expire on May 1, 2021.  *Id.* § 13.

That exception is contained in Part A, § 11.  According to that provision, the execution of a hardship declaration creates a rebuttable presumption that the tenant is experiencing such a hardship.  *Id.*  This presumption could be used in support of a defense that may be considered by judges hearing eviction cases.  *Id.*

In response to CEEFPA, the individual plaintiffs in this case commenced an action challenging its constitutionality.  *Chrysafis v. James*, No. 21-CV-998 (JS), 2021 WL 1405884 (E.D.N.Y. Apr. 14, 2021).  As here, plaintiffs raised a sheaf of constitutional challenges to Part A of the statute and sought preliminary injunctive relief against the State Attorney General.  *Id.* at *11-12.

---

[2] The comprehensive review of CEEFPA's provisions contained in *Chrysafis v. James*, 2021 WL 1405884, at *7-8 (E.D.N.Y. 2021) is hereby incorporated by reference.

Judge Seybert determined that the Attorney General is not responsible for enforcing the statute and dismissed the case. *Id.* at *22.

In a bill dated April 23, 2021, and subsequently signed into law, the legislature extended the moratorium to August 31, 2021. 2021 N.Y. Laws ch. 104; DE 40-4. The express justification for this extension was as follows:

> Current data demonstrates the need for continuing emergency public health measures in New York. According to the CDC, New York's current rates of COVID-19 transmission are among the highest in the nation. In its weekly data summaries, the CDC classifies transmission rates as "high" if there are 100 or more new cases per 100,000 people. As of April 15, 2021, the statewide rate in New York was 233 per 100,000 people. In its March 28, 2021 Order, the CDC stated that 37% of counties nationally had a high rate of transmission and an additional 30% had a "substantial" rate (50-99.9 cases per 100,000 people). As of April 15, 2021, CDC data show that 87% of counties in New York -- 54 of 62 counties, including all of the state's most populous counties -- had a high rate of transmission and all of the other eight counties had a substantial rate of transmission. No county in New York had a "moderate" or "low" rate.

DE 40-4 at 18. The legislature further referenced a March 28, 2021 Order from the CDC extending national restrictions on residential eviction through June 30, 2021, an Order observing "that evictions substantially contribute to COVID-19 transmission." *Id.* at 17.

In response, plaintiffs filed the instant § 1983 action, again seeking preliminary and permanent injunctive relief as against CEEFPA.[3] DE 1. The Court held a preliminary injunction hearing on June 1, 2021, at which two plaintiffs and an administrative officer of the Housing Court testified.

---

[3] As the Court ruled during the hearing, plaintiff Rent Stabilization Association of NYC, Inc., a trade association representing landlords, lacks standing to bring this case. *League of Women Voters of Nassau Cty. v. Nassau Cty. Bd. of Sup'rs*, 737 F.2d 155, 160 (2d Cir. 1984) ("This Circuit has restricted organizational standing under § 1983 by interpreting the rights it secures to be personal to those purportedly injured."). Filings by the Association have been considered as *amicus* submissions. Moreover, because of their marginal involvement in this matter, the case has been stayed as against all defendants other than defendant Chief Administrative Judge Marks to avoid unnecessary costs and expenditures.

*B. Facts Established by Plaintiffs*

The five plaintiffs – Pantelis Chrysafis, Betty Cohen, Brandie LaCasse, Mudan Shi and Feng Zhou[4] – are landlords with modest holdings. Each has faced significant hardship as a result of the state moratorium on evictions:

*Chrysafis* bought a home in Garden City, NY in December 2015. Vekiarellis Decl., DE 13, ¶ 1. Marital separation a few months later led him to put it on the market, but after six months, he decided to rent the property to help meet the $4,700 monthly mortgage payment and $18,000 annual property taxes. *Id.* ¶ 2-3. His cousin located tenants – a couple with a steady pension of $4,700 and additional income of more than $200,000 per annum – who agreed to rent the home for $5,000 per month. *Id.* ¶ 4. By 2019, Chrysafis decided to put the house back on the market. Upon learning this, the tenants indicated that they would no longer pay any rent. *Id.* ¶ 6. When rent was demanded of them in April 2019, the tenants produced a falsified bank statement showing that $5,000 had been wire transferred. This was simply a ruse. *Id.*

By that autumn, the tenants were more than $25,000 in arrears, and Chrysafis filed an eviction proceeding. *Id.* ¶ 7; DE 61-3. In February 2020, Chrysafis obtained a judgment for unpaid rent and a warrant of eviction. DE 13 ¶ 8; DE 61-5. Based on an Order to Show Cause filed by the tenant, in March 2020, the Nassau County District Court granted a short postponement, ordering that the tenant "must vacate by April 30, 2020." DE 61-4. Due to the enactment of the EOs and CEEFPA, the tenant has never been evicted, and continues to reside in the residence rent-free. The rental arrears currently exceed $80,000. DE 13 ¶ 15. According to the manager of the residence, at least one of the tenants has continued to work, seemingly unaffected by the pandemic. *Id.* ¶ 18.

---

[4] Plaintiffs Mudan Shi and Feng Zhou are husband and wife and landlords on a single residential property. DE 1 at 8-9.

*Cohen*, who testified at the hearing, is a 68-year old retiree who depends on the monthly rental income of $1,545 from a single co-op that she owns, a sum that represents 50% of her income. DE 9 ¶¶ 2-3; *see* Hearing Transcript ("Tr."), DE 69-1, at 62. After the start of the pandemic, her tenant of more than 25 years advised that he could no longer afford to pay the rent. DE 9 ¶ 3; *see* Tr. 64. The tenant owes more than $23,175 in arrears. DE 9 ¶ 5; *see* Tr. 74. Cohen has to pay $630 per month in fees and maintenance and a sublet fee for the Co-op apartment. Tr. 75. Cohen has endeavored to weather these financial setbacks, in part, through an SBA loan. *Id.* ¶ 10.

