UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------------x

PANTELIS CHRYSAFIS, BETTY S.     :
COHEN, BRANDIE LACASSE, MUDAN   :
SHI, FENG ZHOU, and RENT       :
STABILIZATION ASSOCIATION OF NYC,  :
INC.,                  :
                    :    No. 21-CV-02516 (GRB)
     *Plaintiffs*,       :
                    :    **AMENDED COMPLAINT**
   -against-         :
                    :    **JURY TRIAL DEMANDED**

LAWRENCE K. MARKS, in his official    :
capacity as Chief Administrative Judge of the  :
Courts of New York State,      :
                    :
     *Defendant*.       :
                    :

------------------------------------------------------------x

Plaintiffs Pantelis Chrysafis, Betty S. Cohen, Brandie LaCasse, Mudan Shi, and Feng

Zhou (collectively, the "Property-Owner Plaintiffs") and Rent Stabilization Association of NYC,

Inc. ("RSA," together with the Property-Owner Plaintiffs, "Plaintiffs"), by and through their

attorneys, Gibson, Dunn & Crutcher LLP, for their Amended Complaint against Defendant

Lawrence K. Marks, in his official capacity as Chief Administrative Judge of the Courts of New

York State, allege as follows:

## NATURE OF THE ACTION

1.     This case challenges the constitutionality of New York's ongoing residential

eviction moratorium, first enacted as the COVID-19 Emergency Eviction and Foreclosure

Prevention Act of 2020 ("CEEFPA Part A," attached as Exhibits A & B) in December 2020, and

now extended and amended as New York Laws Chapter 417 (S50001), Part C, Subpart A (the

"Extension," attached as Exhibit C). This new Extension stretches what State legislators

originally sought to justify as a temporary pause on evictions during the height of the COVID-19

pandemic into more than a year-and-a-half long period during which thousands of the State's small property owners, including the Property-Owner Plaintiffs here and countless RSA members, have had their personal lives and finances decimated by the inability to remove nonpaying or holdover tenants, many of whom stopped paying rent or whose leases expired even before the pandemic began.  Plaintiff LaCasse, for example, a military veteran and single mother, has become homeless with her 11 year-old daughter because she cannot reclaim her own property from non-paying, holdover tenants.   And Plaintiff Chrysafis has become clinically depressed and suicidal because he cannot take possession of his home and is owed over $100,000 in back rent.  At the same time, CEEFPA Part A and now the Extension have trampled on owners' constitutional rights, denied them access to and any benefit from their property, and freed tenants from any consequence for refusing to pay rent, giving them carte blanche to overstay the expiration of their leases—even where their nonpayment or lease expiration began before the pandemic.

2.       On August 12, 2021, the Supreme Court granted Plaintiffs' emergency application to enjoin New York's residential eviction moratorium in its entirety pending final disposition of appellate proceedings in the Second Circuit and the Supreme Court.  The Court's order explained that the law "generally precludes a landlord from contesting" a tenant's "self-certif[ication" of "financial hardship" and "denies the landlord a hearing," contrary to "the Court's longstanding teaching that ordinarily 'no man can be a judge in his own case' consistent with the Due Process Clause."  *Chrysafis v. Marks*, 141 S. Ct. 2482, 2482 (2021) (citation omitted).

3.       But just weeks later, the State Legislature enacted the Extension, expressly "extending" the very "residential eviction moratorium" that had been enjoined through at least January 15, 2022.  Although notionally styled as a "new" statute, this latest iteration of the

moratorium law reenacts virtually all of the provisions enjoined by the Supreme Court.  The Extension, like its predecessor, runs roughshod over the constitutional rights of the Property-Owner Plaintiffs, who are facing devastating, real-life consequences that compound with each passing day.  There is simply no legal, economic, or health rationale or justification for the extension of this eviction moratorium.  The State's attempted end-run around the Supreme Court's injunction cannot be permitted to stand.

4.      Indeed, this latest Extension—though nominally justified on the basis of COVID-19 pandemic—was enacted months *after* then-Governor Cuomo lifted virtually all remaining COVID-related restrictions and declared an end to the "state disaster emergency" based on "New York's dramatic progress against COVID-19, with the success in vaccination rates, and declining hospitalization and positivity statewide."  *Governor Cuomo Announces New York Ending COVID-19 State Disaster Emergency on June* 24 (June 23, 2021), https://www.governor.ny.gov/news/governor-cuomo-announces-new-york-ending-covid-19-state-disaster-emergency-june-24.  Since then, no new COVID-19 shutdowns or gathering restrictions have been imposed by the State, and businesses and entertainment venues throughout the State—including sports arenas and Broadway theaters—are now open for business.  The state courts have fully reopened as well.  Vaccination rates, meanwhile, have improved even further, with 76.6% of New Yorkers eighteen and older now having completed their vaccine series and 85.4% of adults having received at least one dose.  *See* https://covid19vaccine.health.ny.gov/covid-19-vaccine-tracker.  That the residential eviction moratorium has now been extended well into January 2022, without any tailoring to address this current reality on the ground, has only compounded its unconstitutionality and irrationality.  It is time to once again put an end to this governmental overreach.

5.      The Extension tramples on Plaintiffs' constitutional rights in at least four significant, separate ways:  *First*, the Extension violates property owners' procedural due process rights under the federal Due Process clause by providing them with *no meaningful opportunity* to challenge or verify tenants' declarations of hardship, which automatically bar or stay eviction proceedings.  S50001, Part C, Subpart A § 3.  As the Supreme Court recently reaffirmed in striking down the CDC's federal eviction moratorium, "preventing [landlords] from evicting tenants who breach their leases intrudes on one of the most fundamental elements of property ownership—the right to exclude."  *Ala. Ass'n of Realtors v. Dep't of Health & Hum. Servs.*, 2021 WL 3783142, at *4 (U.S. Aug. 26, 2021) (per curiam) (citation omitted).  Although the Extension purports to allow landlords to contest hardship claims if they are first able to swear, under penalty of perjury, to a good-faith belief that those claims are false, this "process" is illusory because landlords typically lack access to the information necessary to make such an attestation.   Thus, the law continues to allow a tenant's check-the-box "self-certif[cation" of "financial hardship" to block eviction proceedings, based on nothing more than tenants' say-so— leaving the tenant to serve as the "judge in his own case" in contravention of the Due Process Clause.  *Chrysafis*, 141 S. Ct. at 2482.  Of course, even under CEEFPA Part A, there were narrow circumstances in which individual landlords could obtain a hearing, but the Supreme Court was clear that these did not save the law because it nevertheless "*generally* precludes a landlord from contesting" the tenant's hardship declaration.  *Id*. (emphasis added).  The same is true for the Extension, which continues to violate landlords' Due Process rights.  And it is doubly true as applied to these Property-Owner Plaintiffs, who do not have sufficient information about their tenants to make such an attestation, as discussed below.

6.      *Second*, the Extension violates Plaintiffs' rights under the First Amendment because it impermissibly compels property owners to "speak a particular message" that they do not support and would not otherwise convey, *Nat'l Inst. of Family & Life Advocates v. Becerra*, 138 S. Ct. 2361, 2371 (2018), despite the presence of numerous less restrictive alternatives that "would communicate the desired information to the public without burdening [Plaintiffs] with unwanted speech," *Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 800 (1988). Like CEEFPA Part A, the Extension requires landlords to distribute a government-drafted hardship declaration detailing how they can evade their rental obligations. *See* S50001, Part C, Subpart A § 2; *see also* Ex. D (Hardship Declaration Form under Extension, available at https://www.nycourts.gov/eefpa/PDF/Residential_Eviction_Hardship_Declaration-English.pdf); Ex. E (Hardship Declaration Form under CEEFPA Part A). The Extension also forces property owners to provide tenants a with a government-curated "list of . . . legal service providers" who are available to assist tenants in seeking to avoid eviction. S50001, Part C, Subpart A § 2. The Extension thus amounts to content-based regulation of speech subject to strict scrutiny, the burden of which the government cannot possibly carry. Accordingly, the Extension is a plain violation of Plaintiffs' First Amendment rights.

7.      *Third*, the Extension is void for vagueness under the federal Due Process clause. It enables tenants to foreclose eviction and forsake their rental obligations by declaring "hardship" based on undefined "[s]ignificant loss of household income," "[i]ncrease in necessary out-of-pocket expenses," or "[o]ther circumstances" purportedly related to the COVID-19 pandemic, among other vague categories. *Id.* § 1. The statute thus fails to give property owners notice of the circumstances under which tenants will be exempted from state-law eviction remedies and no realistic means of predictable implementation. Furthermore, the statute does

not even require that tenants identify the category of "financial hardship" that they assert applies to them.  *Id.*  All of this makes it even more prohibitive for landlords whose only opportunity to rebut their tenants' proclaimed hardship and access the courthouse is to attest—under the penalty of perjury—that they believe the hardship, however unclear, to be false.

