UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-----------------------------------------------------------x

PANTELIS CHRYSAFIS, BETTY S.     :
COHEN, BRANDIE LACASSE, MUDAN   :
SHI, FENG ZHOU, and RENT        :
STABILIZATION ASSOCIATION OF NYC, :
INC.,                         :
                              :
      *Plaintiffs*,        :     No. 21-CV-02516 (GRB)
                              :
      -against-         :
                              :
LAWRENCE K. MARKS, in his official   :
capacity as Chief Administrative Judge of the :
Courts of New York State,        :
                              :
      *Defendant*.       :
                              :

-----------------------------------------------------------x


### MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' APPLICATION FOR A PRELIMINARY INJUNCTION


GIBSON, DUNN & CRUTCHER LLP

200 Park Avenue
New York, NY  10166-0193
Telephone:  212.351.4000
Facsimile:  212.351.4035

*Attorneys for Plaintiffs*

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ............................................................................ 1

FACTUAL BACKGROUND ............................................................................... 6

I. New York's "Temporary" Eviction Moratoria In The Wake Of COVID-19. .................... 6

II. New York Ends Its State Of Emergency And Lifts COVID-Related Restrictions............ 8

III. The Supreme Court Enjoins CEEFPA Part A In Its Entirety. ........................... 8

IV. New York's Legislature And Governor "Extend" The State's Eviction Moratorium........ 9

V. Small-Scale Property Owners Continue To Be Irreparably Harmed. .......................... 10

VI. Further Appellate Proceedings And Remand. ................................................ 12

LEGAL STANDARD ....................................................................................... 13

ARGUMENT ................................................................................................. 13

I. The Extension Is Essentially The Same Law That The Supreme Court Enjoined. .......... 13

    A. The Extension Reenacts The Very Provisions Of CEEFPA Part A That The Supreme Court Already Enjoined And Compounds The Irreparable Harms Already Credited By This Court And The Supreme Court. ................................................ 13

    B. The Extension's Minor Changes Do Not Cure The Due Process Violation. .............. 16

II. The Extension Should Independently Be Enjoined Because Plaintiffs Are Likely To Succeed On The Merits Of Their Claims And Are Suffering Irreparable Harm, And The Balance Of Equities Strongly Favors Relief. .................................................. 17

    A. Plaintiffs Will Be Irreparably Harmed If The Extension Is Not Enjoined. ................ 18

    B. Plaintiffs Are Likely To Succeed On The Merits Of Their Claims. .......................... 18

        1. The Extension Violates Plaintiffs' Procedural Due Process Rights. .............. 18

        2. The Extension Violates Plaintiffs' Free Speech Rights. ................................ 22

    C. The Balance Of Hardships And Public Interest Favor Injunctive Relief.................... 25

CONCLUSION................................................................................................ 25

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Agudath Israel of Am. v. Cuomo,*
983 F.3d 620 (2d Cir. 2020)...........................................................................25

*Ala. Ala. Ass'n of Realtors v. U.S. Dep't of Health & Hum. Servs.,*
2021 WL 3577367 (D.D.C. Aug. 13, 2021) ..........................................14

*Ala. Ass'n of Realtors v. Dep't of Health & Hum. Servs.,*
2021 WL 3783142 (U.S. Aug. 26, 2021) (per curiam)................................ *passim*

*Bill Johnson's Rests., Inc. v. N.L.R.B.,*
461 U.S. 731 (1983).......................................................................................22

*Campbell v. United States,*
365 U.S. 85 (1961).........................................................................................17

*Cedar Point Nursery v. Hassid,*
141 S. Ct. 2063 (2021)...................................................................................19

*Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.,*
447 U.S. 557 (1980).......................................................................................22

*Chrysafis v. Marks,*
141 S. Ct. 2482 (2021) (per curiam) ....................................................... *passim*

*Chrysafis v. Marks,*
2021 WL 4453457 (2d Cir. Sept. 29, 2021) ............................................ *passim*

*City of Vicksburg v. Henson,*
231 U.S. 259 (1913).......................................................................................15

*Connecticut v. Doehr,*
501 U.S. 1 (1991)...............................................................................19, 21, 22

*Fisher v. Univ. of Tex. at Austin,*
570 U.S. 297 (2013).......................................................................................23

*Friends of the E. Hampton Airport, Inc. v. Town of E. Hampton,*
841 F.3d 133 (2d Cir. 2016)...........................................................................13

*Fuentes v. Shevin,*
407 U.S. 67 (1972).........................................................................................22

*Hamdi v. Rumsfeld,*
542 U.S. 507 (2004) (plurality opinion) ........................................................21

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*,
    515 U.S. 557 (1995)............................................................................23

*Mathews v. Eldridge*,
    424 U.S. 319 (1976)..................................................................4, 18, 19

*Nat'l Inst. of Family & Life Advocates v. Becerra*,
    138 S. Ct. 2361 (2018)........................................................5, 22, 23, 24

*Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville*,
    508 U.S. 656 (1993)....................................................................13, 14

*Nutritional Health All. v. Shalala*,
    144 F.3d 220 (2d Cir. 1998)..........................................................14

*Parent Ass'n of Andrew Jackson High Sch. v. Ambach*,
    598 F.2d 705 (2d Cir. 1979)..........................................................13

*Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*,
    487 U.S. 781 (1988)........................................................5, 22, 23, 24

*United States v. James Daniel Good Real Prop.*,
    510 U.S. 43 (1993)......................................................................19

*United States v. Playboy Entm't Grp., Inc.*,
    529 U.S. 803 (2000)....................................................................23

*Wooley v. Maynard*,
    430 U.S. 705 (1977)....................................................................23

*Zauderer v. Office of Disciplinary Counsel of Supreme Court of Ohio*,
    471 U.S. 626 (1985)................................................................23, 24

**Constitutional Provisions**

U.S. Const. amend. I ......................................................................22

U.S. Const. amend. XIV §1 ............................................................18

**Statutes**

CEEFPA Part A ..................................................................... *passim*

N.Y. C.P.L.R. §504........................................................................16

2020 N. Y. Laws ch. 127, §§1, 2(2)(a) ..............................................6

N.Y. Penal Law § 70.00(2)(d) ......................................................17

N.Y. Penal Law § 210.15 ............................................................................................17

S50001 ........................................................................................................ *passim*

**Other Authorities**

Statement by Senator Kavanagh, at 1:05:20, YouTube (Sept. 1, 2021),
    youtube.com/watch?v=oZUO9IGWB18 ...............................................................17

Plaintiffs Pantelis Chrysafis, Betty S. Cohen, Brandie LaCasse, Mudan Shi, Feng Zhou and Rent Stabilization Association of NYC, Inc. ("RSA," and collectively, "Plaintiffs") submit this memorandum of law in support of their application for a preliminary injunction.

