FILED
CLERK

3:55 pm, Nov 29, 2021

U.S. DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
LONG ISLAND OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------------X

PANTELIS CHRYSAFIS, BRANDIE LACASSE,
MUDAN SHI, FENG ZHOU,
AND RENT STABILIZATION
ASSOCIATION OF NYC, INC.,

                               Plaintiffs,

                      -against-

LAWRENCE K. MARKS, in his official
capacity as Chief Administrative Judge of the
Courts of New York State,

                               Defendant.

-------------------------------------------------------------------X

**MEMORANDUM
AND ORDER**
21-cv-2516 (GRB)

**GARY R. BROWN, United States District Judge:**

Before the Court is an application by plaintiffs for preliminary injunctive relief aimed at New York's COVID-19 eviction moratorium, the second such application in this case. The instant motion seeks injunctive relief as to an amended version of the COVID-19 Emergency Eviction and Foreclosure Prevention Act (CEEFPA). That amendment extended the eviction moratorium and made changes intended to address a determination of the United States Supreme Court that the earlier provision violated the Due Process Clause of the United States Constitution. The amended statute provides several avenues for landlords to challenge statutorily-created "hardship declarations" filed by their tenants and seek judicial relief notwithstanding the filing of such declarations.

In an amended complaint, plaintiffs contend that the procedures made available by the new statute are illusory, as they cannot gather and aver to the requisite information to challenge a

hardship declaration filed by a tenant.  At this stage, it appears that the procedures provided by the statute are quite real; plaintiffs' argument is not only chimerical, but disingenuous.  Following a full evidentiary hearing at which the three plaintiff-landlords testified, the facts demonstrate that these plaintiffs (a) have made no attempt to challenge the hardship declarations filed by their tenants and/or (b) have other avenues available to effect an eviction which they have failed or opted not to pursue.  Moreover, examination of caselaw applying the amended statute reveals that courts have afforded hearings and made discovery devices available to permit similarly-situated landlords to meaningfully challenge hardship declarations.  Thus, while the remedies implemented by the legislature may be imperfect, there has been no showing, at this juncture, that would entitle plaintiffs to the extraordinary remedy of a preliminary injunction.

## A.  Procedural History

Much of the burgeoning procedural history of this case is contained in *Chrysafis v. Marks* ("*Chrysafis I*"), 2021 WL 2405802 (E.D.N.Y. June 11, 2021), which is incorporated herein by reference.  On June 11, 2020, this Court issued an opinion denying, after an evidentiary hearing, the initial preliminary injunction application.  *Chrysafis I*, 2021 WL 2405802, at *15.  As the merits had been consolidated with consent of the parties, *id.* at *14, the Court entered judgement on June 14, 2021.  DE 75.  The Second Circuit described the appellate developments that followed:

> On the same day, the Landlords sought an injunction pending appeal, which the District Court denied on June 16.  After filing a notice of appeal, the Landlords, on June 18, sought from this Court an order expediting the appeal and an injunction pending appeal to prevent enforcement of the COVID-19 Emergency Eviction Moratorium Act of 2020.  On June 26, this Court denied the motion for an injunction pending appeal.

*Chrysafis v. Marks*, 15 F.4th 208, 212 (2d Cir. 2021) (the "Remand Order").  On August 12, 2021, in response to an "Emergency Application for Writ of Injunction," the Supreme Court issued an

"order enjoin[ing] the enforcement of only Part A of [CEEFPA].  2020 N. Y. Laws ch. 381," noting "[t]hat is the only relief applicants seek."  *Chrysafis v. Marks*, 141 S. Ct. 2482 (2021).

Subsequent to the Supreme Court's determination, on August 31, 2021, plaintiffs made "an attempt to challenge the new residential eviction moratorium, which is Subpart A of Part C ('Subpart C(A) 2021') of 2021 N.Y. Laws Ch. 417 (S50001), enacted on Sept. 1, 2021, after several provisions of the old moratorium statute expired on Aug. 31, 2021" before the Second Circuit Court of Appeals.  Remand Order, 15 F.4th at 210.  Given the expiry of the old statute, the Court of Appeals "conclude[d] that Plaintiffs' due process claims are moot, that we should dismiss them, and . . . that we should remand the entire case to the District Court. . . . with leave for the parties to amend their pleadings and for reconsideration in light of the intervening changes in New York law."  *Id.* at 211, 216.  On October 15, 2021, plaintiffs accepted the invitation of the Court of Appeals to file an amended complaint challenging the CEEFPA extension and amendment.  DE 83.  The new complaint rests on the assertion, made on behalf of each of the remaining plaintiffs,[1] that:

> [a]lthough the Extension purports to allow landlords to contest hardship claims if they are first able to swear, under penalty of perjury, to a good-faith belief that those claims are false, this "process" is illusory because landlords typically lack access to the information necessary to make such an attestation.

DE 83 at 4.  Along with the amended complaint, plaintiffs filed their motion for a preliminary injunction, and additional filings were made by plaintiffs, defendant and several potential intervenors (ultimately deemed to be *amicus* submissions).  *See* DE 85-92, 98-111, 114-28.

Two other procedural developments bear noting.  The first concerns the status of the Rent Stabilization Association ("RSA") as a plaintiff in this action.  This Court dismissed the claims of RSA, finding that the organization "lacks standing to bring this case," but welcomed its

---

[1] Plaintiff Betty Cohen voluntarily dismissed her action on October 31.  DE 113.

submissions as an *amicus*. *Chrysafis I*, 2021 WL 2405802, at *3 n.3. The Second Circuit recognized this determination, which was not appealed. Remand Order, 15 F.4th at 210 n.2. Undaunted, counsel for plaintiffs, without leave of this Court or the Circuit, reintroduced the RSA as a plaintiff in the amended complaint. DE 83.[2]

The second development concerns the Dutchess County Sheriff's Office, originally a defendant in this action, which was dismissed upon certain representations made during the litigation. After review of the preliminary injunction submissions, the Court issued the following show cause order:

> the Court has considered with some concern the assertions set forth in the LaCasse Affidavit, DE 87, in which plaintiff LaCasse avers that the Dutchess County Sheriff's Office "refused to honor the default judgment and refused to evict my tenants." Para. 18 (referencing default judgment issued on 9/21/21), 19, Ex. B (email from Sheriff's Office taking legal positions regarding court process). In its Order, this Court exercised its discretion to dismiss the case as against the Dutchess County Sheriff and other sheriffs' offices because the "only evidence of record demonstrates that these defendants have not refused any requests to serve a warrant." *Chrysafis v. Marks*, No. 21-CV-2516 (GRB), 2021 WL 2405802, at *14 (E.D.N.Y. June 11, 2021). However, in light of the evidence presented by plaintiff LaCasse, counsel for the Dutchess County Sheriff shall show cause in a written submission (including sworn declarations as necessary) to be filed on or before October 27, 2021, why the Court should not reconsider its determination to dismiss the action as against the Dutchess County Sheriff or whether it will, in fact, execute the subject state court process.