*LaCasse,* who also testified at the hearing, is a single mother and military veteran, who suffers from a service-related disability that has left her immunocompromised. DE 10 ¶ 1. She owns several rental properties, including a single-family home in Rhinebeck, NY which had been rented for approximately $2,500 per month. *Id.* ¶ 2. After advising her tenants in late 2020 of her intent to sell the property, the tenants ceased paying rent. *Id.* The tenants have inflicted significant damage to the property, and efforts to evict them have failed because of CEEFPA. *Id.* ¶¶ 3, 6.[5] LaCasse has some information suggesting that, despite executing the CEEFPA hardship declaration, her tenants' financial circumstances have been unaffected by the pandemic. *Id.* ¶ 7.

*Shi* (along with her husband, co-plaintiff Zhou) own a small house in Staten Island and uses the rent from that home – currently set at $2,400 per month – to pay rent for an apartment in which they live with their extended family. DE 11 ¶¶ 1-3. In spring of 2019, the tenant stopped paying rent for six months. *Id.* ¶¶ 4-6. As a result, Shi and Zhou filed an eviction action and obtained a judgment dated October 31, 2019, directing that a warrant of eviction issue and that

---

[5] At the hearing, plaintiffs provided an exhibit demonstrating that LaCasse has filed an "ejectment" proceeding, which includes an order to show cause returnable in July. DE 69-1, at 44-45. It is undisputed that this proceeding ultimately will be subject to the limitations of CEEFPA. Tr. 44-55; State's Exs. C & D; DE 66.

the tenants be removed "without stay." *Id.* ¶ 6; DE 61-2. However, the advent of the eviction moratorium prevented execution. DE 11 ¶¶ 6, 8. Shi and Zhou asked the tenants to leave, but in response they demanded that the couple pay them, first $10,000 and then $6,000, to get them to agree to leave. *Id.* ¶ 7. Shi and Zhou are now owed more than $57,000 in back rent. *Id.* ¶ 11.

Under the current legislative scheme, none of these landlords will be permitted to commence legal proceedings to attempt to recover their property until August 31, 2021. By that date, the amount of time in which each of these landlords will have not received rent while without any legal remedy will be substantial:

- Chrysafis – 28 months

- Cohen – 17 months

- LaCasse – 10 months

- Shi and Zhou – 29 months

By all accounts, once plaintiffs are permitted to file eviction proceedings, months will transpire before an eviction warrant could issue. Tr. 122-23 (typically four to six months average from the filing of notice and petition to execution of eviction warrant); *see Elmsford Apartment Assocs., LLC*, 469 F. Supp. 3d at 173 ("[I]n New York, the filing of a summary proceeding is but the first step in what often takes years to accomplish, which is the ultimate eviction of a tenant.").

## STANDARD OF REVIEW

A party seeking preliminary injunctive relief must demonstrate "(1) irreparable harm absent injunctive relief; (2) either a likelihood of success on the merits,[6] or a serious question

---

[6] Counsel argues that in a case seeking a "mandatory" injunction, as compared to a "prohibitory" decree which would maintain the *status quo*, plaintiffs would be required to show a "substantial" likelihood of success. *See Mastrovincenzo v. City of New York*, 435 F.3d 78, 89 (2d Cir. 2006). Reasonable minds could differ as to whether

going to the merits to make them a fair ground for trial, with a balance of hardships tipping decidedly in the plaintiff's favor; and (3) that the public's interest weighs in favor of granting an injunction." *Red Earth LLC v. United States*, 657 F.3d 138, 143 (2d Cir. 2011) (citation omitted). The Court has "wide discretion in determining whether to grant a preliminary injunction," as it is "one of the most drastic tools in the arsenal of judicial remedies." *Grand River Enter. Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 66 (2d Cir. 2007) (citations omitted).

## DISCUSSION

While plaintiffs assert a bundle of constitutional challenges, only one requires extended discussion. Before reaching that issue, several threshold issues require resolution.

*A. Abstention*

Defendant Marks argues, somewhat incongruously, that this matter should be dismissed based upon abstention principles. In asserting this defense, counsel attempts to mischaracterize the nature of the relief sought. This is not a case in which this Court is being asked "to alter the manner in which . . . proceedings are conducted." *Disability Rights New York v. New York*, 916 F.3d 129, 130–31 (2d Cir. 2019) (upholding *Younger* abstention in challenge to the Surrogate's Court Procedure Act). Nor is this a matter "in which the prospect of undue interference with state proceedings counsels against federal relief." *Sprint Commc'ns, Inc. v. Jacobs*, 571 U.S. 69, 72 (2013) (reversing lower Court's invocation of *Younger* abstention).

To be clear, there are no parallel civil or criminal proceedings into which this Court is asked to intrude that could implicate abstention concerns. *Id.* at 78. Far from asking this Court to intervene in state court proceedings, plaintiffs' chief complaint centers around the absence of

the instant application seeks to maintain or alter the *status quo*. However, because the undersigned finds that plaintiffs satisfy neither standard, the Court need not resolve this issue.

such proceedings. Primarily, plaintiffs attack the moratorium by which the legislative and executive branches have prevented state courts from conducting proceedings. Vested with jurisdiction to hear plaintiffs' claims, the Court has "no more right to decline the exercise of jurisdiction which is given, than to usurp that which is not given." *Id.* at 77 (citation omitted).

Defendant's motion to dismiss based on abstention is denied.


### B. Irreparable Harm

"A showing of irreparable harm is 'the single most important prerequisite for the issuance of a preliminary injunction.'" *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009) (citation omitted). As the Second Circuit has held, "the alleged injury must be one incapable of being fully remedied by monetary damages." *Reuters Ltd. v. United Press Int'l, Inc.*, 903 F.2d 904, 907 (2d Cir.1990); *cf. General Textile Printing & Processing Corp. v. Expromtorg Int'l Corp.*, 862 F. Supp. 1070, 1075 (S.D.N.Y.1994) ("If the injury complained of may be compensated by an award of monetary damages, then an adequate remedy at law exists and no irreparable harm may be found as a matter of law.") (citation omitted)).