8.      *Fourth*, the Extension violates Plaintiffs' First Amendment right to petition, which has long been interpreted to protect access to the courts.  By effectively barring the filing and prosecution of summary eviction proceedings until at least January 15, 2022 in almost all cases in which a tenant submits a hardship declaration, the Extension tramples on property owners' rights to obtain redress through the courts.

9.      Plaintiffs seek a declaration that the Extension is unconstitutional and preliminary and permanent injunctive relief barring its further implementation and enforcement.

10.     The State's first eviction moratorium, imposed via Executive Order on March 20, 2020, barred the "enforcement" of evictions of residential and commercial tenants.  On May 7, 2020, in a second Executive Order, the State went a step further and barred the initiation of new proceedings, in addition to prohibiting the enforcement of evictions.  This second iteration and a subsequent law continued the moratorium on evictions applied to tenants facing a "financial hardship" due to or during COVID-19.

11.     On December 28, 2020, the State took even more sweeping action, enacting CEEFPA Part A.  CEEFPA Part A imposed a blanket stay on nearly all summary proceedings, new or pending, blocking all eviction proceedings until at least May 1, 2021, if tenants provided

a hardship declaration in the form set out in the law.[1]  In early May, CEEFPA Part A was then

extended through at least August 31, 2021.

12.    Two days after CEEFPA Part A was extended through August 31, Plaintiffs filed

the instant suit challenging the law and moved for a temporary restraining order and preliminary

injunction.  Although the Court denied Plaintiffs' preliminary injunction motion after an

evidentiary hearing, which was consolidated with the merits of the underlying action, the Court

found that Plaintiffs "satisfactorily demonstrated a risk of irreparable harm" from both the

ongoing deprivation of their constitutional rights and their evidentiary "showing" as to CEEFPA

Part A's crippling effects.  After both this Court and the Second Circuit denied Plaintiffs' motion

for an injunction pending appeal, on July 27, Plaintiffs sought an emergency writ of injunction

from the Supreme Court.  The Supreme Court granted that application on August 12, and

enjoined CEEFPA Part A in its entirety.  In so doing, the Court expressly found that CEEPFA

Part A violated Plaintiff's due process rights (and as a result did not reach Plaintiffs' First

Amendment and other claims), and necessarily determined that Plaintiffs had also met their

burden of establishing irreparable harm and a balance of equities in their favor.  Later in August,

the Supreme Court then explicitly found as much in enjoining the far narrower CDC eviction

---

[1]  In response to CEEFPA's December 2020 enactment, the Property-Owner Plaintiffs brought
an action in this District challenging the statute's constitutionality and naming New York
Attorney General Letitia James as a defendant. *See Chrysafis v. James*, No. 2:21-cv-00998
(E.D.N.Y.) ("*Chrysafis I*").  That case was dismissed on grounds unrelated to the merits of
the dispute—the court found that the Attorney General was not a proper party defendant—
thereby mooting the preliminary injunction motion.  *Chrysafis I*, Dkt. 34.  Plaintiffs
corrected that technical defect when filing the instant lawsuit, naming Chief Administrative
Judge Marks as the State official responsible for implementing the statute.   When filing the
instant action, Plaintiffs also named various law enforcement officers who had eviction
warrant-serving responsibilities, but the Court stayed the action as to them.  As Defendant
Marks has not disputed that he is a proper Defendant, Plaintiffs do not here seek to re-
introduce the law enforcement officers as via the instant Amended Complaint.

moratorium, which merely afforded a potential defense to eviction, holding that "landlords across the country" of "modest means" were put "at risk of irreparable harm" by the eviction moratorium, while "the Government's interests have decreased" over time. *Ala. Ass'n of Realtors*, 2021 WL 3783142, at *4.

13.   In response to the Supreme Court's injunction in this very case, the incoming Governor and CEEFPA's New York State Senate sponsor immediately vowed to extend the State's eviction moratorium.  On September 1, the Legislature and Governor followed through on their promises, enacting a law explicitly "extending" the prior "residential eviction moratorium" until at least January 15, 2022.  S50001 § 2; *see also id*. at p. 1 ("AN ACT . . . extending the prohibition on the eviction of residential tenants who have suffered financial hardship during the COVID-19 covered period[.]").  The latest Extension is essentially unchanged from CEEFPA Part A in almost all material respects, thereby continuing and exacerbating the same constitutional and economic harms caused by the earlier, enjoined iteration of the eviction moratorium.  The Second Circuit recently dismissed Plaintiffs' appeal of this Court's decision as to CEEFPA Part A on mootness grounds, in light of the Extension and without reaching the merits, and remanded the case for Plaintiffs to amend their Complaint to take account of the Extension and certain nominal changes it made to the moratorium scheme.

14.   In many cases, landlords have already suffered nearly two years of not being able to pursue their rights against tenants who refuse to comply with their lease obligations.  With the eviction moratorium now extended until at least January 15, 2022, and many property owners consequently not receiving rental income—numerous property owners may not be able to pay their mortgages or otherwise meet their financial obligations, leading to the loss of their

properties and other irreparable harms.  For many property owners, including Property-Owner Plaintiffs here, the Extension pushes them to the brink.

15.    Plaintiffs here are five small property owners whose tenants have refused to pay rent for extended periods—often starting before COVID-19 began; whose tenants refuse to move out even though their leases have expired; and/or whose tenants are subject to eviction orders that cannot now be enforced because of the Extension, together with a residential housing industry trade association.  Each of the Plaintiffs continue to suffer constitutional and other irreparable harms because of the Extension:

- Pantelis Chrysafis is the owner of a single-family home in Garden City, New York, which he currently rents out to tenants.  In early 2019, Chrysafis decided to try to sell the property, and he informed the tenants that they would have a number of months to find a suitable, alternative place to live.  The tenants simply stopped paying rent as a result.  In February 2020—before the COVID-19 pandemic—Chrysafis obtained a judgment against his tenants as well as a warrant of eviction ordering the tenants to vacate by April 1, 2020.  Chrysafis's tenants nevertheless remain in the home because of the eviction moratoria.  They have not paid rent for almost two years.  Chrysafis has been forced to borrow money from his elderly parents to stay afloat.  His inability to collect rental income, while still having significant costs of his own, has caused unending strife within his own family.  Since the passage of the Extension, his mental health has drastically deteriorated, and he is now clinically depressed and suicidal.  Yet he has no way of accessing the courts to evict his tenants because, in July 2021, they submitted a hardship declaration checking the box for "financial hardship"—preventing him from even filing an eviction lawsuit—and he has no way of swearing, under penalty of perjury, to a good faith belief that a financial hardship "does not exist," as required by the Extension, as he is not in contact with them and has no idea of their current circumstances.

- Plaintiff Brandie LaCasse is a retired military veteran.  She is a single mother who owns and manages six properties in New York.  She has a service-connected disability, which has resulted in her being immunocompromised.  And she and her 11 year-old daughter are now homeless because of the Extension.  LaCasse decided to sell one of her properties, a single family house in Rhinebeck, New York, in November 2020.  Accordingly, she served the tenants with a notice of nonrenewal pursuant to the terms of the lease.  The tenants stopped paying rent in response and have refused to vacate the property despite the fact that the lease's term has concluded.  LaCasse filed a holdover proceeding against the tenants in December 2020, which was immediately dismissed as a result of CEEFPA Part A.  Immediately thereafter, her tenants completed a hardship declaration form, claiming "financial hardship," blocking her from evicting them.  To make matters worse, LaCasse's fiancé subsequently broke up with her, and asked her and

her daughter to move out of his home.  Unable to secure the financing she would need to purchase a new residence, she wanted to move into the Rhinebeck property—the only one of her properties in which the occupants' lease has expired—but the nonpaying tenants still refuse to leave.  At the same time, she was forced to leave her fiancé's home.  As a result, LaCasse and her daughter are homeless.  After the Supreme Court's granted emergency injunctive relief, LaCasse obtained a default judgment awarding her possession of her property, and a warrant of eviction.  However, because of the Extension, she has been unable to have the warrant served and reclaim her property.

- Plaintiffs Mudan Shi and Feng Zhou are a married couple who own a single-family home in Staten Island, New York, which they currently rent out to tenants.  The rental income from the house helps cover their own obligations for their family home, which Shi and Zhou live in with their two young children and their three elderly parents.  Shi and Zhou were able to purchase the Staten Island home a few years ago, after working hard for many years and scrupulously saving.  Starting in the spring of 2019—almost a year before the pandemic—the tenants stopped paying rent.  It has now been 30 months since Shi and Zhou last received a rent payment, depriving them of the necessary income that had allowed them to maintain the property while also paying their own rent.  They commenced a nonpayment action in October 2019—well before the coronavirus pandemic—and obtained a judgment.  However, before that judgment could be enforced, the proceeding was stayed as a result of the State's eviction moratoria, and it remains stayed all these months later on account of the Extension.  Thus, even though their tenants' lease has expired and the tenants have not paid rent for well over two years, for reasons completely unrelated to COVID-19, Ms. Shi and Mr. Zhou cannot move their own family into the house.  Shi and Zhou's tenants now refuse to speak with them and have even changed their phone number—meaning Shi and Zhou have no way of knowing their tenants' financial or health situation.  Because they are unwilling to swear under penalty of perjury to information they cannot possibly know, Shi and Zhou are entirely barred by the Extension from accessing the courts and repossessing their property.