## PRELIMINARY STATEMENT

Two months ago, the Supreme Court enjoined the entirety of New York's residential eviction moratorium, Part A of the COVID-19 Emergency Eviction and Foreclosure Prevention Act ("CEEFPA Part A"). *Chrysafis v. Marks*, 141 S. Ct. 2482, 2482 (2021) (per curiam). The Supreme Court expressly found the moratorium's tenant "self-certific[ation]" scheme—which stayed eviction proceedings on the tenant's unsworn say-so—to be inconsistent with the Due Process Clause. *Id*. In so doing, the Court permitted these Plaintiffs, as small property owners, to once again commence and prosecute eviction proceedings in the ordinary course, pending final disposition of the Plaintiffs' merits appeal in the Second Circuit and any subsequent proceedings in the Supreme Court.

Undeterred, the State then enacted legislation that *continued* its eviction moratorium for another four and a half months, through at least January 15, 2022. This latest iteration of the moratorium law expressly "extend[s]" the prior eviction moratorium. Ex. 1 ("S50001") § 2; *see also id*. at p. 1 ("AN ACT . . . extending the prohibition on the eviction of residential tenants who have suffered financial hardship during the COVID-19 covered period[.]").[1] In fact, Defendant Marks, as New York's chief administrative judge, has provided official guidance advising that this extension "reinstates many COVID-19 related protections for respondents in residential . . . eviction proceedings that were previously set forth in statute and in part invalidated by the United

---

[1] Citations to "_____ Decl." are to the declarations submitted herewith in support of Plaintiffs' application for a preliminary injunction. Citations to "Ex. __" are to the exhibits attached to the Declaration of Akiva Shapiro, also submitted herewith.

States Supreme Court" and "continues" nearly every one of the enjoined moratorium's features. Ex. 2. Virtually all of the enjoined provisions have been reenacted—in most instances verbatim—including the tenant's self-certification of hardship. And while the Legislature purports to have "address[ed]" the Supreme Court's "due process concerns," the asserted fix is no fix at all. It is a mirage that effectively continues to bar the courthouse door to landlords and fails to cure the moratorium's due process infirmities.

As a result, these Plaintiffs and other New York small property owners are once again facing devastating consequences that compound with each passing day and can never be remediated later. For example, military veteran Brandie LaCasse and her young daughter are homeless—forced to live out of her car—because she cannot access her own property while non-paying holdover tenants refuse to leave. LaCasse Decl. ¶¶ 1, 16. Mr. Chrysafis remains unable to sell his property, despite securing an eviction warrant pre-COVID, and now faces emotional and financial ruin and the collapse of his marriage and mental health; he avers that, as a result of the extended eviction moratorium, he is now "clinically depressed and suicidal," and that he does not "know how much longer [he] can go on like this." Chrysafis Decl. ¶¶ 2-3. Ms. Shi and Mr. Zhou likewise need a place for their family members to live, but even a pre-COVID judgment against their non-paying holdover tenants cannot help them retake possession. Shi Decl. ¶ 18. And Ms. Cohen, a retiree on a fixed income, is struggling to make ends meet because her tenant refuses to pay rent or leave. Cohen Decl. ¶¶ 1-2, 13-14.

In light of this latest extension, the Second Circuit dismissed Plaintiffs' appeal as moot, vacated this Court's decision and judgment denying Plaintiffs' application for a preliminary injunction and dismissing Plaintiffs' claims, and remanded the case to this Court "for reconsideration in light of the intervening changes in New York law." *Chrysafis v. Marks*, 2021

WL 4453457, at *6 (2d Cir. Sept. 29, 2021). The Court held that it lacked jurisdiction to decide Plaintiffs' motion to enjoin enforcement of the extension during the pendency of the merits proceedings, *id.*, holding that any "objections . . . based on the Supreme Court's injunction" would be more properly adjudicated "in the first instance in" this Court, *id.* at *5 n.9. Plaintiffs therefore now seek a preliminary injunction barring enforcement of this latest extension during the pendency of these proceedings, for two independent reasons.

*First*, the Court should enjoin the extension in light of the Supreme Court's injunction itself. The eviction moratorium's central structure and mechanism is still an unsworn hardship declaration in which the tenant merely checks a box—without specifying the category of hardship claimed, and without providing any documentation of the hardship—thereby blocking the prosecution of eviction lawsuits and the issuance of eviction warrants. In fact, under the extension, once a tenant submits a hardship declaration in a pending proceeding—including one commenced before the pandemic—the proceeding "shall be stayed" until at least January 15, 2022, even if the Hardship Declaration was submitted under the previous (enjoined) version of the moratorium. S50001, Part A, Subpart C §4; *see also* Ex. 2 (Memorandum) at 1.

While the latest extension "modif[ies]" the prior version of the moratorium in one narrow respect that the State erroneously claims "address[es]" the Supreme Court's "due process concern," S50001 § 2—namely, by purporting to offer landlords the opportunity to obtain a hearing to contest a hardship claim—landlords can do so only if they first fulfill a precondition that is effectively an insurmountable hurdle, and appears to be designed precisely to hand-wave at the Supreme Court's decision without actually providing landlords with a meaningful opportunity to contest hardship declarations. Specifically, this extension prevents property owners from initiating or continuing a proceeding against a tenant claiming hardship unless they *first* swear

"under penalty of perjury" that "the petitioner believes in good faith that the hardship certified in the [tenant's] hardship declaration does not exist." S50001, Part A, Subpart C § 3(c). This stands in sharp contrast to the statutory scheme's continuing deference to tenants, whose unsworn say-so alone still automatically blocks eviction proceedings from being filed or prosecuted, even though the tenant need not specify the claimed hardship or substantiate it in any way.

Thus, for landlords to have any prospect of challenging that stay in the tenant's favor, they have to swear to a good-faith belief that their tenants are not suffering any such "hardship," subjecting themselves to potential criminal sanctions in the process. But information about whether a tenant has suffered any of the numerous vague, unspecified COVID-related financial or health "hardships" described in the moratorium law is solely in that tenant's possession. For example, Ms. Shi's tenants, who have not paid rent in over 27 months, "refuse to speak to [her] and have even changed their phone number so [she] can't reach them"—meaning she has no way of knowing their "financial or health situation since the pandemic" and certainly "cannot swear under penalty of perjury whether or not [her] tenants have been facing any of these alleged hardships during the pandemic." Shi Decl. ¶¶ 11, 13. In other words, the tenant remains "a judge in his own case," to these small landlord Plaintiffs' detriment and irreparable harm, in violation of their due process rights. *Chrysafis*, 141 S. Ct. at 2482. Thus, the Supreme Court's injunction order covers this latest extension and establishes that it should be enjoined.