---

[2] Notwithstanding these unusual circumstances, the Court accepted and reviewed submissions from RSA. On the preliminary injunction motion, RSA submitted a declaration which arguably fails to articulate a sufficient basis for organizational standing. *Compare* DE 91 ¶ 13 ("Legal costs normally only comprise three to nine percent of RSA's operating costs, but as a result of the ongoing eviction moratoria, RSA has expended 18 percent of its operations costs this year on legal costs alone") *with Connecticut Parents Union v. Russell-Tucker*, 8 F.4th 167, 173 (2d Cir. 2021) (rejecting an "expansive concept of organizational injury for standing purposes" that would allow an educational nonprofit to "successfully plead an injury simply by pointing to any Connecticut law relating to education that it makes a significant effort to oppose"). The lackluster showing in the declaration proves irrelevant, however, because despite the Court's order that only competent evidence supported by witness testimony would be considered on the motion for a preliminary injunction, Electronic Order dated 10/18/21, RSA produced no witnesses at the hearing. Counsel attempted to enter the declaration into evidence, which was excluded upon a properly-lodged objection by defendants. DE 132-1 (Hrg. Tr.) at 122:13-18, 123:1-2. Thus, on this motion, RSA has submitted no competent evidence to demonstrate entitlement to preliminary injunctive relief.

4

Electronic Order dated 10/18/2021.  After a substantial response from the Dutchess County Sheriff, DE 106, plaintiffs' counsel was directed to respond.  Electronic Order dated 10/28/2021.  In that response, counsel represented that "Plaintiffs take no position as to whether the Sheriff should remain a defendant in this case . . . ."  DE 110.  As plaintiffs sought no relief despite being invited to do so, the Court declined to reconsider its earlier order dismissing the Sheriff.  DE 127; DE 132-1 (Hrg. Tr.) at 190.

The Court held an evidentiary hearing on November 8, 2021.  DE 128.  The parties filed post-hearing submissions.  DE 130-32.  This opinion follows.

**B.  Facts**

This Court has previously made copious findings of fact, which are incorporated herein by reference.  *See generally Chrysafis I.*  At the preliminary injunction hearing, several witnesses were called to testify:

*Plaintiff Chrysafis and Witness Vekiarellis*

Plaintiff Pantelis "Lee" Chrysafis, owner of a home in Garden City, New York, testified via virtual technology that he purchased that residence in 2015 with his former wife.  Tr. 5-8.  After he began having marital difficulties, he turned the residence over to his cousin, Peter Vekiarellis, who acted as a property manager to lease the house.  Tr. 8.  Chrysafis lives with his parents, while his current wife and one-year-old child reside in Japan.  Tr. 9.  Chrysafis reports suffering from mental health issues which, he claims, have been exacerbated by the difficulties associated with efforts to reclaim his property.  Tr. 7.

Chrysafis testified that he is aware that his tenants filed a hardship declaration, but contends that he has no insight into the tenants' financial situation.  Tr. 12-14.[3]  At the same time, Chrysafis effectively disavowed knowledge of the rental situation, as his cousin Vekiarellis "handles everything in relation to [the] property."  Tr. 17-18.  In terms of ability to pay, Chrysafis was aware that one tenant (later revealed to be Jeffrey Coyne) had a sizable pension and owned a limousine business.  Tr. 19, 38.  Furthermore, Chrysafis was aware that the tenant largely paid the $5,000 monthly rent until well into 2018, but stopped paying upon being advised, in 2019, that the house was being sold.  Tr. 19.  In other words, the default happened "well before the pandemic."  Tr. 20.  The default led to a settlement involving payment of $25,000 in back rent in late 2019.  By July of 2021, the tenants paid an additional sum as part of a negotiation to extend their stay and concurrently filed a hardship declaration.  Tr. 25-26.  He reports that his tenants are over $200,000 in arrears.  Tr. 12.

Chrysafis was repeatedly asked a conclusory question which became a mantra for plaintiffs' counsel, to wit: "Would you be able to swear under penalty of perjury to a good faith belief that your tenants are not experiencing any financial hardship?"  Tr. 12.  Much to counsel's frustration, Chrysafis provided varying answers to this inquiry.  *See, e.g.*, Tr. 13 ("Yes"), Tr. 14 ("I said I can't swear because I don't know"), Tr. 29 ("I'm not sure"), Tr. 30 ("Absolutely"), Tr. 33 ("I mean, I don't know their financial status.  So I could say that as far as I know they are not . . . I don't know for sure").  *But see* Tr. 11-12 (Chrysafis testifying that he did not "know anything about [his] tenant's current financial status"), Tr. 15 (counsel attempting to "clarify" his answer because Chrysafis "gave subsequent testimony that's inconsistent" on this subject), Tr. 30-31

---

[3] Chrysafis gave conflicting responses to questions about whether he could swear to the legitimacy of his tenants' hardship declaration.  Tr. 11-14, 29-33.   In light of the evidence that followed, one could venture an explanation for these ambiguities.

(Chrysafis testifying in a series of leading questions to a lack of knowledge concerning the specific categories of hardship on the declaration).  This confused testimony stands in stark contrast to Chrysafis's declaration, submitted in support of this motion and presumably prepared by counsel, in which he unequivocally asserts that he has "no way of knowing whether their hardship claims are true" and "I simply have no way of being able to swear affirmatively, under penalty of perjury, to a good faith belief that a financial hardship 'does not exist' as to my tenants . . . ."  DE 89 at 5-6.  These contradictions foreshadowed more significant problems.

Vekiarellis, Chrysafis's cousin and property manager, had greater detail concerning the situation.  Vekiarellis, a licensed realtor, attempted to sell the property for his cousin and, having been unsuccessful, agreed to take on the responsibility of leasing the property.  Tr. 36.  He found the tenants, a couple with adult children, and received tax returns, a credit report and bank statements in order to evaluate their financial suitability.  Tr. 36.  Vekiarellis, an experienced rental realtor, collected employment information about the couple, Jeffrey and Laura Coyne, and obtained references.  Tr. 40.  For reasons that remain unclear, he did not check the references.  Tr. 40; Tr. 55.  He learned that Jeffrey Coyne was a retired sheriff with a monthly pension of nearly $5,000 and $200,000 in other annual income.  Tr. 41.  The tenants stopped paying rent a full year before COVID because Vekiarellis advised them the house would be sold.  Tr. 42.  In late 2019, he brought an eviction proceeding, which was settled in October 2019 with a $25,000 payment from the tenants.  Tr. 44.  However, by December 2019, the tenants violated the agreement by paying late.  Tr. 44.  Because Jeffrey Coyne was disabled, Vekiarellis agreed to permit the family to remain until April 2020, so they could locate suitable housing.  Tr. 45.  The tenants did not move out.  In July 2021, Vekiarellis returned to court, obtaining via stipulation a money judgment exceeding $93,000, and an agreement that the tenants would move out by September 2021.  Tr.