While the plaintiffs here could – in the main – be compensated for the damages sustained from the eviction moratorium, the analysis is a bit more complicated. Given that the tenants are unlikely to be able to pay the substantial arrears, this matter implicates the principles identified in *Brenntag Int'l Chemicals, Inc. v. Bank of India*, 175 F.3d 245 (2d Cir. 1999). *Brenntag* notes that "a perhaps more accurate description of the circumstances that constitute irreparable harm is that where, but for the grant of equitable relief, there is a substantial chance that upon final resolution of the action the parties cannot be returned to the positions they previously occupied. For this reason, courts have excepted from the general rule regarding monetary injury situations

involving obligations owed by insolvents." *Id.* at 249–50 (citation omitted). Other courts have extended this exception to cases of "threatened insolvency." *See Federated Strategic Income Fund v. Mechala Grp. Jamaica Ltd.*, 1999 WL 993648, at *8 (S.D.N.Y. Nov.2, 1999). However, to obtain injunctive relief under the *Brenntag* exception, "a movant must show that the risk of insolvency is likely and imminent." *CRP/Extell Parcel I, L.P. v. Cuomo*, 394 F. App'x 779, 782 (2d Cir. 2010). Plaintiffs have not made such a showing.

At the same time, "[t]he deprivation of an interest in real property constitutes irreparable harm." *Tioronda, LLC. v. New York*, 386 F. Supp. 2d 342, 350 (S.D.N.Y. 2005). The evidence suggests that, in several instances, the moratorium has precluded varying uses of property, including planned sales or owner-occupancy. *See* DE 13 ¶ 6 (Chrysafis's attempt to sell house thwarted by tenants); Tr. 34-35 (LaCasse testimony reflecting intention to live in the subject premises, or sell it to obtain another home); DE 11 ¶ 12 (Shi's intent to move her family into subject home because they can no longer afford apartment rent). Such deprivation could well be viewed as irreparable harm. *See Brooklyn Heights Ass'n, Inc. v. Nat'l Park Serv.*, 777 F. Supp. 2d 424, 435 (E.D.N.Y. 2011) ("[I]t is well-settled that unauthorized interference with a real property interest constitutes irreparable harm as a matter of law, given that a piece of property is considered to be a unique commodity for which a monetary remedy for injury is an inherently inadequate substitute.").

Tenants are not parties to this action, and the state actors are not subject to a money judgment in this case. "[W]here a plaintiff cannot recover damages due to sovereign immunity, monetary loss may amount to irreparable harm." *Regeneron Pharms., Inc. v. United States Dep't of Health & Hum. Servs.*, No. 20-CV-10488 (KMV), 2020 WL 7778037, at *4 (S.D.N.Y. Dec. 30, 2020) (citing *United States v. New York*, 708 F.2d 92, 93 (2d Cir. 1983) ("[I]njury was

11

irreparable even though losses were only pecuniary because a suit in federal court against New York to recover the damages sustained by the plaintiff would be barred by the Eleventh Amendment.")).

Finally, "[w]hen an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary." *Mitchell v. Cuomo*, 748 F.2d 804, 806 (2d Cir. 1984). Taken together with the showing made, these principles suggest that plaintiffs have demonstrated a risk of irreparable injury sufficient to warrant further consideration of plaintiff's application for preliminary relief.

### C. Likelihood of Success

#### 1. Due Process Violations

Plaintiffs' most significant constitutional challenge arises from alleged procedural due process violations emanating from the moratorium. Relying on the notion that "[t]he fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner,'" *Mathews v. Eldridge,* 424 U.S. 319, 333 (1976) (citation omitted), plaintiffs argue, chiefly, that their inability to file or enforce eviction proceedings until August 31, 2021 amounts to a due process violation. Plaintiffs also take aim at the procedural peculiarities of CEEFPA, which preclude the institution or enforcement of eviction proceedings based upon the execution of the hardship declaration by the tenant, a declaration immune from administrative or judicial review.[7]

---

[7] CEEFPA features certain curious provisions which are not raised by plaintiffs, and are thus not subject to this decision. One such feature is the vacatur of existing court orders through legislative action. *Compare* CEEFPA Part A, § 7 ("If a default judgment has been awarded prior to the effective date of this act, the default judgment shall be removed and the matter restored to the court calendar . . . .") *with County of Suffolk v. Long Island Lighting Co.*, 14 F. Supp. 2d 260, 265 (1998) ("[T]he property of judgment creditors is protected from uncompensated takings by legislatures . . . .").

At first blush, the facts presented by several plaintiffs might appear to raise due process concerns. The pandemic has evolved: in 2021, several effective vaccines became available, and have been distributed free at numerous state-operated facilities for months. As of this writing, 65% adults in New York State have received at least one vaccination, and the statewide positivity rate has hit a new low.[8] These developments dovetail with evidence of significant financial hardship: plaintiffs have been unable to collect rent or regain control over their property for months or years and, in some instances, from circumstances that predate the pandemic. Under the statute, plaintiffs seemingly lack recourse to challenge the hardship declarations. Attempting to apply the *Mathews* factors, though, proves futile, as CEEFPA does not lend itself to review under *Mathews*.

The fundamental flaw in plaintiffs' procedural due process argument is that the treatment afforded a general legislative act differs from that for a case-specific determination. In *Bi-Metallic Inv. Co. v. State Bd. of Equalization*, the Supreme Court offered an apt explanation of this principle:

> *General statutes within the state power are passed that affect the person or property of individuals, sometimes to the point of ruin, without giving them a chance to be heard.* Their rights are protected in the only way that they can be in a complex society, by their power, immediate or remote, over those who make the rule. If the result in this case had been reached, as it might have been by the state's doubling the rate of taxation, no one would suggest that the 14th Amendment was violated unless every person affected had been allowed an opportunity to raise his voice against it before the body intrusted by the state Constitution with the power. In considering this case in this court we must assume that the proper state machinery has been used, and the question is whether, if the state Constitution had declared that Denver had been undervalued as compared with the rest of the state, and had decreed that for the current year the valuation should be 40 per cent higher, the objection now urged could prevail. It appears to us that to put the question is to answer it. There must be a limit to individual argument in such matters if government is to go on.

---

[8] *Governor Cuomo Announces 7-Day Average COVID-19 Positivity Rate Continues to Drop to New Lows*, COVID-19 Updates (June 1, 2021), https://www.governor.ny.gov/news/governor-cuomo-announces-7-day-average-covid-19-positivity-rate-continues-drop-new-lows.