- Plaintiff Betty S. Cohen is the owner of a single co-op unit in Brooklyn, New York, which she currently rents out to a tenant.  Cohen is retired.  The rental income from the co-op is her primary source of financial support, together with Social Security payments.  Starting in March 2020, the tenant stopped paying rent.  Despite Cohen sending him a monthly statement of arrears and notifying him of her desperate need for the rent, the tenant has been living in the co-op rent-free for more than a year.  Cohen sent a notice of late payment, and initiated an eviction proceeding in September 2020.  But CEEFPA Part A barred Cohen from taking any meaningful action to evict the tenant, reclaim her property, or recoup unpaid rent.  The tenant's annual lease expired in December 2020.  On February 4, 2021, the tenant submitted what purports to be a hardship declaration form, checking the box for financial hardship.  Although Ms. Cohen subsequently received funds from the State's Emergency Rental Assistance Program ("ERAP"), those funds failed to make her whole and only cover prospective rent payments through October 2021.  Thereafter, the Extension will continue to bar Ms. Cohen from evicting the tenant even if he again fails to pay rent, as he has for more than 18 months.

- Plaintiff RSA is a trade association dedicated to preserving and serving the interest of the residential housing industry in New York City.  Since December 2020, the organization has had to divert a substantial amount of its limited resources to educational, advocacy, and legal efforts to support its members in the wake of the eviction moratoria.  Now, with the imposition of the Extension, RSA has been forced to continue these efforts until at least January 15, 2022, disrupting its ordinary operations for the foreseeable future.  RSA's 25,000 members, moreover, most of whom own residential properties in the City, are being crushed.  They have reported that tenants across the State have refused to pay rent, breached their leases, or overstayed their lease terms, and the owners have no redress.  RSA's ethnically and socioeconomically diverse members have poured their earnings, savings, and sweat equity into purchasing and maintaining their properties.  With the latest Extension, RSA's members are despondent, with some on the brink of financial ruin and at risk of losing their properties because they have not received rent for a year and a half or more and are struggling to cover their own monthly expenses.[2]

16.     Plaintiffs therefore now file this Amended Complaint challenging the constitutionality of the Extension on these many grounds.  They seek a declaration that the Extension is unconstitutional, and they further seek preliminary and permanent injunctive relief barring the State from further implementing or enforcing the Extension in its entirety.

## **PARTIES**

17.     Plaintiff Pantelis Chrysafis is the owner of a single-family home in Garden City, New York, which he currently rents out to tenants.

18.     Plaintiff Betty S. Cohen is the owner of a single co-op unit in Brooklyn, New York, which she currently rents out to a tenant.

---

[2]  Although the Court previously ruled that RSA lacked standing to serve as a Plaintiff, and instead treated RSA's filings as *amicus* submissions, the allegations supporting RSA's standing have been expanded.  *See infra* Part IX.E. Specifically, RSA respectfully submits that the direct injuries the organization has suffered, as pleaded in this Amended Complaint, establish its standing.  *See Centro de la Comunidad Hispanade Locust Valley v. Town of Oyster Bay*, 868 F.3d 104, 111 (2d Cir. 2017) ("[W]here an organization diverts its resources away from its current activities, it has suffered an injury that has been repeatedly held to be independently sufficient to confer organizational standing." (citing *Bank of Am. Corp. v. City of Miami, Fla.*, 137 S. Ct. 1296, 1303 (2017)).

19.     Plaintiff Brandie LaCasse owns a single-family home in Rhinebeck, New York that she currently rents out to tenants.  She owns five additional properties in New York State that are also rented out to tenants.

20.     Plaintiffs Mudan Shi and Feng Zhou (wife and husband) own a single-family home in Staten Island, New York, which they currently rent out to tenants.

21.     Plaintiff RSA is a New York City trade association representing the residential housing industry.  RSA has had to divert significant resources from other activities in response to New York's eviction moratoria, including the Extension.  RSA has approximately 25,000 landlord and agent members.

22.     Defendant Lawrence K. Marks is the Chief Administrative Judge of the Courts of New York State.  In that role, he directs New York's Office of Court Administration and is responsible for overseeing the operation and administration of New York's courts, and for implementing and administering the Extension.  By its express terms, the Extension requires New York courts to implement and administer the law's hardship declaration provisions, as well as its restrictions and procedural requirements for eviction proceedings.  Chief Administrative Judge Marks issued an Administrative Order, dated September 8, 2021, directing the New York State courts to conduct residential eviction proceedings in accordance with the Extension's provisions, which directive the Administrative Order expressly notes is "required by" the Extension.  *See* Admin. Order of the Chief Admin. Judge of the Courts, Order No. 261-21 (Sept. 8, 2021) (attached as Exhibit F).  Chief Administrative Judge Marks also issued a Memorandum dated the same day setting forth "additional guidance" regarding the implementation of the Extension by the courts (attached as Exhibit G).

23.     In furtherance of the Extension's requirements, the Office of Court Administration has issued hardship declaration forms and mailed them to thousands of tenants with pending eviction cases.  It has also posted on its website a hardship declaration form, along with translations into numerous languages.  The Chief Administrative Judge maintains offices at 4 Empire State Plaza, Albany, New York 12223, and at 25 Beaver St., New York, New York 10004.  The Chief Administrative Judge is named in his official capacity.

## JURISDICTION AND VENUE

24.     This Court has subject matter jurisdiction over Plaintiffs' constitutional claims pursuant to 28 U.S.C. § 1331.

25.     Venue is proper in this Court under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred in this District.

## FACTUAL ALLEGATIONS

**I.     New York's "Temporary" Eviction Moratoria Prior To The Passage Of CEEFPA Part A**

26.     Prior to the COVID-19 pandemic, tenants could be evicted pursuant to New York's Real Property Actions and Proceedings Law ("RPAPL") for, *inter alia*, violating the terms of their leases—including by failing to pay rent or holding over beyond the stated lease term—or creating a nuisance.  *See* RPAPL § 711.  In March 2020, at the outset of the COVID-19 pandemic, then-Governor Cuomo issued an Executive Order prohibiting the enforcement of evictions of residential and commercial tenants for 90 days.  In May 2020, the Governor extended the moratorium through August 19, 2020, prohibiting both the initiation of proceedings and the enforcement of eviction warrants against tenants who were "facing financial hardship due to the COVID-19 pandemic."

27.     On June 30, 2020, the State enacted the Tenant Safe Harbor Act ("TSHA"), which "prohibit[s] the eviction of residential tenants who have suffered financial hardship during the COVID-19 covered period."  Dkt. 14-6.  However, it does not bar eviction proceedings.  Rather, it provides that tenants "may raise financial hardship . . . as a defense in a summary proceeding." *Id.* § 2(2)(a).  Under the TSHA, "[i]n determining whether a tenant . . . suffered a financial hardship during the COVID-19 covered period," the court is to consider, among other factors, a tenant's income prior to and during the pandemic; a tenant's liquid assets; and a tenant's eligibility for public assistance benefits.  *Id.* § 2(2)(b).

## II.     CEEFPA Part A Extends And Expands New York's Eviction Moratorium

28.     CEEFPA Part A was enacted on December 28, 2020.  It required property owners to provide their tenants with a government-drafted "hardship declaration" before commencing eviction proceedings—or when serving a written rent demand or "any other written notice required by the lease" that would be a prerequisite to any such eviction proceedings.  CEEFPA Part A § 3; *see also id.* § 5.  The statute further provided that, if a tenant submitted a hardship declaration, eviction proceedings against the tenant—both pending and new—would be stayed. *Id.* §§ 4, 6.  The submission of a hardship declaration also stayed the execution of any previously issued eviction warrants.  *See id.* § 8(a)(ii).  There were narrow exceptions if the owner "establish[ed]" not only that the tenant was causing a nuisance affecting other tenants or a "substantial" safety hazard to others, but also that the nuisance was still ongoing through the date on which the owner sought a judgment from the court.  *Id.* § 9.  In May 2021, the State extended CEEFPA Part A through "at least August 31."  *See* Ex. B.