*Second*, the Court should enjoin the extension because Plaintiffs continue to suffer irreparable harms and are likely to succeed on the merits of their claims, and the equities strongly weigh in favor of an injunction. This latest extension once again violates the Due Process Clause by denying landlords an "opportunity to be heard at a meaningful time and in a meaningful manner." *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976) (citation and internal quotation marks

omitted). The extension also violates the First Amendment's Free Speech Clause by compelling landlords to "speak a particular message" that they do not support and would not otherwise convey, *Nat'l Inst. of Family & Life Advocates v. Becerra*, 138 S. Ct. 2361, 2371 (2018), despite the presence of numerous less restrictive alternatives that "would communicate the desired information to the public without burdening [Applicants] with unwanted speech," *Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 800 (1988).

All the while, Plaintiffs continue to suffer grave, irreparable harms by virtue of the moratorium's deprivation of "one of the most fundamental elements of property ownership—the right to exclude." *Ala. Ass'n of Realtors v. Dep't of Health & Hum. Servs.*, 2021 WL 3783142, at *4 (U.S. Aug. 26, 2021) (citation omitted) (per curiam). The Supreme Court necessarily found, by granting emergency injunctive relief in *this very case*, that those irreparable harms to Plaintiffs—found by this Court on a full evidentiary record to have been "satisfactorily demonstrated," Dkt. 74 at 2, 6, 11-12, and now exacerbated by the passage of another four-plus months—outweighed any purported government interest in enforcing the eviction moratorium. And "[w]hatever interest the Government had" at an earlier point in time has "since diminished"—including as a result of increasing vaccination rates in New York—while the "harm to [Plaintiffs] has increased." *Ala. Ass'n of Realtors*, 2021 WL 3783142, at *4 (enjoining CDC's far narrower eviction moratorium). Indeed, absent immediate injunctive relief, that irreparable harm will continue unabated for at least another three months.

Plaintiffs therefore respectfully request that this Court grant the requested emergency relief and preliminary enjoin enforcement of New York's latest extension of its residential eviction moratorium until Plaintiffs' claims are fully and finally adjudicated on the merits.

I.     **New York's "Temporary" Eviction Moratoria In The Wake Of COVID-19.**

In March 2020, at the outset of the COVID-19 pandemic, then-Governor Cuomo issued an Executive Order prohibiting the enforcement of evictions of residential and commercial tenants for 90 days.  *See* Dkt. 14-4.  In May 2020, the Governor extended the moratorium through August 19, 2020, prohibiting both the initiation of proceedings and the enforcement of eviction warrants against tenants who were "facing financial hardship due to the COVID-19 pandemic."  Dkt. 14-5.

On June 30, 2020, the State enacted the Tenant Safe Harbor Act ("TSHA"), which "prohibit[s] the eviction of residential tenants who have suffered financial hardship during the COVID-19 covered period."  2020 N. Y. Laws ch. 127, §§1, 2(2)(a).  However, it does not bar eviction proceedings.  Rather, it provides that tenants "may raise financial hardship . . . as a defense in a summary proceeding."  *Id.* § 2(2)(a).  A court is to consider, *inter alia*, a tenant's income prior to and during the pandemic; a tenant's liquid assets; and a tenant's eligibility for public assistance benefits.  *Id.* § 2(2)(b).

CEEFPA Part A was then enacted on December 28, 2020.  It required property owners to provide their tenants with a government-drafted "hardship declaration" before commencing eviction proceedings, or when serving a written rent demand or "any other written notice required by the lease" that would be a prerequisite to any such eviction proceedings.  Ex. 3 ("CEEFPA Part A") § 3; *see also id.* § 5.  The statute further provided that, if a tenant submitted a hardship declaration, eviction proceedings against the tenant—both pending and new—would be stayed.  CEEFPA Part A §§ 4, 6.  The submission of a hardship declaration also stayed the execution of any previously issued eviction warrants.  *See id.* § 8(a)(ii).  There were narrow exceptions if the owner "establish[ed]" not only that the tenant was causing a nuisance affecting other tenants or a "substantial" safety hazard to others, but also that the nuisance was still ongoing through the date

on which the owner sought a judgment from the court. *Id.* § 9. In May 2021, the State extended CEEFPA Part A through "at least August 31." Ex. 4.

The hardship declaration began with a "NOTICE TO TENANT." *Id.* at § 1(4); *see also* Ex. 5. That notice stated that, "[i]f you have lost income or had increased costs during the COVID-19 pandemic . . . and you sign and deliver this hardship declaration form to your landlord, you cannot be evicted until at least [August 31, 2021] for nonpayment of rent or for holding over after the expiration of your lease." CEEFPA Part A § 1. The declaration form offered two "option[s]" via which tenants could effectuate a stay—namely, asserting that they were "experiencing financial hardship" or that "moving . . . would pose a significant health risk" related to the pandemic. *Id.* § 1(4). The form invited the tenants to "select[]" either or both "option[s]" by checking a box, with no further explanation or supporting documentation required. *Id.* Although the form informed the tenant that he or she was "signing and submitting this form under penalty of law," *id.*, the declaration did not need to be signed under penalty of perjury.

There were five grounds for financial hardship under CEEFPA Part A: (1) a "[s]ignificant loss of household income," (2) increased "necessary out-of-pocket expenses related to performing essential work or related to health impacts," (3) "[c]hildcare [or other familial care] responsibilities . . . negatively affect[ing]" the tenant's ability "to obtain meaningful employment" or causing "increased . . . necessary out-of-pocket expenses," (4) "[m]oving expenses and difficulty . . . securing alternative housing," or (5) a catch-all of unspecified "[o]ther circumstances related to . . . COVID-19" that "negatively affected" the tenant's "ability to obtain meaningful employment or earn income," or that "significantly reduced [the tenant's] household income or significantly increased . . . expenses." *Id.* Tenants were not required to identify which subcategory purportedly applied to them or provide any evidence or factual details.

The submission of a declaration claiming financial hardship also created a "rebuttable presumption that the tenant is experiencing financial hardship" under the TSHA, an executive order, or any other state or local law restricting evictions based on asserted "financial hardship during or due to COVID-19." *Id.* § 11. This rebuttable presumption extended indefinitely. *See id.* § 13. In addition to the hardship declaration, landlords were forced to provide tenants with "a list of all not-for-profit legal service providers actively handling housing matters in the county where the subject premises are located," prepared by the Office of Court Administration. *Id.* § 3.

## II. New York Ends Its State Of Emergency And Lifts COVID-Related Restrictions.

As of June 11, 2021, "65% [of] adults in New York State ha[d] received at least one vaccination, and the statewide positivity rate ha[d] hit a new low." Dkt. 74 at 13. Days later, the State achieved its goal of a 70% vaccination rate, lifted virtually all remaining COVID-related restrictions, and celebrated the State's emergence from the pandemic with fireworks throughout the State. Exs. 6, 7. On June 24, then-Governor Cuomo declared an end to the "state disaster emergency" based on "New York's dramatic progress against COVID-19, with the success in vaccination rates, and declining hospitalization and positivity statewide." Ex. 8.