7

46.   At some point during this process, Vekiarellis learned that in 2020, Jeffrey Coyne passed away.[4]  Tr. 47.

Notably, Vekiarellis admitted on cross-examination that he had submitted sworn statements indicating that he believed the tenants were not suffering a hardship due to COVID. Tr. 49.  This testimony apparently refers to an affidavit submitted to this Court in May 2021 in which he stated under oath as follows:

> To my knowledge, the tenants are not suffering hardship due to COVID and one of them has continued to work throughout the pandemic.

DE 13 ¶ 18; Tr. 54.  In fact, Vekiarellis filed a similar sworn statement before another judge of this Court in an earlier, related litigation.  *See Chrysafis v. James*, 21-CV-0998(JS), DE 9 ¶ 16. Tellingly, in both documents, he averred that "Pantelis and I are particularly frustrated that the tenants' issues are clearly not related to COVID – they first stopped paying rent nearly two years ago . . . ."  *Id.* ¶ 17; DE 13 ¶ 19.  Nevertheless, even though he twice swore to a belief before this Court that the tenants were not suffering from a COVID-related hardship, he has not filed an affidavit challenging the hardship declaration in state court, and now claims he is unable to do so "[b]ecause I don't have any direct knowledge of their financial status."  Tr. 38, 50.

*Plaintiff Shi*

While plaintiff Mudan Shi did not testify at the first preliminary injunction hearing in this matter, factual findings related to plaintiffs Shi and her husband, plaintiff Zhou, are incorporated herein by reference.  *Chrysafis I*, 2021 WL 2405802, at *4.  Shi and Zhou live in a rented home with her children and her in-laws in Staten Island.  Tr. 60.  The couple also owns a second home in Staten Island, which they rented out in 2018.  Tr. 62-63.  The tenants stopped paying rent in

---

[4] Incongruously, Vekiarellis, charged with managing the property, has entirely stopped all contact with the tenants due to a text he received from Jeffrey Coyne, who died some time ago.  Tr. 56.

April 2019, leading to the entry of an uncollected $15,000 money judgment in October 2019.  Tr.

63-64.  An eviction warrant was entered in January 2020, but due to technical defects could not be

served.  Tr. 64.  Mrs. Shi planned to evict the tenant and turn the property over to her in-laws so

they could live there.  Tr. 66.  She claimed that she does "not know for sure" about her tenants'

financial circumstances.  Tr. 69-71.  However, it is clear that her tenants stopped paying rent well

before the onset of the pandemic, and that their failure to pay rent was unrelated to the pandemic.

Tr. 74-75.  At one point, a neighbor advised Shi that her tenant engaged in narcotics dealing from

the home; a second neighbor in an attached home complained of insects emanating from the rental

property.  Tr. 84-85.  In September 2021, she learned that her tenant had been arrested for dealing

drugs from the home.  Tr. 88-89.  Shi testified that she declined to apply for aid from the Landlord

Rental Assistance Program (LRAP) because of her understanding that in accepting the aid, she

would have to allow the tenant to "stay there for one year for free."  Tr. 87, 91.

Bewilderingly, Shi testified that she only became aware of the filing of hardship

declarations by her tenant one week before the hearing in October 2021.  Tr. 74.  This statement

stands in stark contrast to her repeated sworn filings in this case, in which she complained of the

effect of the hardship declarations.  DE 11 ¶¶ 8-10, 12; DE 90 ¶¶ 10, 12-14.  She also learned, one

week before the hearing, that city officials had brought a nuisance suit against her and her husband

predicated upon the tenant's drug dealing.  Tr. 89.

*Plaintiff LaCasse*

Plaintiff Brandie LaCasse testified at the first preliminary injunction hearing in this matter.

Factual findings related to LaCasse are incorporated herein by reference.  *Chrysafis I*, 2021 WL

2405802, at *4.  As relevant herein, in September 2021, she obtained a default judgment and

warrant in an eviction action against the occupants of her home in Rhinebeck – with whom

LaCasse entered into a lease but whom she now calls "squatters." Tr. 95-97; Ex. 20. In October 2021, she obtained a warrant of eviction for the property. Tr. 97-98; Ex. 21. For reasons that remain unclear, she has not been able to have the eviction warrant executed. Tr. 98. At the same time, LaCasse stated that she received payments from the Emergency Rental Assistance Program (ERAP), which, while not making her whole, has provided her with significant relief from the unpaid rent from the Rhinebeck property.[5]

LaCasse has repeatedly submitted sworn statements to this Court challenging the *bona fides* of the hardship declaration filed by the subject tenant. In a sworn declaration submitted in support of the initial preliminary injunction motion herein, she represented the following:

> Despite submitting a hardship declaration form, the tenants do not appear to be suffering financially. The male tenant has continued his pre-pandemic employment as an emergency medical technician. The female tenant, who did not work prior to the pandemic, has continued to stay at home. While the tenants' child has been out of school for long periods of time since March 2020, they paid their rent without issue until I provided them with the nonrenewal notice in November. Now they claim that childcare responsibilities are a financial burden, even though their situation has not changed and one of them stays home and does not work. In fact, my understanding is that one of the tenants recently received a large amount of money in connection with a medical malpractice dispute.
>
> Despite this evidence that the tenants are not struggling financially due to the pandemic, property owners like myself have no recourse to challenge the accuracy of the completed hardship declaration forms. The result is that I am unable to evict these non-paying tenants now that they have submitted a hardship declaration form.

DE 10 ¶¶ 7-8. She submitted the identical assertions – again under oath – before another judge in an earlier case. *See Chrysafis v. James*, 21-CV-0998(JS), DE 7 ¶¶ 7-8. Even in her most recent declaration, submitted on October 15, 2021, LaCasse again swore to these facts. DE 87 ¶¶ 10-11. Notwithstanding these detailed averments, her hearing testimony includes the following:

---

[5] In *Chrysafis I*, the Court found that LaCasse had not been paid ten months of rental payments, totaling approximately $25,000. 2021 WL 2405802, at *4. At the second hearing, LaCasse testified that she was owed $5,200 in back rent, exclusive of expenses, and stated in her declaration that she had received $23,000 from ERAP. Tr. 102; DE 87, ¶ 21.