239 U.S. 441, 445 (1915) (emphasis added). The Supreme Court has repeatedly reaffirmed the

*Bi-Metallic* principle, as has the Second Circuit and nearly every other Circuit court.[9] *See E.*

*Enterprises v. Apfel*, 524 U.S. 498, 550 (1998) (Kennedy, J., concurring in part) ("Statutes may

be invalidated on due process grounds only under the most egregious of circumstances"); *United*

*States v. Locke*, 471 U.S. 84, 108 (1985) ("In altering substantive rights through enactment of

rules of general applicability, a legislature generally provides constitutionally adequate process

simply by enacting the statute . . . ."); *Richmond Boro Gun Club, Inc. v. City of New York*, 97

F.3d 681, 689 (2d Cir. 1996) ("When the legislature passes a law which affects a general class of

persons, those persons have all received procedural due process—the legislative process"). As

the Second Circuit has explained:

> Official action that is legislative in nature is not subject to the notice and hearing
> requirements of the due process clause. These constitutional due process
> requirements apply only where the official action is "designed to adjudicate disputed
> facts in particular cases." "When not bounded by statutory procedural requirements,
> the Supreme Court has consistently been willing to assume that due process does not
> require any hearing or participation in 'legislative' decisionmaking other than that
> afforded by judicial review after rule promulgation."

*Interport Pilots Agency, Inc. v. Sammis*, 14 F.3d 133, 142 (2d Cir. 1994) (citations omitted).

---

[9] *See, e.g.*, *Garcia-Rubiera v. Fortuno*, 665 F.3d 261, 272 (1st Cir. 2011) (contrasting legislative actions with "individual adjudications, which require more specific procedures," as set out in, for example, *Mathews v. Eldridge*); *Rogin v. Bensalem Township*, 616 F.2d 680, 693 (3d Cir. 1980) ("To provide every person affected by legislation the various rights encompassed by procedural due process—including hearings, opportunity for confrontation and response, clear standards, an impartial arbiter, and possibly judicial review—would be inconsistent with the structure of our system of government. The act of legislating necessarily entails political trading, compromise, and ad hoc decisionmaking which, in the aggregate, produce policies that at least approximate a fair and equitable distribution of social resources and obligations."); *County Line Joint Venture v. City of Grand Prairie, Tex.*, 839 F.2d 1142, 1144 (5th Cir. 1988); *Smith v. Jefferson Cty. Bd. of Sch. Comm'rs*, 641 F.3d 197, 217 (6th Cir. 2011); *Indiana Land Co. v. City of Greenwood*, 378 F.3d 705, 710 (7th Cir. 2004); *Collier v. City of Springdale*, 733 F.2d 1311, 1316 n.5 (8th Cir. 1984); *Halverson v. Skagit County*, 42 F.3d 1257, 1260-61 (9th Cir. 1994); *Onyx Properties LLC v. Bd. of Cty. Commissioners*, 838 F.3d 1039, 1045 (10th Cir. 2016); *75 Acres, LLC v. Miami-Dade Cty.* 338 F.3d 1288, 1294 (11th Cir. 2003) (citations omitted) ("[A]s one set of commentators has summarized, 'When the legislature passes a law which affects a general class of persons, those persons have all received procedural due process—the legislative process.'") (citation omitted)).

Undoubtedly, the challenged provisions of CEEFPA (and, for that matter, its predecessor EOs) represent legislative, rather than adjudicative acts. Acts are adjudicative, and hence subject to due process claims, where they involve "facts about the parties and their activities, businesses, and properties," and are "designed to adjudicate disputed facts in particular cases." *Edelhertz v. City of Middletown*, 943 F. Supp. 2d 388, 395 (S.D.N.Y. 2012), *aff'd sub nom. Edelhertz v. City of Middletown*, New York, 714 F.3d 749 (2d Cir. 2013) (citations omitted). By contrast, legislative actions entail "the formulation of a general rule to be applied … at a subsequent time." *Id.* (citation omitted). By these measures, CEEFPA, which governs the timing, format and litigation of eviction proceeds generally, clearly constitutes legislative action and "is not subject to the notice and hearing requirements of the due process clause." *Interport Pilots Agency*, 14 F.3d at 142 (citing *RR Village Ass'n v. Denver Sewer Corp.*, 826 F.2d 1197, 1204–05 (2d Cir. 1987)).

Earlier challenges to eviction moratoria have been rejected for essentially the same reasons. As Justice Holmes observed:

> [A] declaration by a legislature concerning public conditions that by necessity and duty it must know, is entitled at least to great respect. In this instance Congress stated a publicly notorious and almost world-wide fact. That the emergency declared by the statute did exist must be assumed, and the question is whether Congress was incompetent to meet it in the way in which it has been met by most of the civilized countries of the world.

*Block v. Hirsh*, 256 U.S. 135, 154–55 (1921) (upholding a Congressional eviction moratorium in the District of Columbia); *see also Edgar A. Levy Leasing Co. v. Siegel*, 258 U.S. 242, 246 (1922). In rejecting such a challenge, Justice Holmes emphasized that "the notion that [property rights] are exempt from the legislative modification from time to time in civilized life is contradicted . . . by . . . the police power in its proper sense, under which property rights may be cut down, and to that extent taken, without pay." *Block*, 256 U.S. at 155. In another case, Justice Holmes upheld an eviction

moratorium[10] imposed by the New York legislature limited to cities with a population of more than one million because "the evil to be met was a very pressing want of shelter in certain crowded centers." *Marcus Brown Holding Co. v. Feldman*, 256 U.S. 170, 199 (1921).

The Court renewed these principles in reviewing a Contracts Clause challenge to legislation aimed at similar effects of the Great Depression:

> Whatever doubt there may have been that the protective power of the state, its police power, may be exercised—without violating the true intent of the provision of the Federal Constitution—in directly preventing the immediate and literal enforcement of contractual obligations by a temporary and conditional restraint, where vital public interests would otherwise suffer, was removed by our decisions relating to the enforcement of provisions of leases during a period of scarcity of housing.

*Home Bldg. & Loan Ass'n v. Blaisdell*, 290 U.S. 398, 440 (1934); *see also Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 249, 98 S. Ct. 2716, 2725, 57 L. Ed. 2d 727 (1978) (noting that *Blaisdell* took judicial notice of "the broad and desperate emergency economic conditions of the early 1930's"). And a half-century later, the Court reiterated that it "has consistently affirmed that States have broad power to regulate housing conditions in general and the landlord-tenant relationship in particular without paying compensation for all economic injuries that such regulation entails." *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 440, (1982).