29.     The hardship declaration that landlords were forced to provide to their tenants under CEEFPA Part A began with a "NOTICE TO TENANT."  CEEFPA Part A § 1(4); *see also* Ex. E.  That notice stated that, "[i]f you have lost income or had increased costs during the

14

COVID-19 pandemic . . . and you sign and deliver this hardship declaration form to your landlord, you cannot be evicted until at least [August 31, 2021] for nonpayment of rent or for holding over after the expiration of your lease."  CEEFPA Part A § 1(4).  The declaration form itself offered two "option[s]" via which tenants could effectuate a stay of existing eviction proceedings or a suspension of new proceedings—namely, asserting that they were "experiencing financial hardship" or that "moving . . . would pose a significant health risk" related to the pandemic.  *Id.*  The declaration invited the tenants to "select[]" either or both "option[s]" by checking a box, with no further explanation or supporting documentation required.  *Id.*  Although the hardship declaration form contained another "notice" clause informing the tenant that he or she was "signing and submitting this form under penalty of law," *id.*, the declaration did not need to be signed under penalty of perjury.

30.     There were five broad enumerated grounds for the financial hardship option under CEEFPA Part A:  (1) a "[s]ignificant loss of household income," (2) increased "necessary out-of-pocket expenses related to performing essential work or related to health impacts," (3) "[c]hildcare [or other familial care] responsibilities . . . negatively affect[ing]" the tenant's ability "to obtain meaningful employment" or causing "increased . . . necessary out-of-pocket expenses," (4) "[m]oving expenses and difficulty . . . securing alternative housing," or (5) a catch-all category of unspecified "[o]ther circumstances related to . . . COVID-19" that "negatively affected" the tenant's "ability to obtain meaningful employment or earn income," or that "significantly reduced [the tenant's] household income or significantly increased . . . expenses."  *Id.*  Tenants were not required to identify which subcategory purportedly applied to them or provide any evidence or factual details.  *Id.*  The vague nature of the categories of hardship, the ability to check a box for "financial hardship" without specifying which specific

hardship category was claimed, and the automatic stay of proceedings that resulted were ripe for abuse and invited arbitrary application.

31.     In addition to staying proceedings, the submission of a hardship declaration claiming financial hardship also created a "rebuttable presumption that the tenant is experiencing financial hardship" under the TSHA, an executive order, or any other state or local law restricting evictions based on asserted "financial hardship during or due to COVID-19." *Id*. § 11. This rebuttable presumption extended indefinitely. *See id*. § 13 (excluding the rebuttable presumption from CEEFPA Part A's sunset provision); Ex. B § 5 (same).

32.     In addition to the hardship declaration, landlords were forced to provide their tenants with "a list of all not-for-profit legal service providers actively handling housing matters in the county where the subject premises are located," prepared by the Office of Court Administration.  CEEFPA Part A § 3.

### III.     Property-Owner Plaintiffs Challenge Constitutionality Of CEEFPA Part A

33.     In response to the enactment of CEEFPA Part A in December 2020, the Property-Owner Plaintiffs filed suit in this District on February 24, 2021, challenging the statute's constitutionality and naming New York Attorney General Letitia James as the defendant.  *See Chrysafis I*.  That suit challenged the constitutionality of CEEFPA Part A on largely the same bases as this Complaint challenges the Extension.  The Property-Owner Plaintiffs filed a motion requesting a temporary restraining order and preliminary injunction shortly after filing suit.  The case was assigned to the late Judge Sandra J. Feuerstein.

34.     After expedited briefing by the parties, Judge Feuerstein held a hearing on the motion for a temporary restraining order and preliminary injunction on March 16.

35.     At the hearing, the Court noted that the statute's hardship declaration requirement "rel[ies] on a box to be checked off without any explanation and very broad permission to stop

paying rent, which [is] not really focused and not specific." *Chrysafis I*, Dkt. 29-1 at 10:20–23. The Court also questioned "why . . . the burden [is] entirely on the landlord" rather than "the one seeking to be excused from their contractual liabilities . . . ." *Id.* at 11:7–11. Counsel for the Attorney General stated that the law was intended to achieve a "public health goal" of "preventing mass evictions," which "was crucial for the time being." *Id.* at 11:12–12:4. The Court pressed the Attorney General's counsel on "where we are now" and whether CEEFPA would be renewed. *Id.* at 12:5–11. Counsel's response was that, while an extension would be up to the State legislature, "it appears that the concerns that brought about the May 1 date"— namely, winter and the delay in the State's distribution of federal rent-relief funds—"will no longer be in play." *Id.* at 12:12–25.

36.    The Court also noted that CEEFPA Part A's requirement that landlords send hardship declarations to tenants "put an additional burden on the plaintiff[s]," and stated that she was "not seeing why they should have the burden of notifying their tenants." *Id*. at 10:4–8. The Court further stated that "the government should be the one to approach these individuals and give them an opportunity to explain why they should not be penalized for not paying their rent or some other reason." *Id.* at 10:9–14.

37.    At the end of the hearing, Judge Feuerstein ordered full briefing, in the form of a motion to dismiss, on the Attorney General's argument that she was not a proper defendant. After Judge Feuerstein's tragic death, the case was reassigned to Judge Joanna Seybert. On April 14, Judge Seybert granted the Attorney General's motion to dismiss, concluding that the Court lacked subject matter jurisdiction because the Attorney General was not a proper defendant. *Chrysafis I*, Dkt. 34. In its opinion, the Court agreed with the Attorney General that "CEEFPA is administered by the New York court system" and that certain of CEEFPA's

17

"litigation-related procedural prerequisites, as well as the '[p]rohibition on initiation of eviction proceedings' . . . are enforced by court employees . . . ." *Id.* at 26; *see also id.* ("[T]he remainder of CEEFPA's mandates apply primarily to courts and law enforcement officers who execute eviction warrants . . . .").

38.   The Court denied as moot Plaintiffs' motion for preliminary relief and did not reach the merits of the Property-Owner Plaintiffs' constitutional challenge. *Id.* at 38 n.15.

### IV.   New York Extends CEEFPA Part A Through August 31, 2021, Exacerbating Its Unconstitutional Effects

39.   On May 3, the New York legislature extended CEEFPA Part A, which Governor Cuomo signed into law on May 4, retroactively extending the effective date of the CEEFPA Part A provisions expiring on May 1 "until at least" August 31.  It otherwise left the law's provisions unchanged.

40.   Since CEEFPA Part A's original passage in December 2020, all adults in New York had become eligible to receive COVID-19 vaccinations, and COVID-19 cases were in decline.  On May 3, in light of New York's "tremendous progress" against COVID-19, Cuomo announced a "major reopening" of New York State beginning May 19, including removal of capacity restrictions for most businesses.  Chris Sommerfeldt and Dennis Slattery, *Cuomo Says New York on Track for Major Reopening, Lifting of COVID Capacity Limits by Mid-May*, N.Y. Daily News (May 3, 2021), https://tinyurl.com/9esz4d4x.

41.   Despite these changes, the State forced property owners like the Property-Owner Plaintiffs and RSA's members to continue to bear the full burdens of the eviction moratoria imposed at the beginning of the COVID-19 pandemic.  While the rest of the State had begun to return to normalcy, landlords were left behind.

### V.     The Property-Owners Challenge CEEFPA Part A Again

42.     On May 6, two days after the CEEFPA Part A was extended through August 31, Plaintiffs filed the instant suit in this Court and moved for a temporary restraining order and preliminary injunction.  The Court held an evidentiary hearing on June 1.  Plaintiffs LaCasse and Cohen testified regarding the state eviction moratorium's devastating impacts, including on their ability to collect essential income and repossess their properties.  Declarations regarding Plaintiffs Shi and Chrysafis were received into evidence in lieu of live testimony.  The State's sole live witness, the Chief Clerk of the New York City Civil Court, testified that the courts "have returned 100 percent of their staff," "[t]he majority of our court operations . . . are in the courtroom," and litigants without access to technology at home are permitted in the courtroom.

43.     On June 11, 2021, this Court denied Plaintiffs' preliminary injunction motion, which was consolidated with the merits of the underlying action, and directed entry of a final judgment on the merits in favor of Defendant.  *See* Dkt. 74.  Notwithstanding the result, the Court found that Plaintiffs "satisfactorily demonstrated a risk of irreparable harm" from both the ongoing deprivation of their constitutional rights and their evidentiary "showing" as to CEEFPA Part A's crippling effects.  *Id*. at 2, 6-8, 11-12.  On June 14, the Clerk of the Court entered final judgment in favor of the Defendant.

44.     On June 14, Plaintiffs moved before the Court for an injunction pending appeal, which was denied on June 15.  On June 16, Plaintiffs filed a notice of appeal from the that order and the final judgment and, two days later, moved for an injunction pending appeal before the Second Circuit.  On July 26, the court of appeals summarily denied that motion based on Applicants' purported "fail[ure] to meet the requisite standard."