Since June, no new COVID-19 shutdowns or gathering restrictions have been imposed by the State, and businesses and entertainment venues throughout the State are open for business. The state courts have fully reopened as well. Vaccination rates, meanwhile, have improved even further, with 76.6% of New Yorkers eighteen and older having completed their vaccine series and 85.4% of adults receiving at least one dose. *See* Ex. 14.

## III. The Supreme Court Enjoins CEEFPA Part A In Its Entirety.

On May 6, 2021, Plaintiffs filed the instant action and sought a preliminary injunction. This Court held an evidentiary hearing on June 1. Ex. 9. On June 11, the Court denied Plaintiffs' application, which had been consolidated with the merits of the underlying action, and directed

entry of a final judgment on the merits in favor of Defendant.  Order at 2, 26.  Plaintiffs filed a notice of appeal and motion for an injunction pending appeal, which the Second Circuit denied on July 26.  Dkts. 72; 80; Ct. App. Dkt. 25.

Plaintiffs then sought an emergency writ of injunction from the Supreme Court.  On August 12, the Supreme Court granted that application and enjoined CEEFPA Part A in its entirety pending final disposition of appellate proceedings in the Second Circuit and before the Supreme Court.  *Chrysafis*, 141 S. Ct. at 2482.  The Court did not enjoin the TSHA, which Plaintiffs "d[id] not challenge," such that tenants could continue to raise COVID-19 financial hardship as an affirmative defense in eviction proceedings.  *Id.* at 2483.

**IV.     New York's Legislature And Governor "Extend" The State's Eviction Moratorium.**

In response to the Supreme Court's injunction, the incoming Governor and CEEFPA's New York State Senate sponsor vowed to extend the State's eviction moratorium.   On September 1, the Legislature and Governor followed through, enacting a law "extending" the prior residential eviction moratorium.  S50001 at p. 1; *id.* § 2.  This latest extension is unchanged from CEEFPA Part A in almost all material respects:  It includes a nearly identical hardship declaration form; continues to permit tenants to claim financial "hardship" by checking a box without identifying which of the categories applies; continues not to require tenants to substantiate or provide any specifics regarding the asserted hardship; continues to permit claims of "hardship" by reference to numerous vague categories; continues to bar the initiation or prosecution of eviction proceedings upon the tenant's delivery of a completed hardship declaration form, with only narrow exceptions; continues to require property owners to provide tenants with hardship forms, a government-drafted notice, and a government-curated list of legal service providers; continues to establish a "rebuttable presumption" of hardship that continues indefinitely, even after expiration of the moratorium; and purports to give effect to hardship declarations previously completed under CEEFPA Part A, thus

reviving hardship declarations invalidated by the Supreme Court's injunction.  S50001, Part A, Subpart C (the "Extension")  §§ 1(4), 2-4, 6, 9-10.

While the Legislature purported to "modify" CEEFPA Part A in one respect "to address the Supreme Court's due process concern," S50001 § 2—namely, by nominally providing landlords an opportunity to contest assertions of hardship—the Extension continues to bar the courthouse door by allowing a landlord to initiate an eviction proceeding only if she first swears "under penalty of perjury" that "the [landlord] believes in good faith that the hardship certified in the hardship declaration does not exist."  S50001, Part A, Subpart C § 3.  In contrast, tenants still need only sign a hardship declaration under "penalty of law." *Id.* § 1(4).  And that "hardship" still need not be specified; a generic check-the-box form suffices.

## V.    Small-Scale Property Owners Continue To Be Irreparably Harmed.

The irreparable harms established by Plaintiffs, and credited by this Court in its prior decision, continue—and have now been reimposed and exacerbated by the Extension.

Plaintiff Master Sergeant Brandie LaCasse is a retired military veteran who served in the Air Force for 24 years.  Ex. 9 at 23:14-24:14.  She is a single mother of an 11-year-old-daughter who owns and manages six single-family homes in New York, and in November 2012, she decided to sell one of them. *Id.* at 25:9-10, 26:17-27:17; 29:7-30:10.  She served her tenants with a notice of nonrenewal pursuant to the lease, and they stopped paying rent altogether and refused to vacate even though the lease expired. *Id.* at 30:6-10; 36:5-14.  She filed a holdover proceeding in December 2020, but it was dismissed because she had not provided her tenants with a hardship declaration. *Id.* at 36:9-14, 37:11-15.  The tenants then completed a hardship declaration.  LaCasse Decl. ¶ 6 (citing Ex. A thereto).  Subsequently, Master Sergeant LaCasse's ex-fiancé asked her and her daughter to move out of his home.  Ex. 9 at 27:19-20, 28:4-8.  Unable to purchase a new residence, she resolved to move into the Rhinebeck house, but the non-paying tenants still refuse

to leave.  LaCasse Decl. ¶ 16; Ex. 9 at 35:7-12.  As a result, she and her daughter became homeless.  LaCasse Decl. ¶ 1.  Following the Supreme Court's decision, Master Sergeant LaCasse was able to obtain a default judgment awarding her possession of her property and a warrant of ejectment.  LaCasse Decl. ¶¶ 17-18, 20; Exs. 10, 11.  However, because of the Extension, she has been unable to effectuate that warrant, perpetuating the irreparable harm.  LaCasse Decl. ¶¶ 19-20 (citing Ex. B thereto).  She and her daughter are still homeless and live out of her car.  *Id.* ¶ 22.

Plaintiffs Mudan Shi and Feng Zhou own a single-family home, which they currently rent to tenants, in Staten Island, New York.  Shi Decl. ¶ 1.  Roughly one year before the pandemic, their tenants stopped paying rent.  *Id.* ¶ 4.  They commenced a non-payment action in October 2019—well before the pandemic—and obtained a judgment.  *Id.* ¶ 6.  However, before it could be enforced, the proceeding was stayed as a result of the eviction moratoria, and it remains stayed all this time.  *Id.* ¶¶ 6, 9.  Thus, even though their tenants' lease has expired and they have not paid rent for 30 months (for reasons unrelated to COVID-19), Ms. Shi and Mr. Zhou cannot move their family members into the house.  *Id.* ¶ 19.

Ms. Shi and Mr. Zhou's tenants now "refuse to speak to [them] and have even changed their phone number"—meaning Ms. Shi and Mr. Zhou have no way of knowing their tenants' "financial or health situation since the pandemic."  Shi Decl. ¶¶ 11, 13.  As Ms. Shi has explained, "[T]he only way I can seek to evict my tenants is by swearing under penalty of perjury to something that I and so many other landlords cannot possibly know without questioning tenants about what they may or may not be enduring during COVID-19.  We have to be able to go to court to do that, yet this latest moratorium extension, like before, prevents us from doing so."  *Id.* ¶ 15.