> Q. Could you swear under penalty of perjury to a good-faith belief your tenants have not experienced any of the hardships described in that form?
>
> A. No, I can't.  I don't know anything about their financial situation.

Tr. 100.

And this turnabout is not the only troubling aspect of LaCasse's testimony: when testifying before this Court and in related state court proceedings, LaCasse has thrice provided an estimate of certain damage that occurred to her rental property.  The problem is that while the damage remained unchanged, her quantification of the cost to repair this damage in sworn statements varied from $15,000, to $21,650 to $35,000.  Tr. 114.  Though she offered an explanation for these discrepancies, it was less than satisfying.  *Id.*

Perhaps the most troubling aspect of LaCasse's testimony surrounds her present circumstances.  Her most recent declaration submitted in support of the preliminary injunction application makes the alarming assertion that, after being ejected from her ex-fiancé's home, "I am now homeless, living out of my car with my daughter, as a result of New York's repeatedly extended residential eviction moratorium."  DE 87, ¶ 1.  This assertion is qualified, though not clarified, at the end of the declaration where she states, "I am homeless and my daughter and I are living with friends and out of my car."  *Id.* ¶ 22.  That counsel's brief echoes this claim without qualification only compounds the nature of this seeming misrepresentation.  *See* DE 86 at 2 ("military veteran Brandie LaCasse and her young daughter are homeless—forced to live out of her car—because she cannot access her own property while non-paying holdover tenants refuse to leave").

LaCasse's sworn statements, together with counsel's arguments, give the impression that she and her pre-teen daughter were living *in* a car.  At the hearing, however, the sworn narrative elicited from LaCasse involves stays in hotels, with friends and in borrowed apartments.  Tr. 102-

11

05.  Implicitly, LaCasse's car serves only as a place to store her "stuff."  *Id.*  While the effect of being without a permanent residence is not to be minimized, statements suggesting she was living in her car amount to embellishment bordering on falsehood.[6]  And the false impression created is not without consequence.  These claims led this Court to take swift and serious action to attempt to assist her in her plight.  Electronic Order dated 10/18/2021.

Though LaCasse testified to attempting "everything possible to get back [her] house," she reluctantly admitted that she has not attempted to challenge the hardship declaration filed by the tenants:

Q. But you won't file an affidavit challenging the hardship declaration.

A. I don't need to file a hardship -- an affidavit. I already have a judgment from a Supreme Court judge and the warrant of eviction. I just need them served.

Q. You have not filed an affidavit challenging their hardship declaration, correct?

A. I don't need the affidavit. I already have a judgment to gain possession of my property.

Q. You did not file an affidavit challenging the hardship declaration, correct?

A. I did not file an affidavit to challenge the hardship declaration.

Tr. 110-11.  LaCasse further testified that her tenants caused "extensive damage" to her property, including damaging the septic system, smoking, setting fires, smashing bunk beds, littering the yard with trash, driving holes in the walls and creating "knife wounds" in the door.  Tr. 111-13.

---

[6] Apparently, this Court was not alone in being misled – a number of news outlets with which, according to her hearing testimony, LaCasse spoke, drew the same erroneous conclusion.  Tr. 110; *see, e.g.*, Emma Colton, *Landlord, Air Force vet homeless after tenants stop paying rent during eviction ban*, Fox Business (Aug. 26, 2021), https://www.foxbusiness.com/economy/landlord-living-out-car-eviction-ban-new-york ("Now, LaCasse is living out of a car with her daughter, as well as staying with friends when she is able"); Mola Lenghi, *Landlord faces homelessness as tenants fall behind on rent during eviction ban*, CBS News (Sept. 9, 2021), https://www.cbsnews.com/news/eviction-ban-landlord-homelessness-tenants-rent/ ("She and her daughter have been living out of her car and staying with friends"); Isabel Vincent, *Air Force veteran left homeless after tenants refuse to pay rent*, New York Post (Aug. 28, 2021), https://nypost.com/2021/08/28/air-force-vet-left-homeless-after-tenants-refuse-to-pay-rent/ ("An Air Force veteran who owns three upstate New York properties has been forced to live in her car because her tenants have refused to pay rent thanks to the eviction moratorium").

In terms of evidence of such destruction, LaCasse testified to having possession of a "TikTok" video of her tenants setting a fire in the bathroom of her home.  Tr. 111-12.

*Defense Witnesses*

The defendant called two witnesses at the hearing.  Bridget Blot is a knowledgeable IT administrator with the state court system, whose responsibilities include management of the Universal Case Management System for local courts.  Tr. 126-31.  Blot conducted a survey, specifically in anticipation of the hearing, aimed at collecting data concerning the number of hearings requested, held and scheduled to challenge hardship declarations.  Tr. 133-51.  The data collection, even if not universally comprehensive, constitutes a diligent effort to provide information about state court proceedings and was therefore admitted.  Tr. 151, 166.  That data identified nearly 700 matters in which hearings were requested, close to 200 hearings that had been held and more than 500 cases in which hearings had been scheduled.  Tr. 167-69; Exs. F, F-1, F-2.  Importantly, these figures represent the number of hearings requested and held in the approximately seven-week period since the adoption of the amended statute on September 1, 2021 through October 20, 2021.  Tr. 167.

Finally, Ali Razzaq, chief clerk for the Civil Court of the City of New York, who previously testified before this Court, took the stand.  Tr. 173.  After introducing certified copies of court files relating to several plaintiffs, Razzaq highlighted aspects of their cases.  As to plaintiff Shi, Razzaq noted that a non-payment proceeding filed by Shi in 2019 was stayed based upon the filing of hardship declarations.  Tr. 177.  There is no record of any attempt by Shi to reopen this case, no information regarding ERAP compensation, and no challenge to her tenants' hardship declarations.  Tr. 177-78.  LaCasse's eviction case filed in Dutchess County reflects the entry of a judgment and warrant of eviction, but there was no challenge to the hardship declaration and "there were defects

in the application that have to be cured." Tr. 178-79.  Lastly, as to Chrysafis, a Nassau County

court file revealed that the case was settled by stipulation but, there has been no affidavit of

noncompliance with the stipulation, no request for ERAP assistance, and no challenge to the

hardship declaration.  Tr. 178-79.