---

[10] That moratorium arose from a nationwide housing crisis described in a separate opinion as follows:

> That there was a very great shortage in dwelling house accommodations in the cities of the state to which the acts apply; that this condition was causing widespread distress; that extortion in most oppressive forms was flagrant in rent profiteering; that, for the purpose of increasing rents, legal process was being abused and eviction was being resorted to as never before; and that unreasonable and extortionate increases of rent had frequently resulted in two or more families being obliged to occupy an apartment adequate only for one family, with a consequent overcrowding, which was resulting in insanitary conditions, disease, immorality, discomfort, and widespread social discontent.

> If this court were disposed, as it is not, to ignore the notorious fact that a grave social problem has arisen from the insufficient supply of dwellings in all large cities of this and other countries, resulting from the cessation of building activities, incident to the war, nevertheless, these reports and the very great respect which courts must give to the legislative declaration that an emergency existed would be amply sufficient to sustain an appropriate resort to the police power for the purpose of dealing with it in the public interest.

*Edgar A. Levy Leasing*, 258 U.S. at 246.

One cannot argue that the CEEFPA moratorium is not reasonably related to COVID crisis.

As one district court held regarding similar anti-COVID restrictions:

> Plaintiff argues that the Act is not "rationally related to preventing the spread of COVID-19" because "the Act provides relief to tenants who were struggling to meet their rent obligations as far back as March 1, 2020 – before the coronavirus ravaged the United States and before any declaration of emergency in Philadelphia or Pennsylvania." On March 6, 2020, Governor Wolf issued a Proclamation of Disaster Emergency; the City's determination that beginning relief on March 1, as opposed to March 6, for residents who have suffered a COVID-19 financial hardship is not irrational.

*HAPCO v. City of Philadelphia*, 482 F. Supp. 3d 337, 357 (E.D. Pa. 2020). These observations are fully applicable to the objections to CEEFPA and the predicate EOs. It is the act of eviction, not the timing of non-payment, that increases the risk of COVID spread. Viewed through this lens, the rationale for applying legislation to pending evictions becomes clear.

Of course, the legislature's power is not without constitutional limitation. *Block*, 256 U.S. at 156 ("[A] public exigency will justify the legislature in restricting property rights in land to a certain extent without compensation."); *cf. Auracle Homes, LLC v. Lamont*, 478 F. Supp. 3d 199, 227 (D. Conn. 2020) (upholding similar action to combat COVID-19 because "the Executive Orders only delay Plaintiffs' ability to initiate evictions; they do not eradicate all future opportunity for Plaintiffs to pursue evictions"). The standard, though, is very different. A legislative act of this kind may be invalidated if "clearly arbitrary and unreasonable, having no substantial relation to the public health, safety, morals, or general welfare." *City of Eastlake v. Forest City Enterprises, Inc.*, 426 U.S. 668, 676 (1976). "It is by now well established that legislative Acts adjusting the burdens and benefits of economic life come to the Court with a presumption of constitutionality, and that the burden is on one complaining of a due process violation to establish that the legislature has acted in an arbitrary and irrational way." *Usery v. Turner Elkhorn Mining Co.*, 428 U.S. 1, 15 (1976). A converse conclusion dictates that the act must be upheld, irrespective of its efficacy:

> Assuming that the end in view otherwise justified the means adopted by Congress, we have no concern of course with the question whether those means were the wisest,

whether they may not cost more than they come to, or will effect the result desired. It is enough that we are not warranted in saying that legislation . . . is futile or has no reasonable relation to the relief sought.

*Block*, 256 U.S. at 158.

Plaintiffs complain of the length of the moratorium. There certainly is a temporal point at which the legislative action would arise to the level of capriciousness. *See Ecogen, LLC v. Town of Italy*, 438 F. Supp. 2d 149, 161 (W.D.N.Y. 2006) ("[A] moratorium must be of reasonable duration"). Yet "[t]here is . . . no bright-line rule as to how long a moratorium can remain in effect without treading upon constitutional rights." *Id.* at 162 (*citing Tahoe–Sierra Pres. Council, Inc. v. Tahoe Regional Planning Agency*, 535 U.S. 302, 342 (2002) (refusing to enjoin zoning moratorium which had been extended to two years)). A hundred-year moratorium would be out of bounds, while a ten-day moratorium warrants no discussion. *Compare Tahoe-Sierra*, 535 U.S. at 341 (noting that "any moratorium that lasts for more than one year should be viewed with special skepticism" while upholding 32-month development moratorium) *with ASF, Inc. v. City of Seattle*, 408 F. Supp. 2d 1102, 1108–09 (W.D. Wash. 2005) (finding 17-year moratorium on issuance of new adult entertainment licenses unconstitutional). So where does the present moratorium fall on that spectrum?

Caselaw from earlier public emergencies provides some guidance. The CEEFPA moratorium – an eight month statutory provision following about ten months of EO suspensions – is not outside the bounds of previously sanctioned moratoria. *See, e.g.*, *Blaisdell*, 290 U.S. 398 (upholding two-and-a-half-year moratorium on foreclosure evictions); *Feldman*, 256 U.S. 170 (approving a 25-month holdover eviction moratorium); *cf. Ecogen, LLC v. Town of Italy*, 438 F. Supp. 2d 149 (refusing to enjoin two-year zoning moratorium).

The specific circumstances surrounding the most recent extension of CEEFPA in April 2021 prove illuminating. Plaintiffs bitterly object to this extension, the catalyst for this lawsuit. DE 1 ¶ 2

("There is simply no legal, economic or health rationale for the extension of this blanket eviction moratorium."). But the Legislature – and the world – remains in the midst of a struggle against the most deadly pandemic in a century. And while progress has been made, as noted by the Legislature in approving the extension, substantial data supported its determination. DE 40-4 at 18. Although plaintiffs argue that the extension's implementation was less than ideal, this Court neither can nor should second-guess such determinations. Courts are equipped with microscopes, while other branches of government have binoculars. Hence, broad public policy decisions are best left to those institutions. *See Jacobson v. Commonwealth of Massachusetts*, 197 U.S. 11, 30 (1905) ("It is no part of the function of a court or a jury to determine which one of two modes was likely to be the most effective for the protection of the public against disease. That was for the legislative department to determine in the light of all the information it had or could obtain.").