VI.     **New York Ends Its State Of Emergency And Lifts COVID-Related
        Restrictions In Light Of High Vaccination Rates**

45.     As this Court has recognized, as of June 11, 2021, "65% [of] adults in New York

State ha[d] received at least one vaccination, and the statewide positivity rate ha[d] hit a new

low." Dkt. 74 at 13. Days later, the State achieved its goal of a 70% vaccination rate, lifted

virtually all remaining COVID-related restrictions, and celebrated the State's emergence from

the pandemic with fireworks displays at ten locations throughout the State.[3] On June 24, then-

Governor Cuomo declared an end to the "state disaster emergency" based on "New York's

dramatic progress against COVID-19, with the success in vaccination rates, and declining

hospitalization and positivity statewide."[4]

46.     Since June, no new COVID-19 shutdowns or gathering restrictions have been

imposed by the State, and businesses and entertainment venues throughout the State—including

sports arenas and Broadway theaters—are now open for business. The state courts have fully

reopened as well. Vaccination rates, meanwhile, have improved even further, with 76.6% of

New Yorkers eighteen and older now having completed their vaccine series and 85.4% of adults

having received at least one dose.[5]

---

[3] *See Governor Cuomo Announces COVID-19 Restrictions Lifted as 70% of Adult New Yorks Have Received First Dose of COVID-19 Vaccine* (June 16, 2021), https://www.governor.ny.gov/news/governor-cuomo-announces-covid-19-restrictions-lifted-70-adult-new-yorkers-have-received-first; *Governor Cuomo Announces State Landmarks to Be Lit Blue and Gold and Firework Displays Across the State in Recognition of Reaching 70% of Single Dose Vaccinations* (June 15, 2021), https://www.governor.ny.gov/news/governor-cuomo-announces-state-landmarks-be-lit-blue-and-gold-and-firework-displays-across.

[4] *Governor Cuomo Announces New York Ending COVID-19 State Disaster Emergency on June 24* (June 23, 2021), https://www.governor.ny.gov/news/governor-cuomo-announces-new-york-ending-covid-19-state-disaster-emergency-june-24.

[5] https://covid19vaccine.health.ny.gov/covid-19-vaccine-tracker. Healthcare workers and state employees are, moreover, now subject to a vaccine mandate.

### VII.    The Supreme Court Enjoins The Eviction Moratorium In Its Entirety

47.     On July 27, Plaintiffs sought an emergency writ of injunction from the U.S.

Supreme Court.  The Court, on August 12, granted that application and enjoined CEEFPA Part A

in its entirety pending final disposition of appellate proceedings in the Second Circuit and

Supreme Court.  *Chrysafis*, 141 S. Ct. at 2482.  The Court's order explained that CEEFPA Part A

"generally precludes a landlord from contesting" a tenant's "self-certifi[cation]" of "financial

hardship" and "denies the landlord a hearing," contrary to "the Court's longstanding teaching

that ordinarily 'no man can be a judge in his own case' consistent with the Due Process Clause."

*Id.* (quoting *In re Murchison*, 349 U.S. 133, 136 (1955)).  The Court did not enjoin the TSHA,

which Applicants "d[id] not challenge," such that tenants could continue to raise COVID-19

financial hardship as an affirmative defense in eviction proceedings.  *Id*. at 2482–83.

### VIII.   Despite The Supreme Court's Order, New York's Legislature And Governor Extend The State's Eviction Moratorium

48.     In response to the Supreme Court's injunction, the incoming Governor and

CEEFPA's New York State Senate sponsor immediately vowed to extend the State's eviction

moratorium.  Although Senator Kavanagh purported to "respect" this Court's decision, in the

same breath he doubled down on his "belie[f] that CEEFPA was a constitutional exercise of [the

State's] authority."  *See* Press Release, New York State Senate, Sen. Kavanagh Statement on

U.S. Supreme Court Invalidating Part of NY COVID-19 Emergency Eviction & Foreclosure

Prevention Act (Aug. 13, 2021), https://www.nysenate.gov/newsroom/press-releases/brian-

kavanagh/sen-kavanagh-statement-us-supreme-court-invalidating-part-ny.

49.     On September 1, the Legislature and Governor followed through on their

promises, enacting a law "extending" the prior residential eviction moratorium through January

15, 2022.  S50001 at p. 1; *id.* § 2.  This latest Extension is unchanged from CEEFPA Part A in

almost all material respects:  It includes a nearly identical hardship declaration form (*see* Ex. D);

continues to permit tenants to claim financial "hardship" by checking a box without identifying

which of the categories applies; continues not to require tenants to substantiate or provide any

specifics regarding the asserted hardship; continues to permit claims of "hardship" by reference

to numerous vague categories; continues to bar the initiation or prosecution of eviction

proceedings upon the tenant's delivery of a completed hardship declaration form, with only

narrow exceptions; continues to require property owners to provide tenants with hardship forms,

a government-drafted notice, and a government-curated list of legal service providers; continues

to establish a "rebuttable presumption" of hardship that continues indefinitely, even after

expiration of the Extension; and purports to give effect to hardship declarations previously

completed under the now-enjoined CEEFPA Part A, thus reviving hardship declarations

invalidated by the Supreme Court's injunction.  S50001 Part C, Subpart A §§ 1(4), 2-4, 6, 9-10;

*see also* Ex. F (Sept. 8, 2021 Administrative Order) at 1 ("Any residential or commercial

eviction proceeding pending on September 2, 2021, including eviction proceedings filed on or

before March 7, 2020, in which a respondent-tenant has filed a hardship declaration, including

those previously filed pursuant to [CEEFPA Part A], are stayed through January 15, 2022.").

50.    The September 8, 2021 memorandum issued by Defendant Marks confirms that

the Extension "reinstates many COVID-19 related protections for respondents in residential and

commercial eviction proceedings that were previously set forth in statute and in part invalidated

by the United States Supreme Court" and describes how the Extension "continues" virtually

every one of the prior moratorium's key features.  Ex. G.

51.    The Extension also "vacate[s]" default judgments awarded "between August 13,

2021," the day after the Supreme Court's order granting the emergency injunction, and "the

effective date of this act," and automatically "restore[s]" these matters to the court calendar upon the tenant's request.  *Id.* § 5.  In other words, property owners who obtained default judgments while CEEFPA Part A was enjoined now must start all over again.

52.     While the Extension purports to "modify" CEEFPA Part A in one respect "to address the Supreme Court's due process concern," S50001 § 2—namely, by nominally providing landlords an opportunity to contest a tenant's assertion of hardship—it in practice continues to bar the courthouse door by staying eviction proceedings until at least January 15, 2022 upon the mere submission of a completed hardship declaration and then allowing a property owner to initiate an eviction proceeding only if the landlord first swears, "under penalty of perjury," that "the [landlord] believes in good faith that the hardship certified in the hardship declaration does not exist."  S50001, Part A, Subpart C § 3.  In stark contrast, tenants still need only sign a hardship declaration under "penalty of law."  *Id.* § 1(4).  And that "hardship" still need not be specified; a generic check-the-box form suffices.  The Extension also does not address any of the First Amendment concerns raised by Plaintiffs.

53.     In passing the Extension, the State has made no attempt to tailor its eviction prohibitions to reflect the strides New York has made in combatting the pandemic.  It has also made no effort to limit the moratorium to those tenants actually in need of relief due to the effect of COVID-19, whether through documentation of hardship, income limitations or caps, or otherwise.

54.     The failure to tailor the Extension's provisions is all the more glaring in light of the fact that the State has allocated more than $2 billion in federal rent relief for tenants behind on their rent, and that the State's scheme for distribution of these rent relief funds contains its own more narrowly-tailored eviction protections and restrictions applicable to landlords who

receive payment out of those funds. Under the State's rent-relief scheme, a New York tenant household is eligible for assistance—and accompanying protections against eviction—if its income is at or below 80% of the area median household-adjusted income, someone in the household is eligible for unemployment or has suffered a loss of income or increase in costs related to COVID-19, and the household demonstrates a risk of homelessness or housing instability. *See* 2021 Sess. Laws of N.Y. Ch. 56 (A. 3006-C), Part BB, Subpart A §§ 5, 8. Within that population, the State will prioritize relief for groups such as households with median incomes at or below 50% of the area median income, certain currently unemployed applicants, vulnerable populations, and tenants living in areas disproportionately impacted by the pandemic. *Id.* The regime also includes application and documentation requirements for determining eligibility. *Id.* §§ 6, 7. While the State's rent-relief eviction restrictions may suffer from their own legal defects, the fact that the State's scheme prioritizes low-income tenants, the unemployed, and other specific populations, employs income requirements or cut-offs, and links stays of eviction to applications for rent relief funds, demonstrates that the Extension is overbroad, insufficiently tailored, and unnecessary.

## IX. Plaintiffs Are Suffering Under The Extension's Unconstitutional Regime

55. Plaintiffs have been harmed in the manner described above by virtue of the Extension's eviction moratorium provisions, which independently and cumulatively violate their rights under the Fourteenth Amendment's Due Process clause, First Amendment's Free Speech clause, and the First Amendment's Petition clause. Each Plaintiff, moreover, is suffering under the Extension as follows.