Plaintiff Pantelis Chrysafis is the owner of a single-family home, located in Garden City, New York, that he rents to tenants.  Chrysafis Decl. ¶ 1.  In early 2019, Mr. Chrysafis informed

the tenants that he intended to sell the house and that they would have a number of months to find a new residence. *Id.* ¶ 9. Instead of moving out, the tenants stopped paying rent. *Id.* ¶ 10. In February 2020, before the pandemic hit New York, Mr. Chrysafis obtained a judgment for unpaid rent, along with an eviction warrant ordering the tenants to vacate by April 1, 2020. *Id.* ¶ 12. However, days before New York shut down, Mr. Chrysafis agreed to a month's extension to allow the tenants more time to find a suitable alternative residence. *Id.* ¶ 13. The tenants remain in the home to this day—and they now have not paid rent for almost two years. *Id.* ¶ 15. As a result, Mr. Chrysafis has been forced to borrow money from his elderly parents to stay afloat, and the situation has caused unending strife within his family, including a near-divorce. *Id.* ¶¶ 16-17. His mental health has drastically deteriorated; he is now clinically depressed and suicidal. *Id.* ¶¶ 2 3.

Plaintiff Betty S. Cohen is the owner of a single co-op unit, located in Brooklyn, New York, that she rents to a tenant. Cohen Decl. ¶ 1; Ex. 9 at 61:5-62:13. Ms. Cohen is a retiree whose income is limited to the rent on the co-op unit and her Social Security benefits. Ex. 9 at 61:11-14. In March 2020, her tenant stopped paying rent. *Id.* at 64:1-5. In September 2020, Ms. Cohen sent a notice of late payment and attempted to initiate an eviction action, but the housing court did not acknowledge the filing. *Id.* at 68:3-13. The lease expired in December 2020. Cohen Decl. ¶ 2. In February 2021, the tenant submitted a hardship declaration form. *Id.* ¶ 7. Although Ms. Cohen received funds from the State's Emergency Rental Assistance Program ("ERAP"), they failed to make her whole and only cover rent payments through October 2021. *Id.* ¶ 13. Thereafter, the Extension will continue to bar Ms. Cohen from evicting the tenant even if he again fails to pay rent, as he has for more than 19 months.

## VI. Further Appellate Proceedings And Remand.

On September 8, Defendant issued a Memorandum and an Administrative Order implementing the Extension. Exs. 2, 12. On September 9, Plaintiffs filed an emergency motion

in the Second Circuit requesting that it enforce the Supreme Court's injunction and enjoin the Extension pending appeal. Ct. App. Dkt. 134. On September 29, the Second Circuit dismissed Plaintiffs' appeal, vacated this Court's decision and judgment, and remanded "for reconsideration in light of the intervening changes in New York law." *Chrysafis*, 2021 WL 4453457, at *6. The Court also directed that any "objections . . . based on the Supreme Court's injunction" would be more properly adjudicated "in the first instance" in this Court. *Id.* at *5 n.9.

## LEGAL STANDARD

It is this Court's "principled responsibility as an inferior federal court to apply the spirit of the rulings of the Supreme Court without resorting to hairline distinctions." *Parent Ass'n of Andrew Jackson High Sch. v. Ambach*, 598 F.2d 705, 715 n.7 (2d Cir. 1979). A preliminary injunction of government action is warranted where, as here, the plaintiff demonstrates "(1) irreparable harm absent injunctive relief, (2) a likelihood of success on the merits, and (3) public interest weighing in favor of granting the injunction." *Friends of the E. Hampton Airport, Inc. v. Town of E. Hampton*, 841 F.3d 133, 143 (2d Cir. 2016).

## ARGUMENT

**I.       The Extension Is Essentially The Same Law That The Supreme Court Enjoined.**

**A.       The Extension Reenacts The Very Provisions Of CEEFPA Part A That The Supreme Court Already Enjoined And Compounds The Irreparable Harms Already Credited By This Court And The Supreme Court.**

The Legislature has now expressly "extend[ed]"—through at least January 2022—the very "residential eviction moratorium" already enjoined by the Supreme Court. S50001 § 2. And although the Legislature purports to have "address[ed]" the Court's "due process concern," *id.*, the Extension reenacts virtually all of CEEFPA Part A's enjoined provisions.

The Supreme Court has made clear that the government cannot replace a challenged law "with one that differs only in some insignificant respect" to frustrate the judicial process. *Ne. Fla.*

*Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 662 (1993). It does not matter if the new law "differs in certain respects from" the original iteration—even if the Extension were to "disadvantage [Plaintiffs] to a lesser degree" than the original—as long as it "disadvantages them in the same fundamental way." *Id.* Courts accordingly treat such a replacement policy "as merely a renewal of the challenged conduct." *Ala. Ala. Ass'n of Realtors v. U.S. Dep't of Health & Hum. Servs.*, 2021 WL 3577367, at *3 (D.D.C. Aug. 13, 2021*) (finding new CDC eviction moratorium, despite multiple "substantive differences" between it and prior versions, "fundamentally similar" to predecessors and thus "fall[ing] within" the court's order governing them); *see also Ala. Ass'n of Realtors*, 2021 WL 3783142 (enjoining amended moratorium); *Nutritional Health All. v. Shalala*, 144 F.3d 220, 227 n.13 (2d Cir. 1998).

Such a renewal of the challenged conduct is precisely what the State has done here. Although tweaked at the margins, the Extension has stepped into the unconstitutional shoes of the already-enjoined CEEFPA Part A and is functionally a continuation of that prior law. In fact, Defendant Marks himself issued official guidance for the New York courts confirming what is already apparent on the face of the statute—namely, that the Extension "reinstates many COVID-19 related protections for respondents in residential . . . eviction proceedings that were previously set forth in statute and in part invalidated by the United States Supreme Court." Ex. 2 at 1. This is particularly apparent when considering that the "new" moratorium law automatically reinstates hardship declarations that were submitted under the earlier, enjoined law; the fact that tenants are not required to file new hardship declarations to avail themselves of the Extension's protections reinforces that it is merely an extension of the earlier law and not materially distinct. Under the Extension, a tenant's hardship declaration (whenever filed) still blocks a landlord from initiating or continuing eviction proceedings or enforcing an eviction warrant, S50001, Part A,

Subpart C §§ 3, 4, 6, 10, and the Extension continues to compel landlords to speak by forcing them to distribute hardship declarations and lists of legal service providers to tenants, *id*. §§ 1(4)(b), 2.