## DISCUSSION

*Standard of Review*

In *Chrysafis I*, this Court set forth extensive discussion of the relevant standards of review

in these circumstances, which discussion is incorporated herein by reference.  *See Chrysafis I*,

2021 WL 2405802, at *4.  Recently, the Second Circuit has reiterated the standard of review for a

motion for preliminary relief in a context particularly relevant to the instant case:

> Issuance of a preliminary injunction is an "extraordinary and drastic remedy" that
> is "never awarded as of right."  *Munaf v. Geren*, 553 U.S. 674, 689–90, 128 S.Ct.
> 2207, 171 L.Ed.2d 1 (2008) (quoting 11A C. Wright, A. Miller, & M. Kane,
> *Federal Practice and Procedure* § 2948, at 129 (2d ed. 1995)).  Preliminary
> injunctive relief "should not be routinely granted."  *Hanson Tr. PLC v. SCM Corp.*,
> 774 F.2d 47, 60 (2d Cir. 1985) (quoting *Medical Soc. of State of N.Y. v. Toia*, 560
> F.2d 535, 537 (2d Cir. 1977)).  When deciding whether to issue a preliminary
> injunction, courts "should pay particular regard for the public consequences in
> employing the extraordinary remedy of injunction."  *Winter v. Nat. Res. Def.
> Council, Inc.*, 555 U.S. 7, 24, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008).
>
> To obtain a preliminary injunction that "will affect government action taken in the
> public interest pursuant to a statute or regulatory scheme, the moving party must
> demonstrate (1) irreparable harm absent injunctive relief, (2) a likelihood of success
> on the merits, and (3) public interest weighing in favor of granting the injunction."
> *Agudath Israel of Am. v. Cuomo*, 983 F.3d 620, 631 (2d Cir. 2020) (internal
> quotation marks omitted).  The movant must also show that the balance of equities
> supports the issuance of an injunction.  *See Yang v. Kosinski*, 960 F.3d 119, 127 (2d
> Cir. 2020).

*We The Patriots USA, Inc. v. Hochul*, No. 21-2179, 2021 WL 5121983, at *6–7 (2d Cir. Nov. 4,

2021) (denying preliminary relief to plaintiffs claiming religious challenge to COVID-19 vaccine

mandate).  That decision further noted that "we have consistently applied the likelihood-of-success

standard to cases challenging government actions taken in the public interest pursuant to a statutory

or regulatory scheme, including in cases involving emergency regulations and orders." *Id.* at *7

n.13 (citing *Agudath Israel*, 983 F.3d at 631; *Alleyne v. New York State Educ. Dep't*, 516 F.3d 96,

99–101 (2d Cir. 2008)).

*Direction From the Appellate Process in this Case*

The Remand Order crisply defines the issues to be resolved.[7]  In determining whether

plaintiffs' claims as to the earlier statute were moot, the Court of Appeals noted that an amendment

of a statute moots an appeal challenging it unless the statute was "'replac[ed] with one that differs

only in some insignificant respect.'" 15 F.4th at 214 (quoting *Ne. Fla. Chapter of Associated Gen.*

*Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 662 (1993)).  The Circuit observed:

> But the pending case does not concern statutory provisions replaced by those
> making insignificant changes or an administrator's superficial change in conduct.
> It concerns a state legislature's enactment of a new law, which legislators, aware of
> the defect identified by the Supreme Court, *see* S50001, § 1, ¶ 3, explicitly sought
> to remedy, *see id.* ¶ 5.  The attempt to challenge the new provisions of S50001
> "present a substantially different controversy from the one that existed" when the
> Supreme Court enjoined enforcement of Part A of CEEFPA.  *Lamar Advertising of*
> *Penn, LLC v. Town of Orchard Park*, 356 F.3d 365, 378 (2d Cir. 2004) (internal
> quotation marks omitted).

*Id.*  Analogizing the case to *Fusari v. Steinberg*, 419 U.S. 379, 95 S.Ct. 533 (1975), the Circuit

concluded that remand was needed because "we cannot be certain how the new procedures in

Subpart C(A) 2021 will be implemented in practice in the state courts or what administrative steps

the Chief Administrative Judge of those courts might think are necessary, if any, to mitigate the

alleged due process deficiencies in those procedures." *Id.* at 215.  "A hearing in a District Court

---

[7] The Supreme Court's order, issued before the enactment of the amended statute, cites two cases.  The first, *In re Murchison*, 349 U.S. 133, 136 (1955), involves an unusual fact pattern in which a judge presided both as a "one-man grand jury" and as a trial judge in a contempt proceeding for violations occurring before that grand jury – a procedure which the Court found, perhaps unsurprisingly, violated Due Process.  The second, *United States v. James Daniel Good Real Prop.*, 510 U.S. 43, 53 (1993), held that pretrial deprivation of residential real property in a civil forfeiture case without a hearing violated Due Process.

proceeding will provide an opportunity to clarify how the new statute will be implemented, thereby creating the basis for an informed appellate ruling as to a due process claim in the event of a subsequent appeal." *Id.*; *cf. id.* at 215 n.9 (noting that following hearing, "the precise implementation of Subpart C(A) 2021 [will be] clarified").

While the Circuit declined to offer any opinion on the merits of the Due Process claims[8] given the amendment and absent a full record, the Court of Appeals noted the views of the parties as to the new statute. On the appeal, plaintiffs took the position that:

> they have an inadequate opportunity to dispute a hardship claim and thereby obtain a hearing because a tenant is not required to specify the precise grounds for the claim of hardship. Furthermore, they contend, landlords can obtain a hearing only by swearing under penalty of perjury that they have a good faith belief that the hardship claim is invalid, and they lack an opportunity, prior to a hearing, to elicit information from a tenant to support their good faith belief.

*Id.* at 213. By contrast, defendant argued:

> that a landlord's opportunity to (a) dispute a tenant's hardship declaration, (b) obtain a hearing on whether the hardship claim is valid, and, (c) if the claim is determined to be invalid, proceed with a hearing on the merits of eviction proceeding remedy the due process violation identified by the Supreme Court. The State Officials also point out that Subpart C(A) 2021 omits from Part A 2020 of the CEEFPA provisions for automatic stays, CEEFPA, Part A, § 2, an obligation for landlords in some circumstances to translate a tenant's hardship declaration into the tenant's primary language, *id.*, § 3, and a prohibition on initiating eviction proceedings, *id.* § 4.

---

[8] The Circuit further suggested that "[i]t is not likely that the Court thought the First Amendment and vagueness claims had sufficient probability of success to warrant an injunction." 15 F.4th at 215 (noting that this "inference gains some strength from the explicit reference in Justice Breyer's dissent to the First Amendment claim, noting 'persuasive arguments' that CEEFPA 'requires only the dissemination of purely factual and uncontroversial information in the context of commercial speech and is therefore authorized by our precedents'"). Though counsel made a halfhearted attempt to reinvigorate these claims in the briefing, at the hearing, counsel appeared to acknowledge that the Due Process claims remained the only viable issue in the case. Tr. 206-07. This Court has already rejected the vagueness and First Amendment arguments, and does not revisit those arguments herein. *Chrysafis I*, 2021 WL 2405802, at *11-13.