Considering all the relevant circumstances, the State's actions fell well within the realm of reasonableness.

Finally, plaintiffs' due process challenge to CEEFPA's procedural treatment of the hardship declarations – both in terms of their inability to obtain substantive review of those declarations now and the rebuttable presumption adopted for subsequent proceedings – fails for largely the same reasons. "Given a constitutional substantive statute, enacted to give effect to a constitutional purpose, the states have a wide discretion as to the remedies which may be deemed necessary to achieve such a result, and it is very clear that that discretion has not been exceeded in this instance by the state of New York." *Edgar A. Levy Leasing*, 258 U.S. at 250. In *Block v. Hirsh*, Justice Holmes wrote:

> The statute is objected to on the further ground that landlords and tenants are deprived by it of a trial by jury on the right to possession of the land. If the power of the Commission established by the statute to regulate the relation is established, as we think it is, by what we have said, this objection amounts to little.

256 U.S. at 158. A court reviewing a parallel Pennsylvania statute noted:

> Plaintiff argues that the Act violates the Due Process Clause because there is no way for landlords "to substantiate a claim of COVID-related financial hardship." However, the certifications of hardship must comply with Section 1-108 of the Philadelphia Code which require certifications to be sworn to under oath and, in any event, it is not arbitrary and irrational for the City to not provide landlords with the means of challenging whether tenants have truly experienced a COVID-19 financial hardship.

*HAPCO*, 482 F. Supp. 3d at 357. Plaintiffs' dislike of the procedures adopted – which predicate a delay of eviction proceeding upon the untested hardship declaration – does not implicate procedural due process concerns.

### 2. Miscellaneous Constitutional Challenges

Plaintiffs' remaining challenges are easily dispatched.

### a. Vagueness

Plaintiffs argue that Part A, § 5 of CEEFPA – which prescribes the language of the hardship declaration form – is impermissibly vague. A statute may be held to be impermissibly vague where it "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." *United States v. Williams*, 553 U.S. 285 (2008). In the context of criminal proceedings, Judge Raggi observed that "[c]ourts rarely invalidate a statute on its face because of alleged vagueness if the statute does not relate to a fundamental constitutional right (usually first amendment freedoms) and if the statute provides 'minimally fair notice' of what the statute prohibits." *Richmond Boro Gun Club, Inc.*, 97 F.3d at 684. Plaintiffs provide little argument and no evidence demonstrating that the hardship declaration is impermissibly vague. DE 8 at 27-28. One state court reviewing an identical CEEFPA challenge found:

> the terminology used in CEEFPA consists of plain language that persons of ordinary intelligence can understand and not be forced to guess at its meaning. In context of the very real pandemic, and the fact that false declarations of hardship are punishable under the penal law, CEEFPA is not is written in a manner that permits or encourages arbitrary application.

*Lakeragh, et al. v. State of New York, et al.*, Index No. 902292-21, (N.Y. Sup. Ct. Albany Cty. March 30, 2021); DE 29-4 at 10.   The undersigned fully agrees.  Plaintiffs' vagueness challenge is meritless.

> b.  *Right to Petition*

Plaintiffs also contend that the moratorium violates their First Amendment right to petition the courts.  Judge McMahon rejected this precise argument raised in conjunction with the EOs:

> The right to petition for a redress of grievances in the form of judicial relief is protected by the First Amendment. *See, e.g.*, *Gagliardi v. Village of Pawling*, 18 F.3d 188, 194 (2d Cir. 1994) (citing *United Mine Workers v. Ill. Bar Assoc.*, 389 U.S. 217, 222, 88 S.Ct. 353, 19 L.Ed.2d 426 (1967)).  The right of access to courts is burdened when state officials take systemic action to frustrate a plaintiff or class of plaintiffs from preparing and filing lawsuits. *Christopher v. Harbury*, 536 U.S. 403, 413, 122 S.Ct. 2179, 153 L.Ed.2d 413 (2002).  To prevail on a denial of access claim, the plaintiff must show "that the defendant took or was responsible for actions that hindered [a plaintiff's] efforts to pursue a legal claim," *Davis v. Goord*, 320 F.3d 346, 351 (2d Cir. 2003); (quoting *Lewis v. Casey*, 518 U.S. 343, 349, 351, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996) (alteration in original)).  "As the Supreme Court has explained, the requirement of actual injury 'derives ultimately from the doctrine of standing.'"  *Monsky v. Moraghan*, 127 F.3d 243, 247 (2d Cir. 1997) (quoting *Lewis*, 518 U.S. at 349, 116 S.Ct. 2174).
>
> Plaintiffs have not shown that the eviction moratorium EO 202.28 "had the actual effect of frustrating [their] effort[s] to pursue a legal claim." *Oliva v. Town of Greece*, 630 Fed. Appx. 43, 45 (2d Cir. 2015).  Although nonpayment proceedings have been suspended, Plaintiffs can still sue their tenants for arrearages through a breach of contract action in the New York Supreme Court – and the fact that is not their preferred remedy is of no moment.  They will also have the opportunity to bring eviction proceedings for reason of nonpayment once the order expires, a right preserved by the portion of EO 202.28 that extends relevant statutes of limitation for the duration of court closures.  Since "mere delay" to filing a lawsuit cannot form the basis of a Petition Clause violation when the plaintiff will, at some point, regain access to legal process, *Davis*, 320 F.3d at 352, the Plaintiffs' right to collect both the monetary remedies and injunctive relief they would seek through an eviction proceeding has not been "completely foreclosed" by EO 202.28, *Sousa v. Marquez*, 702 F.3d 124, 125 (2d Cir. 2012).  The eviction moratorium in EO 202.28 does not violate Plaintiffs' First Amendment rights.

*Elmsford Apartment Assocs., LLC*, 469 F. Supp. 3d at 173–74. This analysis is fully applicable to, and dispositive of, the instant challenge to CEEFPA.