### A. Plaintiff Pantelis Chrysafis

56. Plaintiff Chrysafis purchased the single-family home he owns in Garden City, New York, in 2015, to live in with his then-wife. After he and his wife separated, Chrysafis

decided to sell the property, but did not find a suitable buyer.  Chrysafis identified what he

believed to be suitable tenants instead, and started renting it out for $5,000 per month.  Chrysafis

was essentially breaking even after paying approximately $18,000 in property taxes, as well as

additional costs to maintain the property.  Chrysafis now lives in Japan, where he has a newborn

child.

57.     In early 2019, a few years into the tenancy, Chrysafis determined to try to sell the

property again, and he informed the tenants that they would have a number of months to find a

suitable, alternative place to live.  The tenants simply stopped paying rent as a result.  In the

spring of 2019, well before the COVID-19 pandemic, Chrysafis was forced to hire an attorney to

seek five months of back rent.   The parties temporarily settled, but his tenants failed to pay

timely rent again in December 2019 and January 2020.  In February 2020, Chrysafis obtained a

judgment against his tenants as well as a warrant of eviction ordering the tenants to vacate by

April 1, 2020.  Just days before COVID-19-related shutdowns began, the tenants requested until

the end of April to vacate, and Chrysafis agreed.

58.     Chrysafis's tenants remain in the home because of the eviction moratoria.  They

have not paid rent in over a year and half, forcing Chrysafis to borrow money from his elderly

parents to stay afloat.  His inability to collect rental income, while still having significant costs of

his own, has caused unending strife within his own family.  Since the passage of the Extension,

his mental health has drastically deteriorated, and he is now clinically depressed and suicidal.

Nevertheless, he has no way of accessing the courts for eviction proceedings because, in July

2021, they submitted a hardship declaration checking the box for "financial hardship"—

preventing him from even filing an eviction lawsuit—and he has no way of swearing, under

penalty of perjury, to a good faith belief that a financial hardship "does not exist," as required by

the Extension, as he is not in contact with them and has no idea of their current circumstances.  If the Extension continues to be enforced, it will prolong the stay of Chrysafis's eviction proceedings against his tenants until at least January 15, 2022.

**B.      Plaintiff Brandie LaCasse**

59.      Plaintiff LaCasse is a military veteran, now retired after serving her country for more than 23 years of active-duty service.  She is a single mother who owns six properties in New York, and she serves as the manager of each.  She has a service-connected disability, which has resulted in her being immunocompromised.

60.      LaCasse decided to sell one of her properties, a single family house in Rhinebeck, New York, in November 2020.  Accordingly, she served the tenants with a notice of nonrenewal pursuant to the terms of the lease.  The tenants stopped paying rent in response and the tenants have refused to vacate the property despite the fact that the lease's term has concluded.  LaCasse filed a holdover proceeding against the tenants in December 2020, but it was dismissed because she had not provided a hardship declaration to her tenants—even though CEEFPA Part A was not yet in effect when she had filed suit.  Immediately thereafter, her tenants completed a hardship declaration form, claiming financial hardship, blocking her from evicting them.

61.      To make matters worse, LaCasse's fiancé subsequently broke up with her, and asked her and her daughter to move out of his home.  Because she was unable to secure the financing she would need to purchase a new residence, she wanted to move into the Rhinebeck property—the only one of her properties in which the occupants' lease has expired—but the non-paying tenants still refuse to leave.  At the same time, she was forced to leave her fiancé's home.  As a result, LaCasse and her 11-year-old-daughter have been homeless for months.

62.      After the Supreme Court's granted emergency injunctive relief, LaCasse obtained a default judgment awarding her possession of her property, and a warrant of eviction.  However,

because of the Extension, she has been unable to have the warrant served and reclaim her property.

63.     Tenants in LaCasse's other properties now also believe they can refuse to pay rent with impunity.  In January 2021, tenants at a different property paid their rent late and told LaCasse that she should consider herself lucky to receive any payments at all.   They began paying their rent late, and they told LaCasse that they do not have to pay their rent because it is impossible for her to take them to court.  They stopped paying altogether in June 2021.

64.     LaCasse fears that the message that tenants do not have to pay rent will likely spread to her other properties, three of which are located on the same large lot, and more and more of her tenants will cease paying rent.  That is all the more likely because she must send hardship declarations and lists of legal service providers to these tenants with any written demand for rent or written notice required under the relevant lease or by law, forcing her to speak the State's message and change what she would otherwise say.

**C.     Plaintiffs Mudan Shi and Feng Zhou**

65.     Plaintiffs Shi and Zhou own a single-family home in Staten Island, New York. The rental income from the house helps cover their own obligations for their family home, which Shi and Zhou live in with their two young children and their three elderly parents.

66.     Shi and Zhou were able to purchase the Staten Island home in 2014 after working hard for many years and scrupulously saving.  They lived in the house until 2018 when they decided to rent it out.  In August 2018, Shi and Zhou rented the house to a tenant, who agreed to a two-year lease with a monthly rent of $2,400.  The tenant paid rent from August 2018 through March 2019, but in April 2019 the tenant paid only half the rent due.  He has not paid any rent since.  It has now been 30 months since Shi and Zhou last received a rent payment, depriving

them of the necessary income that had allowed them to maintain the property while also paying their own rent.

67.     Shi and Zhou commenced a nonpayment action on October 31, 2019—well before the coronavirus pandemic—and obtained a favorable judgment.  However, before that judgment could be enforced, the proceeding was stayed as a result of the State's eviction moratoria, and it remains stayed all these months later on account of the Extension.  Thus, even though their tenants' lease has expired and the tenants have failed to pay rent for two-thirds of the lease term (for reasons completely unrelated to COVID-19), Shi and Zhou cannot move their own family into the house.

68.     Shi and Zhou's tenants now refuse to speak to them and have even changed their phone number.  As a result, Shi and Zhou have no way of knowing their tenants' financial or health situation since the pandemic has started.   Because they are unwilling to swear under penalty of perjury to something that they cannot possibly know without questioning their unresponsive tenants, Shi and Zhou remain unable to continue evictions proceedings and repossess their own property.

**D.     Plaintiff Betty S. Cohen**

69.     Plaintiff Cohen owns a one-unit co-op in Brooklyn, New York that she rent outs to a tenant.  Cohen is retired.  The rental income from the co-op is her primary source of financial support, together with social security payments.

70.     Cohen has rented the co-op unit to a single tenant since 1995.  The current rent is $1,545 per month.  Cohen is responsible for paying for the co-op maintenance fees, which she ordinarily pays using the rental income.  The tenant has a mixed history of cooperation when it comes to the co-op fees and rent.  Although the rent is due on the 15th of each month, he has taken every opportunity to extend that deadline.  In March 2020, the tenant did not pay rent.

Cohen agreed to allow him to pay it back the following month and waived the late charge, but the tenant never paid.  Despite Cohen sending him a monthly statement of arrears and notifying him of her desperate need for the rent, the tenant has now been living in the co-op rent-free for nearly a year.  The tenant has refused to communicate with Cohen about the unpaid rent and does not respond to her messages at all.

71.    Cohen sent a notice of late payment, and initiated a non-payment proceeding in September 2020.  But the series of eviction moratoria, including the Extension, have barred Cohen from taking any meaningful action to evict the tenant, reclaim her property, or recoup unpaid rent.  The tenant's annual lease expired in December 2020.  On February 4, 2021, the tenant submitted what purports to be a hardship declaration form, checking the financial hardship box without any further explanation or support.  Although Cohen subsequently obtained funds from ERAP, those funds do not make her whole and only cover prospective rent payments through October 2021.  Thereafter, the Extension will continue to bar Cohen from evicting her tenant even if he again fails to pay rent, as he has for more than 18 months.

**E.    Plaintiff Rent Stabilization Association**

72.    RSA has faced significant challenges as a result of the Extension and the ongoing eviction moratoria.  Since December 2020, RSA has had to divert a substantial amount of its limited resources away from its ordinary activities, such as organizing seminars and free workshops, and instead funnel them into advocacy, educational, and legal efforts related to the eviction moratoria.  The enactment of the Extension has compounded these harms by ensuring that the RSA will have to continue redirecting its limited resources to these efforts until "at least" January 15, 2022, irreparably disrupting its ordinary operations for the foreseeable future.

73.    RSA's 25,000 members, moreover, most of whom own residential properties in the City, are being crushed.  They have reported that tenants across the State have refused to pay

rent, breached their leases, or overstayed their lease terms because of the State's ongoing eviction moratorium, and the owners have no redress.  At the same time, owners are forced to continue to cover the costs of carrying these properties even when they are not deriving any income, and with the knowledge that, while rent is technically accruing while the moratorium is in effect, it will be effectively impossible to collect once the moratorium is lifted.  Tenants have also signed hardship declarations and property owners have no meaningful opportunity to challenge those declarations, prosecute ongoing eviction cases, or file new cases.  This is so even when the tenants had failed to pay rent or breached their leases prior to the pandemic, and even when the property owners had obtained judgments and warrants of eviction that predated the pandemic.