Granted, the State has nominally added a narrow exception to the blanket moratorium if a landlord (1) swears under "penalty of perjury" to a "good faith belief" that the tenant's claimed (but unspecified and unsworn) hardship "does not exist," simply to *secure* a hearing (and thus without the benefit of any discovery), and then (2) convinces a housing court to find the tenant's hardship claim "invalid," or if the tenant is damaging the property. *Id.* §§ 3, 7, 10. But the new "hearing" mechanism is illusory, *see infra* Section I.B, and does nothing to change the fact that the overwhelming majority of the Extension consists of a near-verbatim reenactment of CEEFPA Part A. Indeed, the State seems to be following the ill-fated playbook adopted by federal authorities in the CDC case, in which the Supreme Court issued an order calling the legality of the federal eviction moratorium into question but allowing it to lapse on its own terms, the CDC later amended and extended that moratorium anyway, and the government thereafter took the position that the Supreme Court's prior instructions no longer applied to the "new" version. *See* Brief for Respondents at 9, 17, 26-27, *Ala. Ass'n of Realtors*, No. 21A23 (U.S. Aug. 23, 2021). The Supreme Court enjoined the extended federal moratorium anyway, *see Ala. Ass'n of Realtors*, 2021 WL 3783142, at *2, and that result should follow *a fortiori* here, where, as the Second Circuit recognized, *Chrysafis*, 2021 WL 4453457, at *5 n.9, the prior iteration of New York's moratorium remains subject to an injunction from the Supreme Court. That injunction was designed to shield private property owners from further irreparable harms while their constitutional claims were adjudicated on the merits. Thus, the Extension has frustrated "what the [injunction] was really designed to accomplish." *City of Vicksburg v. Henson*, 231 U.S. 259, 273 (1913).

### B.    The Extension's Minor Changes Do Not Cure The Due Process Violation.

The Extension does not rectify the due process defects that plagued CEEFPA Part A. While the State purports to have cured the violation with one illusory tweak, the scheme still "violates the Court's longstanding teaching that ordinarily 'no man can be a judge in his own case' consistent with the Due Process Clause." *Chrysafis*, 141 S. Ct. at 2482 (citation omitted).

CEEFPA Part A deprived Plaintiffs of core property rights without due process by allowing a tenant's "self-certific[ation] [of] financial hardship" to block eviction proceedings and "den[y] the landlord a hearing." *Id.* Under the Extension, tenants are still permitted to self-certify hardship merely by checking a box, and thereby prevent the initiation or prosecution of eviction actions. *See* S50001, Part A, Subpart C §§ 3, 4, 6, 9; Ex. 13 at 1.

The State nevertheless asserts that a minor change in the law—to in theory provide a narrow avenue for landlords to challenge assertions of hardship if they can first "attest" under "penalty of perjury" to a "good faith" belief that the tenant is *not* suffering from *any* hardship, *id.* § 3—solves the problem. But the State ignores that, prior to initiating a lawsuit (and thus prior even to being able to *seek* any discovery), a landlord such as Ms. Shi—whose tenant stopped paying rent a year prior to the pandemic and then refused to communicate with her, Shi Decl. ¶¶ 4, 11—will generally lack access to facts regarding, for example, whether the tenant has taken on more childcare responsibilities during the pandemic or whether public assistance fails to make up for the loss of household income. *See* S50001, Part A, Subpart C § 5 (defining "Hardship"); *see also* Chrysafis Decl. ¶ 22.[2] Without such personal knowledge, it would be remarkably risky for

---

[2] Because landlords must attest to a good-faith belief that their tenants are not suffering hardship *before* they may commence or continue eviction proceedings, they necessarily do not receive the benefit of discovery before making those attestations. Indeed, even after initiating eviction proceedings, the parties to such a "special proceeding" may only seek discovery with leave of the court. *See* N.Y. C.P.L.R. § 504. Thus, even the Extension's sponsor acknowledged during the bill's legislative hearing that "it is unlikely there's going to be depositions or elaborate discovery" for landlords who seek information from tenants regarding the hardship they

*(Cont'd on next page)*

landlords to swear under oath—hazarding a seven-year prison sentence, N.Y. Penal Law §§ 70.00(2)(d), 210.15—before even being allowed to *file* a suit. The risk is compounded by the fact that tenants still need not specify the purported basis for the alleged hardship, and thus landlords still do not even know what set of facts they are supposed to dispute. And, even if the landlord manages to surmount this hurdle and secure a hearing, the moratorium still remains in effect unless the housing court "find[s] the [tenant's] hardship claim *invalid*." S50001, Part A, Subpart C § 10(a) (emphasis added). Thus, the structure and text of the statute appear on their face to impose on landlords the burden of somehow *proving* the negative at the hearing. *Cf. Campbell v. United States*, 365 U.S. 85, 96 (1961). A tenant, meanwhile, can still rely solely on an unsworn self-attestation to bar the courthouse door. All of this is empty "procedure" meant to give the State cover without meaningfully addressing the underlying due process issues, as tenants remain the judge and jury in their own cases, just as they were under CEEFPA Part A.

Indeed, tenants need not do anything at all: Despite the Supreme Court's order, a tenant's hardship declaration submitted as far back as December 2020 can once again serve to deprive a landlord of his or her property rights without a hearing. S50001, Part A, Subpart C § 1(4)(a). As a result, tenants can unilaterally shut landlords out of court until at least January 15, 2022, effectively restoring—for months—the precise state of affairs that the Supreme Court enjoined.

## II. The Extension Should Independently Be Enjoined Because Plaintiffs Are Likely To Succeed On The Merits Of Their Claims And Are Suffering Irreparable Harm, And The Balance Of Equities Strongly Favors Relief.

Even if evaluated anew, the Extension should be enjoined because Plaintiffs are suffering irreparable harms, are likely to succeed on the merits , and the equities weigh in their favor.

---

are claiming. New York Senate Chamber, Statement by Senator Kavanagh, at 1:05:20, YouTube (Sept. 1, 2021), youtube.com/watch?v=oZUO9IGWB18.

## A.  Plaintiffs Will Be Irreparably Harmed If The Extension Is Not Enjoined.

In June, this Court found that Plaintiffs had adequately demonstrated irreparable harm from the State's eviction moratorium.  Dkt. 74 at 2, 6.  By enjoining CEEFPA Part A in August, the Supreme Court necessarily agreed.  Indeed, Plaintiffs are exactly the types of landlords of "modest means" that the Supreme Court subsequently held were put "at risk of irreparable harm" even by the CDC's far narrower federal eviction moratorium.  *Ala. Ass'n of Realtors*, 2021 WL 3783142, at *4.  The State has never meaningfully disputed the irreparable harms in this case.

And yet, with this latest Extension, the State has reimposed the constitutional violations wrought by the State's eviction moratorium and forced Plaintiffs to continue to bear the "significant hardship[s]" that they had faced before the Supreme Court intervened.  Dkt. 74 at 6; *see also supra* at 10-12.  Because these individual owner Plaintiffs have been unable to reclaim possession of their properties or exercise their right to exclude non-paying tenants for 12-30 months and counting, they and their families have been displaced, financially destroyed, emotionally devastated to the point of being clinically depressed and suicidal, and even rendered homeless with a young child.  *See supra* at 10-12.  And the moratorium and its resultant irreparable harms will continue unabated for at least three more months absent immediate relief.