*Id.* Furthermore, the State assured the Court of Appeals "at oral argument that landlords will encounter no difficulty obtaining a hearing to dispute a tenant's declaration of hardship." *Id.* at 213 n.7.

### Implementation of the New Statute

Based upon the evidence made available at the hearing, as well as a survey of the existing case law, it appears that the implementation of the amended provisions of CEEFPA hew to the State's predictions while avoiding the dire prognostications of the plaintiffs. The statistical evidence introduced by the defendant make one thing clear: in the approximately seven weeks following adoption of the new statute, in hundreds of cases, landlords filed requests for hearings to challenge the *bona fides* of filed hardship declarations. Many were held, and many more timely scheduled. It seems that hearings were available for those landlords who requested one.[9]

A survey of the rapidly-developing caselaw proves even more insightful, and belies the plaintiffs' contentions in this matter. Decisions issued in the weeks following the enactment of the amended statute have granted hearings to challenge hardship declarations for a number of reasons. Courts have scheduled hearings based on casual observation of a tenant's activities, social media posts by the tenant suggesting absence of COVID-related hardship, the presence of government-sourced rent payments and, in the business context, change in corporate structure. *See, e.g.*, *Harbor Tech LLC, v. Correa*, 2021 WL 4945158, at *3 (N.Y. Civ. Ct. Oct. 25, 2021) (holding that social media posts reflecting a tenant's activities "are exactly the kind of discreet [sic], specific, non-conclusory facts — and therefore made in good faith — upon which to form a

---

[9] At the preliminary injunction hearing, counsel for plaintiffs urged the Court to extrapolate from the assertion that there are 150,000 pending eviction proceedings that the statute has proven ineffective at affording process. Tr. 168. Yet nothing can be effectively deduced from that figure. The absence of a larger number of applications may be due to any number of factors, including the advent of the ERAP and LRAP reimbursement programs through which the state distributed substantial relief funds. No evidence was presented that any landlords have been excluded from the process or that any barriers existed to obtaining a hearing. Of the plaintiff-landlords who testified, not one requested a hearing even though, as discussed herein, it appears that each could have sought and obtained one.

'belief' that Respondent Soto has not suffered a pandemic-related hardship"); *Bitzarkis v. Evans*, 2021 WL 4889193, at *2 (N.Y. Civ. Ct. Oct. 20, 2021) (fact that landlord receives rent payments directly from Human Resources Administration and not tenant supported good-faith basis to challenge hardship declaration); *Sanchez-Tiben v. Washington*, 2021 WL 4839235, at *2 (N.Y. Civ. Ct. Oct. 18, 2021) (observations of tenant continuing to commute to work without a mask or other signs of financial or medical distress sufficient for hearing); *cf. Omega Melville, LC v. Fusion Mgmt., Inc.*, 72 Misc. 3d 1048, 1051 (N.Y. Dist. Ct. 2021) (dissolution of corporate tenant combined with certification of continued New York residence of same provided basis for "COVID-19 Moratorium 'standing' hearing" under pre-amendment statute).

Additional elements prove critical here. Several cases have held that a tenant's default that predated the pandemic provides an adequate basis for holding a hearing under CEEFPA. *See, e.g.*, *Windward Bora LLC v. Cohen*, 2021 WL 5139310, at *2 (E.D.N.Y. Nov. 4, 2021) ("that defendant's default long preceded the pandemic, constituted sufficient grounds to hold a hearing" under CEEFPA's analogous mortgage foreclosure provisions); *Diamond Ridge Partners LLC v. Hanspal*, 2021 WL 4271024, at *4 (N.Y. Dist. Ct. Sept. 14, 2021) ("Respondents' behavior, which reflect no payments of any kind for decades, augurs strongly against any protection under the CEEFPA statute, as this could not be considered a temporary issue warranting interim protection."). Furthermore, in examining the implementation of the statute, it appears that courts have been construing the statute liberally, safeguarding landlords' right to challenge hardship declarations. *Lahijani v. Madison Glob. LLC*, 2021 WL 5272384, at *2 (N.Y. Civ. Ct. Nov. 10, 2021) (noting that "courts grant these validity hearings when a landlord can come forward with a reasonable expression of doubt as to the tenant's actual pandemic-related hardship" and characterizing the requisite good faith belief as "a low bar to obtaining the hearing"). Accordingly,

courts have rejected the argument that a landlord must possess a good faith belief for challenging every one of the possible hardship categories because "condition[ing] a hearing on . . . a spectrum of knowledge about a tenant so broad as to be burdensome to the landlord, the landlord would not receive process in a meaningful manner as required for the process to be due . . . ." *Bitzarkis*, 2021 WL 4889193, at *3. Notably, plaintiffs have only been able to identify a single decision in which a request for a hearing was denied. *See C.E.Y. Realty Assocs. V. Michaels*, No. LT-51238-20/NY (N.Y. Civ. Ct. Oct. 21, 2021), Dkt. 33-1 at 2 (denying a hearing for a challenge predicated upon receipt of ERAP funds).

State law offers additional processes for landlords seeking to challenge a hardship declaration. As plaintiffs have acknowledged, CPLR § 408 provides for discovery devices that may be deployed by a landlord seeking to gain information to support a challenge to a hardship declaration. Tr. 197-98. State courts have repeatedly ordered discovery on behalf of a landlord seeking to gather sufficient information to proceed with a hearing. *Dudits v. Rosa*, L&T 51924-19 (N.Y. Civ. Ct. Oct. 8, 2021), Dkt. 16; *Voskoboynik v. Frolova, et al.*, Index No. 309600/2020 (N.Y. Civ. Ct. Oct. 28, 2021), Dkt. 52 (finding the landlord "has ample need to conduct discovery in the form of the production of documents" because "the evidence of [respondent's] hardship is solely within her possession"); *cf. Lahijani*, 2021 WL 5272384, at *4 (scheduling a pre-hearing conference for discovery requests as "this court recognizes the potential for discovery where a party can demonstrate ample need prior to the validity hearing"). Furthermore, CPLR § 408 makes one discovery device – requests to admit under CPLR § 3123 – available without leave of court.

The implementation and construction of the statute's right to a hearing belies the fundamental precept underlying plaintiffs' application.[10]  Plaintiffs' challenge rests on the notion that:

> Although the Extension purports to allow landlords to contest hardship claims if they are first able to swear, under penalty of perjury, to a good-faith belief that those claims are false, this "process" is illusory because landlords typically lack access to the information necessary to make such an attestation.

DE 86 at 20.  Plaintiffs have created a record replete with averments intended to bolster this notion, which prove to be mistaken, contradicted by other evidence and, in some instances, simply false.  While plaintiffs have the right to change their legal arguments based upon alteration of the statutory landscape, they have gone far out of bounds in attempting to change their sworn testimony to accommodate this litigative shift.  As a result, counsel's construct appears spurious.  As several courts have held:

> the Legislature did not require landlords to, for example, show "knowledge" of a tenant's hardship status to obtain a hearing.  Rather, landlords only have to show a "belief," albeit one that has a good-faith basis.