Plaintiffs' argument is further undermined by three additional considerations. First, the *Lakeragh* determination, *supra*, demonstrates that landlords had access to the state court system to challenge the legislative enactment. Second, the evidence at the hearing revealed that one named plaintiff filed an ejectment proceeding and obtained an Order to Show Cause from a state court judge. Tr. 44-55; State's Exs. C & D. Third, CEEFPA's eviction moratorium allows exceptions for nuisance violations, permitting access to the courts for certain purposes. These facts demonstrate that plaintiffs' right to petition has not been violated.

### c. Compelled Speech

Finally, plaintiffs vigorously assert that CEEFPA's notice requirements, directing landlords to provide blank hardship declaration forms and information concerning legal services organizations to their tenants constitutes compelled speech in violation of their First Amendment rights.[11] In a society laden with government-mandated disclosures and warnings, from cigarette packs (which advise, as required by law, that use of the product could result in death), to mandatory disclosures (sometimes in specified font sizes) in leases, mortgages and automobile purchase agreements, one wonders how plaintiffs' rights might be impinged upon by the CEEFPA disclosures. The short answer is that they are not.

As the Second Circuit has held:

Commercial disclosure requirements are treated differently from restrictions on commercial speech because mandated disclosure of accurate, factual, commercial information does not offend the core First Amendment values of promoting efficient exchange of information or protecting individual liberty interests. Such

---

[11] Plaintiffs attack the statute's requirement that landlords translate the declaration form for tenants that do not speak one of the languages in which the form is already provided. (The *nycourts.gov* website appears to offer the form in twenty languages, including Wolof, which is spoken in Senegal). As plaintiffs have elicited no evidence that any of their tenants require such services, this argument is not properly before the Court.

> disclosure furthers, rather than hinders, the First Amendment goal of the discovery of truth and contributes to the efficiency of the "marketplace of ideas." Protection of the robust and free flow of accurate information is the principal First Amendment justification for protecting commercial speech, and requiring disclosure of truthful information promotes that goal. In such a case, then, less exacting scrutiny is required than where truthful, nonmisleading commercial speech is restricted.

*National Elec. Mfrs. Ass'n v. Sorrell*, 272 F.3d 104, 113–14 (2d Cir. 2001). The notice at issue here clearly falls under the umbrella of commercial speech as "expression related solely to the economic interests of the speaker and its audience," *Conn. Bar Ass'n v. United States*, 620 F.3d 81, 94 (2d Cir. 2010) (quoting *Central Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. at 561). Such advisory notices "are traditionally regarded as commercial speech even if they effectively" act against the speakers' interests. *Grocery Mfrs. Ass'n v. Sorrell*, 102 F. Supp. 3d 583, 626 (D. Vt. 2015) (citing *New York State Rest. Ass'n v. New York City Bd. of Health*, 556 F.3d 114, 131, 133 (2d Cir. 2009)). Laws, like CEEFPA, "that compel the reporting of 'factual and uncontroversial' information by commercial entities are scrutinized for rationality." *New York State Rest. Ass'n v. New York City Bd. of Health*, 556 F.3d 114, 134 (2d Cir. 2009) (citation omitted); *National Elec. Mfrs. Ass'n*, 272 F.3d at 115. There is no doubt that the notice requirement here is rational; similar factual notices have been upheld for a range of purposes far less pressing than the mitigation of an ongoing pandemic. *See, e.g.*, *New York State Rest. Ass'n*, 556 F.3d at 134-35; *National Elec. Mfrs. Ass'n*, 272 F.3d at 115-16; *Conn. Bar Ass'n*, 620 F.3d at 96-100. On the other hand, even if the Court were to apply the "strict scrutiny" standard urged by the plaintiffs,[12] the magnitude of the public health emergency overwhelmingly justifies this miniscule burden on plaintiffs.

---

[12] Plaintiffs cite to *Riley v. Nat'l Fed'n of the Blind of N. Carolina, Inc.*, 487 U.S. 781 (1988) in support of this proposition. However, the disclosures at issue in *Riley* were held to necessitate a higher standard of review not on

Thus, plaintiffs have failed to establish a likelihood of success on the merits or a serious question to make them a fair ground for trial. Furthermore, in light of the continuing public health crisis,[13] plaintiffs cannot establish that the balance of the hardships tip decidedly in their favor, or that granting a preliminary injunction would serve the public's interest. *See Auracle Homes*, 478 F. Supp. 3d at 228 ("[G]iven the nature of this pandemic, the balance of the equities and the public interest favor denying a preliminary injunction.").

### D. Dismissal of Claims against Remaining Defendants

Other than defendant Marks, the remaining defendants include several sheriffs and the New York City Department of Investigations, entities which are charged with serving eviction warrants. Several of these defendants have already started the process of filing motions to dismiss. At the hearing, on consent, the matter was stayed as to these defendants – who are largely nominal defendants – to avoid incurring unneeded litigation expenses. The only evidence of record demonstrates that these defendants have not refused any requests to serve a warrant. Tr. 56, 78. In light of the evidence and the determinations herein, plaintiffs' claims against these defendants fail. In order to speed the resolution of this significant matter, and avoid unnecessary litigation costs, consistent with the dictates of Rule 1 of the Federal Rules of Civil Procedure, the Court hereby exercises its discretion to dismiss the complaint as against these defendants under Rule 12(b)(6) of the Federal Rules of Civil Procedure.

---

their own merit, but rather because they were "inextricably intertwined with otherwise fully protected speech" – in that case, "informative and perhaps persuasive speech" about charitable fundraisers' mission and purpose. *Id.* at 796. The disclosures at issue here bear no such connection; indeed, they are, at worst only "intertwined" with other commercial speech, *e.g.*, demands for rent.

[13] See note 1, *supra.*

*E. Consolidation with a Determination on the Merits*

Rule 65(a)(2) of the Federal Rules of Civil Procedure provides that "[b]efore or after beginning the hearing on a motion for a preliminary injunction, the court may advance the trial on the merits and consolidate it with the hearing." This determination is well within a court's discretion. "Given the broad discretion accorded the district court by Rule 65(a)(2), the court's order of consolidation will not be overturned on appeal absent a showing of substantial prejudice in the sense that a party was not allowed to present material evidence." *Abraham Zion Corp. v. Lebow*, 761 F.2d 93, 101 (2d Cir. 1985).