## THE EXTENSION IS INVALID IN ITS ENTIRETY

74.     Since the unconstitutional hardship declaration and the eviction stay it triggers is at the "core" of the Extension and "interwoven inextricably through the entire regulatory scheme," *New York State Superfund Coal. v. New York State Dept. of Envtl. Conservation*, 75 N.Y.2d 88, 94 (1989), the Extension is invalid in its entirety.  The hardship declaration is referenced dozens of times throughout the Extension, including in virtually every operative provision.  It would be "pragmatically impossible, as well as jurisprudentially unsound," for the court to "attempt to identify and excise" the hardship declaration, or the provisions in which it is referenced, while "leaving the remainder of" the Extension intact.  *Boreali v. Axelrod*, 71 N.Y.2d 1, 14 (1987); *see also Nat'l Advert. Co. v. Town of Babylon*, 900 F.2d 551, 557 (2d Cir. 1990) (finding constitutional and unconstitutional provisions of town ordinance restricting commercial speech were inextricably interwoven and that the unconstitutional portions therefore could not be severed from constitutional portions).

## FIRST CAUSE OF ACTION
**Due Process – Fourteenth Amendment of the U.S. Constitution and Article I;**
**42 U.S.C. § 1983**

75.     Plaintiffs repeat and reallege the allegations set forth above as though fully set

forth herein.

76.     The Due Process clause of the Fourteenth Amendment to the United States

Constitution provides in part:  "[N]or shall any State deprive any person of life, liberty, or

property, without due process of law."

77.     Plaintiffs have a legitimate property interest, grounded in state law, in the

property they own and in the right to retake possession of that property pursuant to New York's

lawful eviction process.  *See, e.g.*, *Ala. Ass'n of Realtors*, 2021 WL 3783142, at *4

("[P]reventing [landlords] from evicting tenants who breach their leases intrudes on one of the

most fundamental elements of property ownership—the right to exclude.") (citation omitted).

78.     The Extension deprives property owners, including the Plaintiffs, of their

procedural due process right to "be heard at a meaningful time and in a meaningful manner" with

respect to a tenants' hardship declaration forms, whether premised on claimed financial hardship

or purported health risks associated with relocation.  *Matthews v. Eldridge*, 424 U.S. 319, 335

(1976).  Indeed, the Supreme Court found CEEFPA Part A deprived Plaintiffs of their due

process rights by allowing a tenant's "self-certific[ation] [of] financial hardship" to block

eviction proceedings and "den[y] the landlord a hearing."  *Chrysafis*, 141 S. Ct. at 2482.  Under

the Extension, once a tenant submits a hardship declaration in a pending proceeding—including

one commenced before the pandemic—the proceeding "shall be stayed" until at least January 15,

2022, even if the hardship declaration was submitted under the previous (enjoined) version of the

moratorium.  S50001, Part C, Subpart A § 4; *see also* Ex. D (Administrative Order); Ex. E

(Memorandum).  Although the Extension provides a narrow avenue for landlords to contest

hardship claims if they are first able to swear, under penalty of perjury, to a good-faith belief that those claims are false, this "process" is illusory because landlords typically lack access to the information necessary to make such an attestation.  And these Plaintiffs specifically do not in fact have access to that information.  Without such personal knowledge, it would be remarkably risky for landlords to swear under oath—hazarding a seven-year prison sentence, N.Y. Penal Law §§ 70.00(2)(d), 210.15—before even being allowed to *file* a suit in the ordinary course.

79.     The risk landlords face is compounded by the fact that tenants still need not even specify the purported basis for the alleged hardship, and thus landlords still do not even know what set of facts they are supposed to dispute.  In effect, the only "procedures" safeguarding owners from erroneous deprivations of their property rights are tenants' subjective determinations as to whether they fall within one of the hardship declaration's hopelessly vague categories.   The Extension, like its predecessor, "violates the Court's longstanding teaching that ordinarily 'no man can be a judge in his own case' consistent with the Due Process Clause." *Chrysafis*, 141 S. Ct. at 2482.

80.     Under CEEFPA Part A, there were narrow circumstances in which individual landlords could obtain a hearing or overcome a hardship declaration, such as instances of nuisance behavior, but the Supreme Court was clear that these did not save the law because Due Process is violated so long as the law "*generally* precludes a landlord from contesting" the tenant's self-certification of hardship.  *Id.* (emphasis added).  The Extension continues to do so and therefore violates landlords' Due Process rights.

81.     Under due process principles, "[e]ven a brief and provisional deprivation of property pending judgment is of constitutional importance."  *Spinelli v. City of New York*, 579 F.3d 160, 174 (2d Cir. 2009) (citation omitted).  Needless to say, the many iterations of eviction

restrictions amount to much more than a "brief and provisional deprivation of property."  With the Extension stretching into January 2022, the string of restrictions will have impeded property owners from evicting tenants for nearly *two* years.

82.     Compounding the harms caused by the sheer duration of the eviction moratoria of property owners' (and Property-Owner Plaintiffs') rights, the Extension has an indefinite expiration date.  The initial deadline under CEEFPA Part A was May 1, 2021 but only until the State Legislature extended it for the first time until August 31, 2021.  Now, under this latest Extension, the moratorium will not expire until "at least" January 15, 2022, with no guarantee the Legislature will not extend the moratorium yet again.

83.     Defendant Chief Administrative Judge Marks is depriving Plaintiffs of their property rights without providing an adequate procedural remedy by implementing the Extension's provisions foreclosing Plaintiffs from commencing or prosecuting eviction proceedings or obtaining warrants of eviction upon the submission of a hardship declaration.

84.     Acting under color of state law, Defendant has caused, and will continue to cause, Plaintiffs to be deprived of their property without due process, both facially and as applied to them, in violation of their procedural due process rights under the Fourteenth Amendment.

85.     In the absence of declaratory and injunctive relief, Plaintiffs and other property owners will continue to be irreparably harmed and to be subjected to this deprivation of rights guaranteed to them by the United States Constitution and the New York State Constitution.

## SECOND CAUSE OF ACTION
### Compelled Speech – First Amendment of the U.S. Constitution; 42 U.S.C. § 1983

86.     Plaintiffs repeat and reallege the allegations set forth above as though fully set forth herein.

87.     The First Amendment's Free Speech clause provides that "Congress shall make no law . . . abridging the freedom of speech."  Freedom of speech prohibits the government from telling people what they must say and prevents the government from "interfer[ing] with speech for no better reason than promoting an approved message or discouraging a disfavored one, however enlightened either purpose may strike the government."  *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 579 (1995).

88.     When the government "mandat[es] speech that a speaker would not otherwise make," *Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 795 (1988), or "compel[s] individuals to speak a particular message," thereby "alter[ing] the content" of an individual's speech, those "content-based regulations" are subject to strict scrutiny, *Becerra*, 138 S. Ct. 2361, 2371 (2018) (citation omitted).

89.     The Extension has deprived and will continue to deprive Plaintiffs of their First Amendment free speech rights.

90.     Like CEEFPA Part A before it, the Extension plainly compels landlords to "speak a particular message" that they would not otherwise convey.  *Becerra*, 138 S. Ct. at 2371.  The first page of the hardship declaration is still a government-drafted "NOTICE TO TENANT[S]" instructing them on how to avoid their rental obligations and/or hold over beyond the expiration of their leases without risking eviction.  And the Extension continues to force property owners to include, with any hardship declaration, a State-curated link to a list of legal service providers who are available to assist tenants in avoiding eviction.  S50001, Part C, Subpart A § 2.  The Extension thus forces owners to provide information about, and effectively recommend and vouch for, the organizations included on the list—despite the fact that they would not do so of their own volition.  Because "[m]andating speech that a speaker would not otherwise make

34

necessarily alters the content of the speech," the Extension imposes "a content-based regulation of speech" and is subject to strict scrutiny. *Riley*, 487 U.S. at 795.

91.     The hardship declaration fails strict scrutiny, because it is not narrowly tailored to a compelling government interest.  To the extent the purported compelling government interest in forcing landlords to provide the hardship declarations to tenants is tied to concerns about risks associated with evictions amidst a public health emergency, that government interest no longer exists.  The State cannot claim a compelling public health interest in requiring property owners to convey the State's messaging about the moratorium at the same time that vaccines are readily available and the State has lifted virtually all other COVID-related restrictions.  In any event, the disclosure requirement is not narrowly tailored, as there are multiple less restrictive alternatives that the State could adopt.  "Most obviously, [the State] could inform [tenants] itself with a public information campaign." *Becerra*, 138 S. Ct. at 2375-76.  For instance, the State could mail the notices directly to tenants or direct tenants to the hardship declaration posted on government websites.  Such alternatives "would communicate the desired information to the public without burdening a speaker with unwanted speech." *Riley*, 487 U.S. at 800.