## B.  Plaintiffs Are Likely To Succeed On The Merits Of Their Claims.

### 1.  The Extension Violates Plaintiffs' Procedural Due Process Rights.

Under the Fourteenth Amendment's Due Process Clause, no State shall "deprive any person of life, liberty, or property, without due process of law."  U.S. Const. amend. XIV § 1.  As the Supreme Court has explained, "[p]rocedural due process imposes constraints on governmental decisions which deprive individuals of 'liberty' or 'property' interests within the meaning of the Due Process Clause."  *Mathews*, 424 U.S. at 332.  "The fundamental requirement of due process

is the opportunity to be heard at a meaningful time and in a meaningful manner." *Id.* at 333 (citation and internal quotation marks omitted).[3]

The Supreme Court has adopted a "familiar threefold inquiry" for assessing what process is due when the government seeks to alter procedures in private disputes to provide one party "the overt, significant assistance of state officials." *Connecticut v. Doehr*, 501 U.S. 1, 10-11 (1991) (citation and internal quotation marks omitted). That inquiry considers: (1) the private interest affected by the official action; (2) the "risk of an erroneous deprivation of such interest" via the existing procedures, and "the probable value, if any, of additional or substitute safeguards"; and (3) the interest of the party seeking the procedure, with "due regard for any ancillary interest the government may have in providing the procedure or forgoing the added burden of providing greater protections." *Id.* (quoting *Mathews*, 424 U.S. at 335).

Like CEEFPA Part A before it, the Extension, impacts "one of the most fundamental elements of property ownership—the right to exclude." *Ala. Ass'n of Realtors*, 2021 WL 3783142, at *4 (citation omitted). Indeed, the Supreme Court recently reaffirmed that "the protection of private property is indispensable to the promotion of individual freedom," as "property must be secured, or liberty cannot exist." *Cedar Point Nursery v. Hassid*, 141 S. Ct. 2063, 2071 (2021) (citation and alteration omitted). The Extension has continued CEEFPA Part A's deprivation of "valuable rights of ownership," *United States v. James Daniel Good Real Prop.*, 510 U.S. 43, 53-54 (1993), including the ability to personally inhabit their properties or collect rent.

---

[3] Although the Court previously ruled that *Mathews* is inapplicable to Plaintiffs' claims, Dkt. 74 at 13-15, Plaintiffs respectfully submit that the Supreme Court implicitly rejected that conclusion in ruling that CEEFPA Part A violated the rule that "'no man can be a judge in his own case' consistent with the Due Process Clause." *Chrysafis*, 2021 WL 3560766, at *1 (citation omitted). And the Second Circuit subsequently vacated this Court's decision denying Plaintiffs' due process claim on mootness grounds, granting leave to amend. *See Chrysafis*, 2021 WL 4453457, at *6.

Despite its impact on these core property rights, the Extension fails to provide any meaningful process. Rather, once a tenant submits a hardship declaration in a pending proceeding—including one commenced before the pandemic—the proceeding "shall be stayed" until at least January 15, 2022, even if the hardship declaration was submitted under the previous (enjoined) version of the moratorium. S50001, Part A, Subpart C § 4. Tenants are not required to submit any proof of, or details regarding, their claimed hardships. Those same rules apply even if the court issued an eviction warrant before the Extension took effect. *Id.* § 6. For landlords who have not yet initiated eviction proceedings, the submission of a hardship declaration precludes them even from *commencing* such a proceeding, *see id.* § 3—even though, as the State's own witness testified, it takes an average of four to six months following the commencement of the proceeding for an eviction warrant to be executed. Ex. 9 at 122:18-123:3.

Although the Extension purports to allow landlords to contest hardship claims if they are first able to swear, under penalty of perjury, to a good-faith belief that those claims are false, this "process" is illusory because landlords typically lack access to the information necessary to make such an attestation. *See supra* Section I.B. Like the original version of CEEFPA Part A—which included its own exceptions—the Extension violates due process because it "generally precludes a landlord from contesting" tenants' claims of financial hardship. *Chrysafis*, 141 S. Ct. at 2482.

The good-faith requirement's inherent information asymmetry is compounded by the vagueness of the Extension's provisions. For example, the Extension permits tenants to declare financial hardship based on "[o]ther circumstances related to the COVID-19 pandemic" that have "negatively affected" their "ability to obtain meaningful employment or earn income," or that have "significantly reduced" household income or "significantly increased" expenses. *See* S50001, Part A, Subpart C § 1(4). None of these terms is defined, and all are hopelessly vague. Worse

still, the tenant does not need to indicate which category he claims applies; the tenant makes the eligibility determination unilaterally and then can simply check a box claiming general "financial hardship."

Because "the procedures used," *Doehr*, 501 U.S. at 10, to determine whether an eviction proceeding will be barred are essentially nonexistent, the Extension is likely to result in erroneous deprivations. And, unless the landlord is able to convince a court that "a tenant's hardship claim [is] invalid," a tenant's unsubstantiated claim will create an *indefinite* rebuttable presumption of financial hardship, even after the Extension expires. *Id.* § 9. In reality, then, the only "procedures" safeguarding owners from erroneous deprivations of their property rights are tenants' subjective determinations as to whether they fall within one of the hardship declaration's vague categories. The Extension thus continues to "violate[] the Court's longstanding teaching that ordinarily 'no man can be a judge in his own case' consistent with the Due Process Clause." *Chrysafis*, 141 S. Ct. at 2482 (citation omitted); *Doehr*, 501 U.S. at 14 ("[F]airness can rarely be obtained by secret, one-sided determination[s] of facts decisive of rights." (citation omitted)).

The State's asserted interest in responding to COVID-19 variants—and tenants' related interest in avoiding eviction—cannot possibly provide a basis for denying Plaintiffs a meaningful opportunity to be heard for the duration of the pandemic and beyond. Rather, "[i]t is during our most challenging and uncertain moments that our Nation's commitment to due process is most severely tested; and it is in those times that we must preserve our commitment" to those principles. *Hamdi v. Rumsfeld*, 542 U.S. 507, 532 (2004) (plurality opinion).