*Harbor Tech LLC*, 2021 WL 4945158, at *3; *accord Lahijani*, 2021 WL 5272384, at *2; *Bitzarkis*, 2021 WL 4889193 at *2.  Moreover, as noted, in addition to setting a low bar for a hearing, state statutes and case law provide access to discovery devices for those landlords that require more information.  Finally, repeated invocation of potential exposure to perjury prosecution by plaintiffs' counsel rings hollow given that these plaintiffs have repeatedly made sworn statements before this Court concerning the *bona fides* of their tenants' hardship declarations.  These new-

---

[10] Moreover, a hearing challenging the hardship declaration is not the only means of effecting an eviction under CEEFPA.  Subpart C(A) 2021 provides that landlords may pursue evictions notwithstanding a tenant's hardship declaration where a tenant has "intentionally caused significant damage to the property" or engaged in nuisance conduct that "causes a substantial safety hazard to others . . . ."  S50001, pt. C, subpt. A, §§ 6(b)(ii).

found claims of being unable to make averments concerning their tenants' hardship declarations is belied by, *inter alia*, prior sworn statements made in this case.

Each of the plaintiffs who testified face situations in which the tenants defaulted for reasons apparently unrelated to COVID-19, including, in two cases, defaults that preceded the pandemic – a ground that has been repeatedly held to provide a basis for a hearing.  As discussed, Chrysafis, Shi and LaCasse each testified to issues – including observations and knowledge of circumstances (such as continuing employment and potential eligibility for government relief programs) – that could well serve as separate bases for a hearing.  At least two plaintiffs testified to circumstances – such as a narcotics arrest of a tenant and subsequent nuisance proceedings brought against Shi and LaCasse's access to a video of a fire being started in her bathroom – that would appear to separately justify eviction under the statute's nuisance or property damage exceptions.

It would appear that plaintiffs would be entitled to a hearing and potentially, if not likely, eviction, or at a minimum, they could get discovery to then obtain a hearing.  One fact prevents confirmation of this proposition: not one of the plaintiffs has even tried.  Perplexingly, none of these plaintiffs, each of whom has testified to serious harm purportedly resulting from their inability to evict their tenants, has even requested a hearing or discovery.  Whatever its cause, this failing proves fatal to the plaintiffs' application for a preliminary injunction on the following three grounds, any one of which provides a sufficient basis to deny the application.

   a.  *Standing*

As a result of their failure to even attempt to utilize available remedies, plaintiffs lack standing to bring this action.  "To establish Article III standing, an injury must be concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling."  *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (citation and

internal quotation marks omitted).  "To establish the traceability requirement of standing, a plaintiff must establish that the injury was not 'self-inflicted' or 'so completely due to the plaintiff's own fault as to break the causal chain.'"  *Bandler v. Town of Woodstock*, 832 F. App'x 733, 734 (2d Cir. 2020) (citing *St. Pierre v. Dyer*, 208 F.3d 394, 402 (2d Cir. 2000)); *see also Clapper*, 568 U.S. at 415–18.  "Self-inflicted injury that results from a plaintiff's personal choices rather than a defendant's conduct will not confer standing." *Taylor v. Bernanke*, No. 13-CV-1013, 2013 WL 4811222, at *10 n.5 (E.D.N.Y. Sept. 9, 2013) (citing *McConnell v. F.E.C.*, 540 U.S. 93, 228 (2003), *overruled on other grounds by Citizens United v. F.E.C.*, 558 U.S. 310 (2010)); *see also Union Cosmetic Castle, Inc. v. Amorepacific Cosmetics USA, Inc.*, 454 F. Supp. 2d 62, 71 (E.D.N.Y. 2006) ("A plaintiff cannot establish Article III standing to pursue a cause of action where that plaintiff is the primary cause of its own alleged injury.").  A plethora of cases grant similarly-situated landlords hearings to challenge their tenants' hardship declarations, yet these plaintiffs have opted not to pursue such a hearing based upon artificially inflated requisites for obtaining such process.  Further, plaintiffs' protestations that they cannot swear to facts about their tenants as well as counsel's arguments about perjury risks cannot be credited: these same plaintiffs have repeatedly made sworn statements in this Court branding their tenants' hardship declarations as false.

Hence, plaintiffs' purported reliance on an unrealistically elevated standard for filing a challenge or their new-found, incredible claims about perjury risks cannot provide a basis for preliminary relief in this case.  *See Clapper*, 568 U.S. at 518 ("[a]llegations of a subjective 'chill' are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm") (quoting *Laird v. Tatum*, 408 U.S. 1, 13–14 (1972)); *see also Schickel v. Dilger*, 925 F.3d 858, 868 (6th Cir. 2019), *cert. denied*, 140 S. Ct. 649 (2019) (legislator lacked standing to

challenge a statute prohibiting legislators from accepting anything of even *de minimis* value based on fear that the comfort of air conditioning in a lobbyist's office could give rise to liability). Because the plaintiffs have unreasonably chosen not to avail themselves of a procedure allowing them to challenge their tenants' hardship declarations, the resulting injury is self-imposed and not "fairly traceable" to the defendant.

    *b.   Likelihood of Success on the Merits*

    Plaintiffs' failure to even attempt to invoke available state procedures similarly undercuts any demonstration of a likelihood of success on the merits.   "[W]hen § 1983 claims allege procedural due process violations, we nonetheless evaluate whether state remedies exist because that inquiry goes to whether a constitutional violation has occurred at all."   *Chase Grp. All. LLC v. City of New York Dep't of Fin.*, 620 F.3d 146, 153 (2d Cir. 2010) (quoting *Rivera-Powell v. New York City Bd. of Elections*, 470 F.3d 458, 468 n.12 (2d Cir. 2006)) (finding no due process violation because "Housing Court orders required notice and a court hearing, at which [landlords] could contest proposed loans" and the landlords did not take any action to enforce said orders).   In this regard, the Second Circuit's determination in *New York State Nat. Org. for Women v. Pataki*, 261 F.3d 156 (2d Cir. 2001) proves instructive.   In that § 1983 case, the district court, applying the *Mathews v. Eldridge* factors,[11] held that delays in processing discrimination claims amounted to a due process violation.   In reversing that determination, the Court of Appeals examined the availability of state law procedures under Article 78 of the CPLR.   *New York State Nat. Org. for Women*, 261 F.3d at 169 ("a procedural due process violation cannot have occurred when the

---

[11] Of course, those factors consist of the following "(1) 'the private interest that will be affected by the official action;' (2) 'the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards;' and (3) 'the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.'"   *Id.* at 167–68 (quoting *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976)).

governmental actor provides apparently adequate procedural remedies and the plaintiff has not availed himself of those remedies") (quoting *Alvin v. Suzuki*, 227 F.3d 107, 116 (3d Cir. 2000)); *accord Chase Grp. All. LLC*, 620 F.3d at 152–53.  Given that hundreds of New York landlords have requested and obtained hearings to challenge the validity of their tenants' hardship declarations, the plaintiff-landlords' failure to avail themselves of this apparently adequate procedural remedy undermines their likelihood of success on the merits.  *Compare Kane v. de Blasio*, No. 21-2678 (2d Cir. Nov. 28, 2021) and *Keil v. City of New York*, No. 21-2711 (2d Cir. Nov. 28, 2021) (granting preliminary relief to teachers and school administrators who sought and were denied religious exemptions from COVID-19 vaccine mandate).