In an "Order Re: Consolidation with Merits," the Court observed that:

> the preliminary injunction evidence received and argument heard by the Court could well resolve the case in its entirety, that a fuller record may not be required and that discovery would not likely advance the dispute in any meaningful way. Furthermore, given the importance of the issues at hand, as well as the time-sensitive nature of the dispute, it may be in the parties' interest to provide finality and/or prepare the matter for appellate review as quickly as possible. Based on these observations, counsel for plaintiffs and for defendant Marks will file a letter by close of business, Monday June 7, 2021, indicating whether they consent to consolidation of the preliminary injunction hearing with the trial of the merits herein, or if they object, the basis for such objection.

Electronic Order dated June 4, 2021. In other words, the Court recognized that the preliminary injunction could constitute "the whole ballgame." *D.L. Cromwell Invs., Inc. v. NASD Regul., Inc.*, 279 F.3d 155, 159 (2d Cir. 2002).

In response, counsel for plaintiffs agreed to consolidation on the condition that the Court accept into evidence and consider the unrebutted declarations of two plaintiffs who did not testify – which has been done in connection with this determination. DE 71. Defendant Marks' sole concern emanates from discovery of underlying landlord-tenant records and the impact it could have on the Court's determination of the due process issue. DE 70. As this decision finds

in favor of the defendant on the due process claims, and the landlord-tenant records would have no effect on these proceedings, the undersigned finds that consolidation is appropriate.

In connection with the hearing and preliminary injunction determination, the Court placed no limitation on the evidence or arguments made by the parties. No jury rights will be affected by the outcome, as plaintiffs are not entitled to a jury. Resolving this case on the merits will facilitate appellate review of this important and time-sensitive matter. As such, the Court exercises its discretion to consolidate the merits of this case with the preliminary injunction determination herein.

## CONCLUSION

Based on the foregoing, it is hereby Ordered that:

- Plaintiffs' Motion for a Preliminary Injunction, which has been consolidated with the merits of the underlying action, is denied;

- Judgment shall be entered in favor of defendant Marks; and

- The case is hereby dismissed as to the remaining defendants for failure to state a claim.

The Clerk is directed to enter judgment as above and close the case.


Dated: Central Islip, New York
June 11, 2021

 /s/ Gary R. Brown_____
Gary R. Brown
United States District Judge



# NOTICE TO TENANT:

If you have lost income or had increased costs during the COVID-19 pandemic, ormoving would pose a significant health risk for you or a member of your household dueto an increased risk for severe illness or death from COVID-19 due to an underlyingmedical condition, and you sign and deliver this hardship declaration form to your landlord, you cannot be evicted until at least May 1, 2021 for nonpayment of rentor for holding over after the expiration of your lease. You may still be evicted for violating your lease by persistently and unreasonably engaging in behavior that substantially infringes on the use and enjoyment of other tenants or occupants or causes a substantial safety hazard to others.

If your landlord has provided you with this form, your landlord must also provideyou with a mailing address and e-mail address to which you can return this form. Ifyour landlord has already started an eviction proceeding against you, you can returnthis form to either your landlord, the court, or both at any time. You should keep a copy or picture of the signed form for your records. You will still owe any unpaid rent to your landlord. You should also keep careful track of what you have paid andany amount you still owe.

For more information about legal resources that may be available to you, go to www.nycourts.gov/evictions/nyc/ or call 718-557-1379 if you live in New York City or go to www.nycourts.gov/evictions/outside-nyc/ or call a local bar association or legal services provider if you live outside of New York City. Rent relief may be available to you, and you should contact your local housing assistance office.



Index Number (if known/applicable): _____

County and Court (if known/applicable): _____

# TENANT'S DECLARATION OF HARDSHIP DURING THE COVID-19 PANDEMIC

I am a tenant, lawful occupant, or other person responsible for paying rent, use and occupancy, or any other financial obligation under a lease or tenancy agreement at (address of dwelling unit):

_____

**YOU MUST INDICATE BELOW YOUR QUALIFICATION FOR EVICTION PROTECTION BY SELECTING OPTION "A" OR "B", OR BOTH.**

☐ A. I am experiencing financial hardship, and I am unable to pay my rent or other financial obligations under the lease in full or obtain alternative suitable permanent housing because of one or more of the following:

1. Significant loss of household income during the COVID-19 pandemic.

2. Increase in necessary out-of-pocket expenses related to performing essential work or related to health impacts during the COVID-19 pandemic.

3. Childcare responsibilities or responsibilities to care for an elderly, disabled, or sick family member during the COVID-19 pandemic have negatively affected my ability or the ability of someone in my household to obtain meaningful employment or earn income or increased my necessary out-of-pocket expenses.

4. Moving expenses and difficulty I have securing alternative housing make it a hardship for me to relocate to another residence during the COVID-19 pandemic.

5. Other circumstances related to the COVID-19 pandemic have negativelyaffected my ability to obtain meaningful employment or earn income or have significantly reduced my household income or significantly increased my expenses.

To the extent that I have lost household income or had increased expenses, any public assistance, including unemployment insurance, pandemic unemployment assistance, disability insurance, or paid family leave, that I have received since the start of the COVID-19 pandemic does not fully make up for my loss of household income or increased expenses.

☐ B. Vacating the premises and moving into new permanent housing would pose a significant health risk because I or one or more members of my household have an increased risk for severe illness or death from COVID-19due to being over the age of sixty-five, having a disability or having an underlying medical condition, which may include but is not limited to being immunocompromised.

I understand that I must comply with all other lawful terms under my tenancy, lease agreement or similar contract. I further understand that lawful fees, penalties orinterest for not having paid rent in full or met other financial obligations as requiredby my tenancy, lease agreement or similar contract may still be charged or collectedand may result in a monetary judgment against me. I further understand that my landlord may be able to seek eviction after May 1, 2021, and that the law may providecertain protections at that time that are separate from those available through this declaration.

Signed:

Printed name:

Date signed:

**NOTICE:** You are signing and submitting this form under penalty of law. That means it is against the law to make a statement on this form that you know is false.