92.     Even if the compelled speech were commercial, the hardship declarations would fail the more deferential standard of review.  Because of the ready availability of alternatives, including those presently undertaken by the Government, the Extension imposes requirements that are "unjustified or unduly burdensome." *Becerra*, 138 S. Ct. at 2372.

93.     Defendant Chief Administrative Judge Marks is compelling Plaintiffs to speak in the manner set forth above by implementing the provisions foreclosing Plaintiffs from commencing or prosecuting eviction proceedings or obtaining warrants of eviction absent the tenant's receipt of a hardship declaration.

94.     Acting under color of state law, Defendant has caused, and will continue to cause, Plaintiffs to be deprived of their free speech rights guaranteed to them by the First Amendment to the U.S. Constitution, both facially and as applied to them.

95.     In the absence of declaratory and injunctive relief, Plaintiffs and other property owners will continue to be irreparably harmed and to be subjected to this deprivation of rights.

**THIRD CAUSE OF ACTION**
**Void for Vagueness – Fourteenth Amendment of the U.S. Constitution and Article I;**
**42 U.S.C. § 1983**

96.     Plaintiffs repeat and reallege the allegations set forth above as though fully set forth herein.

97.     The Due Process clause of the Fourteenth Amendment to the United States Constitution provides in part:  "[N]or shall any State deprive any person of life, liberty, or property, without due process of law."

98.     A law is unconstitutionally vague under procedural due process principles if it "authorizes or encourages arbitrary and discriminatory enforcement," by failing to provide any "standard that can be objectively applied" to determine compliance, *Cunney v. Bd. of Trustees of Vill. of Grand View*, 660 F.3d 612, 621-22 (2d Cir. 2011), or if it does not adequately inform people of "what is required of them," *F.C.C. v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012).

99.     Plaintiffs have a legitimate property interest, grounded in state law, in the property they own and in the right to retake possession of that property pursuant to New York's lawful eviction process.

100.    The Extension's hardship provision allowing tenants to claim "[s]ignificant loss of household income," "[i]ncrease in necessary out-of-pocket expenses," and "other circumstances related to the COVID-19 pandemic," among other vague and undefined

circumstances, violates Plaintiff's procedural due process rights, and is void for vagueness, because it fails to provide them fair notice of the Extension's requirements and obligations, is so standardless as to provide for arbitrary and discriminatory enforcement, invites unreviewable abuse by tenants, and deprives them of any procedural opportunity to discern—let alone challenge—the reasoning for declaration forms based on these undefined circumstances.

101.    As described in the foregoing allegations, the Extension's failure to define phrases including but not limited to "other circumstances," "meaningful employment," "significantly increase," and "significantly reduce" renders the "other circumstances" financial hardship category essentially meaningless, robbing landlord owners of fair notice of when a tenant is eligible to avoid eviction.  Tenants' ability to submit a valid hardship declaration form without even specifying the "financial hardship" category they believe applies keeps landlords in the dark about what precisely they are rebutting.  The lack of any evidentiary obligations for tenants and fair notice to landlords makes the declaration forms ripe for abuse.  The same is true for the financial hardship categories of "[s]ignificant loss of household income" and "[i]ncrease in necessary out-of-pocket expenses" relating to "essential work" or "related health impacts" during the COVID-19 pandemic, as well as that childcare responsibilities or responsibilities to care for an elderly, disabled, or sick family member during the COVID-19 pandemic have "negatively affected" the tenant's or household member's ability to obtain "meaningful employment" or "earn income" or increased their "necessary out-of-pocket expenses," that "[m]oving expenses and difficulty . . . securing alternative housing make it a hardship . . . to relocate to another residence during the COVID-19 pandemic."  That vacating the premises and moving would "pose a significant health risk" is equally as vague.  None of these terms is defined.

102.     Because the law provides landlords with no notice about what circumstances prohibit them from evicting tenants, it essentially delegates the authority to determine the scope of the Extension to tenants themselves.  That flies in the face of due process principles, which require "that regulated parties . . . know what is required of them so they may act accordingly." *F.C.C. v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012).

103.     Likewise, the contentless nature of these categories will result in arbitrary and discriminatory enforcement, as they provide no standards to guide their application.  The arbitrary nature of the financial hardship categories is compounded by its creation of a rebuttable presumption of financial hardship in various proceedings, as the Extension is silent on how the presumption may be rebutted.  And if property owners make what law enforcement officials decide, in their unfettered discretion, are false statements about the tenant in their signed affidavit to the court seeking to rebut the vague assertions of the hardship declaration, property owners could face perjury charges carrying substantial fines and jail time.  N.Y. Penal Law § 210, *et. seq.*

104.     Defendant is depriving Plaintiffs of their property rights by means of a constitutionally violative hardship declaration, including by implementing the Extension's provisions foreclosing Plaintiffs from commencing or prosecuting eviction proceedings or obtaining warrants of eviction once a hardship declaration has been submitted.

105.     Acting under color of state law, Defendant has caused, and will continue to cause, Plaintiffs and other property owners to be deprived of their property without due process, both facially and as applied to them, in violation of their due process rights under the Fourteenth Amendment.

106.     In the absence of declaratory and injunctive relief, Plaintiffs and other property owners will continue to be irreparably harmed and to be subjected to this deprivation of rights guaranteed to them by the United States Constitution.

**FOURTH CAUSE OF ACTION**
**Right to Petition – First Amendment of the U.S. Constitution; 42 U.S.C. § 1983**

107.     Plaintiffs repeat and reallege the allegations set forth above as though fully set forth herein.

108.     The Petition clause of the First Amendment of the United States Constitution provides that "Congress shall make no law . . . abridging . . . the right of the people to petition the Government for a redress of grievances."

109.     "[T]he right of access to the courts is an aspect of the First Amendment right to petition the Government for redress of grievances." *Bill Johnson's Rests., Inc. v. N.L.R.B.*, 461 U.S. 731, 741 (1983).

110.     Because the Extension effectively bars a class of property owners, including the Property-Owner Plaintiffs and RSA's members, from exercising their rights to file and prosecute eviction petitions with New York courts until at least January 15, 2022—specifically, all property owners who have received, or whose tenants have submitted, a completed hardship declaration form—it violates their rights under the Petition clause.

111.     The Extension now extends the eviction moratorium until "at least" January 15, 2022, with no end in sight.

112.     Defendant Chief Administrative Judge Marks is depriving Plaintiffs of their access to the courts by implementing the Extension provisions staying Plaintiffs' commencement or prosecution of eviction proceedings upon the submission of a hardship declaration, and by

otherwise implementing the Extension in a manner that prevents them from commencing or prosecuting nonpayment, holdover, ejectment, or related actions.

113.     Acting under color of state law, Defendant has caused, and will continue to cause, Plaintiffs to be deprived of rights of access to the courts and to the petition the government guaranteed to them by the First Amendment to the United States Constitution, both facially and as applied to them.

114.     In the absence of declaratory and injunctive relief, Plaintiffs and other property owners will continue to be irreparably harmed and to be subjected to this deprivation of rights.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for relief and judgment against Defendant Chief Administrative Judge Marks as follows:

1)     A declaration that the Extension is facially unconstitutional in its entirety under the First and Fourteenth Amendments to the United States Constitution;

2)     In the alternative, a declaration that each of the challenged portions and provisions of the Extension are facially unconstitutional under the First, Fifth, and Fourteenth Amendments to the United States Constitution;

3)     A declaration that the Extension is unconstitutional in its entirety as applied to Plaintiffs, or that each of the challenged portions and provisions of the Extension are unconstitutional as applied to Plaintiffs;

4)     A preliminary injunction and permanent injunction enjoining Defendant from implementing or enforcing the Extension, or, in the alternative, of implementing or enforcing each of its challenged portions and provisions, both facially and as applied to Plaintiffs;

5)      An award of fees, costs, expenses, and disbursements, including attorneys' fees and costs to which Plaintiffs are entitled pursuant to 42 U.S.C. § 1988; and

6)      Such other and further relief as the Court may deem just and proper.

## **DEMAND FOR JURY TRIAL**

Pursuant to Federal Rule of Civil Procedure 38, Plaintiffs demand a trial by jury in this action of all issues so triable.

Dated: New York, New York
     October 15, 2021

GIBSON, DUNN & CRUTCHER LLP

By:  /s/ *Randy M. Mastro*
     Randy M. Mastro
     Akiva Shapiro
     Jessica C. Benvenisty
     William J. Moccia
     Lauren Myers

     200 Park Avenue, 47th Floor
     New York, NY  10166-0193
     Telephone:  (212) 351-4000
     RMastro@gibsondunn.com
     AShapiro@gibsondunn.com

     *Attorneys for Plaintiffs*