Nor is the Extension saved from its constitutional infirmities by the fact that it will supposedly expire, as the Supreme Court recognized by enjoining CEEFPA Part A just three weeks before its stated expiration date. That is because "temporary or partial impairments to property

rights . . . are sufficient to merit due process protection." *Doehr*, 501 U.S. at 12; *see also Fuentes v. Shevin*, 407 U.S. 67, 84-85 (1972). Months ago, this Court acknowledged that Plaintiffs had already been deprived of their rights for months or years without any legal recourse. Dkt. 74 at 8. Those deprivations have only worsened, and the Extension ensures they will continue until "at least" January 15, 2022. And, of course, the State has repeatedly pointed to the upcoming expiration of its eviction moratorium in arguing that Plaintiffs have not been denied due process, only to turn around and extend the moratorium again and again.[4]

### 2. The Extension Violates Plaintiffs' Free Speech Rights.

The Free Speech Clause provides that the government "shall make no law . . . abridging the freedom of speech." U.S. Const. amend. I. When the government "mandat[es] speech that a speaker would not otherwise make," *Riley*, 487 U.S. at 795, or "compel[s] individuals to speak a particular message," thereby "alter[ing] the content" of an individual's speech, those "content-based regulations" are subject to strict scrutiny, *Becerra*, 138 S. Ct. at 2371 (citation omitted). Lesser scrutiny applies in cases involving "commercial speech, that is, expression related solely to the economic interests of the speaker and its audience." *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557, 561-63 (1980). That is because of "the commonsense distinction between speech proposing a commercial transaction, which occurs in an area traditionally subject to government regulation, and other varieties of speech." *Id.* at 562 (citation and internal quotation marks omitted). In other words, "[a]lthough the State may at times 'prescribe what shall be orthodox in commercial advertising' by requiring the dissemination of 'purely factual and uncontroversial information,' outside that context it may not compel affirmance

---

[4] For essentially the same reasons, the Extension violates Plaintiffs' right to access the courts under the First Amendment's Petition Clause. *See Bill Johnson's Rests., Inc. v. N.L.R.B.*, 461 U.S. 731, 741 (1983). Plaintiffs reserve the right to continue pursuing this claim on the merits in this action.

of a belief with which the speaker disagrees." *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 573 (1995) (quoting *Zauderer v. Office of Disciplinary Counsel of Supreme Court of Ohio*, 471 U.S. 626, 651 (1985)). This rule extends "equally to statements of fact the speaker would rather avoid." *Id.*

"Strict scrutiny is a searching examination, and it is the government that bears the burden" of proof. *Fisher v. Univ. of Tex. at Austin*, 570 U.S. 297, 310 (2013). Specifically, the government must establish that the law is "narrowly tailored to promote a compelling Government interest." *United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803, 813 (2000). Thus, "if a less restrictive alternative would serve the Government's purpose, the legislature must use that alternative." *Id.*

Because the Extension mandates speech that Plaintiffs would not otherwise make and compels them to speak a particular message—outside the context of a proposed commercial transaction—strict scrutiny applies. The first page of the hardship declaration is a government-drafted "NOTICE TO TENANT[S]" instructing them on how to avoid their rental obligations without risking eviction. Ex. 13. And the Extension forces property owners to include, with any hardship declaration, a State-curated list of legal service providers who are available to assist tenants in avoiding eviction. S50001, Part A, Subpart C § 2. The Extension thus forces owners to provide information about, and effectively recommend and vouch for, the organizations on the list—despite the fact that they would not do so of their own volition. *Becerra*, 138 S. Ct. at 2371; *Wooley v. Maynard*, 430 U.S. 705, 717 (1977). Because "[m]andating speech that a speaker would not otherwise make necessarily alters the content of the speech," the Extension imposes "a content-based regulation of speech" and is subject to strict scrutiny. *Riley*, 487 U.S. at 795.

Nor do these compelled disclosures constitute commercial speech within the meaning of *Zauderer*. *Zauderer* applied lesser scrutiny to requirements for "attorney advertising" that

combatted potential deception of clients. 471 U.S. at 652. As the Supreme Court recently clarified, the "*Zauderer* standard" only applies when, as in *Zauderer* itself, the government mandates the disclosure of "purely factual and uncontroversial information about the terms under which [the speaker's] services will be available." *Becerra*, 138 S. Ct. at 2369, 2372. But the compelled speech at issue here does not speak to the terms under which landlords will offer services to tenants, and the list of legal service providers "in no way relates to the services that [Plaintiffs] provide," instead "requir[ing] these [Plaintiffs] to disclose information" about separate legal services available elsewhere. *Becerra*, 138 S. Ct. at 2372. Strict scrutiny applies.

The government cannot carry its burden of proving that the compelled speech requirement is narrowly tailored to a compelling government interest. As a threshold matter, to the extent the purported compelling government interest is tied to concerns about risks associated with evictions amidst a public health emergency, that government interest no longer exists. *See supra* at 8. The State cannot claim a compelling public health interest in requiring property owners to convey the State's messaging about the moratorium at the same time that vaccines are readily available and the State has lifted virtually all other COVID-related restrictions. In any event, the disclosure requirement is not narrowly tailored, as there are multiple less restrictive alternatives that the State could adopt. "Most obviously, [the State] could inform [tenants] itself with a public-information campaign." *Becerra*, 138 S. Ct. at 2375-76. For instance, the State could mail the notices directly to tenants or direct tenants to the hardship declaration posted on government websites; indeed, the State previously conceded that it has "done both." Brief in Opposition at 23, *Chrysafis v. Marks*, No. 21A8 (U.S. Aug. 4, 2021). Such alternatives "would communicate the desired information to the public without burdening a speaker with unwanted speech." *Riley*, 487 U.S. at 800.

## C. The Balance Of Hardships And Public Interest Favor Injunctive Relief.

The public interest in protecting property owners' constitutional rights and stanching the irreparable harm caused by the Extension weighs heavily in favor of emergency relief. *Agudath Israel of Am. v. Cuomo*, 983 F.3d 620, 636 (2d Cir. 2020). On one side of the ledger is an acute crisis for Plaintiffs and other property owners—a crisis that has been ongoing for months (years even) and has now been extended for at least another three months. On the other, there is simply no public interest in the Extension's continued enforcement pending final disposition of Plaintiffs' claims. *First*, the Supreme Court has recognized that the public interest in combatting the pandemic does not allow government to "act unlawfully even in pursuit of desirable ends," *Ala. Ass'n of Realtors*, 2021 WL 3783142, at *4 (citation omitted), twice enjoining eviction moratoria over invocations of pandemic-related risk—including in this very case. *Second*, enjoining the Extension will merely permit the housing courts to operate according to their usual practices and procedures, subject to the protections afforded to tenants under the TSHA and ERAP. *Third*, just as in the CDC case, "[w]hatever interest the Government had" previously has "since diminished," while the "harm to [Plaintiffs] has increased." *Id.* Indeed, despite the State's prior prognostications that injunctive relief would trigger a parade of horribles, eviction proceedings recommenced in the State for three weeks after the Supreme Court's injunction without any bedlam. And the State's vaccination rates continue to climb. *See* Ex. 14.

Particularly in light of the protections already afforded by the TSHA and ERAP, there is no public interest in the continued enforcement of the Extension.

## CONCLUSION

Plaintiffs respectfully request that the Court grant their application for a preliminary injunction pending the resolution of its claims on the merits.

Dated: New York, New York
       October 15, 2021

GIBSON, DUNN & CRUTCHER LLP

By:    */s/ Randy M. Mastro*
        Randy M. Mastro
        Akiva Shapiro
        Jessica Benvenisty
        William J. Moccia
        Lauren Myers
        200 Park Avenue
        New York, NY 10166
        Tel.:  (212) 351-4000
        rmastro@gibsondunn.com
        ashapiro@gibsondunn.com

        *Attorneys for Plaintiffs*