   *c.  Irreparable harm*

   In *Chrysafis I*, this Court found that the plaintiffs had demonstrated a risk of "irreparable harm absent injunctive relief."  2021 WL 2405802, at *6 (citing *Tioronda, LLC. v. New York*, 386 F. Supp. 2d 342, 350 (S.D.N.Y. 2005) ("[t]he deprivation of an interest in real property constitutes irreparable harm")).  That determination turned not only on interference with real estate interests, but also the likely inability of tenants to pay arrearages.  *Id.* at *5.  Several factors have attenuated this showing.

   First, the implementation of the publicly-funded ERAP and LRAP programs have substantially ameliorated (though not eliminated) the financial harms caused by the moratorium. At the hearing, plaintiff LaCasse acknowledged receipt of tens of thousands of dollars from one of these programs, bringing her tenants nearly current on their rental obligations.  Tr. 106-07.  The record reveals that former plaintiff Cohen received nearly $23,000 in ERAP funds.[12]  DE 88 ¶ 13.

---

[12] The State asserts that Cohen voluntarily dismissed her claims because the acceptance of ERAP funds mooted her case.  DE 118 at 17 n.3.  Plaintiffs' counsel asserts that Cohen's voluntary dismissal was unrelated to standing or the merits of her claims, but fails to provide an alternative explanation.  DE 125 at 8 n.1.

The state and federal governments have delivered on promises to provide these funds, which changes the analysis of irreparable harm here. *Chrysafis*, 141 S. Ct. at 2484 (Breyer, J., dissenting) ("New York is in the process of distributing over $2 billion in federal assistance that will help tenants affected by the pandemic avoid eviction") (citing Consolidated Appropriations Act, 2021, H. R. 133, 116th Cong., 2d Sess., 686–692 (2020)).

While the availability of these funds significantly diminishes plaintiffs' demonstration of irreparable harm, their failure to apply for such funds and, more importantly, utilize state procedures to seek relief from the moratorium, entirely negates this showing. "A movant for extraordinary relief [*i.e.*, a preliminary injunction] cannot mask an ongoing failure on its part to mitigate its damages as an ongoing instance of irreparable harm." *Lanvin Inc. v. Colonia, Inc.*, 739 F. Supp. 182, 192–93 (S.D.N.Y. 1990) (citing *American Brands, Inc. v. Playgirl, Inc.*, 498 F.2d 947, 949–50 (2d Cir. 1974)). Thus, the plaintiffs' failure to utilize available remedies undermines their claims of irreparable harm. This is not only true of their refusal to pursue statutory remedies, but also of their repudiation of available funds, as testified to by plaintiff Shi, under the ERAP and LRAP programs.[13] Tr. at 87:9-13; 90:17-21. Hence, injunctive relief is not appropriate because the irreparable harm upon which plaintiffs rely could be mitigated through application to state courts for relief from the moratorium as well as by obtaining rental assistance through federal programs. *See Chrysafis*, 141 S. Ct. at 2484 ("respondent states that New York is currently distributing more than $2 billion in aid that can be used in part to pay back rent, thereby helping to alleviate the need for evictions").

---

[13] Shi testified that she has not applied for LRAP funds because she believed she would be required to let her tenants stay rent-free for a year. Tr. at 87:9-13; 90:17-21.

Thus, the Court finds that plaintiffs lack standing, have failed to demonstrate a likelihood of success on the merits, and cannot demonstrate irreparable harm.  Therefore, the motion for a preliminary injunction must be denied.

*Consolidation with the Merits*

In *Chrysafis I*, the Court, upon consent of counsel, consolidated the merits of this case with the preliminary injunction application under Rule 65(a)(2) of the Federal Rules of Civil Procedure. 2021 WL 2405802, at *14.  The history of this case has borne out, however, that this matter implicates a rapidly evolving factual and legal landscape.  While plaintiffs have not demonstrated a likelihood of success on the merits, continuing developments, including the continuing progress of efforts to contain the pandemic and mitigate its economic effects, further development of state caselaw regarding the hardship hearings and, potentially, further amendment and extension of the statute,[14] could affect plaintiffs' ability to prevail.  As such, the Court declines to exercise its

---

[14] As this Court previously noted, there "is a temporal point at which the legislative action would arise to the level of capriciousness."  *Chrysafis I*, 2021 WL 2405802, at *10.  Justice Breyer's dissent to the Supreme Court's Order declaring CEEFPA unconstitutional commented favorably on the State's argument that "the law is best viewed not as a deprivation of the right to challenge a tenant's hardship claim but as simply delaying the exercise of that right—as of now for less than three weeks until the law expires."  *Chrysafis v. Marks*, 141 S. Ct. 2482, 2483 (2021).  Indeed, the approval of the three dissenting Justices was presumably predicated, to some degree, on the explicit observation that "[a]fter August 31, [2021], New York's eviction proceedings will be conducted exactly as they were before CEEFPA's enactment."  *Id.* at 2483–84 (observing that "CEEFPA's pause on eviction proceedings will expire in less than three weeks, alleviating the hardship to New York landlords").  Thus, a further extension would only serve to exacerbate an already troubling circumstance.  Therefore, for avoidance of doubt, this Court is denying preliminary injunctive relief only based on present circumstances, without prejudice to plaintiffs' rights to seek further relief from this Court.  *Cf. id.* at 2484 ("Of course, if New York extends CEEFPA's provisions in their current form, applicants can renew their request for an injunction.").

26

discretion to consolidate under Rule 65(a)(2) at this juncture.

## CONCLUSION

Based on the foregoing, plaintiffs' application for a preliminary injunction is DENIED.


Dated: Central Islip, New York
       November  29,  2021

                                  /s/ Gary R. Brown
                                  HON. GARY R. BROWN
                                  United States District Judge